**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| CALVIN R. KENNEDY and | ) | Chapter 11 |
| CYNTHIA M. KENNEDY | ) | Bankruptcy Case No. 20-30208 |
| | ) | |
| Debtors. | ) | |
| | ) | |

**FIRST AMENDED DISCLOSURE STATEMENT**

**ARTICLE I**

**INTRODUCTION AND OVERVIEW**

**NO REPRESENTATIONS CONCERNING THE DEBTORS, THEIR ASSETS, OR THEIR LIABILITIES, OTHER THAN THOSE SPECIFICALLY SET FORTH HEREIN, HAVE BEEN AUTHORIZED BY THE DEBTORS**

**A.      GENERAL**

On February 19, 2020 Calvin Ray Kennedy ("Mr. Kennedy") and Cynthia M. Kennedy ("Mrs. Kennedy") (collectively "the Debtors") filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), with the United States Bankruptcy Court for the Western District of North Carolina (the "Bankruptcy Court"), bearing Case No. 20-30208. The Honorable J. Craig Whitley, United States Bankruptcy Judge, presides over the Debtors' bankruptcy case (referred to as the "Chapter 11 Case" when applicable). The Debtors continue in possession of their properties and the management of their affairs as "debtors in possession" pursuant to sections 1107 and 1108 of the Bankruptcy Code.

The Debtors have filed a First Amended Plan of Reorganization pursuant to § 1121(a) of the Bankruptcy Code (the "Plan"). The Plan sets forth the proposed reorganization of the Debtors' chapter 11 estates (the "Estate") and the distribution of recoveries to creditors (collectively, the "Creditors") of the Debtors' Estate. A copy of the Plan is attached as Exhibit A to this disclosure statement (the "Disclosure Statement"). Pursuant to § 1126 of the Bankruptcy Code, the Debtors are soliciting acceptances of the Plan from the classes of Claims entitled to vote on the Plan. This Disclosure Statement is submitted pursuant to § 1125 of the Bankruptcy Code in order to provide information of the kind necessary to enable a hypothetical reasonable investor to make an informed judgment in the exercise of its right to vote on the Plan.

**B.      PURPOSE OF DISCLOSURE STATEMENT**

The Debtors provide this Disclosure Statement in order to permit eligible parties to make an

informed decision in voting to accept or reject the Plan. The Disclosure Statement is presented to all Creditors in order to satisfy the requirements of § 1125 of the Bankruptcy Code. Section 1125 requires a disclosure statement to provide information sufficient to enable a hypothetical and reasonable investor, typical of the Creditors, to make an informed judgment whether to accept or reject the Plan. This Disclosure Statement may not be relied upon for any purpose other than that described above.

This Disclosure Statement and the Plan are an integral package, and they must be considered together for the reader to be adequately informed.

No representations concerning the Debtors or the value of their property are authorized by the Debtors other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan other than as contained in this Disclosure Statement should not be relied upon by you in arriving at your decision, and such additional representations and inducements should be reported to counsel for the Debtors, who will deliver such information to the Bankruptcy Court for such action as may be appropriate.

The information contained in this Disclosure Statement, including the information contained in the exhibits attached hereto, has not been subject to an audit or independent review. Accordingly, the Debtors are unable to warrant or represent that the information concerning their financial condition is accurate or complete. Any projected information contained in this Disclosure Statement has been presented for illustrative purposes only, and because of the uncertainty and risk factors involved, the Debtors' actual results may not be as projected herein.

Although an effort has been made to be as accurate as possible under the circumstances, the Debtors do not warrant or represent that the information contained in this Disclosure Statement is correct. Each Creditor who is entitled to vote on the Plan is urged to review the Plan prior to casting its vote.

The statements contained in this Disclosure Statement are made as of the date of the Disclosure Statement unless another time is specified. The delivery of this Disclosure Statement shall not under any circumstances create an implication that there has not been any change in the facts set forth since the date of the Disclosure Statement.

Schedules of the assets and liabilities of the Debtors as of the Petition Date (collectively, as may be amended from time to time, the "Schedules") are on file with the Clerk of the Bankruptcy Court and may be reviewed via ECF. Alternatively, the undersigned will, upon request, email you copies of filed documents which you request by email to henderson@title11.com.

This Disclosure Statement has been prepared in accordance with § 1125 of the Bankruptcy Code and not in accordance with federal or state securities law or other applicable nonbankruptcy law. Entities holding or trading in or otherwise purchasing, selling, or transferring Claims against, interests in, or securities of the Debtors should evaluate this Disclosure Statement only in light of the purpose

for which it was prepared.

The Honorable J. Craig Whitley will hold a hearing on confirmation of the Plan (the "Confirmation Hearing") in the United States Bankruptcy Court, Charles Jonas Federal Building, 401 West Trade Street, Courtroom ____, Charlotte, North Carolina on _____, 2021, at ____ a.m. At the Confirmation Hearing, the Bankruptcy Court will consider whether the Plan satisfies the requirements of the Bankruptcy Code, including whether the Plan is in the best interests of the Creditors, and will review the ballot reports concerning votes cast for acceptance and rejection of the Plan.

## C.    BRIEF OVERVIEW OF THE DEBTORS AND THE PLAN

### 1.    Description of the Debtors

The Debtors own, as tenants by the entirety, two parcels of commercial real property which are located at 6025 Clarke Creek, Charlotte, Mecklenburg County, North Carolina ("Clarke Creek") and 16701 Northcross Drive, Charlotte, Mecklenburg County, North Carolina ("Northcross") (hereinafter collectively "Real Property"). The Real Property is utilized by the Ramsey-Peele Corporation d/b/a University Child Development Center ("UCDC"). The Debtors own a controlling interest in UCDC. UCDC leases a third location from an unrelated third party. The Debtors also own their residence.

UCDC operates three licensed and regulated childcare centers in Charlotte, North Carolina. UCDC is the Debtors' primary source of income, which is needed by the Debtors to confirm a Chapter 11 plan. UCDC provides day care services for in excess of 400 largely underprivileged children. The majority of revenue is received from the State of North Carolina and Mecklenburg County. Over the years, the Debtors have loaned UCDC a significant amount of money to bridge short falls in its operating income. The schedules filed in this case on March 16, 2020 show that, as of February 20, 2020, UCDC owed the Debtors approximately $1,825,000.00.

As shown by Schedule I filed in the Debtors' case, the Debtors do not receive rent from UCDC at this time. Historically, and based on the advice of their CPA, the funds received by the Debtors from UCDC are repayments of debt that UCDC owes the Debtors. UCDC pays the monthly payments to the first mortgage holder on the Real Property.

### 2.    Current status of UCDC

The COVID-19 pandemic (the "pandemic") has been challenging for all day care centers and schools, including UCDC. Federal, state and local regulatory agencies, as well as the North Carolina Governor, have frequently changed operating guidelines. Originally, the Debtors decided to keep UCDC operating during the pandemic. Because UCDC serves mainly underprivileged students, the Debtors thought that the parents of these children would not have many other choices for high

quality care and they would need UCDC's services. However, when the state mandated in March, 2020 that all schools close, it also mandated that Pre-K students that were receiving government funding not attend daycare. For a significant time in the Spring of 2020, UCDC operated with the small private paying student population which it has. Private pay students are a small minority of UCDC's student population.

Because UCDC is primarily focused on students who receive government assistance, the decisions as to opening and closing are influenced by the state and county time frames for allowing students to return to school or daycare. State and county agencies have continued to pay UCDC on an interim basis, even though the children are not in attendance. UCDC is paid at the end of each month for services performed the previous month. The agencies are paying in full, whether centers choose to close or stay open. Thus far, the state and county have been committed to not harming daycare centers and the Debtors believe the state and county will continue to pay through the end of the June, 2021 contract term. The state's guidance concerning pandemic issues evolves on a regular basis (*see* ncchildcare.ncdhhs.gov). On December 1, 2020, the North Carolina Department of Health and Human Services ("NCDHHS") issued updated childcare payment policies to provide for bonus payments to childcare teachers and staff during the pandemic. On December 9, 2020, NCDHHS and the North Carolina Division of Child Development and Early Education ("DCDEE") updated their reopening policies for Pre-K programs, clarifying policies for remote learning, temporary closures for COVID-19 clusters (5 or more cases), family engagement and payment policies. Payments to UCDC by DCEE and other agencies will continue for the foreseeable future to be based on assigned teacher rates and the number of "slots" allotted to classrooms, rather than on actual attendance.

UCDC, since March, 2020, has only lost part if its private pay tuition. Private pay tuition averages approximately $21,600 per month from 30 students. The reduction in private pay revenue is being largely offset by a reduction in salaries and other expenses that are eliminated as a result of temporarily closing.

On June 9, 2021, NCDHHS issued updated guidance concerning childcare. This guidance aligns with Governor Cooper's latest Executive Orders, which allow UCDC to continue its childcare operations.

3.    Reasons for the Chapter 11 Filing. The cases were filed due to the failure of American Product Distributors, Inc. ("APD") in 2018. The Debtors owned APD and they had personally guaranteed a significant amount of the APD's unsecured trade debt which was not paid when APD ceased doing business. Collections action and lawsuits by the guaranteed creditors against the Debtors precipitated the Chapter 11 filing.

4.    The Proposed Reorganization of the Debtors' Estate.

The Plan provides for the repayment of secured creditors from the net income of UCDC, and for the payments to general unsecured creditors from several sources: i) the proceeds from the liquidation of certain non-exempt assets; ii) funds borrowed from a third party; and iii) a deferral of

10 monthly payments to the first mortgage holder on the Real Property. Pursuant to the Plan, each holder of an Allowed Claim will receive payments, the amount of which depends on the classification of the Claim as well as the amount of claims which have a higher priority under the Bankruptcy Code.

The Debtors reserve the right to resort to the "cram down" provisions of Section 1129(b) of the Bankruptcy Code, and the filing of the Plan shall constitute a motion for such relief.

## D.     DISTRIBUTIONS UNDER THE PLAN

The classification and treatment of Claims are set forth in the Plan, attached as Exhibit A hereto. The actual amounts to be distributed to Creditor are difficult to estimate, and depend on such things as: i) whether a Creditor is owed by Mr. Kennedy, or Mrs. Kennedy, or jointly; ii) the value of the Truist stock when sold; iii) the sales price of the Debtors' Iredell county real property; and iv) the amount of the allowed claims for administrative expenses.

CREDITORS AND OTHER PARTIES IN INTEREST SHOULD REVIEW THE CONTENTS OF THE PLAN ITSELF, WHICH IS ATTACHED AS EXHIBIT A TO THIS DISCLOSURE STATEMENT IN ITS ENTIRETY.

The reorganization of the Debtors' Estate under the Plan will ensure at least an equivalent return to creditors than they would receive if the Estate were to be liquidated under Chapter 7 of the Bankruptcy Code. For a more detailed explanation, please refer to Article V of this Disclosure Statement below. To the extent that any provisions of this Disclosure Statement are inconsistent with the provisions of the Plan, the terms of the Plan shall control; provided, however, that the Confirmation Order shall control to the extent there is any inconsistency between the Plan and the Confirmation Order.

For a more detailed description of the terms and provisions of the Plan, please refer to the Plan itself.

## E.     CREDITORS ENTITLED TO VOTE ON THE PLAN

Holders of Claims in Classes 1, 2 and 6 through 11 are impaired by the Plan and, as such, the Debtor is soliciting votes from holders of Allowed Claims in these classes as set forth in Article 4 of the Plan. The holders of Claims in Classes 4 and 5 are insiders and are not entitled to vote.

The Plan will be confirmed if it is accepted by the requisite majorities of each Class of Claims entitled to vote on the Plan and all other conditions to confirmation are met by the Debtor. However, the Debtor may seek to "cram down" the Plan pursuant to § 1129(b) of the Bankruptcy Code on any Class of claimants that vote to reject the Plan. (For more information on "cram down," please refer to Article V, Section C below). The requisite majority for confirmation of the Plan by a particular Class without "cram down" is acceptance by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of Allowed Claims that are actually voted.

**F.    INSTRUCTIONS REGARDING VOTING, CONFIRMATION, AND OBJECTIONS TO CONFIRMATION**

**1.    Voting Instructions**

BEFORE VOTING, YOU SHOULD READ THIS DISCLOSURE STATEMENT AND ITS EXHIBITS, INCLUDING THE PLAN AND ITS EXHIBITS, IN THEIR ENTIRETY. BALLOTS MUST BE RECEIVED NO LATER THAN _____, 2021.

You may vote on the Plan by completing and mailing the enclosed Ballot to:

The Henderson Law Firm, PLLC
2030 South Tryon St., Ste 3H
Charlotte, N.C. 28203

You should use the ballots sent to you with this Disclosure Statement to cast your votes for or against the Plan. You may NOT cast ballots or votes orally. In order for your ballot to be considered by the Bankruptcy Court, it must be received at the above address no later than the date designated above. If you are a holder of a Claim entitled to vote on the Plan and did not receive a ballot with this Disclosure Statement, you may obtain a ballot by contacting The Henderson Law Firm at the address shown above, or by email henderson@title11.com.

Only holders of Allowed Claims in impaired Classes are entitled to vote on the Plan. Persons holding Claims transferred by any means after such date will not be permitted to vote on the Plan. An impaired Class of Claims accepts the Plan if at least two-thirds (2/3) in amount, and more than one-half (1/2) in number, of the Allowed Claims in the Class that are actually voted are cast in favor of the Plan. Subject to the terms of the Plan, Claimants who do not vote are not counted as having voted either for or against the Plan. Pursuant to the provisions of § 1126 of the Bankruptcy Code, the Bankruptcy Court may disallow any vote accepting or rejecting the Plan if such vote is not cast in good faith. A Creditor's failure to vote on the Plan will not affect such Creditor's right to a Distribution under the Plan.

If the voting members of an impaired Class do not vote unanimously for the Plan but, nonetheless, vote for the Plan by at least the requisite two-thirds (2/3) in amount of Allowed Claims in that Class and one-half (1/2) in number of Allowed Claims actually voted in that Class, the Plan, at a minimum, must provide that each member of such Class will receive property of a value, as of the Effective Date, that is not less than the amount such Class members would receive or retain if the Estate was liquidated under chapter 7 of the Bankruptcy Code.

The Debtor may dispute Proofs of Claim that have been filed or that the Debtor listed as disputed in its Schedules filed with the Bankruptcy Court. Persons whose Claims are disputed may vote on, or otherwise participate in, Distributions under the Plan only to the extent that the Bankruptcy Court allows their Claims. The Bankruptcy Court may temporarily allow a Claim for

voting purposes only. The Schedules, which list the Claims and whether such Claims are disputed, can be inspected at the Office of the Clerk of the United States Bankruptcy Court for the Western District of North Carolina, Charles Jonas Federal Building, 401 West Trade Street, Room 111, Charlotte, North Carolina.

Whether or not a Claimant votes on the Plan, such Persons will be bound by the Plan, including the terms and treatment of Claims set forth therein, if the Plan is accepted by the requisite majorities of the Classes or is "crammed down" and confirmed by the Bankruptcy Court.

Allowance or disallowance of a Claim for voting purposes does not necessarily mean that all or a portion of that Claim will be allowed or disallowed for purposes of Distribution under the Plan.

## 2.    Confirmation of the Plan

Once it is determined which impaired Classes, if any, have or have not accepted the Plan, the Bankruptcy Court will determine whether the Plan may be confirmed. If all impaired Classes accept the Plan, it will be confirmed provided that the Bankruptcy Court finds the other conditions set forth in § 1129(a) of the Bankruptcy Code satisfied.

The Bankruptcy Court may confirm the Plan, even if all of the impaired Classes do not accept the Plan, if the Bankruptcy Court finds that certain additional conditions are met.

Accordingly, if the Plan is not accepted by the requisite amount of Claims in their respective impaired Classes, the Debtors will seek confirmation of the Plan as to such non-accepting Classes pursuant to § 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code is generally referred to as the "cram down" provision. The Bankruptcy Court may confirm a Plan over the objection of a non-accepting Class if the Plan satisfies one of the alternative requirements of § 1129(b)(2)(A) of the Bankruptcy Code. The Bankruptcy Court may confirm the Plan over the objection of a non-accepting Class if the non-accepting members of the Class will receive the full value of their Claims, or, if the non-accepting members of the Class stand to receive less than full value, no Classes of junior priority will receive anything on account of their respective Claims.

## 3.    Objections to Confirmation

Any objections to confirmation of the Plan must be filed with the Clerk of the Bankruptcy Court and served upon (a) The Henderson Law Firm, 2030 South Tryon St., Ste. 3H, Charlotte NC 28203; and (b) the United States Bankruptcy Administrator, 402 West Trade Street, Charlotte, North Carolina 28202, in such a manner as will cause such objections to be filed with the Bankruptcy Court and received by the aforementioned parties by _____, 2021.

## 4.    Confirmation Hearing

A hearing on confirmation of the Plan is scheduled before the Honorable J. Craig Whitley, United States Bankruptcy Judge, United States Bankruptcy Court for the Western District of North

Carolina, Charles Jonas Federal Building, 401 West Trade Street, Courtroom 1-4, Charlotte, North Carolina on _____, 2021 at 9:30 a.m. Announcement of the adjournment or continuance of such hearing, if any, may be made in writing or in open court. No further written notice is required to be sent to claimants, interest holders, or other parties in interest.

**ARTICLE II**

**BACKGROUND INFORMATION REGARDING THE DEBTORS**

## A.    COMMENCEMENT OF THE CHAPTER 11 CASE

### 1.    Filing of the Petition

The Debtors' voluntary Chapter 11 petition was filed on February 19, 2020.

### 2.    Debtors in Possession; Effect of Bankruptcy Filing

Following the commencement of the Chapter 11 Case, the Debtors have continued to manage their business and affairs as debtors in possession, subject to the oversight of the Bankruptcy Court.

Upon the filing of the Chapter 11 petition, substantially all claims against the Debtors that existed prior to the Petition Date became subject to the automatic stay provisions under § 362 of the Bankruptcy Code. These pre-petition claims may arise from the determination by the Bankruptcy Court of allowed claims for contingent liabilities and other disputed amounts.

## B.    SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASE

### 1.    Filing of Schedules

The Debtors have filed Schedules of Assets and Liabilities and their Statement of Financial Affairs, which may be amended. Copies of any of these documents may be requested by email to henderson@title11.com.

### 2.    Retention of Professionals by the Debtors

The Debtors are represented by The Henderson Law Firm as bankruptcy counsel in connection with the Chapter 11 Case.

### 3.    ASSETS OF THE BANKRUPTCY ESTATES

### a.    *Real property owned as tenants by the entirety and subject to deeds of trust.*
These properties include: i) 4324 Satterwythe Lane, Charlotte, N.C. ("Residence", $600,000.00 scheduled value); ii) 16701 Northcross Drive, Huntersville, N.C

("Northcross", $1,800,000.00 appraised value as of April 22, 2020)[1]; and iii) 6025 Clark Creek Parkway, Charlotte, N.C. ("Clark Creek", $1,900,000.00 appraised value as of April 22, 2020)[2]. Northcross and Clark Creek are commercial properties leased to UCDC for use as day care centers, which have an aggregate appraised value of $3.7M. Northcross and Clark Creek are subject to first deeds of trust in favor of Wilmington Savings Fund Society, FSB, d/b/a Christiana Trust, as Owner Trustee of Residential Credit Opportunities Trust II ("Wilmington Savings"), securing a claim of approximately $2.97M. Northcross and Clark Creek are also subject to: i) a second deed of trust in favor of Kimberly Griffith ("Griffith") securing a debt of approximately $460,000.00 (not including all accrued interest); ii) a third deed of trust in favor of Legolia McGlohon ("McGlohon") securing a debt of approximately $465,000.00 (not including all accrued interest); and iii) a judgment lien in favor of The Essendant Company ("Essendant") securing a debt of approximately $2.1M (not including all accrued interest) (the "Essendant Judgment").

The Plan provides for the approval of a settlement between the Debtors and Essendant, which would partially avoid the Essendant judgment lien.. Even with the avoidance of the Essendant judgment lien on the Northcross and Clark Creek properties, the aggregate debt secured by those properties (approximately $3,895,000.00) exceeds the fair market value of those properties ($3,700,000.00, baased on the Debtors' most recent appraisals dated April 22, 2020) and the Debtors have no equity in those properties.

The Residence is subject to i) a first deed of Trust in favor of the Mill City Mortgage Loan Trust 2018-1 ("Mill City"), securing a debt of approximately $387,000.00; ii) a second deed of trust in favor of Griffith securing a debt of approximately $460,000.00 (not including all accrued interest); iii) a third deed of trust in favor of McGlohon securing a debt of approximately $465,000.00 (not including all accrued interest); and iv) the Essendant Judgment. The aggregate debt secured by the Residence (approximately $2,412,000.00) greatly exceeds the value of the Residence. The Debtors have no equity in the Residence.

b.    ***Real property owned as tenants by the entirety, not subject to deeds of trust, claimed as exempt.*** 4320 Satterwythe Lane, Charlotte, N.C. ("Residence lot") is an undeveloped lot that constitutes part of the Debtors' residence. The Residence lot has a tax value of $57,300.00, and was scheduled by the Debtors as having a value of $60,000.00. Upon information and belief the Residence lot is not subject to any deeds of trust, but it is subject to the Essendant Judgment.

c.    ***Real property owned as tenants by the entirety, not subject to deeds of trust, not claimed as exempt.*** The Debtors own a one acre vacant lot on Kings Circle in

---

1 T.B. Harris, Jr. & Associates, appraiser.
2 *Id.*

Statesville, North Carolina ("Kings Circle"). Kings Circle has a scheduled value of $9,750.00, and it is not believed to be subject to any liens. The Kings Circle lot will be sold pursuant to the Plan and the net proceeds will be distributed according to the Plan.

   d.   *Jointly owned personal property.* The Debtors' schedules indicate that, as of the Petition Date, they owned personal and household items having a value of $12,000.00, most of which has been claimed as exempt. The Debtor's jointly scheduled financial assets total approximately $22,000.00, consisting mostly of cash balances in joint bank accounts.

   e.   *Personal property owned solely by Mr. Kennedy.* The schedules reflect that Mr. Kennedy solely owns stock in Branch Banking & Trust Co. (now Truist Bank) having an approximate value of $14,000.00 as of the Petition Date. This stock was not claimed as exempt and will be sold to pay creditors under the plan. Also, claimed as exempt by Mr. **Kennedy** is the $9,193.99 cash value of a whole life insurance policy, on which Mrs. Kennedy is the beneficiary.

   f.   *Personal property owned solely by Mrs. Kennedy.* This includes bank accounts having a balance of approximately $6,200.00 as of the Petition Date.

   g.   **Ownership of non-publicly traded interests in closely held businesses.** The Debtors have ownerships interests in UCDC and Value Innovation Technologies ("VIT"). The interests in both UCDC and VIT are listed on the Schedules as having a nominal value of $1.00. The Schedules show that UCDC has a negative balance sheet net worth of approximately $2,270,000.00, and that VIT owns no tangible assets of value and has debt whjch exceeds $3,000,000.00. Pursuant to Bankruptcy Rule 2015.3, the Debtors have filed three periodic reports with the Court regarding the value and profitability of UCDC and VIT. The Periodic Reports include balance sheets, income statements, profit and loss reports, and a statement of cash flows for UCDC and VIT as of December 31, 2019, June 30, 2020 and December 31, 2020. These Periodic Reports contain financial information which is consistent with the nominal values shown on the Schedules. Attached as Exhibit B are balance sheets and profit and loss statements for UCDC and VIT as of March 31, 2021.

8.   **CLAIMS AGAINST THE BANKRUPTCY ESTATES**

   a.   *Unsecured Claims against the Debtors jointly.* Includes: SP Richards, claim 6, $1,055,533.61; Essendant, claim 7, Judgment, $2,110,127.75; Charlotte Mecklenburg Hospital Authority, claim 1, $5,154.21; and Department of Treasury, Internal Revenue Service, Claim 5, $7,003.21 (2019 estimated income taxes). Approximate total $3,178,000.00.

   b.   *Unsecured Claims against Mrs. Kennedy only.* Includes: CAN Capital $114,461.49, claim 8 (Ramsey Peele is principal and guarantor Cynthia Kennedy; CareCredit/Synchrony Bank, Claim 12, $8,671.00; and New York Life ($97,820.88). Approximate total $220,950.00.

   c.   *Unsecured Claims against Mr. Kennedy only.* Includes: Ravisanker Ramanathan (landlord, Mallard Creek); American Express $7,344.41 (claim 4, claim filed shows

judgment entered in Case 18 CVD 4023, Mecklenburg County on July 6, 2018 in the amount of $13,343.41 against just Mr. Kennedy); FORA Financial, prepetition lawsuit, APD, Mr. Kennedy and Calvin Ray Kenney II (claim 3, $238,828.75); Suntrust now Truist Bank Credit Card ($7,436.72) claim 2; and Ferguson Receivables, LLC (Claim 11, $70,914.06) Default Judgment against APD only, Wake County June 25, 2018; claim alleges that Calvin Kennedy "fraudulently transferred assets from [APD] to himself and other companies that he controlled at a time when APD was insolvent in an effort to avoid claims of creditors of APD...". Approximate total $338,000.00.

## 9.    APPLICATION OF ABSOLUTE PRIORITY RULE

In order to obtain confirmation of a Chapter 11 plan, a debtor must meet the requirements enumerated in 11 U.S.C.S. § 1129(a)(1)-(16). One of those subsections, 11 U.S.C.S. § 1129(a)(8), requires that all impaired classes under the plan must vote in favor of and accept the plan. However, under 11 U.S.C.S. § 1129(b), if all of the applicable requirements of § 1129(a) other than § 1129(a)(8) are met the Court may still confirm the plan over the objection of an impaired creditor if it is fair and equitable. 11 U.S.C.S. § 1129(b). With respect to a class of unsecured claims, § 1129(b) provides two ways that a debtor may satisfy the "fair and equitable" requirement, with one being the absolute priority rule.

A debtor may cram down a class of unsecured creditors if the plan provides that such creditors will receive property of a value, as of the effective date of the plan, equal to the allowed amounts of their claims. 11 U.S.C.S. § 1129(b)(2)(B)(i). Second, a debtor may cram down a class of unsecured creditors if the plan satisfies the "absolute priority rule" set forth in 11 U.S.C.S. § 1129(b)(2)(B)(ii). The absolute priority rule generally provides that every unsecured creditor in a dissenting impaired class must be paid in full before the debtor, who is an individual, is permitted to retain any property under the plan. 11 U.S.C.S. § 1129(b)(2)(B)(ii). The Fourth Circuit Court of Appeals addressed this issue in *Maharaj v. Stubbs & Perdue, P.A. (In re Maharaj)*, 681 F.3d 558 (4th Cir. 2012), and held that the absolute priority rule does continue to apply in individual cases.

The Court has recognized that an individual Chapter 11 plan which violates the absolute priority rule may nonetheless be confirmed if the debtor can demonstrate such plan satisfies the so-called "new value exception" or "new value corollary" to the absolute priority rule. *See, e.g., In re Eagan*, Case No. 12-30525 (Bankr. WDNC 2013) [Order Confirming Plan, Doc. 171]. Although the "new value" exception to the absolute priority rule was developed with the corporate debtor in mind, it has since been utilized for all forms of debtor entities. In the reorganization of a business, the "new value" exception allows old equity to succeed in keeping hold of the corporation, partnership, LLC or presumably, the sole proprietorship. These kinds of equity security holders, by providing new value in the form of money or money's worth, necessary for the Debtor to survive, and reasonably equivalent to the participation of the equity security holder's interest in the venture, may retain an interest therein. An individual Chapter 11 debtor may satisfy the "new value" exception by substituting sufficient new value for the non-exempt property proposed to be retained.

The new value exception requires a contribution of value that is "(1) new, (2) substantial, (3)

money or money's worth, (4) necessary for a successful reorganization, and (5) reasonably equivalent to the value or interest received." *See Eagan*. The Court in *Eagan* concluded that there can be no formulaic approach for resolving new value issues in every situation. The sufficiency of a new value contribution depends on the application of common sense to the circumstances presented in each unique case. *See, e.g., In re Snyder*, 967 F.2d 1126, 1131-32 (7th Cir. 1992) ("There is no mathematical formula for resolving the substantiality issue, and it will depend on the circumstances of the individual case."). This is particularly true in the case of an individual debtor. The BAPCPA amendments were intended, in part, to keep individual debtors out of liquidation. Without "equity" such as shares or membership interests to offer an investor, however, an individual has far fewer options than a corporate debtor to raise new capital. Simultaneously, Congress has not imposed a requirement of universal consent by creditors to achieve confirmation in cases filed by individuals. A reasonable middle ground must therefore be found if individual Chapter 11 cases are to retain any practical utility.

To comply with the absolute priority rule, Section 7.2 the Debtors' Chapter 11 plan provides that the Debtors will contribute $10,000.00 to the bankruptcy estate, on the Effective Date. This new value is reasonable in the circumstances of this case. While the Debtors are keeping their interests in the Ramsey-Peele Corporation d/b/a UCDC and Value Innovation Technologies, both of those entities are insolvent and the value of equity is little to nothing.

## 10.   THE DEBTORS' PROJECTED DISPOSABLE INCOME

The Plan satisfies the requirements of 11 U.S.C. Section 1129(a)(15), which provides:

In a case in which the debtor is an individual and in which the holder of an allowed unsecured claim objects to the confirmation of the plan—

(A) the value, as of the effective date of the plan, of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; <u>or</u>

(B) the value of the property to be distributed under the plan is not less than the projected disposable income of the debtor <u>(as defined in section 1325(b)(2))</u> to be received during the 5-year period beginning on the date that the first payment is due under the plan, or during the period for which the plan provides payments, whichever is longer.

11 U.S.C. § 1129(a)(15) (emphasis added).

Section 1325(b)(2), in turn, provides, in pertinent part:

"[D]isposable income" means <u>current monthly income</u> received by the debtor (other than child support payments, foster care payments, or disability payments for a dependent child made in accordance with applicable nonbankruptcy law to the extent reasonably necessary to be expended for such child) <u>less amounts reasonably necessary to be expended</u>—

(A)     (i) for the maintenance or support of the debtor or a dependent of the debtor,

or for a domestic support obligation, that first becomes payable after the date the petition is filed; and

(ii) for charitable contributions (that meet the definition of "charitable contribution" under section 548(d)(3)) to a qualified religious or charitable entity or organization (as defined in section 548(d)(4)) in an amount not to exceed 15 percent of gross income of the debtor for the year in which the contributions are made; and

(B) if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business.

11 U.S.C. § 1325(b)(2) (emphasis added).

11 U.S.C. 101(10A) provides that the term "current monthly income":

(A) means the average monthly income from all sources that the debtor receives (or in a joint case the debtor and the debtor's spouse receive) without regard to whether such income is taxable income, <u>derived during the 6-month period ending on—</u>

<u>(i) the last day of the calendar month immediately preceding the date of the commencement of the case if the debtor files the schedule of current income required by section 521(a)(1)(B)(ii);</u> or

(ii) the date on which current income is determined by the court for purposes of this title if the debtor does not file the schedule of current income required by section 521(a)(1)(B)(ii); and

(B) includes any amount paid by any entity other than the debtor (or in a joint case the debtor and the debtor's spouse), on a regular basis for the household expenses of the debtor or the debtor's dependents (and in a joint case the debtor's spouse if not otherwise a dependent), but excludes benefits received under the Social Security Act, payments to victims of war crimes or crimes against humanity on account of their status as victims of such crimes, and payments to victims of international terrorism (as defined in section 2331 of title 18) or domestic terrorism (as defined in section 2331 of title 18) on account of their status as victims of such terrorism.

The Debtors filed their Statement of Current Monthly Income ("CMI") with the Court on March 16, 2020, as required by 11 U.S.C. Section 521(a)(1)(B)(ii) [Doc. 27, pp. 48-49]. Thus, 11 U.S.C. 101(10A)(A)(ii) is not applicable. The CMI shows the Debtors' average monthly income during the 6-month period (August 1, 2019 to January 31, 2020) ending on the last day of the calendar month immediately preceding the date of the commencement of the case (February 19, 2020). This statement shows that the Debtors' "current monthly income" is $14,583.33.

The reasonable and necessary monthly expenses allowed to the Debtors pursuant to Section 1325(b)(2) exceed the Debtors' "current monthly income". The Debtors' monthly expenses, as shown on Schedule J, are $11,453.72. These expenses did not include payments necessary to service the debt secured by second and third deeds of trust on their Residence and two commercial properties. Under

the Plan, the Debtors will also need to pay an estimated $4,000.00 monthly to Griffith and McGlohon, the holders of the second and third deeds of trust on the Real Property and the Residence. The Debtors therefore have no "projected disposable income" under the statutory definition. The Plan complies with Section 1129(a)(15) because the "Value of the property to be distributed under the Plan" (a defined term) is at least $163,750.00, including i) approximately $14,000.00 in liquid assets (from sale of Truist Bank stock); ii) $9,750 estimated gross proceeds from sale of Iredell County vacant lot; iii) $130,000.000 contributions from Distribution Fund; and vi) the $10,000.00 New Value Contribution.

The Debtors believe that the Plan is confirmable as the $163,750.00 "value of property to be distributed under the Plan" exceeds the Debtors' "projected disposable income".

## ARTICLE III

## THE DEBTORS' PLAN OF REORGANIZATION

**THE FOLLOWING IS A SUMMARY OF THE PROVISIONS OF THE PLAN AND, ACCORDINGLY, IS NOT AS COMPLETE AS THE FULL TEXT OF THE PLAN THAT ACCOMPANIES THIS DISCLOSURE STATEMENT. THE PLAN ITSELF, ATTACHED AS EXHIBIT A HERETO, SHOULD BE READ IN ITS ENTIRETY.**

### A.   SUMMARY OF PAYMENT PROVISIONS OF THE PLAN

#### 1.   Impairment of Claims

Under the Bankruptcy Code, a class of claims or interests is deemed "impaired" under a chapter 11 Plan unless, in general, the rights of the holders of the claims or interests of such class are not altered or, with respect to interests, the holders receive cash equal to the greater of (a) any liquidation preference or (b) the redemption price, if either is applicable. Any class that is deemed impaired must accept the Plan by the requisite majority before the Plan can be confirmed, unless the Bankruptcy Court finds, pursuant to § 1129(b) of the Bankruptcy Code, that the Plan is fair and equitable and does not discriminate unfairly with respect to each class that is impaired and has not accepted the Plan.

#### 2.   Treatment of Claims

The treatment of and consideration to be received by holders of Allowed Claims pursuant to the Plan will be in full settlement, release, and discharge of their respective Allowed Claims relating to the Debtors and other Persons, as applicable, as specified in the Plan.

### B.   CLASSIFIED CLAIMS UNDER THE PLAN

The Plan divides the Claims against the Debtors into various Classes and designations. Please

refer to the attached Plan (Exhibit A) for a description of the general Classes and designations of claims against the Debtors and the corresponding treatment thereof under the Plan. Allowed Administrative Claims and Allowed Priority Tax Claims are not designated as classes of Claims for purposes of the Plan pursuant to Sections 1123, 1124, 1126 and 1129 of the Bankruptcy Code.

All amounts listed for each Class of Claims are merely estimates, subject to change through the Debtors' claims review and objection process. All capitalized terms not defined herein shall have the meanings ascribed to them in the Plan.

## ARTICLE IV
## OTHER PROVISIONS OF THE PLAN

### A.    ADMINISTRATIVE BAR DATE

In accordance with Section 2.2 of the Plan, and except as otherwise ordered by the Bankruptcy Court (including any order providing for an earlier date), requests for payment of Administrative Claims, including all applications for final allowance of compensation and reimbursement of expenses of Professionals incurred before the Confirmation Date, must be filed and served on the Reorganized Debtors and the Bankruptcy Administrator no later than thirty (30) days after the Effective Date. Any Person required to file and serve a request for payment of an Administrative Claim and who fails to timely file and serve such request, shall be forever barred, estopped, and enjoined from asserting such Claim or participating in distributions under the Plan on account thereof. The Administrative Claims Bar Date shall not apply to fees and expenses of Professionals incurred after the Effective Date.

### B.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES

The Debtors will assume the leases with UCDC and Rocky River Storage. The Debtor hereby gives notice that there are no Cure Payments due by the Debtors with respect to any executory contracts and unexpired leases to be assumed under the Plan. Any non-debtor party to any executory contract or unexpired lease to be assumed under the Plan that objects to assumption of the executory contract or unexpired lease or believes that a Cure Payment is due in connection with such assumption must file a written objection to the assumption of such executory contract or unexpired lease with no Cure Payment and state in the written objection the grounds for such objection and specifically set forth the amount of any request for a Cure Payment by the deadline established by the Bankruptcy Court for filing objections to confirmation of the Plan. Any other executory contracts and unexpired leases are rejected.

### C.    RETAINED CAUSES OF ACTION

Except as otherwise specifically provided in the Plan, the Reorganized Debtors shall retain all rights and are authorized to commence and pursue, as the Reorganized Debtors deem appropriate, any and all claims, causes of action, objections, and defenses, including, but not limited to, Avoidance Actions, whether arising before or after the Petition Date, in any court or other tribunal including, without limitation, in an adversary proceeding filed in the Chapter 11 Case, and

including but not limited to, the claims and causes of action specified in the Plan or in any Plan exhibit.

## D.   DISTRIBUTIONS

All Distributions made under the Plan will be made as outlined above and as set forth specifically in Articles 3 and 6 of the Plan.

## E.   OBJECTIONS TO CLAIMS

Following the Effective Date, the Reorganized Debtors shall be authorized to object to, or to succeed or otherwise join any objection filed by the Debtors prior to the Effective Date, Claims, so as to have the Bankruptcy Court determine the amounts to be allowed, if any, of such Claims and thus paid pursuant to the Plan. Objections to Claims shall be filed with the Bankruptcy Court and served upon the holders of such Claims no later than sixty (60) days after the Effective Date; provided, however, that this deadline may be extended by order of the Bankruptcy Court. An objection to the allowance of a Claim by the Reorganized Debtors must be filed with the Bankruptcy Court and served upon the holder of the Claim and all parties who have requested notice.

Notwithstanding the foregoing, unless an order of the Bankruptcy Court specifically provides for a later date, any proof of claim for pre-petition debts of the Debtors filed after the Confirmation Date shall be automatically disallowed as a late-filed claim, without any action by the Reorganized Debtors, unless and until the party filing such Claim obtains (i) the written consent of the Reorganized Debtors to file such Claim late, or (ii) approval from the Bankruptcy Court upon notice to the Reorganized Debtors that permits the late filing of the Claim, in which event, the Reorganized Debtors shall have 120 days from the date of such written consent or order to object to such Claim, which deadline may be extended by the Bankruptcy Court upon motion of the Reorganized Debtors.

Prior to the Effective Date, the Debtors shall litigate to judgment, propose settlements of, or withdraw objections to such Disputed Claims asserted against it as the Debtors may choose. From and after the Effective Date, the Reorganized Debtors shall litigate to judgment, propose settlements of, or withdraw objections to all Disputed Claims. Prior to the expiration of thirty (30) days from the date of service of the objection, the Claimant whose Claim was the subject of the objection must file a response to the objection with the Bankruptcy Court and serve the response upon the objecting party and the Reorganized Debtors. If the Claimant whose Claim was the subject of the objection fails to file and serve its response to the objection within the 30-day response deadline, the Bankruptcy Court may grant the relief requested in the objection against the non-responding Claimant without further notice or hearing. All proposed settlements of Disputed Claims shall be subject to the approval of the Bankruptcy Court after notice and opportunity for a hearing (as that term is used in § 102(1) of the Bankruptcy Code).

## F.    MISCELLANEOUS

### 1.    Consummation – Retention of Jurisdiction

Consummation of the Plan consists of satisfaction of any and all conditions to the effectiveness of the Plan. Pursuant to Article 12 of the Plan, the Bankruptcy Court will retain jurisdiction after Confirmation of the Plan to resolve all outstanding matters in the Chapter 11 Case and with respect to the fulfillment of the obligations of the Reorganized Debtors under the Plan.

### 2.    Discharge

(a)    Discharge of the Debtors. The consideration distributed under this Plan shall be in exchange for, and in complete satisfaction, discharge, release, and termination of all Claims of any nature whatsoever against the Debtors and the Estate. The Debtors shall be entitled to move for entry of a discharge pursuant § 1141 of the Bankruptcy Code. If such discharge is approved by Order of the Bankruptcy Court (the "Discharge Order"), the Debtors shall be deemed discharged and released pursuant to § 1141 of the Bankruptcy Code from any and all Claims, including but not limited to demands and liabilities that arose before the date of the Discharge Order, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code, whether or not (a) a proof of claim based upon such debt is filed or deemed filed under § 501 of the Bankruptcy Code; (b) a Claim based upon such debt is allowed under § 502 of the Bankruptcy Code; or (c) the holder of a Claim based upon such debt has accepted this Plan.

(b)    Effect of Discharge. The Discharge Order shall be a judicial determination of discharge and termination of all liabilities of and all Claims against the Debtors and the Estate, except as otherwise specifically provided in this Plan. Upon the entry of the Discharge Order, as to every discharged Claim and other debt of the Debtors, the holder of such Claim or other debt of the Debtors shall be permanently enjoined and precluded from asserting against the Reorganized Debtors, or against their assets or properties or any transferee thereof, any other or further Claim or other debt of the Debtors based upon any document, instrument, or act, omission, transaction, or other activity of any kind or nature that occurred prior to the entry of the Discharge Order except as expressly set forth in the Plan. In the event that, after entry of the Discharge Order, any Person asserts, against the Reorganized Debtors or any of their subsidiaries or affiliates, any right to payment or equitable remedy for breach of performance which gives rise to a right of payment, which right was not asserted prior to the entry of the Discharge Order but is based on any act, fact, event, occurrence, or omission, by or relating to the Debtors as they existed before the entry of the Discharge Order, and in the further event that such right is determined by the Bankruptcy Court (a) not to have been discharged pursuant to the provisions of § 1141 of the Bankruptcy Code and this Plan, and (b) that such right may be asserted against the Reorganized Debtors, then, in such circumstances the holder of such right shall be entitled to receive from the Reorganized Debtors value equivalent to that such holder would have received if such right had been asserted against the Debtors before the Confirmation Date and only to the extent such right would have been an Allowed Claim. Nothing in the Plan, this Disclosure Statement, or any Confirmation Order shall have the effect of excepting from discharge any Claim that is or would be discharged pursuant to §

1141 of the Bankruptcy Code or the Plan.

### 3. Release of Certain Claims and Actions; Related Injunction

As of and on the Confirmation Date, all Persons who have held, hold, or may hold Claims against the Debtors and/or the Estate shall be deemed to have waived, released, and discharged all rights or claims, whether based upon tort, contract or otherwise, which they possessed or may possess prior to the Effective Date against the Debtors and/or the Estate, except as otherwise provided for in the Plan (including the documents filed as Schedules or Exhibits to the Plan) or the Confirmation Order; provided, however, that the foregoing release shall not apply to nonperformance under the Plan. The Confirmation Order shall constitute a permanent injunction effectuating these releases, such that all Persons who have held, hold, or may hold Claims against the Debtors and/or the Estate shall be expressly prohibited from taking any action to enforce such Claims against the Reorganized Debtors or their property, or any transferee of such property.

### 4.     Conditions Precedent to Confirmation

The Plan shall not be confirmed unless and until the Bankruptcy Court has entered the Confirmation Order.

### 5.     Conditions Precedent to the Effective Date

The Plan shall not become effective and operative unless and until the Effective Date occurs. The Effective Date shall occur upon the earlier of: (i) the Business Day that is 15 days after entry of the Confirmation Order; or (b) satisfaction of the other conditions set forth in Article 10 of the Plan are satisfied.

### G.     SETTLEMENT OF ADVERSARY PROCEEDING BETWEEN THE DEBTORS AND ESSENDANT CO.

Essendant Co. ("Essendant")_provided inventory to APD. APD maintained a line of credit with Essendant for the purchase on inventory, which was guaranteed by the Debtors. A significant portion of the line of credit owed to Essendant by APD remained unpaid when APD ceased doing business. On May 14, 2018, Essendant filed a lawsuit against APD and the Debtors in the U.S. District Court for the Northern District of Illinois (the "District Court"), seeking a judgment in excess of $2,000,000.00.

On September 27, 2019, the District Court entered judgment against the Debtors in the amount of $2,110,127.75, plus costs, accruing interest at the annual rate of nine percent. Essendant domesticated the Illinois judgment in Mecklenburg County, North Carolina on November 22, 2019. Thereupon, the Essendant judgment became a lien on all real property owned by the Debtors in Mecklenburg County. The Debtors were unable to settle Essendant's claim prior to filing their bankruptcy petition.

On September 10, 2020 Essendant filed an adversary proceeding in this Bankruptcy against the Debtors (the "Adversary"). The Adversary seeks a finding by the Bankruptcy Court that Essendant's claim….in excess of $2,100,000.000…was not dischargeable in this Bankruptcy case. In April, 2021, the Debtors and Essendant participated in a mediated settlement conference concerning the issues in the Adversary. At the settlement conference, Essendant and the Debtors agreed upon settlement terms which are contained in a Memorandum of Mediated Settlement Agreement (the "Settlement Agreement").

The Settlement Agreement is attached to the Plan as Exhibit A and is incorporated in the Plan by reference. In summary, the Settlement Agreement provides:

The Debtors shall pay Essendant $300,000.00 over time, and the $300,000.00 shall not be dischargeable;

      1.    Essendant's judgment lien shall remain on the Debtor's residence and adjoining lot to secure only the $300,000.00 settlement amount;

      2.    The judgment liens on the Debtors' two commercial properties shall be released;

      3.    The Deeds of Trust in favor of Legolia McGlohon and Kimberly Griffith shall be subordinated to Essendant's judgment lien;

      4.    In addition to the $300,000.00 settlement payments, Essendant will participate on a pro rata basis in any distributions to be made to Class 8 General Unsecured Claims for Which Both Debtors Liable.

Confirmation of the Plan shall constitute approval of the Settlement Agreement by the Bankruptcy Court pursuant to Bankruptcy Rule 9019.

## ARTICLE V
## CONFIRMATION OF THE PLAN

### A.    FEASIBILITY

Section 1129(a) of the Bankruptcy Code requires a judicial determination that confirmation of the Plan will not likely be followed by liquidation or the need for further financial reorganization of the Debtors unless liquidation is contemplated under the Plan. In connection therewith, the Debtors are confident that there will be sufficient funds available to satisfy the minimum distributions required under § 1129(a)(9) of the Bankruptcy Code and the obligations of the Reorganized Debtors from the sources identified in the Plan.

The Debtors, while they cannot guarantee their future income, nor that of UCDC (and the Bankruptcy Code does not require such a guarantee), are presenting a Plan in which i) they pay creditors more than their Projected Disposable Income "to be received during the 5-year period beginning on the date that the first payment is due under the plan, or during the period for which the plan provides payments, whichever is longer", and ii) creditors receive more

than they would in a Chapter 7 liquidation.

## B.     ACCEPTANCE OF THE PLAN

As a condition to Confirmation of the Plan, § 1129(a) of the Bankruptcy Code, with certain exceptions, requires that each impaired Class accept the Plan. In general, a class is "impaired" if the legal, equitable, or contractual rights attaching to the Claims of that class are modified, other than by curing defaults and reinstating maturities or by payment in full in cash.

The Bankruptcy Code defines acceptance of a Plan (a) by a class of creditors entitled to vote thereon as acceptance by holders of two-thirds in dollar amount and a majority in number of Allowed Claims in that class and (b) by a class of equity holders entitled to vote thereon by acceptance two-thirds in amount of such interests. Each calculation, however, includes only those holders of Allowed Claims who actually vote to accept or reject the Plan.

Under § 1126(f) of the Bankruptcy Code, classes of Allowed Claims that are not "impaired" under the Plan are conclusively deemed to have accepted the Plan. Under § 1126(g) of the Bankruptcy Code, classes that receive no distributions under the Plan are conclusively deemed to have rejected the Plan. For these reasons, acceptances of the Plan are being solicited from all Classes impaired pursuant to the Plan, if any.

## C.     NON-ACCEPTANCE AND CRAM DOWN

If any Class of impaired Claims fails to accept the Plan, the Debtors will seek to effect a "cram down" on such dissenting Class and all Classes that are junior to such dissenting Class under § 1129(b) of the Bankruptcy Code. The Debtors also reserve the right to amend the Plan and request the Bankruptcy Court to confirm the Plan as further amended. If an amendment to the Plan is material, the Debtors may have to re-solicit acceptances from any Class affected by the change(s), unless that Class can be deemed to have accepted or rejected the Plan.

The Plan's treatment of Classes is consistent with the foregoing. Consequently, the Debtors believe that if any of the holders in Classes that are impaired reject the Plan, the Plan may be confirmed over such opposition. Pursuant to § 1129(b) of the Bankruptcy Code, the Debtors will seek Confirmation of the Plan, notwithstanding the possible rejection of the Plan by holders of Claims in any class.

## D.     BEST INTERESTS TEST - LIQUIDATION ANALYSIS

Notwithstanding acceptance of the Plan in accordance with Section 1126 of the Bankruptcy Code, the Bankruptcy Court must find that each member of an impaired class of creditors has each accepted the Plan, or will receive or retain property of a value, as of the Effective Date of the Plan, that is not less than the amount such creditor or interest holder would have received or retained if the Estate was liquidated under Chapter 7 of the Bankruptcy Code. The Debtors believe that the

Plan complies with this "best interests" test.

To determine what Creditors would receive if the Debtors' Estate were liquidated under Chapter 7, the dollar amount that would be generated from the liquidation of the Debtors' assets must be considered. The amount that would be available for the satisfaction of Claims would consist of the Debtors' interest in the net proceeds resulting from the disposition of the Estate's assets. The Estate's interest would necessarily be reduced by the amount of any secured claims, the costs and expenses of liquidation, and such additional administrative or priority Claims that may result from the liquidation of the Estate assets.

The Debtors assert that conversion of the Chapter 11 Case to a case administered under Chapter 7 of the Bankruptcy Code, followed by liquidation, would involve greater expense and risk than the reorganization contemplated by the Plan. For example, conversion of the Chapter 11 Case would require the appointment of a trustee to conduct the liquidation of the Estate. Such a trustee would likely have limited knowledge of the Chapter 11 Case and the Debtors' records, assets, or business affairs. The fees charged by a Chapter 7 trustee and any professionals he or she would hire (such as legal counsel, accountants, appraisers, brokers, and the like) could impose additional administrative costs on the Estate that will not be incurred under the Plan, and which would be paid ahead of allowed administrative and priority Claims. When coupled with the inevitable delay caused by the appointment of a Chapter 7 trustee and retention of the trustee's professionals, distributions to Creditors that would otherwise be made on or after the Effective Date of the Plan necessarily would be delayed for an indefinite period. These calculations are set forth in a hypothetical liquidation analysis of the Debtors' Estates, attached hereto as **Exhibit C**.

Creditors will receive more under the Plan than they would receive in a Chapter 7 liquidation. Accordingly, the Debtors believe that confirmation of the Plan is in the best interests of Creditors and fully complies with the statutory requirements of the Bankruptcy Code.

## ARTICLE VI
## MATERIAL UNCERTAIN TIES AND RISK FACTORS

Holders of Claims against the Debtors and the Estate should read and carefully consider the risk factors set forth below, as well as other information set forth in the Disclosure Statement (and the documents delivered together herewith and/or incorporated herein). These risk factors should not, however, be regarded as constituting the only risks involved in connection with the Plan and its implementation.

## A.    CERTAIN DISPUTED CLAIMS

The feasibility of the Plan is predicated upon the levels of the Claims not being materially in excess of the amounts estimated herein and in the Plan. If such claims are substantially in excess of the estimated amounts, the Debtors' ability to satisfy the payment obligations under the Plan could be impacted. Moreover, the stated amounts of Claims in each Class listed above are merely estimates

based on the amounts listed on the Debtors' Schedules. All amounts are subject to change upon the completion of the claims review and objection process.

## B.    CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE

As more fully discussed in the Plan, if certain conditions precedent to Confirmation and the Effective Date are not satisfied, the Plan may be withdrawn and the Confirmation Order vacated.

## C.    CERTAIN TAX MATTERS

The Debtors are unaware of any material federal income tax consequences to the Debtors or the holders of Claims resulting from the Plan. However, nothing in the Plan or the Disclosure Statement should be construed as a representation, warranty, or advice concerning any such tax consequences.

**ARTICLE VII**
**CONCLUSION**

For the reasons set forth in this Disclosure Statement, the Debtors believe that confirmation and consummation of the Plan is preferable to all other alternatives. The Debtors thus urge all Creditors entitled to vote to accept the Plan and to evidence such acceptance by returning their ballots so that they will be received by _____, 2021.

Respectfully submitted, June 15, 2021.

**[signature page follows]**

/s/ Calvin R. Kennedy
Calvin R. Kennedy


/s/ Cynthia M. Kennedy
Cynthia M. Kennedy

**THE HENDERSON LAW FIRM**

By: /s/ James H. Henderson
James H. Henderson
NC State Bar No. 13536
2030 South Tryon St., Ste. 3H
Charlotte, North Carolina 28203
Email henderson@title11.com
Telephone: (704) 333.3444
Counsel for the Debtors

EXHIBIT A

# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

In Re:                                )
                                      )
CALVIN R. KENNEDY and                 )        Chapter 11
CYNTHIA M. KENNEDY                    )        Bankruptcy Case No. 20-30208
                                      )
                    Debtors.          )
                                      )

---

## FIRST AMENDED PLAN OF REORGANIZATION

Calvin R. Kennedy and Cynthia M. Kennedy (collectively the "Debtors"), submit this First Amended Plan of Reorganization (the "Plan") pursuant to section 1121(a) under Title 11 of the United States Code, 11 U.S.C. § 101 et seq.

## ARTICLE I
## DEFINITIONS

As used in this chapter 11 plan, the following terms shall have the respective meanings specified below:

**Administrative Claim**.  Any cost or expense of administration of the Chapter 11 Case (a) required to be asserted by filing an application with the Bankruptcy Court on or before the Administrative Bar Date, or (b) Allowed under section 503(b) of the Bankruptcy Code, except to the extent the holder of such Claim agrees to be treated differently. Administrative Claims include, but are not limited to, (i) any actual and necessary expenses of preserving either Estate incurred during the Chapter 11 Case, (ii) any actual and necessary expenses of operating the Debtors' business incurred during the Chapter 11 Case, (iii) any indebtedness or obligations incurred or assumed by the Debtors in connection with the conduct of their business as debtors in possession, or for the acquisition or lease of property by, or for the rendition of services to, the Debtors as debtors in possession, (iv) obligations pursuant to executory contracts assumed by the Debtors pursuant to an order of the Bankruptcy Court, (v) all Claims as provided by § 507(b) of the Bankruptcy Code, (vi) all allowances of compensation or reimbursement of expenses to the extent allowed by the Bankruptcy Court, (vii) any Allowed Contingent Claims which are granted administrative priority status by Final Order of the Bankruptcy Court, (viii) all fees payable and unpaid under section 1930 of Title 28, United States Code, and (ix) any fees or charges assessed against the Estate under chapter 123 of Title 28, United States Code.

**Administrative Claims Bar Date**.  The date thirty (30) days after the Effective Date or such other date(s), if any, as determined by order of the Bankruptcy Court, by which all requests for allowance of Administrative Claims must be filed with the Bankruptcy Court. The Administrative Claims Bar Date shall not apply to fees and expenses of Professionals incurred after the Confirmation Date.

**Allowed Administrative Claim**. All or that portion of any Administrative Claim that is or has become an Allowed Claim.

**Allowed Claim**. Any Claim against the Debtors (i) proof of which was filed on or before the date designated by the Bankruptcy Court as the last date for filing proofs of claims against the Debtors or, if no proof of claim is filed, which has been or hereafter is listed by the Debtors in their Schedules, as liquidated in amount and not disputed or contingent and, in either case, a Claim as to which no objection to the allowance thereof has been interposed within the applicable period of limitation fixed by this Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or (ii) in favor of any Person arising from a judgment against such Person in any Avoidance Action (if the effect of such judgment gives such Person an Allowed General Unsecured Claim). A Disputed Claim shall be an Allowed Claim if, and only to the extent that, a Final Order has been entered allowing such Disputed Claim. The term "Allowed," when used to modify a reference in this Plan to any Claim or class of Claims, shall mean a Claim (or any Claim in any such class) that is allowed (e.g., an Allowed Secured Claim is a Claim that has been Allowed to the extent of the value of any interest in property of the Estate securing such Claim), as determined by the Bankruptcy Court pursuant to § 506(a) of the Bankruptcy Code. Unless otherwise specified in this Plan or in the Final Order of the Bankruptcy Court allowing such Claim, "Allowed Claim" shall not include interest on the amount of such Claim from and after the Petition Date.

**Assumed Agreement**. Unexpired leases and other executory contracts of the Debtors that are being assumed pursuant to the Plan, if any.

**Avoidance Action**. Any and all actions which a trustee, debtor in possession, or other appropriate party in interest may assert on behalf of the Estate under the Bankruptcy Code, including actions pursuant to sections 542, 543, 544, 545, 546, 547, 548, 549, 550, and/or 551 of the Bankruptcy Code.

**Avoidance Action Claims**. Claims asserted by parties pursuant to sections 502(d) and/or 502(h) of the Bankruptcy Code in connection with any Avoidance Action(s) brought by the Debtors against such parties.

**Ballot**. The document used in voting on the Plan that must be executed and delivered by holders of Claims entitled to vote on the Plan.

**Bankruptcy Administrator**. The United States Bankruptcy Administrator for the Western District of North Carolina.

**Bankruptcy Code**. The United States Bankruptcy Code, 11 U.S.C. § 101 et seq.

**Bankruptcy Court**. The United States Bankruptcy Court for the Western District of North Carolina, having jurisdiction over this Chapter 11 Case.

2

**Bankruptcy Rules**.  The Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, as applicable to the Chapter 11 Case.

**Business Day**.  Any day other than a Saturday, Sunday, or other day on which commercial banks in the State of North Carolina are authorized or required by law to close.

**Cash**. Cash and readily marketable securities or instruments including, without limitation, readily marketable direct obligations of the United States of America or agencies or instrumentalities thereof, time certificates of deposit issued by any bank, and commercial paper.

**Certified Funds.** Certified Funds shall mean a wire transfer that has finally cleared such account, such that it cannot be recalled, or a cashier's check drawn on a federally insured financial institution.

**Chapter 11 Case**. The Debtors' bankruptcy case under Chapter 11 of the Bankruptcy Code, which is pending before the Bankruptcy Court.

**Claim**.  Any right to payment from the Estate, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, and arising at any time before the Effective Date or relating to any event that occurred before the Effective Date; or any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment from the Estate, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured, and arising at any time before the Effective Date or relating to any event that occurred before the Effective Date.

**Clark Creek Property**. Located at 6025 Clark Creek Parkway in Charlotte, N.C. Owned as tenants by the entirety. Tax Parcel ID 02973604. The Clark Creek Property is leased to Ramsey-Peele.

**Class**. Means a classification of Allowed Claims for the purposes of treatment and distributions under this Plan.

**Confirmation Date**. The date upon which the Bankruptcy Court enters the Confirmation Order confirming this Plan or any amendment thereto.

**Confirmation Hearing**. The hearing before the Bankruptcy Court to consider confirmation of this Plan.

**Confirmation Order**.  An order of the Bankruptcy Court, in form and substance satisfactory to the Debtor, confirming this Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

**Contingent Claim**.  A Claim that is either contingent or unliquidated on or immediately before the Confirmation Date.

3

61189538.9

**Creditor**.  Any Person that holds a Claim against the Estate.

**Debtors**.   C. Ray Kennedy and Cynthia Kennedy.

**Disclosure Statement**. The disclosure statement filed with the Bankruptcy Court with respect to this Plan, pursuant to section 1125 of the Bankruptcy Code, either in its present form or as it may be altered, amended, or modified from time to time.

**Disputed Claim**.  A Claim which is the subject of a timely objection interposed by the Debtors, if at that time such objection remains unresolved; provided, however, that the Bankruptcy Court may determine the amount of a Disputed Claim for purposes of allowance pursuant to section 502(c) of the Bankruptcy Code; provided, further, that the Debtors, in their sole discretion, may elect to treat the portion of a Disputed Claim, if any, that is not in dispute as an Allowed Claim, with the disputed portion remaining a Disputed Claim.

**Distribution Account**.  The account established by the Reorganized Debtors pursuant to Article 6 of this Plan from which all cash distribution under the Plan shall be made with respect to all Allowed Claims.

**Effective Date**. The Business Day on which all of the conditions set forth in Article 10 of this Plan shall have been satisfied or waived.

**Essendant**. The Essendant Company.

**Essendant Settlement.** The settlement agreement between the Debtors and Essendant, contained in the Memorandum of Mediated Settlement Agreement attached to the Plan as Exhibit A and incorporated by reference herein. Confirmation of this Plan shall constitute Bankruptcy Court approval of the settlement agreement pursuant to Bankruptcy Rule 9019.

**Estate**.  The bankruptcy estate of the Debtors. All property of the Estate shall be vested in the Reorganized Debtors upon the occurrence of the Effective Date of the Plan.

**Final Order**.  An order that is no longer subject to appeal, certiorari proceeding or other proceeding for review or rehearing, and as to which no appeal, certiorari proceeding, or other proceeding for review or rehearing shall then be pending.

**General Unsecured Claim**.  Any Unsecured Claim, other than an Administrative Claim, an Other Priority Claim, or a Priority Tax Claim. Allowed General Unsecured Claims include, without limitation, Allowed Unsecured Deficiency Claims, and any Claim in favor of any Person arising from a judgment against such Person in any Avoidance Action (if the effect of such judgment gives such Person an Allowed General Unsecured Claim).

**Griffith**. Kimberly Griffith, holder of second deeds of trust on the Satterwythe Lane Residence

4

Lot A, the Northcross Property and the Clark Creek Property.

**Kings Circle Property**. Unimproved real property located in Iredell County, N.C., consisting of approximately one acre. Owned as tenants by the entirety.

**McGlohon**. Legolia McGlohon, holder of third deeds of trust on the Satterwythe Lane Residence Lot A, the Northcross Property and the Clark Creek Property.

**Mill City.** The Mill City Mortgage Loan Trust 2018-1. First deed of trust on the Satterwythe Lane Residence Lot A.

**New Value Contribution**. $10,000.00, which the Debtors will borrow from a third party on an unsecured or, if necessary, a secured basis.

**Non-Exempt Assets** means the Debtor's interest in the vacant Iredell County real property and the Branch Banking & Trust stock, together with any other or further assets of the Debtors that are determined by the Bankruptcy Court to be non-exempt property of the Debtors' estate prior to the Effective Date.

**Northcross Property**. 16701 Northcross Drive, Charlotte, N.C. Owned as tenants by the entirety. Property ID 00930105. The Northcross Property is leased to Ramsey-Peele.

**Other Priority Claims**. Any Claim to the extent entitled to priority in payment under sections 507(a)(2) through 507(a)(7) of the Bankruptcy Code.

**Person**. An individual, a corporation, a company, a partnership, an association, a joint stock company, a joint venture, an estate, a trust, an unincorporated organization, or a government, governmental unit or any subdivision thereof or any other entity.

**Petition Date**. February 19, 2020.

**Plan**. This First Amended Chapter 11 Plan or, as it may be from time to time modified, amended or supplemented, together with any exhibits thereto.

**Priority Non-Tax Claim**. Any Claim arising prior to the Petition Date entitled to priority in payment under Sections 507(a)(1)-(a)(7) of the Bankruptcy Code.

**Priority Tax Claim**. Any Claim arising prior to the Petition Date entitled to priority in payment under section 507(a)(8) of the Bankruptcy Code.

**Pro Rata Share**. As of any certain date, with respect to any Allowed Claim in any Class, the proportionate share that such Allowed Claim bears to the aggregate amount of all Claims, including Disputed Claims, in such Class.

61189538.9

**Professional**.  Any attorney, accountant, appraiser, auctioneer, or other professional person retained and employed by the Estate in the Chapter 11 Case in accordance with sections 327 and/or 328 of the Bankruptcy Code.

**Projected Disposable Income**. For purposes of 11 USC § 1129(a)(15), it is presumed that no disposable income will be received by the Debtors during the 5-year period beginning on the date that the first payment is due under the Plan, or during the period for which the Plan provides payments, whichever is longer.

**Ramsey-Peele**. The Ramsey-Peele Corporation, d/b/a University Child Development Center ("UCDC").

**Rejected Agreement**. Each unexpired lease or other executory contract of the Debtors, which (i) is not an Assumed Agreement, (ii) has not been expressly assumed or rejected by order of the Bankruptcy Court prior to the Confirmation Date, or (iii) is not the subject of a pending motion to assume on the Effective Date.

**Reorganized Debtors**. The Debtors, as reorganized and re-vested with all of the assets of the Estate pursuant to this Plan.

**Satterwythe Lane Residence Lot A**. Real property constituting a portion of the Debtors' residence, located at 4324 Satterwythe Lane, Charlotte, N.C., tax parcel ID 10518157. Owned as tenants by the entirety.

**Satterwythe Lane Residence Lot B.** Real property constituting a portion of the Debtors' residence,  located at 4320 Satterwythe Lane, Charlotte, N.C., tax parcel ID 10518184. Owned as tenants by the entirety.

**Schedules**.  The Schedules of Assets and Liabilities, and any amendments thereto, filed by the Debtors with the Bankruptcy Court in accordance with section 521(l) of the Bankruptcy Code.

**Secured Claim**.  A Claim to the extent of the value, of any interest in property of the Estate securing such Claim, as determined pursuant to section 506(a) or 1111(b) of the Bankruptcy Code. To the extent that the value of such interest is less than the amount of the Claim which has the benefit of such security, such Claim is an Unsecured Deficiency Claim unless, in any such case, the class of which such Claim is a part makes a valid and timely election under section 1111(b) of the Bankruptcy Code to have such Claim treated as a Secured Claim to the extent allowed.

**Secured Tax Claim**. A claim for Taxes owed by the Debtors, which is secured by a lien of any nature.

**Taxes**.  All income, franchise, excise, sales, use, employment, withholding, property, payroll, and other taxes, assessments, and governmental charges, together with any interest, penalties, additions to tax, fines, and similar amounts relating thereto, imposed or collected by any federal, state, local, or

6

foreign governmental authority.

**Unsecured Claim**.  A Claim not secured by a charge against or interest in property in which the Estate has an interest, including any Unsecured Deficiency Claim, and any Claim arising at any time under Bankruptcy Rule 3002(c)(3).

**Unsecured Convenience Claim.** A General Unsecured Claim in the amount of $10,000.00 or less.

**Unsecured Deficiency Claim**.  A Claim by a Creditor arising out of the same transaction as a Secured Claim to the extent that the value, as determined by the Bankruptcy Court pursuant to section 506(a) of the Bankruptcy Code or by stipulation, of such Creditor's interest in property of the Estate securing such Claim is less than the amount of the Claim which has the benefit of such security as provided by section 506(a) of the Bankruptcy Code.

**Value of property to be distributed under the Plan.** As that phrase is used in 11 USC § 1129(a)(15)(B), no less than $163,750.00, consisting of  i) $14,000.00 in liquid assets (Branch Banking & Trust Stock owned by Calvin Kennedy); ii) $9,750.00 estimated gross proceeds from sale of non-liquid assets (vacant Iredell County lot, owned as tenants by the entirety); iii) $130,000.00 contributions to Distribution Fund; and vi) the $10,000.00 New Value Contribution.

**Voting Deadline**.  The date set in an order of the Bankruptcy Court as the deadline for the return of Ballots accepting or rejecting the Plan.

**Wilmington Savings**. Wilmington Savings Fund Society, FSB, d/b/a Christiana Trust, not in its individual capacity but solely as Owner Trustee of Residential Credit Opportunities Trust II.

**Wilmington Savings Claim**. Claim 9 filed on the Court's Claims registry.

**Wilmington Savings Collateral**. Real property alleged to secure the Wilmington Trust Claim, which is the Northcross Property and the Clark Creek Property.

**Other Definitions**.  Unless the context otherwise requires, any capitalized term used and not defined herein or elsewhere in this Plan but that is defined in the Bankruptcy Code or Bankruptcy Rules shall have the meaning set forth therein. Wherever from the context it appears appropriate, each term stated in either of the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, the feminine and the neuter. The words "herein," "hereof," "hereto," "hereunder," and others of similar inference refer to this Plan as a whole and not to any particular article, section, subsection, or clause contained in this Plan. The word "including" shall mean "including without limitation."

## ARTICLE 2

## PROVISIONS FOR PAYMENT OF ALLOWED ADMINISTRATIVE

61189538.9

## CLAIMS; ADMINISTRATIVE CLAIMS BAR DATE; PROVISIONS
## FOR PAYMENT OF ALLOWED PRIORITY TAX CLAIMS

**2.1 Administrative Claims and Priority Tax Claims are Not Classified in this Plan**. Administrative Claims and Priority Tax Claims are not classified and are not entitled to vote to accept or reject the Plan. The treatment of and consideration to be received by holders of Administrative Claims and Allowed Priority Tax Claims pursuant to this Article 2 of the Plan shall be in full and complete satisfaction, settlement, release, and discharge of such Claims. The Debtors' obligations in respect of such Allowed Administrative and Priority Tax Claims shall be satisfied in accordance with the terms of this Plan.

**2.2 Administrative Claims Bar Date**.  Unless otherwise ordered by the Bankruptcy Court, requests for payment of Administrative Claims, including applications for final allowance of compensation and reimbursement of expenses of Professionals incurred before the Confirmation Date, must be filed and served on the Debtors and the Bankruptcy Administrator no later than 30 days after the Effective Date. Any Person required to file and serve a request for payment of an Administrative Claim and who fails to timely file and serve such request, shall be forever barred, estopped, and enjoined from asserting such Claim or participating in distributions under the Plan on account thereof. However, the Administrative Claims Bar Date shall not apply to fees and expenses of Professionals incurred after the Effective Date.

**2.3 Treatment of Allowed Administrative Claims**.  Except to the extent the holder of an Allowed Administrative Claim agrees otherwise, each holder of an Allowed Administrative Claim shall be paid, in respect of such Allowed Claim, the full amount thereof in Cash (or such other form as is agreed upon by any holder of an Allowed Administrative Claim) as soon as practicable after the later of (a) the Effective Date and (b) the date on which such Claim becomes an Allowed Claim, except that Allowed Administrative Claims arising in the ordinary course of business shall, if due at a later date pursuant to its terms, be paid when otherwise due. Allowed Administrative Claims may be paid from the Distribution Fund. Furthermore, all fees payable pursuant to Section 1930 of title 28 of the United States Code shall be paid pursuant to Section 11.1 of this Plan.

**2.4 Treatment of Priority Tax Claims**.  Each holder of an Allowed Priority Tax Claim shall be paid the Allowed Amount of its Allowed Priority Tax Claim, at the option of the Reorganized Debtors: (a) in full, in Cash, on the Effective Date or as soon as practicable thereafter; (b) upon such other terms as may be mutually agreed upon between such holder of an Allowed Priority Tax Claim and the Reorganized Debtors; or (c) in four Cash payments commencing on or before June 30, 2018 and continuing in three additional, annual installments thereafter on or before June 30th of years 2019-2021, respectively, in an aggregate amount equal to such Allowed Priority Tax Claim (less any payments made by the Debtors with respect thereto during the Chapter 11 Case) together with interest at such rate as required by Section 511 of the Bankruptcy Code or otherwise as required by Section l129(a)(9)(C) or (D) of the Bankruptcy Code.

8

## ARTICLE 3
## CLASSIFICATION AND TREATMENT
## OF CLAIMS AND INTERESTS

**3.1 Class 1:      Secured Tax Claims**

3.1.1    Classification

Class 1 consists of all Allowed Secured Tax Claims.

3.1.2 Treatment

Each holder of an Allowed Secured Tax Claim, shall be paid the Allowed Amount of its Allowed Secured Tax Claim, at the option of the Reorganized Debtors: (a) in full, in Cash, on the Effective Date or as soon as practicable thereafter; (b) upon such other terms as may be mutually agreed upon between such holder of an Allowed Secured Claim and the Reorganized Debtors; or (c) in four Cash payments commencing on or before June 1, 2021 and continuing in three additional, annual installments thereafter on or before May 31st of years 2022-2024, respectively, in an aggregate amount equal to such Allowed Secured Tax Claim (less any payments made by the Debtors with respect thereto during the Chapter 11 Case) together with interest at such rate as required by Section 511 of the Bankruptcy Code or otherwise as required by Section l129(a)(9)(C) or (D) of the Bankruptcy Code. Each holder of an Allowed Secured Tax claim shall retain its existing liens, privileges and encumbrances, which shall retain the same validity, priority and extent that existed on the Petition Date.

3.1.3 Impairment and Voting

Class 1 is impaired by the Plan. The holders of Class 1 Claims are entitled to vote to accept or reject the Plan. For purposes of voting, each holder of an Allowed Secured Tax Claim shall be considered to be the sole member of a separate class.

**3.2      Class 2:      Secured Claim of Wilmington Savings**

3.2.1 Classification

Class 2 consists of the Allowed Secured Claim of Wilmington Savings.

3.2.2 Treatment

This Claim (claim number 9 in the amount of $2,927,332.40) shall be treated as a secured obligation of the Reorganized Debtors. Wilmington Savings shall retain its liens and the priority thereof on the Northcross Property and the Clark Creek Property (appraised as of April 22, 2020 to have an aggregate value of $3,700,000.00).

9

61189538.9

The terms of the Loan Documents shall control subsequent to the Effective Date, except such Loan Documents shall be modified as follows:

a.  **Maturity Date.** The new Maturity Date shall be October 1, 2052 (a five-year extension from the original Maturity Date of October 1, 2047).

b.  **Interest.** Interest prior to the Effective Date shall accrue at the non-default rate pursuant to the Loan Documents. Interest on the balance due at all times subsequent to the Effective Date will accrue and be payable at a fixed annual rate of 3.25%.

c.  **Amortization Period.** 360 months from commencement of monthly payments of principal and interest.

d.  **Monthly Debt Service Payments.** The Debtors will make no payments of principal and interest to Wilmington Savings for the ten-month period following the Effective Date. Interest which accrues during this time period shall be added to the principal amount of the debt. On a monthly basis during this ten-month period, the Debtors will deposit $13,000.00 into the Distribution Fund, which will be used to fund payments to other classes of creditors under the plan. The Debtors will commence making monthly payments of principal and interest to Wilmington Savings on the first day of the eleventh month following the Effective Date, and continuing each month thereafter until the loan is paid in full.

e.  **Amount and timing of Monthly Debt Service Payments after Effective Date.** Such amount as shall cause the unpaid principal balance of the Mortgage Loan (including accrued interest and any allowed charged under 11 U.S.C. § 506) as of the first day of the eleventh month following the Effective  Date to be amortized in equal monthly installments over the Remaining Amortization Period at the 3.25% fixed interest rate. By way of example, if the Effective Date is March 15, 2021, no payments of principal and interest will be made to Wilmington Savings until February 1, 2022.  If the unpaid principal balance of the Mortgage Loan on February 1, 2022 is $3,000,000.000, the monthly payment of principal and interest commencing on February 1, 2022, and until the Maturity Date, will be $13,056.19.

f.  **Prepayment Premiums.** There shall be no Prepayment Premiums.

g.  **Monthly Taxes and Insurance Impositions Deposit.** The Debtors will continue making such deposits, in accordance with the Loan Documents, on a monthly basis, subsequent to the Effective Date.

h.  **11 U.S.C. § 506 charges.** Any additional charges which may be allowed to Wilmington Savings by the Bankruptcy Court pursuant to 11 U.S.C. § 506 shall be allowed only upon compliance with 11 U.S.C. § 506 and the entry of a Final Order allowing such charges. Such charges shall be added to the Principal Balance of the Mortgage Loan.

i.  **Default.** Entry of Confirmation Order shall constitute the cure and waiver of any non-

10

monetary defaults which occurred or may have occurred prior to the entry of such order.

j.        **Notice.** Prior to exercising any remedies in connection with any alleged default under the Loan Documents or the Plan, Wilmington Savings shall provide the Debtors and undersigned bankruptcy counsel with written notice, sent by First Class Mail, giving the Debtors notice of the nature of the alleged default and a 30 day opportunity to cure the alleged default (from the dated of receipt). Otherwise, comply with terms of "Loan Documents", as that term is defined in Schedule 1 to the Loan and Security Agreement.

### 3.2.3 Injunction from collection actions against Ramsey-Peele

Ramsey-Peele, a non-debtor entity solely owned by the Debtors, is alleged to be a guarantor of the Debtors' obligations to Wilmington Savings. The Debtors' ownership interest in Ramsey-Peele is property of the Estate. The majority of the funds needed to make the Plan feasible (including monthly debt service payments to Wilmington Savings) are derived from the operations of Ramsey-Peele (three day care centers servicing approximately 450 low income children). As such, without the income from Ramsey-Peele, the integrity of the Debtors' Estate is impaired.

Upon information and belief, Wilmington Savings has instituted a collection action against Ramsey-Peele in state court. Such action against Ramsey-Peele threatens and interferes with the Debtors' reorganization, it adversely and detrimentally influences and pressures the Debtors through Ramsey-Peele, and it impairs this Court's jurisdiction over the Debtors' bankruptcy case. As the value of Wilmington Savings Collateral exceeds the Wilmington Savings Claim by more than $700,000.00, Wilmington Savings is adequately protected and will not be harmed by such an injunction. The entry of the Confirmation Order shall therefore, pursuant to 11 U.S.C. §§ 105 and 362(a)(1), constitute a permanent injunction against Wilmington Savings from pursuing any collection actions against Ramsey-Peele.

### 3.2.4  Impairment and Voting

Class 2 is impaired by the Plan. The holder of Class 2 Claim is entitled to vote to accept or reject the Plan.

### 3.3 Class 3:    Secured Claim of Mill City

### 3.3.1 Classification

Class 3 consists of the Allowed Secured Claim of Mill City, which is secured by a first mortgage on the Satterwythe Residence Lot A.

### 3.3.2 Treatment

This claim (claim 13, $386,887.15) shall be treated as a secured obligation. Mill City shall retain its lien with the priority thereof, as it existed on the Petition Date pursuant to §1129(b)(2)(A)(i)(I) of the

11

61189538.9

Bankruptcy Code on the Satterwythe Residence Lot A until its Allowed Class 3 Claim is satisfied. The Debtors will comply with all existing loan terms.

### 3.3.3  Impairment and Voting

Class 3 is not impaired by the Plan. The holder of the Class 3 Claim is not entitled to vote to accept or reject the Plan.

## 3.4 Class 4:    Secured Claim of Griffith

### 3.4.1 Classification

Class 4 consists of the secured claim of Kimberly Griffith.

### 3.4.2 Treatment

This Claim (scheduled in the amount of $460,000.00) shall be treated as a secured obligation of the Reorganized Debtors. Payments to Griffith shall begin in the eleventh full calendar month following the Effective Date. Griffith shall retain her liens on the Satterwythe Lane Residence Lot A, the Northcross Property and the Clark Creek Property.

The terms of the Loan Documents shall control subsequent to the Effective Date, except such Loan Documents shall be modified as follows:

a.    Maturity Date. The new Maturity Date shall be October 1, 2052.

b.    Interest. Interest prior to the Effective Date shall accrue at the non-default rate pursuant to the Loan Documents. Interest on the balance due at all times subsequent to the Effective Date will accrue and be payable at a fixed annual rate of 3.25%.

c.    Amortization Period. 360 months from commencement of monthly payments of principal and interest.

d.    Monthly Debt Service Payments.  The Debtors will make no payments of principal and interest to Griffith for the ten-month period following the Effective Date. Interest which accrues during this time period shall be added to the principal amount of the debt. The Debtors will commence making monthly payments of principal and interest to Griffith on the first day of the eleventh month following the Effective Date.

e.    Amount and timing of Monthly Debt Service Payments after Effective Date. Such amount as shall cause the unpaid principal balance of the Mortgage Loan (including accrued interest and any allowed charged under 11 U.S.C. § 506) as of the first day of the eleventh month following the Effective Date to be amortized in equal monthly installments over the Remaining Amortization Period at the 3.25% fixed interest rate. By way of example, if the

12

Effective Date is March 15, 2021, no payments of principal and interest will be made to Griffith until February 1, 2022. If the unpaid principal balance of the Mortgage Loan on February 1, 2022 is $460,000.00, the monthly payment of principal and interest commencing on February 1, 2022, and until the Maturity Date, will be $2,001.95.

f.      Prepayment Premiums. There shall be no Prepayment Premiums.

g.      Monthly Taxes and Insurance Impositions Deposit. No such deposits shall be made to Griffith, as those deposits are being made to Wilmington Savings.

h.      11 U.S.C. § 506 charges. Any additional charges which may be allowed to Griffith pursuant to 11 U.S.C. § 506 shall be allowed only upon compliance with 11 U.S.C. § 506 and the entry of a Final Order allowing such charges. Such charges shall be added to the Principal Balance of the Mortgage Loan.

i.      Default. Entry of Confirmation Order shall constitute the cure and waiver of any non-monetary defaults which occurred or may have occurred prior to the entry of such order.

j.      Notice. Prior to exercising any remedies in connection with any alleged default under the Loan Documents or the Plan, Griffith shall provide the Debtors and undersigned bankruptcy counsel with written notice, sent by First Class Mail, giving the Debtors notice of the nature of the alleged default and a 30 day opportunity to cure the alleged default (from the date of receipt). Otherwise, the Debtors will comply with terms of note and deed of trust with Griffith.

k.      Subordination. Pursuant to the Essendant Settlement, the Griffith Deed of Trust shall be subordinate to the balance of the Essendant claim, which is secured by a judgment lien ($300,000.00, less payments made pursuant to this Plan).

3.4.3  Impairment and Voting

Class 4 is impaired by the Plan. The holder of the Class 4 Claim is an insider and not entitled to vote to accept or reject the Plan.

**3.5 Class 5:    Secured Claim of McGlohon**

3.5.1 Classification

Class 5 consists of the secured claim of Legolia McGlohon.

3.5.2 Treatment

This Claim (scheduled in the amount of $463,770.31) shall be treated as a secured obligation of the Reorganized Debtors. Payments to McGlohon shall begin in the eleventh full calendar month

13

following the Effective Date. McGlohon shall retain her liens and the priority thereof on the Satterwythe Lane Residence Lot A, the Northcross Property and the Clark Creek Property.

The terms of the Loan Documents shall control subsequent to the Effective Date, except such Loan Documents shall be modified as follows:

a.      Maturity Date. The new Maturity Date shall be October 1, 2052.

b.      Interest. Interest prior to the Effective Date shall accrue at the non-default rate pursuant to the Loan Documents. Interest on the balance due at all times subsequent to the Effective Date will accrue and be payable at a fixed annual rate of 3.25%.

c.      Amortization Period. 360 months from commencement of monthly payments of principal and interest.

d.      Monthly Debt Service Payments.  The Debtors will make no payments of principal and interest to McGlohon for the ten-month period following the Effective Date. Interest which accrues during this time period shall be added to the principal amount of the debt. The Debtors will commence making monthly payments of principal and interest to McGlohon on the first day of the eleventh month following the Effective Date.

e.      Amount and timing of Monthly Debt Service Payments after Effective Date. Such amount as shall cause the unpaid principal balance of the Mortgage Loan (including accrued interest and any allowed charged under 11 U.S.C. § 506) as of the first day of the eleventh month following the Effective Date to be amortized in equal monthly installments over the Remaining Amortization Period at the 3.25% fixed interest rate. By way of example, if the Effective Date is March 15, 2021, no payments of principal and interest will be made to McGlohon until February 1, 2022.  If the unpaid principal balance of the Mortgage Loan on February 1, 2022 is $463,770.31, the monthly payment of principal and interest commencing on February 1, 2022, and until the Maturity Date, will be $2,018.36.

f.      Prepayment Premiums. There shall be no Prepayment Premiums.

g.      Monthly Taxes and Insurance Impositions Deposit. No such deposits shall be made to McGlohon, as those deposits are being made to Wilmington Savings.

h.      11 U.S.C. § 506 charges. Any additional charges which may be allowed to McGlohon pursuant to 11 U.S.C. § 506 shall be allowed only upon compliance with 11 U.S.C. § 506 and the entry of a Final Order allowing such charges. Such charges shall be added to the Principal Balance of the Mortgage Loan.

i.      Default. Entry of Confirmation Order shall constitute the cure and waiver of any non-monetary defaults which occurred or may have occurred prior to the entry of such order.

14

j.      Notice. Prior to exercising any remedies in connection with any alleged default under the Loan Documents or the Plan, McGlohon shall provide the Debtors and undersigned bankruptcy counsel with written notice, sent by First Class Mail, giving the Debtors notice of the nature of the alleged default and a 30 day opportunity to cure the alleged default (from the date of receipt). Otherwise, the Debtors will comply with terms of note and deed of trust with McGlohon.

k.      Subordination. Pursuant to the Essendant Settlement, the McGlohon Deed of Trust shall be subordinate to the balance of the Essendant claim, which is secured by a judgment lien ($300,000.00, less payments made pursuant to this Plan).

### 3.5.3  Impairment and Voting

Class 5 is impaired by the Plan. The holder of the Class 5 Claim is an insider and not entitled to vote to accept or reject the Plan.

## 3.6 Class 6:      Secured Judgment Claim of Essendant

### 3.6.1 Classification

Class 6 consists of the Secured Judgment Claim of Essendant (claim 7, $2,110,127.75)

### 3.6.2 Treatment

The Essendant claim and judgment liens shall be treated pursuant to the terms of the Essendant Settlement, attached hereto as Exhibit A and incorporated herein by reference. Upon confirmation of this Plan, Essendant and the Debtors shall be authorized to execute such documents as are necessary to effectuate the Essendant Settlement, and to file such documents as necessary with any appropriate clerk of court or register of deeds.

### 3.6.3 Impairment and Voting

Class 6 is impaired by the Plan. The holder of the Class 6 Claim is entitled to vote to accept or reject the Plan.

## 3.7 Class 7:      Priority Non-Tax Claims

### 3.7.1 Classification

Class 7 consists of Allowed Priority Non-Tax Claims.

### 3.7.2 Treatment

15

Each holder of an Allowed Priority Non-Tax Claim shall be paid the Allowed Amount of its Allowed Priority Non-Tax Claim, at the option of the Reorganized Debtors: (a) in full, in Cash, on the Effective Date or as soon as practicable thereafter; (b) upon such other terms as may be mutually agreed upon between the holder of an Allowed Priority Claim and the Reorganized Debtors; or (c) in four Cash payments commencing on or before June 30, 2019 and continuing in three additional, annual installments thereafter on or before June 30th of years 2020-2022, respectively, with interest at the rate of 3.25% per annum and any fees due thereon.

### 3.7.3 Impairment and Voting

Class 7 is impaired by the Plan. The holders of the Class 7 Claims are entitled to vote to accept or reject the Plan.

## 3.8 Class 8:    Allowed General Unsecured Claims for Which Both Debtors Liable

### 3.8.1 Classification.

Class 8 consists of Allowed General Unsecured Claims asserted jointly against the Debtors. Creditors in the Class initially include (but are not necessarily limited to) SP Richards (claim 6, $1,055,533.61) and the dischargeable Essendant Claim,(the amount of the Essendant Claim less $300,000.00).

### 3.8.2 Treatment

These Claims shall be treated as an unsecured obligation of the Reorganized Debtors. In full satisfaction of their claims, the holders of Allowed Class 8 Claims will receive even quarterly pro-rata distributions from the Distribution Account after the payment in full to the holders of Allowed Administrative Claims, Allowed Priority Claims and Class 11 Convenience Claims. Distributions will commence on the first day of the calendar quarter subsequent to the payment in full of the Allowed Administrative Claims, Allowed Priority Claims and Class 11 Convenience Claims.  Payments will cease when all of the Value of Property to be Distributed Under the Plan has been distributed. In determining the amount of the pro-rata distributions, the proceeds from the sale of the Branch Banking & Trust stock (owned solely by Calvin Kennedy) will not be distributed to Class 10 creditors having Allowed Claims solely against Cynthia Kennedy.

### 3.8.3 Impairment and Voting

Class 8 is impaired by the Plan. The holders of the Class 8 Claims are entitled to vote to accept or reject the Plan.

## 3.9 Class 9: General Unsecured Claims for Which Calvin Kennedy is Solely Liable

### 3.9.1 Classification

16

Class 9 consists of Allowed Claims for which Calvin Kennedy is solely liable. Claims which may be Allowed Claims in Class 9 include (but are not necessarily limited to) FORA Financial (claim 3, $238,828.75) and Ferguson Receivables, LLC (Claim 11, $70,914.06).

### 3.9.2 Treatment

These Claims shall be treated as an unsecured obligation of the Reorganized Debtors. In full satisfaction of their claims, the holders of Allowed Class 9 Claims will receive even quarterly pro-rata distributions from the Distribution Account after the payment in full to the holders of Allowed Administrative Claims, Allowed Priority Claims and Class 11 Convenience Claims. Distributions will commence on the first day of the calendar quarter subsequent to the payment in full of the Allowed Administrative Claims, Allowed Priority Claims and Class 11 Convenience Claims. Payments will cease when all of the Value of Property to be Distributed Under the Plan has been distributed. In determining the amount of the pro-rata distributions, the proceeds from the sale of the Branch Banking & Trust stock (owned solely by Calvin Kennedy) will not be distributed to Class 10 creditors having Allowed Claims solely against Cynthia Kennedy.

### 3.9.3 Impairment and Voting

Class 9 is impaired by the Plan. The holders of the Class 9 Claims are entitled to vote to accept or reject the Plan.

### 3.10 Class 10: General Unsecured Claims for Which Cynthia Kennedy is Solely Liable

### 3.10.1 Classification

Class 10 consists of Allowed Claims for which Cynthia Kennedy is solely liable. Claims which may be Allowed Claims in Class 10 include (but are not necessarily limited to) CAN Capital (claim 8, $114,461.49) and New York Life ($97,820.88).

### 3.10.2 Treatment

These Claims shall be treated as an unsecured obligation of the Reorganized Debtors. In full satisfaction of their claims, the holders of Allowed Class 10 Claims will receive even quarterly pro-rata distributions from the Distribution Account after the payment in full to the holders of Allowed Administrative Claims, Allowed Priority Claims and Class 11 Convenience Claims. Distributions will commence on the first day of the calendar quarter subsequent to the payment in full of the Allowed Administrative Claims, Allowed Priority Claims and Class 11 Convenience Claims. Payments will cease when all of the Value of Property to be Distributed Under the Plan has been distributed. In determining the amount of the pro-rata distributions, the proceeds from the sale of the Branch Banking & Trust stock (owned solely by Calvin Kennedy) will not be distributed to Class 10 creditors have Allowed Claims solely against Cynthia Kennedy.

### 3.10.3 Impairment and Voting

Class 10 is impaired by the Plan. The holders of the Class 10 Claims are entitled to vote to accept or reject the Plan.

## ARTICLE 4
## ACCEPTANCE OR REJECTION OF THE PLAN

**4.1 Impaired Classes Vote**. Each holder of a Claim or Interest in an impaired Class receiving or retaining anything under this Plan is entitled to vote to accept or reject this Plan to the extent and in the manner provided in the Plan, the Bankruptcy Code and the Bankruptcy Rules, or in any voting procedures order.

**4.2 Acceptance by Impaired Classes of Claims**. Acceptance of this Plan by any Impaired Class entitled to vote shall be determined in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any voting procedures order entered by the Bankruptcy Court.

**4.3 Designation of Classes Entitled to Vote**. All Classes are impaired, and the holders of Claims and Interests in all Classes are entitled to vote on the Plan.

**4.4 Nonconsensual Confirmation**. With respect to any Impaired Class, including any Class of Claims or Interests created pursuant to amendments or modifications to this Plan, that does not accept the Plan, the Debtor will request that the Bankruptcy Court confirm this Plan by "cramdown" under Section 1129(b) of the Bankruptcy Code with respect to any such nonaccepting Class or Classes at the Confirmation Hearing, and the filing of this Plan shall constitute a motion for such relief.

## ARTICLE 5
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**5.1 Assumption and Rejection; Exceptions Thereto**. The Debtors with Ramsey-Peele and Rocky River Storage. Any executory contract or unexpired lease assumed pursuant to the Plan shall be and hereby is assumed by the Reorganized Debtors as of the Effective Date and shall be fully enforceable by the Reorganized Debtors in accordance with its terms, and shall include all written modifications, amendments, supplements of said executory contract or unexpired lease and, as with respect to executory contracts or unexpired leases that relate to real property, shall include all written agreements and leases appurtenant to the premises, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easements, and any other interests in real property or rights in rem related to such premises.

**5.2 Cure Payments, Compensation for Pecuniary Loss, and Adequate Assurance**. All payments, including any and all cure payments, adequate assurance or compensation for actual pecuniary loss, required to be paid or provided for by §§ 365(b)(1)(A)-(C) of the Bankruptcy Code (the "Cure Payments") for any executory contract or unexpired lease that is being assumed under the Plan, unless disputed by the Debtors, shall be made by the Reorganized Debtors on the Effective Date. The Debtors

18

hereby give notice that there are no Cure Payments due with respect to any executory contracts and unexpired leases to be assumed under the Plan. Any non-debtor party to any executory contract or unexpired lease to be assumed under the Plan that objects to assumption of the executory contract or unexpired lease or believes that a Cure Payment is due in connection with such assumption must file a written objection to the assumption of such executory contract or unexpired lease with no Cure Payment and state in the written objection the grounds for such objection and specifically set forth the amount of any request for a Cure Payment by the deadline established by the Bankruptcy Court for filing objections to confirmation of the Plan. Unless the non-debtor party to any executory contract or unexpired lease to be assumed files and serves on the Debtors and their counsel an objection to assumption of such executory contract or unexpired lease for any reason, or asserting that a Cure Payment is required or owed in connection with such assumption, by the deadline established by the Bankruptcy Court for filing objections to confirmation of the Plan, then the executory contracts and unexpired leases shall be assumed, and any default then existing in the executory contract and/or unexpired lease shall be deemed cured as of the Effective Date, and there shall be no other cure obligation or Cure Payment due or owed by anyone, including the Debtors and the Reorganized Debtors, in connection with such assumption. Any Claims for Cure Payments not filed as part of a written objection to the proposed assumption within such time period will be forever barred from assertion against the Debtors, their Estate, the Reorganized Debtors, and their assets, and the holders of any such Claims are barred from recovering any distributions under the Plan on account thereof. In the event of an objection to the assumption of executory contracts or unexpired leases regarding the amount of any Cure Payment, or the ability of the Reorganized Debtors to provide adequate assurance of future performance or any other matter pertaining to assumption, (a) the Bankruptcy Court will hear and determine such dispute at the Confirmation Hearing, and (b) in the discretion of the Debtors, the Debtors (i) may assume such disputed executory contract or unexpired lease by curing any default or providing adequate assurance in the manner determined by the Bankruptcy Court, or (ii) the Debtors may reject such executory contract or unexpired lease as of the Effective Date. The Reorganized Debtors shall make any Cure Payment on the later of the Effective Date or the date such Cure Payment is due pursuant to a Final Order. Any executory contract or unexpired lease not specifically assumed shall be deemed rejected as of the Effective Date.

      **5.3 Effect of Confirmation Order on Executory Contracts and Unexpired Leases**. Subject to the occurrence of the Effective Date, entry of the Confirmation Order shall constitute approval of any such assumptions pursuant to Section 365(a) and 1123(b)(2) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption is in the best interest of the Debtors, their estate, and all parties in interest. In addition, the Confirmation Order shall constitute a finding of fact and conclusion of law that (i) there are no defaults of the Debtors, no Cure Payments owing (including that there is no compensation due for any actual pecuniary loss), (ii) there is adequate assurance of future performance with respect to each such assumed executory contract or unexpired lease, (iii) such assumption is in the best interest of the Debtors and the Estate, (iv) upon the Effective Date, the assumed executory contracts or unexpired leases constitute legal, valid, binding and enforceable contracts in accordance with the terms thereof, and (v) the non-debtor counter party to each assumed executory contract or unexpired lease is required to and ordered to perform under and honor the terms of the assumed executory contract or unexpired lease. All executory contracts and unexpired leases assumed under the Plan or during the Chapter 11 Case constitute valid contracts and leases, as applicable, enforceable by the Debtors or

19

Reorganized Debtors against the non-debtor counterparties regardless of any cross-default or change of control provisions in any contracts or leases assumed or rejected under the Plan or during the Chapter 11 Case.

Likewise, subject to the occurrence of the Effective Date, the Confirmation Order shall constitute an order of the Bankruptcy Court approving the rejection as of the Effective Date of all executory contracts and unexpired leases which are not assumed under this Plan, with the rejection effective as of the day before the Petition Date, as being burdensome and not in the best interest of the Estate.

**5.4 Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan**. Any Claims for damages arising from the rejection of an executory contract or unexpired lease under this Plan must be Filed within thirty (30) days after the Confirmation Date or such Claims will be forever barred and unenforceable against the Debtors, the Reorganized Debtors, and the Estate, and the holders of any such Claims are barred from receiving any distributions under the Plan.

# ARTICLE 6
# DISTRIBUTIONS

**6.1 Establishment of Distribution Account**. Upon confirmation of the Plan, The Henderson Law firm on behalf of the Reorganized Debtors shall establish a segregated trust account which will be the Distribution Account. Thereafter, the Reorganized Debtors shall fund the Distribution Account as necessary to fulfill the obligations of the Debtors under this Plan.

**6.2 Distributions Under the Plan**. The Reorganized Debtors or, at the option of the Reorganized Debtors, any distribution agent the Reorganized Debtors may retain, shall make all distributions to the holders of Allowed Claims and Allowed Interests that are required under this Plan. Whenever any distribution to be made under this Plan shall be due on a day other than a Business Day, such distribution shall instead be made, without the accrual of any interest, on the immediately succeeding Business Day, but shall be deemed to have been made on the date due.

**6.3 Delivery of Distributions, Instruments, or Property**. Distributions or delivery of instruments required under this Plan shall be made at the addresses indicated in the Debtors' records. In the event that any distribution or instrument is returned as undeliverable, the Reorganized Debtors shall use reasonable efforts to determine the current address of the applicable claimant, and no distribution or delivery to such claimant shall be made unless and until the Reorganized Debtors have determined such then current address; provided, however, that if any distribution or instrument remains unclaimed after the first anniversary after distribution or delivery, such distribution or instrument shall be deemed unclaimed property pursuant to section 347(b) of the Bankruptcy Code and shall be vested in the Reorganized Debtors. In such event, the Claim of the holder for such distribution or instrument shall no longer be deemed to be Allowed, and such holder shall be deemed to have waived its rights to such distribution or delivery under this Plan pursuant to section 1143 of the Bankruptcy Code, shall have no further claim or right thereto, and shall not participate in any further distributions under this Plan with

20

61189538.9

respect to such Claim. Checks issued by the Reorganized Debtors in respect of Allowed Claims shall be null and void if not negotiated within 120 days after the date of issuance thereof. Surrender of any property under this Plan to a holder of an Allowed Claim shall be made by mailing written notice of such surrender to the holder of the applicable Allowed Claim at its address as shown in a filed Proof of Claim or in the Schedules. In the event that the recipient of such notice does not contact the Reorganized Debtors or their counsel to arrange for retrieval or storage of the surrendered property at such recipient's expense within thirty (30) days' of the date thereof, such property shall be deemed unclaimed pursuant to § 347(b) and shall become vested in the Reorganized Debtors. The Claim of the holder otherwise entitled to such surrender shall no longer be deemed to be Allowed, and such holder shall be deemed to have waived its rights to any distribution or surrender under this Plan pursuant to § 1143 of the Bankruptcy Code, shall have no further claim or right thereto, and shall not participate in any further distributions under this Plan with respect to such Claim. In such event, the Reorganized Debtors may seek entry of an order by the Bankruptcy Court cancelling any lien, encumbrance, or interest on or in the affected property.

**6.4 Third-Party Agreements**. Distributions to the Classes of Claims or Interests hereunder will not affect the right of any entity to levy, garnish, attach, or employ any other legal process with respect to such distributions by reason of any claimed subordination of lien priority rights or otherwise. All subordination agreements entered into by any parties in interest shall be enforceable to the extent permitted by applicable law, and all distributions and payments made pursuant to the Plan shall be subject to applicable law.

**6.5 Manner of Payment Under the Plan**. At the option of the Reorganized Debtors, any payment in Cash to be made under the Plan may be made by check or wire transfer from a domestic bank or as otherwise required by applicable agreement.

**6.6 No Fractional Distributions**. No fractional dollars shall be distributed under the Plan. For purposes of distributions, Cash distributions shall be rounded up or down, as applicable, to the nearest whole dollar.

**6.7 Withholding and Reporting**. The Reorganized Debtors shall comply with all applicable withholding and reporting requirements imposed by federal, state, and local taxing authorities, and all distributions shall be subject to such withholding and reporting requirements.

## ARTICLE 7
## MEANS FOR EXECUTION AND IMPLEMENTATION OF THE PLAN

**7.1 Sources of Funding**. The Plan contemplates that distributions will be funded by any means necessary, including but not limited to the Debtor's Liquid Non-Exempt Assets, the proceeds from the sale of Non-Liquid Non-Exempt Assets, the New Value Contribution, and the contributions to the Distribution Account.

**7.2 New Value Contribution**. The Debtors will contribute a lump sum of $10,000 to the Distribution Account on the Effective Date. Said funds may be borrowed by the Debtors on a secured or

21

unsecured basis. If secured, the Debtors are authorized to grant the lender a first deed of trust on the Satterwythe Residence Lot B to secure such loan.

**7.3 Authority to Act Following Confirmation Date**. Upon confirmation of this Plan, the Debtors shall be authorized to take all necessary steps, and perform all necessary acts, to consummate the terms and conditions of this Plan including, without limitation, the execution and filing of all documents required or contemplated by this Plan. In connection with the occurrence of the Effective Date, the Reorganized Debtors are authorized to execute, deliver, or record such contracts, instruments, releases, indentures, and other agreements or documents, and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.

**7.4 Authority to Act Following Effective Date**. The Reorganized Debtors shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan and any notes or securities issued pursuant to this Plan.

**7.5 Status of Existing Liens**. Unless otherwise provided in this Plan or by Order of the Bankruptcy Court, on the Effective Date, all existing liens established by properly perfected security agreements and held by any Class or Classes on the Debtors' assets as described in this Plan shall retain the same priority that existed on the Petition Date, provided that such liens and any related rights shall not extend to property acquired by the Debtor after commencement of the Chapter 11 Case as set forth in section 552 of the Bankruptcy Code.

Section 552 of the Bankruptcy Code shall continue to apply to all such liens following confirmation of the Plan. All other liens, encumbrances, and related rights (including, but not limited to, rights of setoff) not specifically provided for in the Plan shall be deemed automatically canceled, terminated and of no further force or effect without further act or action under any applicable agreement, law, regulation, order, or rule.

**7.6 Effectuating Documents and Further Transactions**. The Debtors and the Reorganized Debtors shall be authorized, but not required, to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan and any notes or securities issued pursuant to this Plan.

**7.7 Liquidation of Non-Liquid Non-Exempt Assets.** On or before 6 months after the Effective Date, the Debtors shall deposit the net proceeds from the sale of all Non-Liquid Non-Exempt Assets (that are not already reduced to cash as of the Effective Date) to the Distribution Account.

## ARTICLE 8
## RESOLUTION OF DISPUTED CLAIMS AND INTERESTS

**8.1 Objections to Claims and Interests**. The Debtors, and after the Effective Date, the Reorganized Debtors, shall have the exclusive right to object to the allowance, amount or classification of

22

Claims and Interests asserted in the Chapter 11 Case, and such objections may be litigated to Final Order by the Debtors or Reorganized Debtors, or compromised and settled in accordance with the business judgment of the Debtors or Reorganized Debtors, as applicable, without further order of the Bankruptcy Court. Unless otherwise provided herein or ordered by the Bankruptcy Court, all objections to Claims and Interests shall be Filed no later than sixty (60) days after the Effective Date, subject to any extensions granted pursuant to a further order of the Bankruptcy Court, which extensions may be obtained by the Reorganized Debtors without notice upon ex parte motion.

**8.2 Estimation of Disputed Claims and Interests**. The Debtors and, after the Effective Date, the Reorganized Debtors, may at any time request that the Bankruptcy Court estimate for all purposes, including distributions under this Plan, any Disputed, contingent or unliquidated Claim or Interest pursuant to Section 502(c) of the Bankruptcy Code whether or not the Debtors or the Reorganized Debtors have previously objected to such Claim or Interest. The Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest at any time, including, without limitation, during the pendency of an appeal relating to such objection.

**8.3 No Distribution on Account of Disputed Claims and Interests.** Notwithstanding anything else contained in this Plan, except with respect to any undisputed, non-contingent and liquidated portion of General Unsecured Claims, no distribution shall be due or made with respect to all or any portion of any disputed, contingent, or unliquidated Claim until the Claim becomes an Allowed Claim by Final Order.

## ARTICLE 9
## EFFECT OF CONFIRMATION OF PLAN

**9.1 Vesting of Assets and Retained Causes of Action**. On the Effective Date, pursuant to Section 1141(b) of the Bankruptcy Code, all assets and property of the Debtors shall vest in the Reorganized Debtors free and clear of any and all Claims, Liens, Interests, and other interests, charges and encumbrances, except as otherwise expressly provided in this Plan or in the Confirmation Order. Consistent with the terms of this Plan, from and after the Effective Date the Reorganized Debtors may operate their businesses, and may own, use, acquire and dispose of their respective property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if the Chapter 11 Case had never been filed. Except as otherwise provided in this Plan, the Reorganized Debtors shall retain all rights and are authorized to commence and pursue, as the Reorganized Debtors deem appropriate, any and all claims and causes of action, including, but not limited to Avoidance Actions, whether arising before or after the Petition Date, in any court or other tribunal including, without limitation, in an adversary proceeding filed in the Chapter 11 Case, and including but not limited to, the claims and causes of action specified in the Plan, any Plan exhibit, the Disclosure Statement, or any exhibit to the Disclosure Statement.

**9.2 Binding Effect**. Subject to the occurrence of the Effective Date on or before the deadline set forth in Article 10 of the Plan, on and after the occurrence of the Confirmation Date, the provisions of

61189538.9

this Plan shall bind any holder of a Claim against, or an Interest in, the Debtors and/or their Estate and such holder's successors and assigns, whether or not such holder's Claim or Interest is impaired under the Plan, whether or not such holder has accepted the Plan, and whether or not such holder is entitled to a distribution under the Plan.

**9.3 Discharge of the Debtors**. Except as noted in Article 14, the consideration distributed under this Plan shall be in exchange for, and in complete satisfaction, discharge, release, and termination of all Claims of any nature whatsoever against the Debtors and their Estate. The Debtors shall be entitled to move for entry of a discharge pursuant to section 1141 of the Bankruptcy Code. If such discharge is approved by Order of the Bankruptcy Court (the "Discharge Order"), the Debtors shall be deemed discharged and released pursuant to section 1141 of the Bankruptcy Code from any and all Claims, including but not limited to demands and liabilities that arose before the date of the Discharge Order, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code, whether or not (a) a proof of claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code; (b) a Claim based upon such debt is allowed under section 502 of the Bankruptcy Code; or (c) the holder of a Claim based upon such debt has accepted this Plan.

**9.4 Effect of Discharge**. Except as noted in Article 14, the Discharge Order shall be a judicial determination of discharge and termination of all liabilities of and all Claims against the Debtors and the Estate, except as otherwise specifically provided in this Plan. Upon the entry of the Discharge Order, as to every discharged Claim and other debt of the Debtors, the holder of such Claim or other debt of the Debtors shall be permanently enjoined and precluded from asserting against the Reorganized Debtors, or against their assets or properties or any transferee thereof, any other or further Claim or other debt of the Debtors based upon any document, instrument, or act, omission, transaction, or other activity of any kind or nature that occurred prior to the entry of the Discharge Order except as expressly set forth in this Plan. In the event that, after entry of the Discharge Order, any Person asserts, against the Reorganized Debtors or any of their subsidiaries or affiliates, any right to payment or equitable remedy for breach of performance which gives rise to a right of payment, which right was not asserted prior to the entry of the Discharge Order but is based on any act, fact, event, occurrence, or omission, by or relating to the Debtors as they existed before the entry of the Discharge Order, and in the further event that such right is determined by the Bankruptcy Court (a) not to have been discharged pursuant to the provisions of section 1141 of the Bankruptcy Code and this Plan, and (b) that such right may be asserted against the Reorganized Debtors, then, in such circumstances the holder of such right shall be entitled to receive from the Reorganized Debtors value equivalent to that such holder would have received if such right had been asserted against the Debtors before the Confirmation Date and only to the extent such right would have been an Allowed Claim. Nothing in this section 9.4 shall have the effect of excepting from discharge any Claim that is or would be discharged pursuant to section 1141 of the Bankruptcy Code or this Plan.

**9.5 Terms of Certain Injunctions**. Except as noted in Article 14, as of and on the Confirmation Date, all Persons who have held, hold, or may hold Claims against the Debtors and/or the Estate shall be deemed to have waived, released, and discharged all rights or claims, whether based upon tort, contract or otherwise, which they possessed or may possess prior to the Confirmation Date against the Debtors and/or the Estate, except as otherwise provided for in this Plan (including the documents filed as Schedules or Exhibits to the Plan) or the Confirmation Order; provided, however, that the foregoing

24

release shall not apply to nonperformance under the Plan. The Confirmation Order shall constitute a permanent injunction effectuating these releases, such that all Persons who have held, hold, or may hold Claims against the Debtors and/or the Estate shall be expressly prohibited from taking any action to enforce such Claims against the Reorganized Debtors or their property, or any transferee of such property.

Unless otherwise provided herein or in the Confirmation Order, all injunctions and/or stays provided for in, or in connection with, this Chapter 11 Case shall remain in full force and effect through the Effective Date and thereafter. In addition, the Debtors or the Reorganized Debtors may seek such further orders as they deem necessary or appropriate to preserve the status quo following occurrence of the Confirmation Date.

**9.6 No Successor Liability**. Except as otherwise specifically provided in the Plan or the Confirmation Order, neither the Debtors nor the Reorganized Debtors will have any responsibilities, pursuant to the Plan or otherwise, for any liabilities or obligations of the Debtors or any of the Debtors' past or present companies, affiliates, subsidiaries or predecessors-in interest relating to or arising out of the operations of or assets of the Debtors or any of the Debtors' past or present companies, affiliates, subsidiaries, or predecessors-in-interest whether arising prior to, or resulting from actions, events, or circumstances occurring or existing at any time prior to the Effective Date. The Reorganized Debtors shall have no successor or transferee liability of any kind for any Claims; provided, however, that the Reorganized Debtors shall have the obligations specifically and expressly provided, and solely in the manner stated, in the Plan.

**9.7 Preservation of All Causes of Action Not Expressly Settled or Released**. Except as noted in Article 14, without limiting or restricting any other provisions of this Plan, including but not limited to Section 9.1, unless a Claim, cause of action, or objection against a Creditor or other entity is expressly and specifically waived, relinquished, released, compromised or settled in this Plan or any Final Order, the Reorganized Debtors expressly reserve such claim, cause of action, or objection for adjudication or pursuit by the Reorganized Debtors after the Effective Date.

Therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such claims, causes of action, or objections by the Reorganized Debtors upon or after the Confirmation Date or Effective Date of the Plan based on the Disclosure Statement, the Plan, the Confirmation Order or otherwise. The Reorganized Debtors expressly reserve the right to pursue or adopt any claims (and any defenses), causes of action, or objections of the Debtors or the Debtors in Possession, as trustees for or on behalf of the Creditors, not specifically and expressly waived, relinquished, released, compromised or settled in this Plan or any Final Order against any entity, including, without limitation, the plaintiffs or codefendants in any lawsuits. The Reorganized Debtors shall be the representatives of the Estate appointed for the purposes of pursuing any and all such claims, causes of action, and objections under section 1123(b)(3)(B) of the Bankruptcy Code.

Any Person to whom the Debtors have incurred an obligation (whether on account of services, purchase or sale of goods, tort, breach of contract or otherwise), or who has received services from the

25

Debtors or a transfer of money or property of the Debtors, or who has transacted business with the Debtors, or leased equipment or property from the Debtors, should assume that such obligation, transfer, or transaction may be reviewed by the Reorganized Debtors subsequent to the Effective Date and may, to the extent not theretofore specifically waived, relinquished, released, compromised or settled in this Plan or any Final Order, be the subject of an action, claim, demand, or objection after the Confirmation Date or the Effective Date, whether or not (a) such Person has filed a proof of claim in the Chapter 11 Case, (b) such Person's proof of claim has been objected to, (c) such Person's Claim was included in the Debtors' Schedules, or (d) such Person's scheduled Claim has been objected to or has been identified by the Debtors as disputed, contingent, or unliquidated.

## ARTICLE 10
## THE EFFECTIVE DATE OF THE PLAN

**10.1 Conditions to Occurrence of Effective Date of Plan**. The "effective date of the plan", as used in Section 1129 of the Bankruptcy Code, shall not occur until the Effective Date as defined herein. The Effective Date shall occur upon the earlier of: (a) the Business Day that is thirty (30) days after entry of the Confirmation Order; or (b) upon satisfaction of the following conditions precedent (or conditions subsequent with respect to actions that are to be taken contemporaneously with, or immediately upon, the occurrence of the Effective Date), any of which may be waived in writing by the Debtors.

10.1.1 The Confirmation Order shall have been entered by the Bankruptcy Court.

10.1.2 The Confirmation Order shall have become a Final Order.

10.1.3 All actions, agreements and instruments, or other documents necessary to implement the terms and provisions of the Plan, if any, shall have been executed and delivered by any applicable non-debtor parties in form and substance satisfactory to the Debtors.

10.1.4 All actions, agreements and instruments, or other documents necessary to implement the terms and provisions of the Plan, shall have been executed by the Debtors.

10.1.5 The new value contribution contemplated in section 7.2 of the Plan shall have been deposited into the Distribution Account.

10.1.6 Any federal, state, local and foreign governmental authorizations, consents and regulatory approvals required for the consummation of each of the transactions contemplated in the Plan shall have been obtained and shall have become final and non-appealable and, with respect to any court proceeding relating thereto, been approved by Final Order.

10.1.7 All fees and expenses due to or incurred by Professionals for the Debtors through the Effective Date not previously paid pursuant to interim or Final Orders shall have been paid into and shall be held in trust, free and clear of Liens, Claims and encumbrances (other than the rights of such Professionals) until due and payable in accordance with applicable court order, unless otherwise agreed

26

by such Professionals.

10.1.8 All payments required to be made on the Effective Date shall have been made or waived in a separate writing by such party with the right to receive the payment.

10.2 Filing of Notice of Effective Date. Within fourteen (14) Business Days of the occurrence of the Effective Date, the Reorganized Debtors shall file a notice of occurrence of the Effective Date signed by their counsel in the record of the Bankruptcy Court reflecting (a) that the foregoing conditions to the occurrence of the Effective Date have been satisfied or waived by the Debtors and any other person whose consent or waiver is required, (b) the date of the Effective Date, and (c) acknowledging that the Effective Date has occurred on and as of such date.

10.3 Revocation of Confirmation Order or Withdrawal of Plan. The Debtors may revoke or withdraw the Plan prior to the Confirmation Date by filing a Notice of Withdrawal of Plan in the record of the Chapter 11 Case. If the Plan is withdrawn prior to the Confirmation Date or if the Effective Date does not occur prior to the date set forth in Article 10, then the Plan shall be deemed withdrawn and the Confirmation Order (if any has been entered) shall be automatically revoked without the need for any action by any party in interest or the Bankruptcy Court. In such event, the Plan and the Confirmation Order shall be of no further force or effect and, the Debtors and all holders of Claims and Interests shall be restored to the status quo ante as of the day immediately preceding the filing of the Plan, and (ii) all the Debtors' respective obligations with respect to Claims and Interests shall remain unchanged, all of the Debtors' rights and claims against all Entities shall be fully preserved and nothing contained herein or in the Disclosure Statement shall be deemed to constitute an admission or statement against interest or to constitute a waiver or release of any claims by or against the Debtors or any other Persons or to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors or any other Persons.

# ARTICLE 11
## MISCELLANEOUS PROVISIONS

11.1 Payment of Statutory Fees. All fees payable pursuant to Section 1930 of title 28 of the United States Code shall be paid by the Reorganized Debtors, as, when and in the amount as required by applicable law, without the filing of any motion or request therefor.

11.2 Notice. Any notice required or permitted to be provided to the Debtors or Reorganized Debtors under the Plan shall be in writing and served by either (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery, or (c) reputable overnight courier service, freight prepaid, to be addressed as follows: The Henderson Law Firm, 2030 South Tryon Street, Suite 3H, Charlotte, NC 28203.

11.3 Headings. The headings used in this Plan are inserted for convenience only and do not in any manner affect the construction of the provisions of this Plan.

11.4 Governing Law. Unless a rule of law or procedure is supplied by federal law (including the

27

61189538.9

Bankruptcy Code and Bankruptcy Rules), the laws of the State of North Carolina, without giving effect to any conflicts of law principles thereof that would result in the application of the laws of any other jurisdiction, shall govern the construction of this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as otherwise expressly provided in such instruments, agreements, or documents.

11.5 Additional Documents. The Debtors and Reorganized Debtors have the authority to take any and all actions and execute (and perform) any agreements and documents as the Debtors and/or Reorganized Debtors deem necessary or appropriate in their reasonable discretion to effectuate and further evidence the terms and conditions of this Plan.

11.6 Compliance with Tax Requirements. In connection with this Plan, the Debtors and the Reorganized Debtors will comply with all applicable withholding and reporting requirements imposed by federal, state, and local taxing authorities, and all distributions hereunder shall be subject to such withholding and reporting requirements.

11.7 Legal Representation Regarding the Plan. The Debtors and the Bankruptcy Estates of both are represented by James H. Henderson regarding all parts and process of this Plan.

11.8 Exemption from Transfer Taxes. To the extent applicable, the issuance, transfer, or exchange of any securities under this Plan, the making or delivery of any mortgage, deed of trust, other security interest, or other instrument of transfer under, in furtherance of, or in connection with this Plan, shall be exempt from all taxes as provided in Section 1146(a) of the Bankruptcy Code.

11.9 Further Authorizations. The Debtors, and after the Effective Date, the Reorganized Debtors, may seek such orders, judgments, injunctions, and rulings they deem necessary or useful to carry out the intention and purpose of, and to give full effect to, the provisions of this Plan.

11.10 Successors and Assigns. The rights, benefits and obligations of any Person named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, personal representative, successor or assign of such Person.

11.11 Modification and Amendment of the Plan. Subject to section 1127 of the Bankruptcy Code and Bankruptcy Rules 2002 and 3019, this Plan may be amended or modified exclusively by the Debtors. Confirmation of the Plan will serve to conclusively establish the Debtors' Projected Disposable Income, and neither the United States Bankruptcy Administrator nor any holder of an allowed unsecured claim may request or be allowed an increase in the amount of payments provided for in the Plan.

11.12 Upon the occurrence of a default under the terms of this Plan, the Creditor shall send written notice of such default to the Debtors and shall provide the Debtor with a period of thirty (30) days from the date said notice is delivered to the Debtors to cure such default, prior to exercising any rights and remedies under this Plan or under applicable law. A copy of any notice of default required to be given by this Plan shall be served on the Debtors, with a copy served on James H. Henderson, The Henderson Law Firm, 2030 South Tryon Street, Suite 3H, Charlotte, NC 28203.

61189538.9

# ARTICLE 12
# RETENTION OF JURISDICTION

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall retain jurisdiction over any matter arising under the Bankruptcy Code or arising in or related to the Chapter 11 Case or this Plan, including, without limitation, the following:

12.1 Executory Contracts and Unexpired Leases. To hear and determine any and all motions or applications (i) for the assumption, assumption and assignment or rejection of executory contracts or unexpired leases to which the Debtors are a party or with respect to which the Debtors may be liable, (ii) to review and determine all Cure Payments under any such assumed executory contract or unexpired lease, and (iii) to review and determine any Claims resulting from the rejection of any executory contract or unexpired lease.

12.2 Causes of Action. To determine any and all causes of action, including all adversary proceedings, applications, motions, and contested or litigated matters that may be pending on the Effective Date or that, pursuant to this Plan, may be instituted by the Reorganized Debtors after the Effective Date.

12.3 Disputed Claims, Contingent Claims and Unliquidated Claims Allowance/Disallowance. To hear and determine any objections to the allowance of Claims or Interests (other than Claims that are Allowed pursuant to the Plan), including but not limited to any objections to the classification of any Claim, and to allow or disallow any contingent Claim, Disputed Claim, unliquidated Claim, contingent Interest, disputed Interest in whole or in part, and to determine any and all disputes among Creditors and holders of Interests with respect to their Claims and Interests.

12.4 Enforcement/Modification of Plan (other than a request to increase payments under 11 USC § 1127(e)(1)).

12.4.1 To hear and determine any requests to modify this Plan, remedy any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order.

12.4.2 To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with this Plan or any other Plan documents or their interpretation, implementation, enforcement, or consummation.

12.4.3 To hear and determine such other matters that may be set forth in the Plan and the Confirmation Order or that relate to any transaction required or contemplated by the Plan.

12.4.4 To hear and determine any other matters related hereto, including matters related to the implementation and enforcement of the Plan, the Confirmation Order, and all orders entered by the Bankruptcy Court in this Chapter 11 Case.

29

12.4.5 To hear and determine any issue relating to distributions under the Plan.

12.4.6 To enter such orders as are necessary to implement and enforce the injunctions described herein, including orders extending the protections afforded under section 105 of the Bankruptcy Code.

12.4.7 To issue such orders in aid of execution of this Plan to the fullest extent authorized or contemplated by section 1142 of the Bankruptcy Code.

12.5 Compensation of Professionals. To hear and determine all applications for allowance of compensation and reimbursement of expenses of Professionals, any other fees and expenses authorized to be paid or reimbursed under this Plan, and to approve the reasonableness of any payments made or to be made as provided in section 1129(a)(4) of the Bankruptcy Code.

12.6 Settlements. To the extent that Bankruptcy Court approval is required, to consider and act on any compromise and settlement of any Claim against or cause of action by the Debtors or the Reorganized Debtors.

12.7 Taxes. To hear and determine matters concerning state, local, and federal taxes, fines, penalties, or additions to taxes for which the Debtors or Debtors in Possession may be liable, directly or indirectly, in accordance with sections 346, 505, and 1146 of the Bankruptcy Code.

12.8 506(b), (c) Claims. To determine the amounts, if any, of the reasonable fees, costs and other charges payable under sections 506(b) and/or (c) of the Bankruptcy Code.

12.9 Specific Purposes. To hear and determine such other matters as may be provided for in the Confirmation Order or may be appropriate under applicable law.

12.10 Final Decrees. To enter an order or final decree closing the Chapter 11 Case.

## ARTICLE 13
## ALTERNATIVES TO THE PLAN

The Debtors believe that the Plan provides holders of claims with the greatest possible value that could be realized on their respective claims. The alternatives to Confirmation of the Plan are: (1) confirmation of an alternative plan of reorganization submitted by another party-in-interest; (2) liquidation of the Debtors under Chapter 7 of the Bankruptcy Code; (3) confirmation of a plan of liquidation; or (4) dismissal of this bankruptcy proceeding. The Debtors believe that neither liquidation of the Debtors' property under Chapter 7, confirmation of a plan of liquidation, nor the dismissal of this bankruptcy case are viable alternatives and would not be in the best interests of holders of claims and

30

interests.

## CONCLUSION

The Debtors believe they have explored all reasonably available alternatives for their Plan of Reorganization and that the Plan affords the Debtors' creditors with the most beneficial results.

This 15th day of June, 2021.

/s/ Calvin Kennedy
Calvin Kennedy

/s/ Cynthia Kennedy
Cynthia Kennedy

**THE HENDERSON LAW FIRM, PLLC**

/s/ James H. Henderson
James H. Henderson
NC State Bar No. 13536
2030 South Tryon St., Suite 3H
Charlotte, North Carolina 28203
Email henderson@title11.com
Telephone: (704) 333.3444
Counsel for the Debtors

31

EXHIBIT B

# Ramsey-Peele Corporation
# Balance Sheet
### As of March 31, 2021

|  |  | Total |
|---|---|---|
| **ASSETS** |  |  |
| **Current Assets** |  |  |
| Total Bank Accounts | $ | 1,302,369.41 |
| Other Current Assets |  |  |
| 1255 Due to/(from) Affiliates |  | 187,506.34 |
| Total Other Current Assets | $ | 187,506.34 |
| Total Current Assets | $ | 1,489,875.75 |
| Total Fixed Assets | $ | 69,989.89 |
| Other Assets |  |  |
| Security Deposits |  | 19,415.00 |
| Total Other Assets | $ | 19,415.00 |
| **TOTAL ASSETS** | $ | 1,579,280.64 |
| **LIABILITIES AND EQUITY** |  |  |
| Liabilities |  |  |
| Current Liabilities |  |  |
| Accounts Payable (A/P) |  | 103,865.67 |
| Total Accounts Payable | $ | 103,865.67 |
| Total Credit Cards | $ | 11,886.50 |
| Other Current Liabilities |  |  |
| 2152 Due to/(from)-C. Ray Kennedy |  | 0.00 |
| PPP Loan Payable |  | 564,770.00 |
| Total Other Current Liabilities | $ | 564,770.00 |
| Total Current Liabilities | $ | 680,522.17 |
| Long-Term Liabilities |  |  |
| 2130 Notes Payable - Daimler Truck |  | 13,523.55 |
| 2132 Notes Payable - Nissan Motor |  | 0.00 |
| Notes Payable |  | 0.00 |
| Notes Payable - C.Ray & Cynthia Kennedy |  | 1,612,036.74 |
| Notes Payable - Cynthia Kennedy |  | 51,347.16 |
| Notes Payable - Kim Griffith |  | 390,811.57 |
| Notes Payable - Lending Club |  | 98,446.21 |
| Total Long-Term Liabilities | $ | 2,166,165.23 |
| Total Liabilities | $ | 2,846,687.40 |
| Equity |  |  |
| 3000 Common Stock |  | 1,000.00 |
| 3001 Paid-In Capital or Surplus |  | 175,921.49 |
| Opening Balance Equity |  | -2,214,467.00 |
| Owner's Pay & Personal Expenses |  | 0.00 |
| Retained Earnings |  | 543,674.90 |
| Net Income |  | 226,463.85 |
| Total Equity | -$ | 1,267,406.76 |
| **TOTAL LIABILITIES AND EQUITY** | $ | 1,579,280.64 |

# Ramsey-Peele Corporation

### Profit and Loss

January - March, 2021

| | JAN 2021 | FEB 2021 | MAR 2021 | TOTAL |
|---|---|---|---|---|
| Income | | | | |
| Food Services | 4,552.89 | 7,960.07 | 9,133.40 | $21,646.36 |
| Grants | | | | $0.00 |
| DHHS - Depart Health & Human Srvcs | 114,667.00 | 91,881.00 | 144,853.82 | $351,401.82 |
| **Total Grants** | **114,667.00** | **91,881.00** | **144,853.82** | **$351,401.82** |
| NC Pre-K | 110,915.27 | 110,686.91 | 113,144.98 | $334,747.16 |
| Tuition | 26,770.11 | 20,669.97 | 35,287.88 | $82,727.96 |
| Child Care Resources | 157,385.77 | 156,858.74 | 153,328.07 | $467,572.58 |
| **Total Tuition** | **184,155.88** | **177,528.71** | **188,615.95** | **$550,300.54** |
| **Total Income** | **$414,291.04** | **$388,056.69** | **$455,748.15** | **$1,258,095.88** |
| Cost of Goods Sold | | | | |
| Activities | 77.03 | | 117.07 | $194.10 |
| Credit Card Processing Fees | 579.55 | 623.98 | 566.53 | $1,770.06 |
| Food Costs | 16,988.91 | 21,741.09 | 30,812.43 | $69,542.43 |
| Supplies & Materials - COGS | 2,307.84 | 2,010.69 | 2,791.78 | $7,110.31 |
| **Total Cost of Goods Sold** | **$19,953.33** | **$24,375.76** | **$34,287.81** | **$78,616.90** |
| **GROSS PROFIT** | **$394,337.71** | **$363,680.93** | **$421,460.34** | **$1,179,478.98** |
| Expenses | | | | |
| 6300 Insurance | -7,982.23 | -4,300.04 | -6,008.37 | $ -18,290.64 |
| 6302 Life | 1,624.98 | 2,648.94 | 3,046.11 | $7,320.03 |
| 6303 General Liability | | | 280.02 | $280.02 |
| 6304 Medical | 17,957.69 | 16,795.56 | 19,817.36 | $54,570.61 |
| 6305 Worker's Comp | | 514.00 | | $514.00 |
| 6306 Dental & Vision | 1,907.47 | 1,837.18 | 2,098.16 | $5,842.81 |
| **Total 6300 Insurance** | **13,507.91** | **17,495.64** | **19,233.28** | **$50,236.83** |
| 6700 Salaries and Wages | 211,389.53 | 203,494.06 | 237,518.18 | $652,401.77 |
| 6730 Payroll Taxes | | | | $0.00 |
| 6731 Social Security Withholding | 8,714.52 | 5,809.68 | 13,782.38 | $28,306.58 |
| 6732 Medicare Withholding | 2,037.99 | 1,358.66 | 3,223.30 | $6,619.95 |
| 6733 Federal Unemployment | 83.58 | 55.72 | 268.20 | $407.50 |
| 6734 State Unemployment | 62.37 | 41.58 | 72.62 | $176.57 |
| **Total 6730 Payroll Taxes** | **10,898.46** | **7,265.64** | **17,346.50** | **$35,510.60** |
| 6740 401K Employer Match | 175.14 | 116.76 | 728.52 | $1,020.42 |
| 6750 Other Payroll Expenses | 2,435.44 | 2,757.44 | 3,788.73 | $8,981.61 |
| Bank Charges & Fees | 269.29 | 253.14 | 209.26 | $731.69 |
| Car & Truck | 0.00 | 0.00 | 0.00 | $0.00 |
| Auto Insurance | 2,463.50 | 2,463.50 | 2,463.50 | $7,390.50 |
| Gas | 386.18 | 315.84 | 458.04 | $1,160.06 |
| Maint. & Repair | | | 1,579.45 | $1,579.45 |
| **Total Car & Truck** | **2,849.68** | **2,779.34** | **4,500.99** | **$10,130.01** |

# Ramsey-Peele Corporation

## Profit and Loss

January - March, 2021

| | JAN 2021 | FEB 2021 | MAR 2021 | TOTAL |
|---|---|---|---|---|
| Dues & subscriptions | 7.49 | 7.49 | 331.49 | $346.47 |
| Employee Benefits | | 99.42 | | $99.42 |
| Employee Training | 217.17 | | 287.60 | $504.77 |
| Interest Paid | 395.64 | 397.46 | 402.81 | $1,195.91 |
| Legal & Professional Services | | | | $0.00 |
| Accounting | 1,000.00 | 1,000.00 | 1,000.00 | $3,000.00 |
| **Total Legal & Professional Services** | **1,000.00** | **1,000.00** | **1,000.00** | **$3,000.00** |
| Office Supplies & Software | 596.21 | 824.94 | 577.87 | $1,999.02 |
| Other Business Expenses | 159.91 | | | $159.91 |
| Rent & Lease | 44,463.44 | 45,026.96 | 45,026.96 | $134,517.36 |
| Repairs & Maintenance | 5,657.31 | 2,153.00 | 5,585.50 | $13,395.81 |
| Cleaning Services | 3,561.28 | 1,304.87 | 2,311.28 | $7,177.43 |
| Grounds Maint. / Landscaping | | 1,065.00 | 390.00 | $1,455.00 |
| **Total Repairs & Maintenance** | **9,218.59** | **4,522.87** | **8,286.78** | **$22,028.24** |
| Shipping and Postage | | 95.50 | 70.90 | $166.40 |
| Storage | 1,072.00 | 1,072.00 | 1,072.00 | $3,216.00 |
| Supplies & Materials | 273.24 | 38.07 | 283.96 | $595.27 |
| Taxes & Licenses | 2,654.27 | 17.96 | 37.12 | $2,709.35 |
| Travel | | 20.00 | | $20.00 |
| Utilities | 2,784.10 | 3,289.58 | 2,740.97 | $8,814.65 |
| Cable/Internet | 487.92 | 657.31 | 852.27 | $1,997.50 |
| Sanitation | 1,092.98 | 577.29 | 1,608.67 | $3,278.94 |
| Security Systems | 419.94 | 1,519.60 | 179.97 | $2,119.51 |
| Telephone | 1,208.12 | 1,326.67 | 1,206.02 | $3,740.81 |
| Water | 721.23 | 1,263.50 | 1,507.94 | $3,492.67 |
| **Total Utilities** | **6,714.29** | **8,633.95** | **8,095.84** | **$23,444.08** |
| **Total Expenses** | **$308,297.70** | **$295,918.64** | **$348,798.79** | **$953,015.13** |
| **NET OPERATING INCOME** | **$86,040.01** | **$67,762.29** | **$72,661.55** | **$226,463.85** |
| **NET INCOME** | **$86,040.01** | **$67,762.29** | **$72,661.55** | **$226,463.85** |

# Value Innovation Technologies
## Balance Sheet
### As of March 1, 2021

|  |  | Total |
|---|---|---|
| **ASSETS** |  |  |
| **Current Assets** |  |  |
| **Total Bank Accounts** | $ | 17,508.10 |
| **Total Current Assets** | $ | 17,508.10 |
| **Total Fixed Assets** | $ | 1,777,002.10 |
| **TOTAL ASSETS** | $ | 1,794,510.20 |
| **LIABILITIES AND EQUITY** |  |  |
| **Liabilities** |  |  |
| **Current Liabilities** |  |  |
| **Total Accounts Payable** | $ | 49,055.52 |
| **Other Current Liabilities** |  |  |
| 2010 Unearned Income |  | 41,666.69 |
| Loan Payable |  | 217,706.44 |
| Payroll Clearing |  | 0.00 |
| PPP Loan Payable |  | 50,510.00 |
| **Total Other Current Liabilities** | $ | 309,883.13 |
| **Total Current Liabilities** | $ | 358,938.65 |
| **Long-Term Liabilities** |  |  |
| 2110 Note Payable - R. Annable |  | 150,000.00 |
| 2120 Note Payable - C. McKee |  | 34,371.14 |
| 2130 Note Payable - Decathlon |  | 2,405,030.90 |
| 2150 Note Payable - eLink Software |  | 0.00 |
| 2152 Note Payable - Mr. Kennedy |  | 246,352.52 |
| 2155 Note Payable - Related Parties |  | 194,454.45 |
| **Total Long-Term Liabilities** | $ | 3,030,209.01 |
| **Total Liabilities** | $ | 3,389,147.66 |
| **Equity** |  |  |
| 3000 Common Stock |  | 891,714.64 |
| 3500 Redeemable Preferred Stock |  | 0.00 |
| 3550 Paid-In Capital |  | 20,759.92 |
| Opening Balance Equity |  | -2,753,186.00 |
| Retained Earnings |  | 277,343.05 |
| Net Income |  | -31,269.07 |
| **Total Equity** | -$ | 1,594,637.46 |
| **TOTAL LIABILITIES AND EQUITY** | $ | 1,794,510.20 |

# Value Innovation Technologies

Profit and Loss

January - March, 2021

| | JAN 2021 | FEB 2021 | MAR 2021 | TOTAL |
|---|---:|---:|---:|---:|
| **Income** | | | | |
| 4028 Gateway Subscription | 8,333.33 | 8,333.33 | 8,333.33 | $24,999.99 |
| Consulting | 15,000.00 | | | $15,000.00 |
| **Total Income** | **$23,333.33** | **$8,333.33** | **$8,333.33** | **$39,999.99** |
| **Cost of Goods Sold** | | | | |
| 5000 eLink Software Costs | 4,807.19 | 4,829.36 | 4,555.19 | $14,191.74 |
| **Total Cost of Goods Sold** | **$4,807.19** | **$4,829.36** | **$4,555.19** | **$14,191.74** |
| **GROSS PROFIT** | **$18,526.14** | **$3,503.97** | **$3,778.14** | **$25,808.25** |
| **Expenses** | | | | |
| 6300 Insurance | | | | $0.00 |
| 6302 Life | 288.76 | 288.76 | 288.76 | $866.28 |
| 6304 Medical | 2,960.68 | 2,960.68 | 2,960.68 | $8,882.04 |
| 6306 Dental & Vision | 345.42 | 345.42 | 345.42 | $1,036.26 |
| **Total 6300 Insurance** | **3,594.86** | **3,594.86** | **3,594.86** | **$10,784.58** |
| 6700 Salaries and wages | 9,825.00 | 10,175.00 | 10,000.00 | $30,000.00 |
| 6710 Contractors | 9,365.33 | 1,380.00 | 1,052.70 | $11,798.03 |
| 6730 Payroll Taxes | | | | $0.00 |
| 6731 Social Security Withholding | 620.00 | 620.00 | 620.00 | $1,860.00 |
| 6732 Medicare Withholding | 145.00 | 145.00 | 145.00 | $435.00 |
| 6733 Federal Unemployment | 60.00 | 24.00 | 0.00 | $84.00 |
| 6734 State Unemployment | 312.00 | 312.00 | 415.50 | $1,039.50 |
| **Total 6730 Payroll Taxes** | **1,137.00** | **1,101.00** | **1,180.50** | **$3,418.50** |
| Bank Charges & Fees | 101.00 | 42.00 | 41.00 | $184.00 |
| Legal & Professional Services | 67.98 | 39.98 | 164.98 | $272.94 |
| Office Supplies & Software | 703.00 | 1,031.75 | | $1,734.75 |
| Rent & Lease | 3,412.76 | 3,412.76 | 3,498.85 | $10,324.37 |
| Utilities | | | | $0.00 |
| Telephone | 463.38 | 352.67 | 350.91 | $1,166.96 |
| **Total Utilities** | **463.38** | **352.67** | **350.91** | **$1,166.96** |
| **Total Expenses** | **$28,670.31** | **$21,130.02** | **$19,883.80** | **$69,684.13** |
| **NET OPERATING INCOME** | **$ -10,144.17** | **$ -17,626.05** | **$ -16,105.66** | **$ -43,875.88** |
| **NET INCOME** | **$ -10,144.17** | **$ -17,626.05** | **$ -16,105.66** | **$ -43,875.88** |

**EXHIBIT C**

**Hypothetical Liquidation Analysis of Assets**

**A.    Introduction**

Under the "best interests" of creditors test set forth in section 1129(a)(7) of the Bankruptcy Code, the Bankruptcy Court may not confirm a plan of reorganization unless the plan provides each holder of a claim or interest who does not otherwise vote in favor of the plan with property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code. To demonstrate that the Plan satisfies the "best interests" of creditors test, the Debtors have prepared the following hypothetical Liquidation Analysis, which is based upon certain assumptions discussed in the Disclosure Statement and in the notes accompanying the Liquidation Analysis (the "Notes"). The Liquidation Analysis estimates potential Cash distributions to Holders of Allowed Claims and Interests in a hypothetical chapter 7 liquidation of the Debtor's assets.

**B.    Scope, Intent, and Purpose of the Liquidation Analysis**

The determination of the costs of, and hypothetical proceeds from, the liquidation of the Debtors' assets is an uncertain process involving the extensive use of estimates and assumptions that, although considered reasonable by the Debtors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors. Inevitably, some assumptions in the Liquidation Analysis would not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could affect the ultimate results in an actual chapter 7 liquidation. The Liquidation Analysis was prepared for the sole purpose of generating a reasonable good-faith estimate of the proceeds that would be generated if the Debtors were liquidated in accordance with chapter 7 of the Bankruptcy Code. The Liquidation Analysis is not intended and should not be used for any other purpose. The underlying financial information in the Liquidation Analysis was not compiled or examined by any independent accountants. No independent appraisals were conducted (other than for the commercial real property) in preparing the Liquidation Analysis.

THE DEBTORS DO NOT MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THE LIQUIDATION ANALYSIS. ACTUAL RESULTS COULD VARY MATERIALLY.

In preparing the Liquidation Analysis, the Debtors estimated Allowed Claims based upon a review of Claims listed on the Debtors' Schedules and Proofs of Claim filed to date. In addition, the Liquidation Analysis includes estimates for Claims not currently asserted in the Chapter 11 Cases, but which could be asserted and Allowed in a chapter 7 liquidation, including Administrative Claims, wind down costs, trustee fees, tax liabilities, and certain lease and contract rejection damages Claims. To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims used for purposes of preparing this Liquidation Analysis. For purposes of the Liquidation Analysis, the Debtors' estimates of Allowed Claims contained in the Liquidation Analysis references specific Claims estimates, even though the Debtors' estimates of ranges of projected recoveries under the Plan to Holders of Allowed Claims and Interests are based on ranges of Allowed Claims

and Interests. Therefore, the Debtors' estimate of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims and Interests under the Plan.

NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION OR ADMISSION OF THE DEBTORS. THE ACTUAL AMOUNT OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH IN THE LIQUIDATION ANALYSIS.

### Notes to the Liquidation Analysis

1. **Conversion Date and Appointment of a Chapter 7 Trustee**

The Liquidation Analysis assumes conversion of the Debtors' Chapter 11 Cases to chapter 7 liquidation cases on August 1, 2021 (the "Conversion Date") and the liquidation of all of the Debtors' non-exempt assets. On the Conversion Date, it is assumed that the Bankruptcy Court would appoint one chapter 7 trustee (the "Trustee") to oversee the liquidation of the Estate. Should the Trustee in the Debtors' individual proceeding determine that a Chapter 7 should be filed for any entities owned by the Debtors, multiple Trustees would be appointed to administer the Estates, lower recoveries and higher administrative costs could result and distributions to Creditors could be delayed.

2. **Assets of the Debtors' Bankruptcy Estates**

   a. Real property owned as tenants by the entirety and subject to deeds of trust. These properties include: i) 4324 Satterwythe Lane, Charlotte, N.C. ("Residence", $600,000.00 scheduled value); ii) 16701 Northcross Drive, Huntersville, N.C ("Northcross", $1,800,000.00 appraised value as of April 22, 2020)[1]; and iii) 6025 Clark Creek Parkway, Charlotte, N.C. ("Clark Creek", $1,900,000.00 appraised value as of April 22, 2020)[2]. Northcross and Clark Creek are commercial properties leased to UCDC for use as day care centers, which have an aggregate appraised value of $3.7M. Northcross and Clark Creek are subject to first deeds of trust in favor of Wilmington Savings Fund Society, FSB, d/b/a Christiana Trust, as Owner Trustee of Residential Credit Opportunities Trust II ("Wilmington Savings"), securing a claim of approximately $2.97M. Northcross and Clark Creek are also subject to: i) a second deed of trust in favor of Kimberly Griffith ("Griffith") securing a debt of approximately $460,000.00 (not including all accrued interest); ii) a third deed of trust in favor of Legolia McGlohon ("McGlohon") securing a debt of approximately $465,000.00 (not including all accrued interest); and iii) a judgment lien in favor of The Essendant Company ("Essendant") securing a debt of approximately $2.1M (not including all accrued interest) (the "Essendant Judgment").

   The Plan provides for the partial avoidance of the Essendant judgment lien, on the basis that the attachment of the lien constitutes of preferential transfer which is

---

[1] T.B. Harris, Jr. & Associates, appraiser.

[2] *Id.*

avoidable. If this case is converted to Chapter 7, the Debtors' Settlement Agreement with Essendant and the judgment lien would not necessarily to avoided in full or in part. If the Essendant lien is avoided by a Chapter 7 trustee, the aggregate debt secured by the Northcross and Clark Creek properties (approximately $3,895,000.00) exceeds the fair market value of those properties ($3,700,000.00) and the Debtors have no equity in those properties.

The Residence is subject to i) a first deed of Trust in favor of the Mill City Mortgage Loan Trust 2018-1 ("Mill City"), securing a debt of approximately $387,000.00; ii) a second deed of trust in favor of Griffith securing a debt of approximately $460,000.00 (not including all accrued interest); iii) a third deed of trust in favor of McGlohon securing a debt of approximately $465,000.00 (not including all accrued interest); and iv) the Essendant Judgment. The aggregate debt secured by the Residence (approximately $1,312,000.00), excluding the Essendant Judgment, greatly exceeds the value of the Residence. The Debtors have no equity in the Residence.

b.   ***Real property owned as tenants by the entirety, not subject to deeds of trust, claimed as exempt.*** 4320 Satterwythe Lane, Charlotte, N.C. ("Residence lot") is a lot which adjoins the Debtors' residence and which is used by the Debtors as part of the Residence. The Residence lot has a tax value of $57,300.00, and was scheduled by the Debtors as having a value of $60,000.00. Upon information and belief the Residence lot is not subject to any deeds of trust, but it is subject to the Essendant Judgment (which is to be partially avoided in the Plan). The Debtors propose to waive their claimed exemption as part of the proposed settlement with Essendant. In a Chapter 7, it is doubtful that the Debtors would waive their exemption.

c.   ***Real property owned as tenants by the entirety, not subject to deeds of trust, not claimed as exempt.*** The Debtors own a one acre vacant lot on Kings Circle in Statesville, North Carolina ("Kings Circle"). Kings Circle has a scheduled value of $9,750.00, and it is not believed to be subject to any liens. The Kings Circle lot will be sold pursuant to the Plan and the net proceeds will be distributed according to the Plan. This lot would also likely be sold by a Chapter 7 trustee.

d.   ***Jointly owned personal property.*** The Debtors' schedules indicate that, as of the Petition Date, they owned personal and household items having a value of $12,000.00, most of which has been claimed as exempt. The Debtor's jointly scheduled financial assets total approximately $22,000.00, consisting mostly of cash balances in joint bank accounts.

e.   ***Personal property owned solely by Mr. Kennedy.*** The schedules reflect that Mr. Kennedy solely owns stock in Branch Banking & Trust Co. (now Truist Bank) having an approximate value of $14,000.00 as of the Petition Date. This stock was not claimed as exempt and will be sold to pay creditors under the plan. Also, claimed as exempt by Mr. Kennedy is the $9,193.99 cash value of a whole life insurance policy, on which Mrs. Kennedy is the beneficiary. In a Chapter 7, any net proceeds of assets owned solely by Mr. Kennedy, after the deduction of pro-rata

administrative expenses[3], would be distributed to the creditors with claims against Mr. and Mrs. Kennedy and claims solely against Mr. Kennedy (but not creditors with claims solely against Mrs. Kennedy).

    **f.**    ***Personal property owned solely by Mrs. Kennedy.*** This includes bank accounts having a balance of approximately $6,200.00 as of the Petition Date.   In a Chapter 7, any net proceeds of assets owned solely by Mrs. Kennedy, after the deduction of pro-rata administrative expenses[4], would be distributed to the creditors with claims against Mr. and Mrs. Kennedy and claims solely against Mrs. Kennedy (but not creditors with claims solely against Mr. Kennedy).

3.    **Other assets**

Any balances in the Debtors' non-exempt cash accounts are not significant. The Debtors also own the majority of stock in: i) Ramsey-Peele, Inc. d/b/a University Child Development Center ("UCDC"), which operates three large day care centers servicing hundreds of low income children; and ii) Value Innovation Technologies Corp. (VIT").   Upon conversion of the case to Chapter 7, a Trustee is likely to take immediate steps to discontinue the operations of UCDC. and VIT.   Upon information and belief, the possibility and risk of negligence claims against the Chapter 7 estate would preclude the continued operations of UCDC and VIT. The Debtors have recently filed their Periodic Report in this proceeding, showing that both UCDC and VIT are balance sheet insolvent. The Debtors do not believe that their equity interests in UCDC and VIT have any value, and as such those interests could not be sold for the benefit of creditors in the Debtors' Chapter 7.

4.    **Factors Considered in Valuing Hypothetical Liquidation Proceeds**

Certain factors may limit the amount of the Liquidation Proceeds available to the Trustee. It is probable that distribution of the Liquidation Proceeds in a Chapter 7 would be delayed while the Trustee and his or her professionals become knowledgeable about the Chapter 11 Cases and the Debtors' business and operations. This delay would materially reduce the value, on a "present value" basis, of the Liquidation Proceeds.

---

[3]Determined by the ratio of allowed unsecured joint claims to allowed unsecured individual claims. For example, assume total allowed unsecured claims are $3,559,000.00 in the following subclasses: i) allowed unsecured joint claims total $3M (84.3% of total claims); ii) allowed unsecured claims solely against Mr. Kennedy total $338,000.00 (9.4% of total claims); iii) allowed unsecured claims solely against Mrs. Kennedy total $221,000.00 (6.2% of total claims) and iv) administrative expenses total $100,000.00. The administrative claim would be assessed against the subclasses in the amount of $84,300.00, $9,400.00 and $6,200.00, respectively.

[4]Determined by the ratio of allowed unsecured joint claims to allowed unsecured individual claims. For example, assume total allowed unsecured claims are $3,559,000.00 in the following subclasses: i) allowed unsecured joint claims total $3M (84.3% of total claims); ii) allowed unsecured claims solely against Mr. Kennedy total $338,000.00 (9.4% of total claims); iii) allowed unsecured claims solely against Mrs. Kennedy total $221,000.00 (6.2% of total claims) and iv) administrative expenses total $100,000.00. The administrative claim would be assessed against the subclasses in the amount of $84,300.00, $9,400.00 and $6,200.00, respectively.

5.     Scheduled of assets and anticipated proceeds available for distribution to unsecured creditors in Chapter 7

| Asset | Exempt Status | Value | Debt secured by asset | Amount Realizable in Chapter 7 (after payment of secured claims) |
|---|---|---|---|---|
| 4324 Satterwythe Lane | no equity to claim as exempt | $600,000.00 | $2,412,000.00 | $0.00 |
| 4320 Satterwythe Lane | claimed as exempt, NCGS 1C-1601(a)(1) | 57,300.00 | 2,100,000.00 | 0.00 |
| 16701 Northcross Drive and 6025 Clark Creek Parkway | no equity to claim as exempt | 3,700,000.00 | 3,895,000.00 | 0.00 |
| Iredell County lot | not claimed as exempt | 9,750.00 | 0.00 | 9,750.00 |
| Personal and household items | all claimed exempt except for pistol valued at $200.00 | 12,000.00 | 0.00 | 0.00 |
| Financial assets | all claimed as exempt, except i) $22K balance in M&F Bank which was spent post-petition on ordinary expenses | 51,749.52 | 0.00 | 14,000.00 |

| | | |
|---|---|---:|
| | **TOTAL REALIZABLE ASSETS IN CHAPTER 7** | **$23,750.00** |
| Less: | Liquidation costs (statutory trustee commission, 11 USC Section 326) | 3,000.00 |
| Less: | Chapter 7 administrative fees (11 USC Section 327 and 330) | 10,000.00 |
| Less: | Chapter 11 administrative expenses | 100,000.00 |
| | ***Net available for distribution to priority and general unsecured creditors*** | ***-89,250.00*** |