IN THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

IN RE:

CALVIN RAY KENNEDY a/k/a
C. RAY KENNEDY and
CYNTHIA M. KENNEDY,

      Debtors.

CASE NO.: 20-30208
CHAPTER 11

## WITNESS AND EXHIBIT LIST

  Wilmington Savings Fund Society, FSB, d/b/a Christiana Trust, not in its individual capacity but solely as Owner Trustee of Residential Credit Opportunities Trust II, by and through counsel, hereby submits the following list of witnesses will be called to testify and exhibits which will be introduced at the hearing scheduled for 9:30 a.m. on Thursday, August 17, 2023.

Witnesses:

1. Calvin Ray Kennedy, Debtor
2. Cynthia M. Kennedy, Debtor
3. Sally R. Torres, Senior Loan Analyst

Exhibits:

1. Promissory Note dated Sept. 26, 2017
2. Loan and Security Agreement-Cherrywood Commercial dated Sept 26, 2017
3. Deed of Trust, Assignment of Lease and Rents, Security Agreement and Fixture Filing Recorded Sept. 28, 2017
4. Assignment of Deed of Trust Recorded Sept. 28, 2017
5. Corrective Assignment of Deed of Trust Recorded Feb. 20, 2019
6. Guaranty
7. Subordination of Lease dated Sept. 28, 2017
8. Subordination of Lease dated Sept. 26, 2017
9. Schedule A/B of Debtors
10. 3 Collier on Bankruptcy P 330.03
11. *In re Parker*, 2015 Bankr. LEXIS 2861 (Bankr. E.D.NC. 2015)
12. *Colorado Bankers Life Insurance Company v. Academy Financial Assets, LLC,* No. 22-1104 (4th Cir. 2023)
13. Servicing Agreement which will be provided at Court.

This the _15_ day of August, 2023.

HUTCHENS LAW FIRM LLP
Attorneys for Wilmington Savings Fund Society, FSB, d/b/a
Christiana Trust, not in its individual capacity but solely as
Owner Trustee of Residential Credit Opportunities Trust II

By: _____

William Walt Pettit
N.C. Bar No. 9407
6230 Fairview Road, Suite 315
Charlotte, N.C. 28210
Telephone: (704) 362-9255
Email: walt.pettit@hutchenslawfirm.com

# PROMISSORY NOTE

US $3,000,000.00                                                    September 26, 2017

**FOR VALUE RECEIVED,** C. Ray Kennedy & Cynthia M. Kennedy ("**Borrower**") promises to pay to the order of CHERRYWOOD COMMERCIAL LENDING, LLC, a Delaware limited liability company ("**Lender**"), the principal amount of Three Million and 00/100 Dollars ($3,000,000.00) (the "**Mortgage Loan**"), together with interest thereon accruing at the Interest Rate on the unpaid principal balance from the date the Mortgage Loan proceeds are disbursed until fully paid in accordance with the terms hereof and of that certain Loan and Security Agreement dated as of the date hereof, by and between Borrower and Lender (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Loan Agreement**").

1.      Defined Terms.

Capitalized terms used and not specifically defined in this Promissory Note (this "**Note**") have the meanings given to such terms in the Loan Agreement.

2.      Repayment.

Borrower agrees to pay the principal amount of the Mortgage Loan and interest on the principal amount of the Mortgage Loan from time to time outstanding at the Interest Rate or such other rate or rates and at the times specified in the Loan Agreement, together with all other amounts due to Lender under the Loan Documents. The outstanding balance of the Mortgage Loan and all accrued and unpaid interest thereon shall be due and payable on the Maturity Date, together with all other amounts due to Lender under the Loan Documents.

3.      Security

The Mortgage Loan evidenced by this Note, together with all other Indebtedness is secured by, among other things, the Security Instrument, the Loan Agreement and the other Loan Documents. All of the terms, covenants and conditions contained in the Loan Agreement, the Security Instrument and the other Loan Documents are hereby made part of this Note to the same extent and with the same force as if they were fully set forth herein. In the event of a conflict or inconsistency between the terms of this Note and the Loan Agreement, the terms and provisions of the Loan Agreement shall govern.

**EXHIBIT**

_____

Promissory Note

Page 1 of 5

4.      Acceleration

In accordance with the Loan Agreement, if an Event of Default has occurred and is continuing, the entire unpaid principal balance of the Mortgage Loan, any accrued and unpaid interest, including interest accruing at the Default Rate, the Prepayment Premium (if applicable), and all other amounts payable under this Note, the Loan Agreement and any other Loan Documentshall at once become due and payable, at the option of Lender, without any prior notice to Borrower, unless applicable law requires otherwise (and in such case, after satisfactory notice has been given).

5.      Personal Liability.

The provisions of Article 3 (Personal Liability) of the Loan Agreement are hereby incorporated by reference into this Note to the same extent and with the same force as if fully set forth herein.

6.      Governing Law.

This Note shall be governed in accordance with the terms and provisions of Section 15.01 (Governing Law; Consent to Jurisdiction and Venue) of the Loan Agreement.

7.      Waivers.

Presentment, demand for payment, notice of nonpayment and dishonor, protest and notice of protest, notice of acceleration, notice of intent to demand or accelerate payment or maturity, presentment for payment, notice of nonpayment, grace and diligence in collecting the Indebtedness are waived by Borrower, for and on behalf of itself, Guarantor and Key Principal, and all endorsers and guarantors of this Note and all other third party obligors or others who may become liable for the payment of all or any part of the Indebtedness.

8.      Commercial Purpose.

Borrower represents that the Indebtedness is being incurred by Borrower solely for the purpose of carrying on a business or commercial enterprise or activity, and not for agricultural, personal, family or household purposes.

9.      Construction; Joint and Several (or Solidary, as applicable) Liability.

(a)      Section 15.08 (Construction) of the Loan Agreement is hereby incorporated herein as if fully set forth in the body of this Note.

(b)        If more than one Person executes this Note as Borrower, the obligations of such Person shall be joint and several (solidary instead for purposes of Louisiana law).

## 10.        Notices.

All Notices required or permitted to be given by Lender to Borrower pursuant to this Note shall be given in accordance with Section 15.02 (Notice) of the Loan Agreement.

## 11.        Time is of the Essence.

Borrower agrees that, with respect to each and every obligation and covenant contained in this Note, time is of the essence.

## 12.        Loan Charges Savings Clause.

Borrower agrees to pay an effective rate of interest equal to the sum of the Interest Rate and any additional rate of interest resulting from any other charges of interest or in the nature of interest paid or to be paid in connection with the Mortgage Loan and any other fees or amounts to be paid by Borrower pursuant to any of the other Loan Documents. Neither this Note, the Loan Agreement nor any of the other Loan Documents shall be construed to create a contract for the use, forbearance or detention of money requiring payment of interest at a rate greater than the maximum interest rate permitted to be charged under applicable law. It is expressly stipulated and agreed to be the intent of Borrower and Lender at all times to comply with all applicable laws governing the maximum rate or amount of interest payable on the Indebtedness evidenced by this Note and the other Loan Documents. If any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower is interpreted so that any interest or other charge or amount provided for in any Loan Document, whether considered separately or together with other charges or amounts provided for in any other Loan Document, or otherwise charged, taken, reserved or received in connection with the Mortgage Loan, or on acceleration of the maturity of the Mortgage Loan or as a result of any prepayment by Borrower or otherwise, violates that law, and Borrower is entitled to the benefit of that law, that interest or charge is hereby reduced to the extent necessary to eliminate any such violation. Amounts, if any, previously paid to Lender in excess of the permitted amounts shall be applied by Lender to reduce the unpaid principal balance of the Mortgage Loan without the payment of any prepayment premium (or, if the Mortgage Loan has been or would thereby be paid in full, shall be refunded to Borrower), and the provisions of the Loan Agreement and any other Loan Documents immediately shall be deemed reformed and the amounts thereafter collectible under the Loan Agreement and any other Loan Documents reduced, without the necessity of the execution of any new documents, so as to comply with any applicable law, but so as to permit the recovery of the fullest amount otherwise payable under the Loan Documents. For the purpose of determining whether any applicable law

limiting the amount of interest or other charges permitted to be collected from Borrower has been violated, all Indebtedness that constitutes interest, as well as all other charges made in connection with the Indebtedness that constitute interest, and any amount paid or agreed to be paid to Lender for the use, forbearance or detention of the Indebtedness, shall be deemed to be allocated and spread ratably over the stated term of the Mortgage Loan. Unless otherwise required by applicable law, such allocation and spreading shall be effected in such a manner that the rate of interest so computed is uniform throughout the stated term of the Mortgage Loan.

13.     **WAIVER OF TRIAL BY JURY.**

TO THE MAXIMUM EXTENT PERMITTED BY LAW, EACH OF BORROWER AND LENDER (A) AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS NOTE OR THE RELATIONSHIP BETWEEN THE PARTIES AS LENDER AND BORROWER THAT IS TRIABLE OF RIGHT BY A JURY AND (B) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH ISSUE TO THE EXTENT   THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY EACH PARTY, KNOWINGLY AND VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL.

14.     Receipt of Loan Documents.

Borrower acknowledges receipt of a copy of each of the Loan Documents.

15.     Incorporation of Schedules.

The schedules, if any, attached to this Note are incorporated fully into this Note by this reference and each constitutes a substantive part of this Note.

ATTACHED SCHEDULE. The following Schedule is attached to this Note:

NONE

[Remainder of Page Intentionally Blank]

**IN WITNESS WHEREOF.** Borrower has signed and delivered this Note under seal (where applicable) or has caused this Note to be signed and delivered under seal (where applicable) by its duly authorized representative.  Where applicable law so provides, Borrower intends that this Note shall be deemed to be signed and delivered as a sealed instrument.

C. Ray Kennedy

Cynthia M. Kennedy



LOAN AND SECURITY AGREEMENT

BY AND BETWEEN

C. Ray Kennedy & Cynthia M. Kennedy

AND

CHERRYWOOD COMMERCIAL LENDING, LLC, a Delaware limited liability company

DATED AS OF SEPTEMBER 26, 2017

ARTICLE 1 - DEFINITIONS; SUMMARY OF MORTGAGE LOAN TERMS _____ 1
    SECTION.1.01      DEFINED TERMS _____ 1
    SECTION 1.02      SCHEDULES, EXHIBITS, AND ATTACHMENTS INCORPORATED _____ 1
ARTICLE 2 - GENERAL MORTGAGE LOAN TERMS _____ 1
    SECTION 2.01      MORTGAGE LOAN ORIGINATION AND SECURITY _____ 1
    (b)      Making of Mortgage Loan _____ 1
    (c)      Security for Mortgage Loan _____ 1
    (d)      Protective Advances _____ 1
    SECTION 2.02      PAYMENTS ON MORTGAGE LOAN _____ 1
    (a)      Debt Service Payments _____ 1
    (b)      Capitalization of Accrued But Unpaid Interest _____ 2
    (c)      Late Charges _____ 2
    (d)      Default Rate _____ 2
    (e)      Address for Payments _____ 3
    (f)      Application of Payments _____ 3
    SECTION 2.03      PREPAYMENT _____ 3
    (a)      Prepayment; Prepayment Premium; Voluntary Prepayment in Part _____ 3
    (b)      Voluntary Prepayment in Full _____ 3
    (c)      Acceleration of Mortgage Loan _____ 3
    (d)      Application of Collateral _____ 4
    (e)      Casualty and Condemnation _____ 4
    (f)      No Effect on Payment Obligations _____ 4
    (g)      Loss Resulting from Prepayment _____ 4
ARTICLE 3      PERSONAL LIABILITY _____ 4
    SECTION 3.01      BORROWER PERSONALLY LIABLE _____ 4
    SECTION 3.02      [INTENTIONALLY DELETED.] _____ 4
    SECTION 3.03      PERSONAL LIABILITY FOR INDEMNITY OBLIGATIONS _____ 4
    SECTION 3.04      LENDER'S RIGHT TO FOREGO RIGHTS AGAINST MORTGAGED PROPERTY ___ 4
ARTICLE 4      BORROWER STATUS _____ 4
    SECTION 4.01      REPRESENTATIONS AND WARRANTIES _____ 4
    (a)      Due Organization and Qualification _____ 4
    (b)      Location _____ 4
    (c)      Power and Authority _____ 5
    (d)      Due Authorization _____ 5
    (e)      Valid and Binding Obligations _____ 5
    (f)      Effect of Mortgage Loan on Borrower's Financial Condition _____ 5
    (g)      Economic Sanctions, Anti-Money Laundering, and Anti-Corruption _____ 5
    (h)      Borrower Status _____ 5
    (i)      No Bankruptcies or Judgments _____ 6
    (j)      No Litigation _____ 6
    (k)      Payment of Taxes, Assessments, and Other Charges _____ 6
    (l)      Not a Foreign Person _____ 7

| | | |
|---|---|---|
| (m) | ERISA | 7 |
| (n) | Default Under Other Obligations | 7 |
| (o) | Prohibited Person | 7 |
| (p) | No Contravention | 7 |
| (q) | Lockbox Arrangement | 7 |
| SECTION 4.02 | COVENANTS | 7 |
| (a) | Maintenance of Existence; Organizational Documents | 7 |
| (b) | Economic Sanctions, Anti-Money Laundering, and Anti-Corruption | 7 |
| (c) | Payment of Taxes, Assessments, and Other Charges | 8 |
| (d) | Borrower Status | 8 |
| (e) | ERISA | 8 |
| (f) | Notice of Litigation or Insolvency | 9 |
| (g) | Payment of Costs, Fees, and Expenses | 9 |
| (h) | Restrictions on Distributions | 9 |
| (i) | Lockbox Arrangement | 9 |
| ARTICLE 5 | THE MORTGAGE LOAN | 9 |
| SECTION 5.01 | REPRESENTATIONS AND WARRANTIES | 9 |
| (a) | Receipt and Review of Loan Documents | 9 |
| (b) | No Default | 9 |
| (c) | No Defenses | 9 |
| (d) | Loan Document Taxes. | 9 |
| SECTION 5.02 | COVENANTS | 9 |
| (a) | Ratification of Covenants; Estoppels; Certifications | 9 |
| (b) | Further Assurances | 10 |
| (c) | Sale of Mortgage Loan | 10 |
| (d) | Limitations on Further Acts of Borrower. | 10 |
| (e) | Financing Statements; Record Searches | 10 |
| (f) | Loan Document Taxes | 11 |
| ARTICLE 6 | PROPERTY USE, PRESERVATION, AND MAINTENANCE | 11 |
| SECTION 6.01 | REPRESENTATIONS AND WARRANTIES | 11 |
| (a) | Compliance with Law; Permits and Licenses | 11 |
| (b) | Property Characteristics | 11 |
| (c) | Property Ownership | 11 |
| (d) | Condition of the Mortgaged Property. | 11 |
| (e) | Personal Property | 12 |
| SECTION 6.02 | COVENANTS | 12 |
| (a) | Use of Property | 12 |
| (b) | Property Maintenance | 12 |
| (c) | Property Preservation | 13 |
| (d) | Property Inspections | 13 |
| (e) | Compliance with Laws | 13 |
| SECTION 6.03 | MORTGAGE LOAN ADMINISTRATION MATTERS REGARDING THE PROPERTY | 13 |

| | | |
|---|---|---|
| (a) | Property Management | 13 |
| (b) | Subordination of Fees to Affiliated Property Managers | 13 |
| (c) | Physical Needs Assessment | 14 |
| **ARTICLE 7** | **LEASES AND RENTS** | 14 |
| SECTION 7.01 | REPRESENTATIONS AND WARRANTIES | 14 |
| (a) | Prior Assignment of Rents | 14 |
| (b) | Prepaid Rents | 14 |
| (c) | Rent Rolls | 14 |
| SECTION 7.02 | COVENANTS | 14 |
| (a) | Leases | 14 |
| (b) | [Intentionally Deleted] | 15 |
| (c) | Payment of Rents | 15 |
| (d) | Assignment of Rents | 15 |
| (e) | Further Assignments of Leases and Rents | 15 |
| (f) | Options to Purchase by Tenants | 15 |
| SECTION 7.03 | MORTGAGE LOAN ADMINISTRATION REGARDING LEASES AND RENTS | 15 |
| (a) | Lease Requirements | 15 |
| (b) | Rent Schedule | 16 |
| **ARTICLE 8** | **BOOKS AND RECORDS; FINANCIAL REPORTING** | 16 |
| SECTION 8.01 | REPRESENTATIONS AND WARRANTIES | 16 |
| (a) | Financial Information | 16 |
| (b) | No Change in Facts or Circumstances | 16 |
| SECTION 8.02 | COVENANTS | 16 |
| (a) | Obligation to Maintain Accurate Books and Records | 16 |
| (b) | Items to Furnish to Lender | 16 |
| (c) | Audited Financials | 17 |
| (d) | Delivery of Books and Records | 17 |
| SECTION 8.03 | MORTGAGE LOAN ADMINISTRATION MATTERS REGARDING BOOKS AND | 17 |
| (a) | Lender's Right to Obtain Audited Books and Records | 17 |
| (b) | Credit Reports; Credit Score | 18 |
| **ARTICLE 9** | **INSURANCE** | 18 |
| SECTION 9.01 | REPRESENTATIONS AND WARRANTIES | 18 |
| (a) | Compliance with Insurance Requirements | 18 |
| (b) | Property Condition | 18 |
| SECTION 9.02 | COVENANTS | 18 |
| (a) | Insurance Requirements | 18 |
| (b) | Delivery of Policies, Renewals, Notices, and Proceeds | 18 |
| SECTION 9.03 | MORTGAGE LOAN ADMINISTRATION MATTERS REGARDING INSURANCE | 18 |
| (a) | Lender's Ongoing Insurance Requirements | 18 |
| (b) | Application of Proceeds on Event of Loss | 19 |
| (c) | Payment Obligations Unaffected | 19 |
| (d) | Foreclosure Sale | 20 |

| | | | |
|---|---|---|---|
| (e) | Appointment of Lender as Attorney-In-Fact. | | 20 |
| **ARTICLE 10** | **CONDEMNATION** | | 20 |
| SECTION 10.01 | REPRESENTATIONS AND WARRANTIES | | 20 |
| (a) | Prior Condemnation Action. | | 20 |
| (b) | Pending Condemnation Actions | | 20 |
| SECTION 10.02 | COVENANTS | | 20 |
| (a) | Notice of Condemnation | | 20 |
| (b) | Condemnation Proceeds | | 20 |
| SECTION 10.03 | MORTGAGE LOAN ADMINISTRATION MATTERS REGARDING | | 20 |
| (a) | Application of Condemnation Awards | | 20 |
| (b) | Payment Obligations Unaffected | | 20 |
| (c) | Appointment of Lender as Attorney-In-Fact | | 20 |
| (d) | Preservation of Mortgaged Property | | 20 |
| (e) | REMIC Trust | | 20 |
| **ARTICLE 11** | **LIENS, TRANSFERS, AND ASSUMPTIONS** | | 21 |
| SECTION 11.01 | REPRESENTATIONS AND WARRANTIES | | 21 |
| (a) | No Labor or Materialmen's Claims | | 21 |
| (b) | No Other Interests | | 21 |
| SECTION 11.02 | COVENANTS | | 21 |
| (a) | Liens; Encumbrances | | 21 |
| (b) | Transfers | | 21 |
| (c) | No Other Indebtedness and Mezzanine Financing. | | 22 |
| SECTION 11.03 | MORTGAGE LOAN ADMINISTRATION MATTERS REGARDING LIENS, | | 22 |
| (a) | Assumption of Mortgage Loan | | 22 |
| (b) | Acceleration or "Due on Sale" provision | | 23 |
| (c) | [Intentionally Deleted.] | | 23 |
| (d) | [Intentionally Deleted.] | | 23 |
| (e) | [Intentionally Deleted.] | | 23 |
| (f) | Death of Borrower, Key Principal, or Guarantor | | 23 |
| (g) | [Intentionally Deleted.] | | 23 |
| (h) | Further Conditions to Transfers and Assumption. | | 23 |
| **ARTICLE 12** | **IMPOSITIONS** | | 24 |
| SECTION 12.01 | REPRESENTATIONS AND WARRANTIES | | 24 |
| (a) | Payment of Taxes, Assessments, and Other Charges | | 24 |
| SECTION 12.02 | COVENANTS | | 24 |
| (a) | Imposition Deposits, Taxes, and Other Charges | | 24 |
| SECTION 12.03 | REPRESENTATIONS AND WARRANTIES | | 24 |
| (a) | Maintenance of Records by Lender | | 24 |
| (b) | Imposition Accounts | | 24 |
| (c) | Payment of Impositions; Sufficiency of Imposition Deposits | | 24 |
| (d) | Imposition Deposits Upon Event of Default. | | 25 |
| (e) | Contesting Impositions | | 25 |

| | | |
|---|---|---|
| (f) | Release to Borrower _____ | 25 |
| ARTICLE 13 | INTENTIONLY OMITTED _____ | 25 |
| ARTICLE 14 | DEFAULTS/REMEDIES _____ | 25 |
| SECTION 14.01 | EVENTS OF DEFAULT _____ | 25 |
| (a) | Automatic Events of Default _____ | 25 |
| (b) | Events of Default Subject to a Specified Cure Period _____ | 26 |
| (c) | Events of Default Subject to Extended Cure Period. _____ | 26 |
| SECTION 14.02 | REMEDIES _____ | 26 |
| (a) | Acceleration; Foreclosure _____ | 26 |
| (b) | Loss of Right to Disbursements from Collateral Accounts _____ | 26 |
| (c) | Remedies Cumulative _____ | 27 |
| SECTION 14.03 | ADDITIONAL LENDER RIGHTS; FORBEARANCE _____ | 27 |
| (a) | No Effect Upon Obligations _____ | 27 |
| (b) | No Waiver of Rights or Remedies _____ | 27 |
| (c) | Appointment of Lender as Attorney-In-Fact _____ | 27 |
| (d) | Borrower Waivers _____ | 28 |
| SECTION 14.04 | WAIVER OF MARSHALING _____ | 28 |
| ARTICLE 15 | MISCELLANEOUS _____ | 28 |
| SECTION 15.01 | GOVERNING LAW; CONSENT TO JURISDICTION AND VENUE _____ | 28 |
| (a) | Governing Law _____ | 28 |
| (b) | Venue _____ | 28 |
| SECTION 15.02 | NOTICE _____ | 28 |
| (a) | Process of Serving Notice _____ | 28 |
| (b) | Change of Address _____ | 29 |
| (c) | Default Method of Notice _____ | 29 |
| (d) | Receipt of Notices _____ | 29 |
| SECTION 15.03 | SUCCESSORS AND ASSIGNS BOUND; SALE OF MORTGAGE LOAN _____ | 29 |
| (a) | Binding Agreement _____ | 29 |
| (b) | Sale of Mortgage Loan; Change of Loan Servicer _____ | 29 |
| SECTION 15.04 | COUNTERPARTS _____ | 29 |
| SECTION 15.05 | JOINT AND SEVERAL (OR SOLIDARY) LIABILITY _____ | 29 |
| SECTION 15.06 | RELATIONSHIP OF PARTIES; NO THIRD PARTY BENEFICIARY _____ | 29 |
| (a) | Solely Creditor and Debtor _____ | 29 |
| (b) | No Third Party Beneficiaries _____ | 29 |
| SECTION 15.07 | SEVERABILITY; ENTIRE AGREEMENT; AMENDMENTS _____ | 29 |
| SECTION 15.08 | CONSTRUCTION _____ | 29 |
| SECTION 15.09 | MORTGAGE LOAN SERVICING _____ | 30 |
| SECTION 15.10 | DISCLOSURE OF INFORMATION _____ | 30 |
| SECTION 15.11 | WAIVER; CONFLICT _____ | 30 |
| SECTION 15.12 | NO RELIANCE _____ | 30 |
| SECTION 15.13 | SUBROGATION _____ | 30 |
| SECTION 15.14 | COUNTING OF DAYS _____ | 30 |

SECTION 15.15    REVIVAL AND REINSTATEMENT OF INDEBTEDNESS _____ 31
SECTION 15.16    TIME IS OF THE ESSENCE _____ 31
SECTION 15.17    FINAL AGREEMENT _____ 31
SECTION 15.18    WAIVER OF TRIAL BY JURY _____ 31

## SCHEDULES & EXHIBITS

Schedules
Schedule 1       Definitions Schedule
Schedule 2       Summary of Loan Terms
Schedule 3       Interest Rate Type Provisions (required)
Schedule 4       Prepayment Premium Schedule
Schedule 5       Insurance Requirements

## LOAN AND SECURITY AGREEMENT

This LOAN AND SECURITY AGREEMENT (as amended, restated, replaced, supplemented, or otherwise modified from time to time, the "Agreement") is made as of the Effective Date (as hereinafter defined) by and between C. Ray Kennedy & Cynthia M. Kennedy ("Borrower"), and CHERRYWOOD COMMERCIAL LENDING, LLC, a Delaware limited liability company ("Lender").

## RECITALS:

WHEREAS, Borrower desires to obtain the Mortgage Loan (as hereinafter defined) from Lender to be secured by the Mortgaged Property (as hereinafter defined); and

WHEREAS, Lender is willing to make the Mortgage Loan on the terms and conditions contained in this Loan Agreement and in the other Loan Documents (as hereinafter defined);

NOW, THEREFORE, in consideration of the making of the Mortgage Loan by Lender and other good and valuable consideration, the receipt and adequacy of which are hereby conclusively acknowledged, the parties hereby covenant, agree, represent, and warrant as follows

## AGREEMENTS:

### ARTICLE 1- DEFINITIONS; SUMMARY OF MORTGAGE LOAN TERMS:

**Section 1.01**      **Defined Terms**

Capitalized terms not otherwise defined in the body of this Loan Agreement shall have the meanings set forth in the Definitions Schedule attached as Schedule 1 to this Loan Agreement.

**Section 1.02**      **Schedules, Exhibits, and Attachments Incorporated.**

The schedules, exhibits, and any other addenda or attachments are incorporated fully into this Loan Agreement by this reference and each constitutes a substantive part of this Loan Agreement. Any failure of Borrower to initial or sign a schedule or Exhibit shall not affect the enforceability of such Schedule or Exhibit or Borrower's obligation to comply with such Schedule and/or Exhibit.

### ARTICLE 2 - GENERAL MORTGAGE LOAN TERMS

**Section 2.01**      **Mortgage Loan Origination and Security.**

    (a)      **Making of Mortgage Loan.**

Subject to the terms and conditions of this Loan Agreement and the other Loan Documents, Lender hereby makes the Mortgage Loan to Borrower, and Borrower hereby accepts the Mortgage Loan from Lender. Borrower covenants and agrees that it shall:

        (1)      pay the Indebtedness, including the Prepayment Premium, if any (whether in connection with any voluntary prepayment or in connection with an acceleration by Lender of the Indebtedness), in accordance with the terms of this Loan Agreement and the other Loan Documents; and

        (2)      perform, observe, and comply with this Loan Agreement and all other provisions of the other Loan Documents.

    (b)      **Security for Mortgage Loan.**

The Mortgage Loan is made pursuant to this Loan Agreement, is evidenced by the Note, and is secured by the Security Instrument, this Loan Agreement, and the other Loan Documents that are expressly stated to be security for the Mortgage Loan.

    (c)      **Protective Advances.**

Page 1 of 45

As provided in the Security Instrument, Lender, its successors or assigns or the Loan Servicer may take such actions or disburse such funds as Lender reasonably deems necessary to perform the obligations of Borrower under this Loan Agreement and the other Loan Documents and to protect Lender's interest in the Mortgaged Property. Such funds disbursed by the Lender or Loan Servicer shall be advances for which, unless reimbursed by the Borrower to the Lender, its successors or assigns or the Loan Servicer, shall become added to, and become part of, the principal balance of the Indebtedness, be immediately due and payable and bear interest at the Default Rate from the date of disbursement until fully paid.

**Section 2.02**      Payments on Mortgage Loan.

    (a)      Debt Service Payments.

        (1)      Short Month Interest.

If the date the Mortgage Loan proceeds are disbursed is any day other than the first day of the month, interest for the period beginning on the disbursement date and ending on and including the last day of the month in which the disbursement occurs shall be payable by, or credited to, Borrower as set forth in the Summary of Loan Terms.

        (2)      Interest Accrual and Computation.

Except as provided in Section 2.02(a)(1), interest shall be paid in arrears. Interest shall accrue as provided in the Schedule of Interest Rate Type Provisions attached as Schedule 3 to this Loan Agreement and shall be computed in accordance with the Interest Accrual Method. If the Interest Accrual Method is "Actual/360," Borrower acknowledges and agrees that the amount allocated to interest for each month will vary depending on the actual number of calendar days during such month.

        (3)      Monthly Debt Service Payments.

Consecutive monthly debt service installments, each in the amount of the applicable Monthly Debt Service Payment, shall be due and payable on the First Payment Date, and on each Payment Date thereafter until the Maturity Date, at which time all Indebtedness shall be due. Any regularly scheduled Monthly Debt Service Payment that is received by Lender before the applicable Payment Date shall be deemed to have been received on such Payment Date solely for the purpose of calculating interest due. All payments made by Borrower under this Loan Agreement shall be made without set-off, counterclaim, or other defense.

        (4)      Payment at Maturity.

The unpaid principal balance of the Mortgage Loan, any Accrued Interest thereon, any unreimbursed servicing advances, and all other Indebtedness shall be due and payable on the Maturity Date.

        (5)      Interest Rate Type.

See the Schedule of Interest Rate Type Provisions for additional provisions, if any, specific to the Interest Rate Type.

    (b)      Capitalization of Accrued But Unpaid Interest.

Any accrued and unpaid interest on the Mortgage Loan remaining past due for thirty (30) days or more may, at Lender's election, be added to and become part of the unpaid principal balance of the Mortgage Loan.

    (c)      Late Charges.

        (1)      If any Monthly Debt Service Payment due hereunder is not received by Lender within ten (10) days after the applicable Payment Date, or any amount payable under this Loan Agreement (other than the payment due on the Maturity Date for repayment of the Mortgage Loan in full) or any other Loan Document is not received by Lender within ten (10) days after the date such amount is due, inclusive of the date on which such amount is due, Borrower shall pay to Lender, immediately without demand by Lender, the Late Charge.

The Late Charge is payable in addition to, and not in lieu of, any interest payable at the Default Rate pursuant to Section 2.02(d).

        (2)      Borrower acknowledges and agrees that:

           (A)      its failure to make timely payments will cause Lender to incur additional expenses in servicing and processing the Mortgage Loan;

           (B)      it is extremely difficult and impractical to determine those additional expenses;

           (C)      Lender is entitled to be compensated for such additional expenses; and

           (D)      the Late Charge represents a fair and reasonable estimate, taking into account all circumstances existing on the date hereof, of the additional expenses Lender will incur by reason of any such late payment.

    (d)      Default Rate.

(1)     Default interest shall be paid as follows:

(A)     If any amount due in respect of the Mortgage Loan (other than amounts due on the Maturity Date) remains past due for thirty (30) days or more, interest on such unpaid amount(s) shall accrue from the date payment is due at the Default Rate and shall be payable upon demand by Lender.

(B)     If any Indebtedness due is not paid in full on the Maturity Date, then interest shall accrue at the Default Rate on all such unpaid amounts from the Maturity Date until fully paid and shall be payable upon demand by Lender.

Absent a demand by Lender, any such amounts shall be payable by Borrower in the same manner as provided for the payment of Monthly Debt Service Payments. To the extent permitted by applicable law, interest shall also accrue at the Default Rate on any judgment obtained by Lender against Borrower in connection with the Mortgage Loan. To the extent Borrower or any other Person is vested with a right of redemption, interest shall continue to accrue at the Default Rate during any redemption period until such time as the Mortgaged Property has been redeemed.

(2)     Borrower acknowledges and agrees that:

(A)     its failure to make timely payments will cause Lender to incur additional expenses in servicing and processing the Mortgage Loan; and

(B)     in connection with any failure to timely pay all amounts due in respect of the Mortgage Loan on the Maturity Date, or during the time that any amount due in respect of the Mortgage Loan is delinquent for more than thirty (30) days:

(i)     Lender's risk of nonpayment of the Mortgage Loan will be materially increased;

(ii)     Lender's ability to meet its other obligations and to take advantage of other investment opportunities will be adversely impacted;

(iii)     Lender will incur additional costs and expenses arising from its loss of the use of the amounts due;

(iv)     it is extremely difficult and impractical to determine such additional costs and expenses;

(v)     Lender is entitled to be compensated for such additional risks, costs, and expenses; and

(vi)     the increase from the Interest Rate to the Default Rate represents a fair and reasonable estimate of the additional risks, costs, and expenses Lender will incur by reason of Borrower's delinquent payment and the additional compensation Lender is entitled to receive for the increased risks of nonpayment associated with a delinquency on the Mortgage Loan (taking into account all circumstances existing on the Effective Date).

(e)     Address for Payments.

All payments due pursuant to the Loan Documents shall be payable at Lender's Payment Address, as set forth in Schedule 2 to this Loan Agreement, or such other place and in such manner as may be designated from time to time by written notice to Borrower by Lender.

(f)     Application of Payments.

If at any time Lender receives, from Borrower or otherwise, any amount in respect of the Indebtedness that is less than all amounts due and payable at such time, then Lender may apply such payment to amounts then due and payable in any manner and in any order determined by Lender or hold in suspense and not apply such amount at Lender's election. Neither Lender's acceptance of an amount that is less than all amounts then due and payable, nor Lender's application of, or suspension of the application of, such payment, shall constitute or be deemed to constitute either a waiver of the unpaid amounts or an accord and satisfaction. Notwithstanding the application of any such amount to the Indebtedness, Borrower's obligations under this Loan Agreement and the other Loan Documents shall remain unchanged.

Section 2.03     Prepayment.

(a)     Prepayment; Prepayment Premium; Voluntary Prepayment in Part.

(1)     Except as expressly provided in this Loan Agreement (including as provided in the Prepayment Premium Schedule), a Prepayment Premium calculated in accordance with the Prepayment Premium Schedule shall be payable in connection with any prepayment of the Mortgage Loan. Borrower may voluntarily prepay the Mortgage Loan in part on any Permitted Payment Date. In connection with any voluntary prepayment in part, Borrower acknowledges and agrees that the Prepayment Premium due on such prepaid amount shall be immediately due and payable and may be netted out of the principal portion of such prepayment.

(b)     Voluntary Prepayment in Full.

Borrower may voluntarily prepay the Mortgage Loan in full on a Permitted Prepayment Date so long as:

    (1)    Borrower delivers to Lender a Prepayment Notice specifying the Intended Prepayment Date not more than sixty (60) days, but not less than thirty (30) days (if given via U.S. Postal Service) or twenty (20) days (if given via facsimile, e-mail, or overnight courier) prior to such Intended Prepayment Date; and

    (2)    Borrower pays to Lender an amount equal to the sum of:

        (A)    the entire unpaid principal balance of the Mortgage Loan; plus

        (B)    all Accrued Interest (calculated through the last day of the month in which the prepayment occurs); plus

        (C)    the Prepayment Premium; plus

        (D)    all other Indebtedness.

In connection with any such voluntary prepayment, Borrower acknowledges and agrees that interest shall always be calculated and paid through the last day of the month in which the prepayment occurs (even if the Permitted Prepayment Date for such month is not the last day of such month, or if Lender approves prepayment on an Intended Prepayment Date that is not a Permitted Prepayment Date). Borrower further acknowledges that Lender is not required to accept a voluntary prepayment of the Mortgage Loan on any day other than a Permitted Prepayment Date. However, if Lender does approve an Intended Prepayment Date that is not a Permitted Prepayment Date and accepts a prepayment on such Intended Prepayment Date, such prepayment shall be deemed to be received on the immediately following Permitted Prepayment Date. If Borrower fails to prepay the Mortgage Loan on the Intended Prepayment Date for any reason (including on any Intended Prepayment Date that is approved by Lender) and such failure either continues for five (5) Business Days, or into the following month, Lender shall have the right to recalculate the payoff amount. If Borrower prepays the Mortgage Loan either in the following month or more than five (5) Business Days after the Intended Prepayment Date that was approved by Lender, Lender shall also have the right to recalculate the payoff amount based upon the amount of such payment and the date such payment was received by Lender. Borrower shall immediately pay to Lender any additional amounts required by any such recalculation.

    (c)    **Acceleration of Mortgage Loan.**

Upon acceleration of the Mortgage Loan, Borrower shall pay to Lender:

        (1)    the entire unpaid principal balance of the Mortgage Loan; plus

        (2)    all Accrued Interest (calculated through the last day of the month in which the acceleration occurs); plus

        (3)    the Prepayment Premium; plus

        (4)    all other Indebtedness.

    (d)    **Application of Collateral.**

Any application by Lender of any collateral or other security to the repayment of all or any portion of the unpaid principal balance of the Mortgage Loan prior to the Maturity Date in accordance with the Loan Documents shall be deemed to be a prepayment by Borrower. Any such prepayment shall require the payment to Lender by Borrower of the Prepayment Premium calculated on the amount being prepaid in accordance with this Loan Agreement.

    (e)    **Casualty and Condemnation.**

Notwithstanding any provision of this Loan Agreement to the contrary, no Prepayment Premium shall be payable with respect to any prepayment occurring as a result of the application of any insurance proceeds or amounts received in connection with a Condemnation Action in accordance with this Loan Agreement.

    (f)    **No Effect on Payment Obligations.**

Unless otherwise expressly provided in this Loan Agreement, any prepayment required by any Loan Document of less than the entire unpaid principal balance of the Mortgage Loan shall not extend or postpone the due date of any subsequent Monthly Debt Service Payments or other payment, or change the amount of any such payments or deposits.

    (g)    **Loss Resulting from Prepayment.**

In any circumstance in which a Prepayment Premium is due under this Loan Agreement, Borrower acknowledges that:

    (1)    any prepayment of the unpaid principal balance of the Mortgage Loan, whether voluntary or involuntary, or following the occurrence of an Event of Default by Borrower, will result in Lender's incurring loss, including reinvestment loss, additional risk, expense, and frustration or impairment of Lender's ability to meet its commitments to third parties;

    (2)    it is extremely difficult and impractical to ascertain the extent of such losses, risks, and damages;

    (3)    the formula for calculating the Prepayment Premium represents a reasonable estimate of the losses, risks, and damages Lender will incur as a result of a prepayment; and

Page 4 of 45

(4)     the provisions regarding the Prepayment Premium contained in this Loan Agreement are a material part of the consideration for the Mortgage Loan, and that the terms of the Mortgage Loan are in other respects more favorable to Borrower as a result of Borrower's voluntary agreement to such prepayment provisions.

## ARTICLE 3 - PERSONAL LIABILITY

**Section 3.01**     **Borrower Personally Liable.**

The Mortgage Loan is a full recourse loan and Borrower is personally liable for all obligations hereunder, including payment of the Indebtedness.

**Section 3.02**     [Intentionally Deleted.]

**Section 3.03**     **Personal Liability for Indemnity Obligations.**

Borrower shall be personally and fully liable to Lender for Borrower's indemnity obligations under the Required Repairs Agreement, the Environmental Indemnity Agreement, and any other express indemnity obligations provided by Borrower under any Loan Document. Borrower's liability for such indemnity obligations shall not be limited by the amount of the Indebtedness, the repayment of the Indebtedness, or otherwise, provided that Borrower's liability for such indemnities shall not include any loss caused by the gross negligence or willful misconduct of Lender as determined by a court of competent jurisdiction pursuant to a final non-appealable court order.

**Section 3.04**     **Lender's Right to Forego Rights Against Mortgaged Property.**

Lender may exercise its rights against Borrower personally to the fullest extent permitted by applicable law without regard to whether Lender has exercised any rights against the Mortgaged Property, the UCC Collateral, or any other security, or pursued any rights against Guarantor, or pursued any other rights available to Lender under this Loan Agreement, any other Loan Document, or applicable law. To the fullest extent permitted by applicable law, in any action to enforce Borrower's personal liability under this Article 3, Borrower waives any right to set off the value of the Mortgaged Property against such personal liability.

## ARTICLE 4 - BORROWER STATUS

**Section 4.01**     **Representations and Warranties.**

The representations and warranties made by Borrower to Lender in this Section 4.01 are made as of the date hereof and the Effective Date and are true and correct.

(a)     **Due Organization and Qualification.**

If Borrower is not an individual, Borrower is validly existing and qualified to transact business and is in good standing in the state in which it is formed or organized, the Property Jurisdiction, and in each other jurisdiction that qualification or good standing is required according to applicable law to conduct its business with respect to the Mortgaged Property and where the failure to be so qualified or in good standing would adversely affect Borrower's operation of the Mortgaged Property or the validity, enforceability or the ability of Borrower to perform its obligations under this Loan Agreement or any other Loan Document.

(b)     Intentionally Deleted

(c)     **Power and Authority.**

Borrower has the requisite power and authority:

(1)     to own the Mortgaged Property and to carry on its business as now conducted and as contemplated to be conducted in connection with the performance of its obligations under this Loan Agreement and under the other Loan Documents to which it is a party; and

(2)     to execute and deliver this Loan Agreement and the other Loan Documents to which it is a party, and to carry out the transactions contemplated by this Loan Agreement and the other Loan Documents to which it is a party.

(d)     **Due Authorization.**

The execution, delivery, and performance of this Loan Agreement and the other Loan Documents to which it is a party have been duly authorized by all necessary action and proceedings by or on behalf of Borrower, and no further approvals or filings of any kind, including any approval of or filing with any Governmental Authority, are required by or on behalf of Borrower as a condition to the valid execution, delivery, and performance by Borrower of this Loan Agreement or any of the other Loan Documents to which it is a party, except filings required to perfect and maintain the liens to be granted under the Loan Documents and, if the Borrower is not an individual, routine filings to maintain good standing and its existence.

Page 5 of 45

(e)      Valid and Binding Obligations.

This Loan Agreement and the other Loan Documents to which it is a party have been duly executed and delivered by Borrower and constitute the legal, valid, and binding obligations of Borrower, enforceable against Borrower in accordance with their respective terms, except as such enforceability may be limited by applicable Insolvency Laws or by the exercise of discretion by any court.

(f)      Effect of Mortgage Loan on Borrower's Financial Condition.

Borrower is not presently Insolvent, and the Mortgage Loan will not render Borrower Insolvent. Borrower has sufficient working capital, including proceeds from the Mortgage Loan, cash flow from the Mortgaged Property, or other sources, not only to adequately maintain the Mortgaged Property, but also to pay all of Borrower's outstanding debts as they come due, including all Debt Service Amounts. In connection with the execution and delivery of this Loan Agreement and the other Loan Documents (and the delivery to, or for the benefit of, Lender of any collateral contemplated thereunder), and the incurrence by Borrower of the obligations under this Loan Agreement and the other Loan Documents, Borrower did not receive less than reasonably equivalent value in exchange for the incurrence of the obligations of Borrower under this Loan Agreement and the other Loan Documents.

(g)      Economic Sanctions, Anti-Money Laundering, and Anti-Corruption.

(1)      None of Borrower, Guarantor, or Key Principal, nor to Borrower's knowledge, any Person Controlling Borrower, Guarantor, or Key Principal, nor any Person Controlled by Borrower, Guarantor, or Key Principal that also has a direct or indirect ownership interest in any of them, is in violation of:

(A)      any applicable anti-money laundering laws, including those contained in the Bank Secrecy Act and USA Patriot Act of 2001; and

(B)      any applicable anti-drug trafficking, anti-terrorism, or anti-corruption laws, civil or criminal.

(2)      None of Borrower, Guarantor, or Key Principal, nor to Borrower's knowledge, any Person Controlling Borrower, Guarantor, or Key Principal, nor any Person Controlled by Borrower, Guarantor, or Key Principal that also has a direct or indirect ownership interest in any of them, is a Person:

(A)      that is charged with, or has received actual notice that he, she, or it is under investigation for, any violation of any laws described in Section 4.01(g)(1);

(B)      that has been convicted of any violation of, has been subject to civil penalties pursuant to, or had any of its property seized or forfeited under, any laws described in Section 4.01(g)(1); or

(C)      with whom any United States Person, any entity organized under the laws of the United States or its constituent states or territories, or any entity, regardless of where organized, having its principal place of business within the United States or any of its territories, is prohibited from transacting business of the type contemplated by this Loan Agreement and the other Loan Documents under any other applicable law.

(3)      None of Borrower, Guarantor, or Key Principal, nor to Borrower's knowledge, any Person Controlling Borrower, Guarantor, or Key Principal, nor any Person Controlled by Borrower, Guarantor, or Key Principal that also has a direct or indirect ownership interest in any of them, is in violation of any obligation to maintain appropriate internal controls as required by the governing laws of the jurisdiction of such Person as are necessary to ensure compliance with the economic sanctions, anti-money laundering, and anti-corruption laws of the United States and the jurisdiction where the Person resides, is domiciled, or has its principal place of business.

(4)      Borrower, Guarantor, and Key Principal are in compliance with all applicable economic sanctions laws administered by OFAC, the United States Department of State, or the United States Department of Commerce.

(h)      Borrower Status.

Borrower:

(1)      does not own or lease any real property, personal property or assets other than the Mortgaged Property, unless Borrower is an individual;

(2)      does not own, operate or participate in any business other than the leasing, ownership, management, operation and maintenance of the Mortgaged Property, unless Borrower is an individual;

(3)      has no material financial obligation under or secured by any indenture, mortgage, deed of trust, deed to secure debt, loan agreement or other agreement or instrument to which the Borrower is a party, or by which Borrower is otherwise bound, or to which the Mortgaged Property is subject or by which it is otherwise encumbered, other than:

(A)      unsecured trade payables incurred in the ordinary course of the operation of the Mortgaged Property, provided that any trade payables (i) are not evidenced by a promissory note, and (ii) are paid within sixty (60) days of the due date of such trade payable;

Page 6 of 45

(B)    if the Security Instrument grants a lien on a leasehold estate, Borrower's obligations as lessee under the ground lease creating such leasehold estate;

(C)    obligations under the Loan Documents and obligations secured by the Mortgaged Property to the extent permitted by the Loan Documents;

(D)    if Borrower is an individual, obligations that do not subject, pledged or otherwise encumber the Mortgaged Property.

(4)    has accurately maintained its financial statements, accounting records, and other partnership, real estate investment trust, limited liability company, or corporate documents, as the case may be, separate from those of any other Person (unless Borrower's assets have been included in a consolidated financial statement prepared in accordance with generally accepted accounting principles);

(5)    has not commingled its assets or funds with those of any other Person, unless such assets or funds can easily be segregated and identified in the ordinary course of business from those of any other Person;

(6)    has been adequately capitalized in light of its contemplated and actual business operations;

(7)    has not assumed, guaranteed, or pledged the Mortgaged Property or if Borrower is not an individual, any of its assets to secure the liabilities or obligations of any other Person (except in connection with the Mortgage Loan or other mortgage loans that have been paid in full or collaterally assigned to Lender, including in connection with any Consolidation, Extension and Modification Agreement or similar instrument), or held out its credit as being available to satisfy the obligations of any other Person;

(8)    if Borrower is not an individual, has not made loans or advances to any other Person; and

(9)    has not entered into, and is not a party to, any transaction with any Borrower Affiliate, except in the ordinary course of business and on terms which are no more favorable to any such Borrower Affiliate than would be obtained in a comparable arm's length transaction with an unrelated third party.

(i)    No Bankruptcies or Judgments.

None of Borrower, Guarantor, or Key Principal, nor to Borrower's knowledge, any Person Controlling Borrower, Guarantor, or Key Principal, nor any Person Controlled by Borrower, Guarantor, or Key Principal that also has a direct or indirect ownership interest in any of them, is currently:

(1)    the subject of or a party to any completed or pending bankruptcy, reorganization, including any receivership or other insolvency proceeding;

(2)    preparing or intending to be the subject of a Bankruptcy Event; or

(3)    the subject of any judgment unsatisfied of record or docketed in any court; or

(4)    Insolvent.

(j)    No Litigation.

(1)    There are no claims, actions, suits, or proceedings at law or in equity (including any insolvency, bankruptcy, or receivership proceedings) by or before any Governmental Authority now pending or, to Borrower's knowledge, threatened against or affecting Borrower or the Mortgaged Property not otherwise covered by insurance (except for claims, actions, suits, or proceedings regarding fair housing, anti-discrimination, or equal opportunity, which shall always be disclosed); and

(2)    there are no claims, actions, suits, or proceedings at law or in equity (including any insolvency, bankruptcy, or receivership proceedings) by or before any Governmental Authority now pending or, to Borrower's knowledge, threatened against or affecting Guarantor or Key Principal, which claims, actions, suits, or proceedings, if adversely determined (individually or in the aggregate) would reasonably be expected to materially adversely affect the financial condition or business of Borrower, Guarantor, or Key Principal or the condition, operation, or ownership of the Mortgaged Property (except for claims, actions, suits, or proceedings regarding fair housing, anti-discrimination, or equal opportunity, which shall always be deemed material).

(k)    Payment of Taxes, Assessments, and Other Charges.

Borrower confirms that:

(1)    it has filed all federal, state, county, and municipal tax returns and reports required to have been filed by Borrower;

(2)    it has paid, before any fine, penalty, interest, lien, or costs may be added thereto, all taxes, governmental charges, and assessments due and payable with respect to such returns and reports;

(3)    there is no controversy or objection pending, or to the knowledge of Borrower, threatened in respect of any tax returns of Borrower; and

Page 7 of 45

(4)     it has made adequate reserves on its books and records for all taxes that have accrued but which are not yet due and payable.

(l)     Not a Foreign Person.

Borrower is not a "foreign person" within the meaning of Section 1445(f)(3) of the Internal Revenue Code.

(m)     ERISA.

Borrower represents and warrants that:

(1)     Borrower is not an Employee Benefit Plan;

(2)     no asset of Borrower constitutes "plan assets" (within the meaning of Section 3(42) of ERISA and Department of Labor Regulation Section 2510.3-101) of an Employee Benefit Plan;

(3)     no asset of Borrower is subject to any laws of any Governmental Authority governing the assets of an Employee Benefit Plan; and

(4)     neither Borrower nor any ERISA Affiliate is subject to any obligation or liability with respect to any ERISA Plan.

(n)     Default Under Other Obligations.

(1)     The execution, delivery, and performance of the obligations imposed on Borrower under this Loan Agreement and the Loan Documents to which it is a party will not cause Borrower to be in default under the provisions of any agreement, judgment, or order to which Borrower is a party or by which Borrower is bound or results in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of its property or assets, except as contemplated by the provisions of the Loan Documents.

(2)     None of Borrower, Guarantor, or Key Principal is in default under any obligation to Lender.

(o)     Prohibited Person.

None of Borrower, Guarantor or Key Principal is a Prohibited Person nor, to Borrower's Knowledge is any of the following Persons a Prohibited Person:

(1)     a Person controlling Borrower, Guarantor, or Key Principal; or

(2)     a Person controlled by and having a direct or indirect ownership interest in Borrower, Guarantor, or Key Principal a Prohibited Person.

(p)     No Contravention.

Neither the execution and delivery of this Loan Agreement and the other Loan Documents to which Borrower is a party, nor the fulfillment of or compliance with the terms and conditions of this Loan Agreement and the other Loan Documents to which Borrower is a party, nor the performance of the obligations of Borrower under this Loan Agreement and the other Loan Documents does or will conflict with or result in any breach or violation of, or constitute a default under, any of the terms, conditions, or provisions of Borrower's organizational documents, or any indenture, existing agreement, or other instrument to which Borrower is a party or to which Borrower, the Mortgaged Property, or other assets of Borrower are subject.

(q)     Lockbox Arrangement.

Neither Borrower nor the direct or indirect owners of Borrower is party to any type of lockbox agreement or other similar cash management arrangement with any direct or indirect owner of Borrower that has not been approved by Lender in writing. In the event that Lender has approved any such arrangement, Borrower has, at Lender's option, entered into a lockbox agreement or other similar cash management agreement with Lender in form and substance acceptable to Lender.

Section 4.02     Covenants.

(a)     Maintenance of Existence; Organizational Documents.

Borrower shall maintain its existence, its entity status, franchises, rights, and privileges under the laws of the state of its formation or organization. Borrower shall continue to be duly qualified and in good standing to transact business in each jurisdiction in which qualification or standing is required according to applicable law to conduct its business with respect to the Mortgaged Property and where the failure to do so would adversely affect Borrower's operation of the Mortgaged Property or the validity, enforceability, or the ability of Borrower to perform its obligations under this Loan Agreement or any other Loan Document. Neither Borrower nor any partner, member, manager, officer, or director of Borrower shall:

(1)     make or allow any material change to the organizational documents or organizational structure of Borrower, including changes relating to the Control of Borrower, or

(2)     file any action, complaint, petition, or other claim to:

(A)     divide, partition, or otherwise compel the sale of the Mortgaged Property, or

(B)     otherwise change the Control of Borrower.

Page 8 of 45

The foregoing covenants in this Section 4.02(a), other than that set forth in clause (a)(2)(A), shall not apply if Borrower is an individual.

(b)    Economic Sanctions, Anti-Money Laundering, and Anti-Corruption.

(1)    Borrower shall at all times remain, and shall cause Guarantor, Key Principal, and any Person Controlling Borrower, Guarantor, or Key Principal, or any Person Controlled by Borrower, Guarantor, or Key Principal that also has a direct or indirect ownership interest in any of them to remain, in compliance with:

(A)    any applicable anti-money laundering laws, including those contained in the Bank Secrecy Act; and

(B)    any applicable anti-drug trafficking, anti-terrorism, or anti-corruption laws, civil or criminal.

(2)    At no time shall Borrower, Guarantor, or Key Principal, or any Person Controlling Borrower, Guarantor, or Key Principal, or any Person Controlled by Borrower, Guarantor, or Key Principal that also has a direct or indirect ownership interest in any of them, be a Person:

(A)    that is charged with, or has received actual notice that he, she, or it is under investigation for, any violation of any laws described in Section 4.02(b)(1);

(B)    that has been convicted of any violation of, has been subject to civil penalties pursuant to, or had any of its property seized or forfeited under, any laws described in Section 4.02(b)(1); or

(C)    with whom any United States Person, any entity organized under the laws of the United States or its constituent states or territories, or any entity, regardless of where organized, having its principal place of business within the United States or any of its territories, is prohibited from transacting business of the type contemplated by this Loan Agreement and the other Loan Documents under any other applicable law.

(3)    At no time shall Borrower, Guarantor, or Key Principal, or any Person Controlling Borrower, Guarantor, or Key Principal, or any Person Controlled by Borrower, Guarantor, or Key Principal that also has a direct or indirect ownership interest in any of them, be a Person in violation of any obligation to maintain appropriate internal controls as required by the governing laws of the jurisdiction of such Person as are necessary to ensure compliance with the economic sanctions, anti-money laundering, and anti-corruption laws of the United States and the jurisdiction where the Person resides, is domiciled or has its principal place of business.

(4)    Borrower shall at all times remain, and shall cause Guarantor and Key Principal to remain, in compliance with any applicable economic sanctions laws administered by OFAC, the United States Department of State, or the United States Department of Commerce.

(c)    Payment of Taxes, Assessments, and Other Charges.

Borrower shall file all federal, state, county, and municipal tax returns and reports required to be filed by Borrower and shall pay, before any fine, penalty, interest, or cost may be added thereto, all taxes payable with respect to such returns and reports.

(d)    Borrower Status.

Until the Indebtedness is fully paid, Borrower:

(1)    unless Borrower is an individual, shall not acquire or lease any real property, personal property or other assets other than the Mortgaged Property, unless Borrower is an individual;

(2)    unless Borrower is an individual, shall not acquire, own, operate, or participate in any business other than the leasing, ownership, management, operation and maintenance, of the Mortgaged Property, unless Borrower is an individual;

(3)    shall not commingle its assets or funds with those of any other Person, unless such assets or funds can easily be segregated and identified in the ordinary course of business from those of any other Person;

(4)    shall accurately maintain its financial statements, accounting records, and other partnership, real estate investment trust, limited liability company, or corporate documents, as the case may be, separate from those of any other Person (unless Borrower's assets are included in a consolidated financial statement prepared in accordance with generally accepted accounting principles);

(5)    shall have no material financial obligation under or secured by any indenture, mortgage, deed of trust, deed to secure debt, loan agreement or other agreement or instrument to which the Borrower is a party, or by which Borrower is otherwise bound, or to which the Mortgaged Property is subject or by which it is otherwise encumbered, other than:

(A)    unsecured trade payables incurred in the ordinary course of the operation of the Mortgaged Property, provided that any trade payables (i) are not evidenced by a promissory note, and (ii) are paid within sixty (60) days of the due date of such trade payable;

(B)         if the Security Instrument grants a lien on a leasehold estate, Borrower's obligations as lessee under the ground lease creating such leasehold estate; and

(C)         obligations under the Loan Documents and obligations secured by the Mortgaged Property to the extent permitted by the Loan Documents;

(D)         If Borrower is an individual, obligations that do not subject, pledge or otherwise encumber the Mortgaged Property.

(6)         shall not assume, guaranty, or pledge the Mortgaged Property nor, unless Borrower is an individual, any of its assets to secure the liabilities or obligations of any other Person (except in connection with the Mortgage Loan or other mortgage loans that have been paid in full collaterally assigned to Lender, including in connection with any Consolidation, Extension and Modification Agreement or similar instrument) or hold out its credit as being available to satisfy the obligations of any other Person;

(7)         shall not make loans or advances to any other Person; or

(8)         shall not enter into, or become a party to, any transaction with any Borrower Affiliate, except in the ordinary course of business and on terms which are no more favorable to any such Borrower Affiliate than would be obtained in a comparable arm's-length transaction with an unrelated third party.

(e)     **ERISA.**

Borrower covenants that:

(1)         no asset of Borrower shall constitute "plan assets" (within the meaning of Section 3(42) of ERISA and Department of Labor Regulation Section 2510.3-101) of an Employee Benefit Plan;

(2)         no asset of Borrower shall be subject to the laws of any Governmental Authority governing the assets of an Employee Benefit Plan; and

(3)         neither Borrower nor any ERISA Affiliate shall incur any obligation or liability with respect to any ERISA Plan.

(f)     **Notice of Litigation or Insolvency.**

Borrower shall give immediate written notice to Lender of any claims, actions, suits, or proceedings at law or in equity (including any insolvency, bankruptcy, or receivership proceeding) by or before any Governmental Authority pending or, to Borrower's knowledge, threatened against or affecting Borrower, Guarantor, Key Principal, or the Mortgaged Property, which claims, actions, suits, or proceedings, if adversely determined reasonably could be expected to materially adversely affect the financial condition or business of Borrower, Guarantor, or Key Principal, or the condition, operation, or ownership of the Mortgaged Property (including any claims, actions, suits, or proceedings regarding fair housing, anti-discrimination, or equal opportunity, which shall always be deemed material).

(g)     **Payment of Costs, Fees, and Expenses.**

In addition to the payments specified in this Loan Agreement, Borrower shall pay, on demand, all of Lender's out-of-pocket fees, costs, charges, or expenses (including the reasonable fees and expenses of attorneys, accountants, and other experts) incurred by Lender in connection with:

(1)         any amendment to, or consent, or waiver required under, this Loan Agreement or any of the Loan Documents (whether or not any such amendments, consents, or waivers are entered into);

(2)         defending or participating in any litigation arising from actions by third parties and brought against or involving Lender with respect to:

(A)         the Mortgaged Property;

(B)         any event, act, condition, or circumstance in connection with the Mortgaged Property; or

(C)         the relationship between Lender, Borrower, Key Principal, and Guarantor in connection with this Loan Agreement or any of the transactions contemplated by this Loan Agreement;

(3)         the administration or enforcement of, or preservation of rights or remedies under, this Loan Agreement or any other Loan Documents including, or in connection with, any litigation or appeals, any Foreclosure Event or other disposition of any collateral granted pursuant to the Loan Documents; and

(4)         any Bankruptcy Event or Guarantor Bankruptcy Event.

(h)     **Restrictions on Distributions.**

Borrower shall not declare or make any distributions or dividends of any nature to any Person having an ownership interest in Borrower if an Event of Default has occurred and is continuing.

(i)     **Lockbox Arrangement.**

Neither Borrower nor the direct or indirect owners of Borrower shall enter into any type of lockbox agreement or other similar cash management arrangement with any direct or indirect owner of Borrower without the prior written consent of Lender. In the event that Lender issues such consent, Borrower shall, at Lender's option, be required to enter into a lockbox agreement or other similar cash management agreement with Lender in form and substance acceptable to Lender.

## ARTICLE 5 – THE MORTGAGE LOAN

**Section 5.01**        **Representations and Warranties.**

The representations and warranties made by Borrower to Lender in this Section 5.01 are made as of the date hereof and the Effective Date and are true and correct.

(a)        Receipt and Review of Loan Documents.

Borrower has received and reviewed this Loan Agreement and all of the other Loan Documents. All information, documentation and data provided by, or on behalf of the Borrower to Lender is complete, true and correct in all material respects as of the date furnished and the date hereof.

(b)        No Default.

No Event of Default exists under any of the Loan Documents, and the execution, delivery, and performance of the obligations imposed on Borrower under the Loan Documents will not cause Borrower to be in default under the provisions of any agreement, judgment, or order to which Borrower is a party or by which Borrower is bound.

(c)        No Defenses.

The Loan Documents are not currently subject to any right of rescission, set-off, counterclaim, or defense by either Borrower or Guarantor, including the defense of usury, and neither Borrower nor Guarantor has asserted any right of rescission, set-off, counterclaim, or defense with respect thereto.

(d)        Loan Document Taxes.

All mortgage, mortgage recording, stamp, intangible, or any other similar taxes required to be paid by any Person under applicable law currently in effect in connection with the execution, delivery, recordation, filing, registration, perfection, or enforcement of any of the Loan Documents, including the Security Instrument, have been paid or will be paid by Borrower in the ordinary course of the closing of the Mortgage Loan.

**Section 5.02**        **Covenants**

(a)        Ratification of Covenants; Estoppels; Certifications.

Borrower shall:

(1)        promptly notify Lender in writing upon any violation of any covenant set forth in any Loan Document of which Borrower has notice or knowledge; provided, however, any such written notice by Borrower to Lender shall not relieve Borrower of, or result in a waiver of, any obligation under this Loan Agreement or any other Loan Document; and

(2)        within ten (10) days after a request from Lender, provide a written statement, signed and acknowledged by Borrower, certifying to Lender or any person designated by Lender, as of the date of such statement:

(A)        that the Loan Documents are unmodified and in full force and effect (or, if there have been modifications, that the Loan Documents are in full force and effect as modified and setting forth such modifications);

(B)        the unpaid principal balance of the Mortgage Loan;

(C)        the date to which interest on the Mortgage Loan has been paid;

(D)        that Borrower is not in default in paying the Indebtedness or in performing or observing any of the covenants or agreements contained in this Loan Agreement or any of the other Loan Documents (or, if Borrower is in default, describing such default in reasonable detail);

(E)        whether or not there are then-existing any setoffs or defenses known to Borrower against the enforcement of any right or remedy of Lender under the Loan Documents; and

(F)        any additional facts reasonably requested in writing by Lender.

(b)        Further Assurances.

(1)        Other Documents As Lender May Require.

Page 11 of 45

Within ten (10) days after request by Lender, Borrower shall, subject to Section 5.02(d) below, execute, acknowledge, and deliver, at its cost and expense, all further acts, deeds, conveyances, assignments, financing statements, transfers, and assurances as Lender may reasonably require from time to time in order to better assure, grant, and convey to Lender the rights intended to be granted, now or in the future, to Lender under this Loan Agreement and the other Loan Documents.

(2)    Corrective Actions.

Within ten (10) days after request by Lender, Borrower shall provide, or cause to be provided, to Lender, at Borrower's cost and expense, such further documentation or information reasonably deemed necessary or appropriate by Lender in the exercise of its rights under the Loan Documents or to correct patent mistakes in the Loan Documents, the Title Policy, or the funding of the Mortgage Loan.

(c)    Sale of Mortgage Loan.

Borrower shall, subject to Section 5.02(d) below:

(1)    comply with the reasonable requirements of Lender or any Investor of the Mortgage Loan or provide, or cause to be provided, to Lender or any Investor of the Mortgage Loan within ten (10) days of the request, at Borrower's cost and expense, such further documentation or information as Lender or Investor may reasonably require, in order to enable:

(A)    Lender to sell the Mortgage Loan to such Investor;

(B)    Lender to obtain a refund of any commitment fee from any such Investor; or

(C)    any such Investor to further sell or securitize the Mortgage Loan;

(2)    ratify and affirm in writing the representations and warranties set forth in any Loan Document as of such date specified by Lender, modified as necessary to reflect changes that have occurred subsequent to the Effective Date;

(3)    confirm that Borrower is not in default in paying the Indebtedness or in performing or observing any of the covenants or agreements contained in this Loan Agreement or any of the other Loan Documents (or, if Borrower is in default, describing such default in reasonable detail); and

(4)    execute and deliver to Lender and/or any Investor such other documentation, including any amendments, corrections, deletions, or additions to this Loan Agreement or other Loan Document(s) as is reasonably required by Lender or such Investor.

(d)    Limitations on Further Acts of Borrower.

Nothing in Section 5.02(b) and Section 5.02(c) shall require Borrower to do any further act that has the effect of:

(1)    materially changing the economic terms of the Mortgage Loan set forth in the Summary of Loan Terms to this Loan Agreement;

(2)    imposing on Borrower or Guarantor greater personal liability under the Loan Documents ; or

(3)    materially changing the rights and obligations of Borrower or Guarantor than those set forth under the Loan Documents.

(e)    Financing Statements; Record Searches.

(1)    Borrower shall pay all costs and expenses associated with:

(A)    any filing or recording of any financing statements, including all continuation statements, termination statements, and amendments or any other filings related to security interests in or liens on collateral; and

(B)    any record searches for financing statements that Lender may require.

(2)    Borrower hereby authorizes Lender to file any financing statements, continuation statements, termination statements, and amendments (including an "all assets" or "all personal property" collateral description or words of similar import) in form and substance as Lender may require in order to protect and preserve Lender's lien priority and security interest in the Mortgaged Property (and to the extent Lender has filed any such financing statements, continuation statements, or amendments prior to the Effective Date, such filings by Lender are hereby authorized and ratified by Borrower).

(f)    Loan Document Taxes.

Borrower shall pay, on demand, any transfer taxes, documentary taxes, assessments, or charges made by any Governmental Authority in connection with the execution, delivery, recordation, filing, registration, perfection, or enforcement of any of the Loan Documents or the Mortgage Loan.

## ARTICLE 6 - PROPERTY USE, PRESERVATION, AND MAINTENANCE

**Section 6.01        Representations and Warranties.**

The representations and warranties made by Borrower to Lender in this Section 6.01 are made as of the date hereof and the Effective Date and are true and correct.

(a)        Compliance with Law; Permits and Licenses.

(1)        To Borrower's knowledge, all improvements to the Land and the use of the Mortgaged Property comply with all applicable laws, ordinances, statutes, rules, and regulations, including all applicable statutes, rules, and regulations pertaining to requirements for equal opportunity, anti-discrimination, fair housing, rent control, and environmental protection, and Borrower has no knowledge of any action or proceeding (or threatened action or proceeding) regarding noncompliance or nonconformity with any of the foregoing.

(2)        To Borrower's knowledge, there is no evidence of any illegal activities on the Mortgaged Property.

(3)        All required permits, licenses, and certificates to comply with all zoning and land use statutes, laws, ordinances, rules, and regulations, and all applicable health, fire, safety, and building codes, and for the lawful use and operation of the Mortgaged Property, including certificates of occupancy, apartment licenses, or the equivalent, have been obtained and are in full force and effect.

(4)        No portion of the Mortgaged Property has been purchased with the proceeds of any illegal activity.

(b)        Property Characteristics.

(1)        No part of the Land is included or assessed under or as part of another tax lot or parcel, and no part of any other property is included or assessed under or as part of the tax lot or parcels for the Land.

(2)        The Mortgaged Property is located on or adjacent to a public road and has direct legal access to such road, or, has access via an irrevocable easement or irrevocable right of way permitting ingress and egress to/from a public road.

(3)        The Mortgaged Property is served by or has uninhibited access rights to public or private water and sewer (or well and septic) and all required utilities, all of which are appropriate for the current use of the Mortgaged Property.

(4)        All material Improvements that were included for the purpose of determining the appraised value of the related Mortgaged Property as of the date hereof and the Effective Date are within the boundaries of the related Mortgaged Property, except encroachments that do not materially and adversely affect the value or current use of such Mortgaged Property or for which insurance or endorsements were obtained under the Title Policy. No Improvements on adjoining parcels encroach onto the related Mortgaged Property except for encroachments that do not materially and adversely affect the value or current use of such Mortgaged Property or for which insurance or endorsements were obtained under the Title Policy.  No Improvements encroach upon any easements except for encroachments, the removal of, which would not materially and adversely affect the value or current use of such Mortgaged Property or for which insurance or endorsements obtained with respect to the Title Policy.

(c)        Property Ownership.

Borrower is sole owner or ground lessee of the Mortgaged Property.

(d)        Condition of the Mortgaged Property.

(1)        Borrower has not made any claims, and to the knowledge of Borrower no claims have been made, against any contractor, engineer, architect, or other party with respect to the construction or condition of the Mortgaged Property or the existence of any structural or other material defect therein; and

(2)        neither the Land nor the Improvements has sustained any damage other than damage which has been fully repaired, or is fully insured and is being repaired in the ordinary course of business.

(e)        Personal Property.

Borrower owns (or, to the extent disclosed in writing to, and acknowledged in writing by, Lender leases) all of the Personal Property that is material to and is used in connection with the management, ownership, and operation of the Mortgaged Property.

**Section 6.02        Covenants**

(a)        Use of Property.

From and after the Effective Date, Borrower shall not, unless required by applicable law or Governmental Authority:

(1)        allow changes in the use of all or any part of the Mortgaged Property;

    (2)     convert any individual residential dwelling units or common areas to commercial use;

    (3)     initiate or acquiesce in a change in the zoning classification of the Land;

    (4)     establish any condominium or cooperative regime with respect to the Mortgaged Property;

    (5)     subdivide the Land; or

    (6)     suffer, permit, or initiate the joint assessment of any Mortgaged Property with any other real property constituting a tax lot separate from such Mortgaged Property which could cause the part of the Land to be included or assessed under or as part of another tax lot or parcel, or any part of any other property to be included or assessed under or as part of the tax lot or parcels for the Land.

**(b)**    **Property Maintenance.**

Borrower shall:

    (1)     pay the expenses of operating, managing, maintaining, and repairing the Mortgaged Property (including insurance premiums, utilities, repairs, and replacements) before the last date upon which each such payment may be made without any penalty or interest charge being added;

    (2)     keep the Mortgaged Property in good repair and marketable condition (ordinary wear and tear excepted) (including the replacement of Personalty and Fixtures with items of equal or better function and quality) and subject to Section 9.03(b)(5) and Section 10.03(d) restore or repair promptly, in a good and workmanlike manner, any damaged part of the Mortgaged Property to the equivalent of its original condition or condition immediately prior to the damage (if improved after the Effective Date), whether or not insurance proceeds are or any condemnation award is available to cover any costs of such restoration or repair and in accordance with all applicable laws, ordinance, rules, and regulations of any Governmental Authority, including applicable building codes, special use permits and environmental regulations.

    (3)     commence, make, construct, install, diligently perform, and complete all Replacements and Repairs as required by Lender or the Required Repairs Agreement, if any.

    (4)     if required by Lender as set forth in the Summary of Loan Terms and subject to the terms of Section 6.03(a), provide for professional management of the Mortgaged Property by the property manager named in the Summary of Loan Terms or another property manager satisfactory to Lender under a contract approved by Lender in writing;

    (5)     give written notice to Lender of, and, unless otherwise directed in writing by Lender, appear in and defend any action or proceeding purporting to affect the Mortgaged Property, Lender's security for the Mortgage Loan, or Lender's rights under this Loan Agreement; and

    (6)     upon Lender's written request, submit to Lender any contracts or work orders related to the maintenance or repair of the Mortgaged Property.

**(C)**    **Property Preservation.**

Borrower shall:

    (1)     not commit waste or abandon or (ordinary wear and tear excepted) permit impairment or deterioration of the Mortgaged Property;

    (2)     except as otherwise permitted herein in connection with Repairs and Replacements, not remove, demolish, or alter the Mortgaged Property or any part of the Mortgaged Property (or permit any tenant or any other person to do the same) except in connection with the replacement of tangible Personalty or Fixtures (provided such Personalty and Fixtures are replaced with items of equal or better function and quality);

    (3)     not engage in or knowingly permit, and shall take appropriate measures to prevent and abate or cease and desist, any illegal activities at the Mortgaged Property that could endanger tenants or visitors, result in damage to the Mortgaged Property, result in forfeiture of the Land or otherwise materially impair the lien created by the Security Instrument or Lender's interest in the Mortgaged Property;

    (4)     not permit any condition to exist on the Mortgaged Property that would invalidate any part of any insurance coverage required by this Loan Agreement; or

    (5)     not subject the Mortgaged Property to any voluntary, elective, or non-compulsory tax lien or assessment (or opt in to any voluntary, elective, or non-compulsory special tax district or similar regime).

**(d)**    **Property Inspections.**

Borrower shall:

(1)      permit Lender, its agents, representatives, and designees to enter upon and inspect the Mortgaged Property (including in connection with any Replacement or Repair, or to conduct any Environmental Inspection pursuant to the Environmental Indemnity Agreement), and shall cooperate and provide access to all areas of the Mortgaged Property (subject to the rights of tenants under the Leases):

     (A)      during normal business hours;

     (B)      at such other reasonable time upon reasonable notice of not less than one (1) Business Day;

     (C)      at any time when exigent circumstances exist; or

     (D)      at any time after an Event of Default has occurred and is continuing; and

(2)      pay for reasonable costs or expenses incurred by Lender or its agents in connection with any such inspections.

(e)      **Compliance with Laws.**

Borrower shall:

(1)      comply with all laws, ordinances, statutes, rules, and regulations of any Governmental Authority, and all recorded lawful covenants and agreements relating to or affecting the Mortgaged Property, including all laws, ordinances, statutes, rules and regulations, and covenants pertaining to construction of improvements on the Land, fair housing, and requirements for equal opportunity, anti-discrimination, environmental protection, and Leases;

(2)      maintain all required permits, licenses, and certificates necessary to comply with all zoning and land use statutes, laws, ordinances, rules and regulations, and all applicable health, fire, safety, and building codes and for the lawful use and operation of the Mortgaged Property, including certificates of occupancy, apartment licenses, or the equivalent;

(3)      comply with all applicable laws that pertain to the maintenance and disposition of tenant security deposits;

(4)      at all times maintain records sufficient to demonstrate compliance with the provisions of this Section 6.02(e); and

(5)      promptly after receipt or notification thereof, provide Lender copies of any building code or zoning violation from any Governmental Authority with respect to the Mortgaged Property.

Section 6.03      **Mortgage Loan Administration Matters Regarding the Property.**

(a)      **Property Management.**

From and after the Effective Date, each property manager (including the Borrower or a Guarantor) and each property management agreement must be approved by Lender. The Mortgaged Property shall be managed by the Borrower, a Guarantor or a professional manager satisfactory to Lender, and if a professional manager, under a contract approved by Lender in writing. If, in connection with the making of the Mortgage Loan, or at any later date, Lender waives in writing this requirement that Borrower enter into a written contract for management of the Mortgaged Property, and Borrower later elects to enter into a written contract or change the management of the Mortgaged Property, such new property manager or the property management agreement must be approved by Lender. As a condition to any approval by Lender, Lender may require that Borrower and such new property manager enter into a collateral assignment of the property management agreement on a form approved by Lender.

(b)      **Subordination of Fees to Affiliated Property Managers.**

Any property manager that is a Borrower Affiliate and to whom fees are payable for the management of the Mortgaged Property must enter into an assignment of management agreement or other agreement with Lender, in a form approved by Lender, providing for subordination of those fees and such other provisions as Lender may require.

(c)      **Physical Needs Assessment.**

If, in connection with any inspection of the Mortgaged Property, Lender determines that the condition of the Mortgaged Property has deteriorated (ordinary wear and tear excepted) since the Effective Date, Lender may obtain, at Borrower's expense, a physical needs assessment of the Mortgaged Property. Lender's right to obtain a physical needs assessment pursuant to this Section 6.03(c) shall be in addition to any other rights available to Lender under this Loan Agreement in connection with any such deterioration. Any such inspection or physical needs assessment may result in Lender requiring Additional Lender Repairs or Additional Lender Replacements.

ARTICLE 7 - LEASES AND RENTS

Section 7.01      **Representations and Warranties.**

The representations and warranties made by Borrower to Lender in this Section 7.01 are made as of the date hereof and the Effective Date and are true and correct.

(a)     Prior Assignment of Rents.

Borrower has not executed any:

(1)     prior assignment of Rents (other than an assignment of Rents securing prior indebtedness that has been paid off and discharged or will be paid off and discharged with the proceeds of the Mortgage Loan); or

(2)     instrument which would prevent Lender from exercising its rights under this Loan Agreement or the Security Instrument.

(b)     Prepaid Rents.

Borrower has not accepted, and does not expect to receive prepayment of, any Rents for more than two (2) months prior to the due dates of such Rents.

(c)     Rent Rolls

(1)     Borrower has delivered to Lender a true, correct and complete schedule of all Leases affecting the Mortgaged Property (a "Rent Roll") as of the date hereof, certified by Borrower as being true and correct, which Rent Roll accurately and completely sets forth in all material respects for each such Lease, the following: the name of the tenant, the space occupied, the square footage of the space occupied, the Lease start date, the Lease expiration date, extension and renewal provisions, the base rent payable, any other monthly charges or other amounts owed, the security deposit held thereunder, the rent payable for the current month, the date through which rent has been paid, any other material provisions of such Lease, and any related information requested by Lender.

(2)     Each Lease constitutes the legal, valid and binding obligation of Borrower and, to the best of Borrower's knowledge and belief, is enforceable against the tenant thereof. No default exists, or with the passing of time or the giving of notice or both would exist, under any Lease which would, in the aggregate, have a material adverse effect on Borrower or the Mortgaged Property.

(3)     All work to be performed by Borrower under the Leases has been substantially performed, all contributions to be made by Borrower to the tenants thereunder have been made and all other conditions precedent to each such tenant's obligations thereunder have been satisfied.

(4)     Each tenant under a Lease has entered into occupancy of the demised premises.

(5)     If required by Lender, Borrower has delivered to Lender true, correct and complete copies of all Leases described in the Rent Roll.

(6)     To the best of Borrower's knowledge and belief, each Tenant is free from bankruptcy, reorganization or arrangement proceedings or a general assignment for the benefit of creditors.

(7)     No Lease provides any party with the right to obtain a lien or encumbrance upon the Mortgaged Property superior to the lien of the Security Instrument.

(8)     No person or entity has any possessory interest in the Mortgaged Property or right to occupy the same except under and pursuant to the provisions of the Leases.

(9)     As of the date hereof and as of the Effective Date, (i) Borrower is the owner and holder of the landlord's interest under each Lease; (ii) each Lease is in full force and effect; (iii) neither Borrower nor any tenant under any Lease is in default under any of the terms, covenants or provisions of any Lease, and Borrower knows of no event which, but for the passage of time or the giving of notice or both, would constitute an event of default under any Lease; and (iv) there are no offsets or defenses to the payment of any portion of the Rents.

Section 7.02     Covenants

(a)     Leases.

Borrower shall:

(1)     comply with and observe Borrower's obligations under all Leases, including Borrower's obligations pertaining to the maintenance and disposition of tenant security deposits;

(2)     surrender possession of the Mortgaged Property, including all Leases and all security deposits and prepaid Rents, immediately upon appointment of a receiver or Lender's entry upon and taking of possession and control of the Mortgaged Property, as applicable;

(3)     not modify the terms of, extend, or terminate any Material Lease (including any lease replacing a Material Lease in existence on the Effective Date) without the prior written consent of Lender;

(4)     not permit any Lease to contain an option to purchase or right of first refusal to purchase or right of first offer to purchase (except when such option or right is required by applicable law);

(5)      promptly provide Lender a copy of any Lease upon Lender's written request and promptly provide Lender with a copy of any non-residential lease of the Mortgaged Property at the time such lease is executed (subject to the Lender's consent rights if such lease is a Material Lease);

(6)      not enter into any Lease that materially alters the use and type of operation of the premises subject to the Lease in effect as of the Effective Date or reduces the number or size of units at the Mortgaged Property; or

(7)      not modify the terms of any Lease (including any Lease in existence on the Effective Date) in any way that materially alters the use and type of operation of the premises subject to such Lease in effect as of the Effective Date, or reduces the number or size of units at the Mortgaged Property;

(8)      cause the tenant under each lease to provide within ten (10) days after request by Lender, a certificate or estoppel, or if not provided by tenant within such ten (10) day period, Borrower shall provide such certificate of estoppel, certifying:

(A)      that such Lease is unmodified and in full force and effect (or if there have been modifications, that such Lease is in full force and effect as modified and stating the modifications);

(B)      the term of the Lease including any extensions thereto;

(C)      the dates to which the Rent and any other charges hereunder have been paid by tenant;

(D)      the amount of any security deposit delivered to Borrower as landlord;

(E)      whether or not Borrower or tenant is in default (or whether any event or condition exists which, with the passage of time, would constitute an event of default) under such Lease;

(F)      the address to which notices to tenant should be sent; and

(G)      any other information as may be reasonably required by Lender.

(b)      [Intentionally Deleted].

(c)      Payment of Rents.

Borrower shall:

(1)      pay to Lender upon demand all Rents after an Event of Default has occurred and is continuing;

(2)      cooperate with Lender's efforts in connection with the assignment of Rents set forth in the Security Instrument; and

(3)      not accept Rent under any Lease (whether residential or non-residential) for more than two (2) months in advance.

(d)      Assignment of Rents.

Borrower shall not:

(1)      perform any acts and shall not execute any instrument that would prevent Lender from exercising its rights under the assignment of Rents granted in the Security Instrument or in any other Loan Document; or

(2)      interfere with Lender's collection of such Rents.

(e)      Further Assignments of Leases and Rents.

Borrower shall execute and deliver any further assignments of Leases and Rents as Lender may reasonably require.

(f)      Options to Purchase by Tenants.

No Lease shall contain an option to purchase, right of first refusal to purchase or right of first offer to purchase, except as required by applicable law.

Section 7.03      Mortgage Loan Administration Regarding Leases and Rents.

(a)      Lease Requirements.

Each Lease, including any renewal or extension of any Lease in existence as of the Effective Date, shall provide, directly or pursuant to a subordination, non-disturbance and attornment agreement approved by Lender, that:

(1)      the tenant shall, upon written notice from Lender after the occurrence of an Event of Default, pay all Rents payable under such Lease to Lender;

(2)      such Lease and all rights of the tenant thereby are expressly subordinate to the lien of the Security Instrument;

(3)      the tenant shall attorn to Lender and any purchaser at a Foreclosure Event (such attornment to be self-executing and effective upon acquisition of title to the Mortgaged Property by any purchaser at a Foreclosure Event or by Lender in any manner);

(4)      the tenant agrees to execute such further evidences of attornment as Lender or any purchaser at a Foreclosure Event may from time to time request; and

(5)      such Lease shall not terminate as a result of a Foreclosure Event unless Lender or any other purchaser at such Foreclosure Event affirmatively elects to terminate such Lease pursuant to the terms of the subordination, non-disturbance and attornment agreement.

(b)      Rent Schedule.

Borrower shall furnish to Lender, within ten (10) days after a request by Lender to do so, a true, correct, complete and current schedule of all Leases affecting the Mortgaged Property, certified by Borrower as being true and correct, which accurately and completely sets forth in all material respects for each such lease, the following: the name of the tenant, the space occupied, the square footage of the space occupied, the Lease start date, the Lease expiration date, extension and renewal provisions, the base rent payable, any other monthly charges or other amounts owed, the security deposit held thereunder, the rent payable for the current month, the date through which rent has been paid, any other material provisions of such Lease, and any related information requested by Lender.  Borrower (i) shall not do or suffer to be done any act, or omit to take any action, that might result in a default by the landlord, lessor or licensor under any such Lease or allow the tenant thereunder to withhold payment of rent or cancel or terminate same; (ii) shall not further assign any such Lease or the Rents; (iii) shall enforce, short of termination, the performance and observance of each and every condition and covenant of each of the parties under such Leases; and (iv) shall not consent to any assignment of or subletting under any Lease not in accordance with its terms.

## ARTICLE 8 – BOOKS AND RECORDS; FINANCIAL REPORTING

Section 8.01      Representations and Warranties.

The representations and warranties made by Borrower to Lender in this Section 8.01 are made as of the date hereof and the Effective Date and are true and correct.

.  (a)      Financial Information.

All financial statements and data, including statements of cash flow and income and operating expenses that have been delivered to Lender in respect of the Mortgaged Property:

(1)      are true, complete, and correct in all material respects; and

(2)      accurately represent the financial condition of the Mortgaged Property as of such date.

(b)      No Change in Facts or Circumstances.

All information in the Loan Application and in all financial statements, rent rolls, reports, certificates, and other documents submitted in connection with the Loan Application are complete and accurate in all material respects.  There has been no material adverse change in any fact or circumstance that would make any such information incomplete or inaccurate.

Section 8.02      Covenants.

(a)      Obligation to Maintain Accurate Books and Records.

Borrower shall keep and maintain at all times at the Mortgaged Property or the property management agent's offices or Borrower's business address and, upon Lender's written request, shall make available at the Land:

(1)      complete and accurate books of account and records (including copies of supporting bills and invoices) adequate to reflect correctly the operation of the Mortgaged Property; and

(2)      copies of all written contracts, Leases, and other instruments that affect Borrower or the Mortgaged Property.

(b)      Items to Furnish to Lender.

Borrower shall furnish to Lender the following, certified as true, complete, and accurate in all material respects, by an individual having authority to bind Borrower (or Guarantor, as applicable), in such form and with such detail as Lender reasonably requires:

(1)      upon Lender's request, a statement of income and expenses and a statement of cash flow for Borrower on a year-to-date basis as of the end of the most recently ended calendar quarter;

(2)      within one hundred twenty (120) days after the end of each calendar year:

(A)      for any Borrower and any Guarantor that is an entity, a statement of income and expenses and a statement of cash flows for such calendar year;

(B)      for any Borrower and any Guarantor that is an individual, or a trust established for estate-planning purposes, a personal financial statement for such calendar year;

(C)      when requested in writing by Lender, balance sheet(s) showing all assets and liabilities of · Borrower and Guarantor and a statement of all contingent liabilities as of the end of such calendar year;

Page 18 of 45

(D) a written certification ratifying and affirming that:

 (i) Borrower has taken no action in violation of Section 4.02(d) regarding its single asset status;

 (ii) Borrower has received no notice of any building code violation, or if Borrower has received such notice, evidence of remediation;

 (iii) Borrower has made no application for rezoning nor received any notice that the Mortgaged Property has been or is being rezoned; and

 (iv) Borrower has taken no action and has no knowledge of any action that would violate the provisions of Section 11.02(b) regarding liens encumbering the Mortgaged Property;

(E) when requested in writing by Lender, an accounting of all security deposits held pursuant to all Leases, including the name of the institution (if any) and the names and identification numbers of the accounts (if any) in which such security deposits are held and the name of the person to contact at such financial institution, along with any authority or release necessary for Lender to access information regarding such accounts; and

(F) when requested in writing by Lender, written confirmation of:

 (i) any changes occurring since the Effective Date (or that no such changes have occurred since the Effective Date) in (1) the direct owners of Borrower, (2) the indirect owners (and any non-member managers) of Borrower that Control Borrower (excluding any Publicly-Held Corporations or Publicly-Held Trusts), or (3) the indirect owners of Borrower that hold twenty-five percent (25%) or more of the ownership interests in Borrower (excluding any Publicly-Held Corporations or Publicly-Held Trusts), and their respective interests;

 (ii) the names of all officers and directors of (1) any Borrower which is a corporation, (2) any corporation which is a general partner of any Borrower which is a partnership, or (3) any corporation which is the managing member or non-member manager of any Borrower which is a limited liability company; and

 (iii) the names of all managers who are not members of (1) any Borrower which is a limited liability company, (2) any limited liability company which is a general partner of any Borrower which is a partnership, or (3) any limited liability company which is the managing member or non-member manager of any Borrower which is a limited liability company; and

(3) within one hundred twenty (120) days after the end of each calendar year, and at any other time upon Lender's written request, a true, correct, complete and current Rent Roll as of the last day of such calendar year, or the date of such request, as applicable;

(4) upon Lender's written request (but, absent an Event of Default, no more frequently than once in any six (6) month period):

(A) any item described in Section 8.02(b)(1) or Section 8.02(b)(2) for Borrower, certified as true, complete and accurate by an individual having authority to bind Borrower;

(B) a property management or leasing report for the Mortgaged Property, showing the number of rental applications received from tenants or prospective tenants and deposits received from tenants or prospective tenants, and any other information requested by Lender;

(C) a statement of income and expenses for Borrower's operation of the Mortgaged Property on a year-to-date basis as of the end of each month for such period as requested by Lender, which statement shall be delivered within thirty (30) days after the end of such month requested by Lender;

(D) a statement of real estate owned directly or indirectly by Borrower and Guarantor for such period as requested by Lender, which statement(s) shall be delivered within thirty (30) days after the end of such month requested by Lender; and

(E) a statement that identifies:

 (iv) the direct owners of Borrower and their respective interests;

 (v) the indirect owners (and any non-member managers) of Borrower that Control Borrower (excluding any Publicly-Held Corporations or Publicly-Held Trusts) and their respective interests; and

 (vi) the indirect owners of Borrower that hold twenty-five percent (25%) or more of the ownership interests in Borrower (excluding any Publicly-Held Corporations or Publicly-Held Trusts) and their respective interests.

(e) Audited Financials.

In the event Borrower or Guarantor receives or obtains any audited financial statements and financial statements are required to be delivered to Lender under Section 8.02(b), Borrower shall deliver or cause to be delivered to Lender the audited versions of such financial statements.

      (d)    **Delivery of Books and Records.**

If an Event of Default has occurred and is continuing, Borrower shall deliver to Lender, upon written demand, all books and records relating to the Mortgaged Property or its operation.

**Section 8.03**    **Mortgage Loan Administration Matters Regarding Books and Records and Financial Reporting.**

      (a)    **Lender's Right to Obtain Audited Books and Records.**

Lender may require that Borrower's or Guarantor's books and records be audited, at Borrower's expense, by an independent certified public accountant selected by Lender in order to produce or audit any statements, schedules, and reports of Borrower, Guarantor, or the Mortgaged Property required by Section 8.02, if:

          (1)    [Intentionally Deleted.]

          (2)    the statements, schedules, and reports submitted to Lender pursuant to Section 8.02 are not full, complete, and accurate in all material respects as determined by Lender; or

          (3)    an Event of Default has occurred and is continuing.

Notwithstanding the foregoing, the ability of Lender to require the delivery of audited financial statements shall be limited to not more than once per Borrower's fiscal year so long as no Event of Default has occurred during such fiscal year (or any event which, with the giving of written notice or the passage of time, or both, would constitute an Event of Default has occurred and is continuing). Borrower shall cooperate with Lender in order to satisfy the provisions of this Section 8.03(a). All related costs and expenses of Lender shall become immediately due and payable within ten (10) Business Days after demand therefor.

      (b)    **Credit Reports; Credit Score.**

Lender is authorized at any time during which the Mortgage Loan is outstanding to obtain a credit report (if applicable) and a Credit Score on Borrower or Guarantor, the cost of which report shall be paid by Borrower.

ARTICLE 9 - INSURANCE

**Section 9.01**    **Representations and Warranties.**

The representations and warranties made by Borrower to Lender in this Section 9.01 are made as of the date hereof and the Effective Date and are true and correct.

      (a)    **Compliance with Insurance Requirements.**

Borrower is in compliance with Lender's insurance requirements set forth in Schedule 5 to this Loan Agreement (or has obtained a written waiver from Lender for any non-compliant coverage) and has timely paid all premiums on all required insurance policies.

      (b)    **Property Condition.**

          (1)    The Mortgaged Property has not been damaged by fire, water, wind, or other cause of loss; or

          (2)    if previously damaged, any previous damage to the Mortgaged Property has been repaired and the Mortgaged Property has been fully restored.

**Section 9.02**    **Covenants**

      (a)    **Insurance Requirements.**

          Until the Indebtedness is paid in full, Borrower shall keep the Improvements and Mortgaged Property insured at all times in accordance with Lender's insurance requirements set forth in Schedule 5 of this Loan Agreement as may be modified from time to time.

      (b)    **Delivery of Policies, Renewals, Notices, and Proceeds.**

Borrower shall:

          (1)    cause all insurance policies (including any policies not otherwise required by Lender) which can be endorsed with standard non-contributing, non-reporting mortgagee clauses making loss payable to Lender (or Lender's assigns) to be so endorsed;

          (2)    promptly deliver to Lender a copy of all renewal and other notices received by Borrower with respect to the policies and all receipts for paid premiums;

(3)    deliver evidence, in form and content acceptable to Lender, that each required insurance policy under this Article 9 has been renewed not less than fifteen (15) days prior to the applicable expiration date, and (if such evidence is other than an original or duplicate original of a renewal policy) deliver the original or duplicate original of each renewal policy (or such other evidence of insurance as may be required by or acceptable to Lender) in form and content acceptable to Lender within ninety (90) days after the applicable expiration date of the original insurance policy;

(4)    provide immediate written notice to the insurance company and to Lender of any event of loss;

(5)    execute such further evidence of assignment of any insurance proceeds as Lender may require; and

(6)    provide immediate written notice to Lender of Borrower's receipt of any insurance proceeds under any insurance policy required by Section 9.02(a)(1)(A) above and, if requested by Lender, deliver to Lender all of such proceeds received by Borrower to be applied by Lender in accordance with this Article 9.

Section 9.03    Mortgage Loan Administration Matters Regarding Insurance.

(a)    Lender's Ongoing Insurance Requirements.

Borrower acknowledges that Lender's insurance requirements may change from time to time. All insurance policies and renewals of insurance policies required by this Loan Agreement shall be:

(1)    in the form and with the terms required by Lender;

(2)    in such amounts, with such maximum deductibles and for such periods required by Lender; and

(3)    issued by insurance companies satisfactory to Lender.

BORROWER ACKNOWLEDGES THAT ANY FAILURE OF BORROWER TO COMPLY WITH THE REQUIREMENTS SET FORTH IN SECTION 9.02(a) OR SECTION 9.02(b)(3) ABOVE SHALL PERMIT LENDER TO PURCHASE THE APPLICABLE INSURANCE AT BORROWER'S COST. SUCH INSURANCE MAY, BUT NEED NOT, PROTECT BORROWER'S INTERESTS. THE COVERAGE THAT LENDER PURCHASES MAY NOT PAY ANY CLAIM THAT BORROWER MAKES OR ANY CLAIM THAT IS MADE AGAINST BORROWER IN CONNECTION WITH THE MORTGAGED PROPERTY. IF LENDER PURCHASES INSURANCE FOR THE MORTGAGED PROPERTY AS PERMITTED HEREUNDER, BORROWER WILL BE RESPONSIBLE FOR THE COSTS OF THAT INSURANCE, INCLUDING INTEREST AT THE DEFAULT RATE AND ANY OTHER CHARGES LENDER MAY IMPOSE IN CONNECTION WITH THE PLACEMENT OF THE INSURANCE UNTIL THE EFFECTIVE DATE OF THE CANCELLATION OR THE EXPIRATION OF THE INSURANCE. THE COSTS OF THE INSURANCE SHALL BE ADDED TO BORROWER'S TOTAL OUTSTANDING BALANCE OR OBLIGATION AND SHALL CONSTITUTE ADDITIONAL INDEBTEDNESS. THE COSTS OF THE INSURANCE MAY BE MORE THAN THE COST OF INSURANCE BORROWER MAY BE ABLE TO OBTAIN ON ITS OWN. BORROWER MAY LATER CANCEL ANY INSURANCE PURCHASED BY LENDER, BUT ONLY AFTER PROVIDING EVIDENCE THAT BORROWER HAS OBTAINED INSURANCE AS REQUIRED BY THIS LOAN AGREEMENT AND THE OTHER LOAN DOCUMENTS.

(b)    Application of Proceeds on Event of Loss.

(1)    Upon an event of loss, Lender may, at Lender's option:

(A)    hold such proceeds to be applied to reimburse Borrower for the cost of Restoration (in accordance with Lender's then-current policies relating to the restoration of casualty damage on similar properties); or

(B)    apply such proceeds to the payment of the Indebtedness, whether or not then due;

(2)    Notwithstanding the foregoing, if any loss is estimated to be in an amount equal to or less than $10,000, Lender shall not exercise its rights and remedies as power-of-attorney herein and shall allow Borrower to make proof of loss, to adjust and compromise any claims under policies of property damage insurance, to appear in and prosecute any action arising from such policies of property damage insurance, and to collect and receive the proceeds of property damage insurance; provided that each of the following conditions shall be satisfied:

(A)    Borrower shall immediately notify Lender of the casualty giving rise to the claim;

(B)    no Event of Default has occurred and is continuing (or any event which, with the giving of written notice or the passage of time, or both, would constitute an Event of Default has occurred and is continuing);

(C)    the Restoration will be completed before the earlier of (i) one year before the stated Maturity Date, or (ii) one year after the date of the loss or casualty;

(D)    Lender determines that the combination of insurance proceeds and amounts provided by Borrower will be sufficient funds to complete the Restoration;

(E)    all proceeds of property damage insurance shall be issued in the form of joint checks to Borrower and Lender;

(F)     all proceeds of property damage insurance shall be applied to the Restoration;

(G)     Borrower shall deliver to Lender evidence satisfactory to Lender of completion of the Restoration and obtainment of all lien releases;

(H)     Borrower shall have complied to Lender's satisfaction with the foregoing requirements on any prior claims subject to this provision, if any; and

(I)     Lender shall have the right to inspect the Mortgaged Property (subject to the rights of tenants under the Leases).

(3)     If Lender elects to apply insurance proceeds to the Indebtedness in accordance with the terms of this Loan Agreement, Borrower shall not be obligated to restore or repair the Mortgaged Property.  Rather, Borrower shall restrict access to the damaged portion of the Mortgaged Property and, at its expense and regardless of whether such costs are covered by insurance, clean up any debris resulting from the casualty event, and, if required or otherwise permitted by Lender, demolish or raze any remaining part of the damaged Mortgaged Property to the extent necessary to keep and maintain the Mortgaged Property in a safe, habitable, and marketable condition.  Nothing in this Section 9.03(b) shall affect any of Lender's remedial rights against Borrower in connection with a breach by Borrower of any of its obligations under this Loan Agreement or under any Loan Document, including any failure to timely pay Monthly Debt Service Payments or maintain the insurance coverage(s) required by this Loan Agreement.

(c)     **Payment Obligations Unaffected.**

The application of any insurance proceeds to the Indebtedness shall not extend or postpone the Maturity Date, or the due date or the full payment of any Monthly Debt Service Payment or any other installments referred to in this Loan Agreement or in any other Loan Document.  In the event any such insurance proceeds shall be used to reduce the Indebtedness, Lender shall apply any such sums received by it first to the payment of all of its costs and expenses (including, but not limited to, reasonable legal fees and disbursements) incurred in obtaining those sums.

(d)     **Foreclosure Sale.**

If the Mortgaged Property is transferred pursuant to a Foreclosure Event or Lender otherwise acquires title to the Mortgaged Property, Borrower acknowledges that Lender shall automatically succeed to all rights of Borrower in and to any insurance policies and unearned insurance premiums applicable to the Mortgaged Property and in and to the proceeds resulting from any damage to the Mortgaged Property prior to such Foreclosure Event or such acquisition.

(e)     **Appointment of Lender as Attorney-In-Fact.**

Borrower hereby authorizes and appoints Lender as attorney-in-fact pursuant to Section 14.03(c).

## ARTICLE 10 – CONDEMNATION

Section 10.01     Representations and Warranties.

The representations and warranties made by Borrower to Lender in this Section 10.01 are made as of the date hereof and the Effective Date and are true and correct.

(a)     **Prior Condemnation Action.**

No part of the Mortgaged Property has been taken in connection with a Condemnation Action.

(b)     **Pending Condemnation Actions.**

No Condemnation Action is pending nor, to Borrower's knowledge, is threatened for the partial or total condemnation or taking of the Mortgaged Property.

Section 10.02     Covenants.

(a)     Notice of Condemnation.

Borrower shall:

(1)     promptly notify Lender of any Condemnation Action of which Borrower has knowledge;

(2)     appear in and prosecute or defend, at its own cost and expense, any action or proceeding relating to any Condemnation Action, including any defense of Lender's interest in the Mortgaged Property tendered to Borrower by Lender, unless otherwise directed by Lender in writing; and

(3)     execute such further evidence of assignment of any condemnation award in connection with a Condemnation Action as Lender may require.

(b)     **Condemnation Proceeds.**

Borrower shall pay to Lender all awards or proceeds of a Condemnation Action promptly upon receipt.

Section 10.03     Mortgage Loan Administration Matters Regarding Condemnation.

   (a)      Application of Condemnation Awards.

Lender may apply any awards or proceeds of a Condemnation Action, after the deduction of Lender's expenses incurred in the collection of such amounts, to:

        (1)      the restoration or repair of the Mortgaged Property, if applicable;

        (2)      the payment of the Indebtedness, with the balance, if any, paid to Borrower; or

        (3)      Borrower.

   (b)      Payment Obligations Unaffected.

The application of any awards or proceeds of a Condemnation Action to the Indebtedness shall not extend or postpone the Maturity Date, or the due date or the full payment of any Monthly Debt Service Payment or any other installments referred to in this Loan Agreement or in any other Loan Document.

   (c)      Appointment of Lender as Attorney-In-Fact.

Borrower hereby authorizes and appoints Lender as attorney-in-fact pursuant to Section 14.03(c).

   (d)      Preservation of Mortgaged Property.

If a Condemnation Action results in or from damage to the Mortgaged Property and Lender elects to apply the proceeds or awards from such Condemnation Action to the Indebtedness in accordance with the terms of this Loan Agreement, Borrower shall not be obligated to restore or repair the Mortgaged Property. Rather, Borrower shall restrict access to any portion of the Mortgaged Property which has been damaged or destroyed in connection with such Condemnation Action and, at Borrower's expense and regardless of whether such costs are covered by insurance, clean up any debris resulting in or from the Condemnation Action, and, if required by any Governmental Authority or otherwise permitted by Lender, demolish or raze any remaining part of the damaged Mortgaged Property to the extent necessary to keep and maintain the Mortgaged Property in a safe, habitable, and marketable condition. Nothing in this Section 10.03(d) shall affect any of Lender's remedial rights against Borrower in connection with a breach by Borrower of any of its obligations under this Loan Agreement or under any Loan Document, including any failure to timely pay Monthly Debt Service Payments or maintain the insurance coverage(s) required by this Loan Agreement.

   (e)      REMIC Trust.

Notwithstanding the foregoing provisions in this Section 10, if the Loan or any portion thereof is included in a REMIC Trust and immediately following a release of any portion of the Lien of the Security Instrument in connection with a Condemnation Action (but taking into account any proposed Restoration of the remaining portion of the Property that remains subject to the Lien), the Loan-to-Value Ratio of the remaining portion of the Property that remains subject to the Lien is greater than 125% (such value to be determined, in Lender's sole discretion, by any commercially reasonable method permitted to a REMIC Trust, based solely on real property and excluding any personal property and going concern value, if any) , then the principal balance of the Loan must be paid down by an amount equal to the least of the following amounts: (i) the net Condemnation proceeds or award, (ii) the fair market value of the released property at the time of the release, or (iii) an amount such that the Loan-to-Value Ratio (as so determined by Lender) does not increase after the release unless Lender receives an opinion of counsel that if such amount is not paid, the securitization will not fail to maintain its status as a REMIC Trust as a result of the related release of such portion of the Lien of the Security Instrument.

### ARTICLE 11 - LIENS, TRANSFERS, AND ASSUMPTIONS

Section 11.01     Representations and Warranties.

The representations and warranties made by Borrower to Lender in this Section 11.01 are made as of the date hereof and the Effective Date and are true and correct.

   (a)      No Labor or Materialmen's Claims.

All parties furnishing labor and materials on behalf of Borrower have been paid in full. There are no mechanics' or materialmen's liens (whether filed or unfiled) outstanding for work, labor, or materials (and no claims or work outstanding that under applicable law could give rise to any such mechanics' or materialmen's liens) affecting the Mortgaged Property, whether prior to, equal with, or subordinate to the lien of the Security Instrument.

   (b)      No Other Interests.

No Person:

        (1)      other than Borrower has any possessory ownership or interest in the Mortgaged Property or right to occupy the same except under and pursuant to the provisions of existing Leases, the material terms of all such Leases having been previously disclosed in writing to Lender; nor

        (2)      has an option, right of first refusal, or right of first offer (except as required by applicable law) to purchase the Mortgaged Property, or any interest in the Mortgaged Property.

Section 11.02      Covenants.

    (a)      Liens; Encumbrances.

    Borrower shall not permit the grant, creation, or existence of any Lien, whether voluntary, involuntary, or by operation of law, on all or any portion of the Mortgaged Property (including any voluntary, elective, or non-compulsory tax lien or assessment pursuant to a voluntary, elective, or non-compulsory special tax district or similar regime) other than:

        (1)      Permitted Encumbrances;

        (2)      the creation of any tax lien, municipal lien, utility lien, mechanics' lien, materialmen's lien, or judgment lien against the Mortgaged Property if bonded off, released of record, or otherwise remedied to Lender's satisfaction within sixty (60) days after the earlier of the date Borrower has actual notice or constructive notice of the existence of such lien, or the creation of any mechanics' or materialmen's liens which attach automatically under the laws of any Governmental Authority upon the commencement of any work upon, or delivery of any materials to, the Mortgaged Property and for which Borrower is not delinquent in the payment for any such work or materials; and

        (3)      the lien created by the Loan Documents.

    (b)      Transfers.

        (1)      Mortgaged Property..

    Borrower shall not Transfer, or cause or permit a Transfer of, all or any part of the Mortgaged Property (including any interest in the Mortgaged Property) other than:

        (A)      a Transfer to which Lender has consented in writing;

        (B)      Leases permitted pursuant to the Loan Documents;

        (C)      [Intentionally Deleted.];

        (D)      a Transfer of obsolete or worn out Personalty or Fixtures that are contemporaneously replaced by items of equal or better function and quality which are free of Liens (other than those created by the Loan Documents);

        (E)      the grant of an easement, servitude, or restrictive covenant to which Lender has consented, and Borrower has paid to Lender, upon demand, all costs and expenses incurred by Lender in connection with reviewing Borrower's request;

        (F)      a lien permitted pursuant to Section 11.02(a) of this Loan Agreement; or

        (G)      the conveyance of the Mortgaged Property following a Foreclosure Event.

        (2)      Interests in Borrower, Key Principal, or Guarantor.

    Other than a Transfer to which Lender has consented in writing, Borrower shall not Transfer, or cause or permit to be Transferred:

        (A)      any direct or indirect ownership interest in Borrower, Key Principal, or Guarantor (if applicable) if such Transfer would cause a change in Control;

        (B)      a direct or indirect Restricted Ownership Interest in Borrower, Key Principal, or Guarantor (if applicable);

        (C)      any or all of Key Principal's or Guarantor's direct or indirect ownership interests in Borrower that existed on the Effective Date (individually or on an aggregate basis); or

        (D)      the economic benefits or rights to cash flows attributable to any ownership interests in Borrower, Key Principal, or Guarantor (if applicable) separate from the Transfer of the underlying ownership interests if the Transfer of the underlying ownership interest is prohibited by this Loan Agreement.

Notwithstanding the foregoing, if any direct or indirect ownership interests in Borrower, Key Principal, or Guarantor are owned by a Publicly-Held Corporation or a Publicly-Held Trust, a Transfer of any ownership interests in such Publicly-Held Corporation or Publicly-Held Trust shall not be prohibited under this Loan Agreement as long as (i) such Transfer does not result in a conversion of such Publicly-Held Corporation or Publicly-Held Trust to a privately held entity, and (ii) Borrower provides written notice to Lender not later than thirty (30) days thereafter of any such Transfer that results in any Person owning ten percent (10%) or more of the ownership interests in such Publicly-Held Corporation or Publicly-Held Trust.

        (3)      Name Change or Entity Conversion.

    Lender shall consent to Borrower changing its name, changing its jurisdiction of organization, or converting from one type of legal entity into another type of legal entity for any lawful purpose, provided that Borrower shall not be permitted to convert to a Delaware Statutory Trust, and provided further that:

(A)      Lender receives written notice at least thirty (30) days prior to such change or conversion, which notice shall include organizational charts that reflect the structure of Borrower both prior to and subsequent to such name change or entity conversion;

(B)      such Transfer is not otherwise prohibited under the provisions of Section 11.02(b);

(C)      Borrower executes an amendment to this Loan Agreement and any other Loan Documents required by Lender documenting the name change or entity conversion;

(D)      Borrower agrees and acknowledges, at Borrower's expense, that (i) Borrower will execute and record in the land records any instrument required by the Property Jurisdiction to be recorded to evidence such name change or entity conversion (or provide Lender with written confirmation from the title company (via electronic mail or letter) that no such instrument is required), (ii) Borrower will execute any documents required by Lender, including the amendment to this Loan Agreement, and allow such documents to be recorded or filed in the land records of the Property Jurisdiction, (iii) Lender will obtain a "date down" endorsement to the Lender's Loan Policy (or obtain a new Loan Policy if a "date down" endorsement is not available in the Property Jurisdiction), evidencing title to the Mortgaged Property being in the name of the successor entity and the Lien of the Security Instrument against the Mortgaged Property, and (iv) Lender will file any required UCC-3 financing statement and make any other filing deemed necessary to maintain the priority of its Liens in the Mortgaged Property; and

(E)      no later than ten (10) days subsequent to such name change or entity conversion, Borrower shall provide Lender (i) the documentation filed with the appropriate office in Borrower's state of formation evidencing such name change or entity conversion, (ii) copies of the organizational documents of Borrower, including any amendments, filed with the appropriate office in Borrower's state of formation reflecting the post-conversion Borrower name, form of organization, and structure, and (iii) if available, new certificates of good standing or valid formation for Borrower.

(4)      No Delaware Statutory Trust or Series LLC Conversion.

Notwithstanding any provisions herein to the contrary, no Borrower, Guarantor, or Key Principal shall convert to a Delaware Statutory Trust or a series limited liability company.

(c)      No Other Indebtedness and Mezzanine Financing.

Other than the Mortgage Loan, Borrower shall not incur or be obligated at any time with respect to any loan or other indebtedness (except trade payables as otherwise permitted in this Loan Agreement), including any indebtedness secured by a Lien on, or the cash flows from, the Mortgaged Property. Neither Borrower nor any direct or indirect owner of Borrower shall (1) incur any "mezzanine debt" or issue any Preferred Equity other than Permitted Preferred Equity, or (2) incur any similar indebtedness or issue any similar equity.

Section 11.03      Mortgage Loan Administration Matters Regarding Liens, Transfers, and Assumptions

(a)      Assumption of Mortgage Loan.

Lender may consent in its sole discretion to a Transfer of the Mortgaged Property to, and an assumption of the Mortgage Loan by, a new borrower if each of the following conditions is satisfied prior to the Transfer:

(1)      Lender determines that the Transfer will not result in a "significant modification" under Section 1001 of the Internal Revenue Code of any Mortgage Loan;

(2)      Borrower has submitted to Lender all information required by Lender to make the determination required by this Section 11.03(a);

(3)      no Event of Default has occurred and is continuing, and no event which, with the giving of written notice or the passage of time, or both, would constitute an Event of Default has occurred and is continuing;

(4)      Lender determines that:

(A)      the proposed new borrower, new key principal, and any other new guarantor fully satisfy all of Lender's then-applicable borrower, key principal or guarantor eligibility, credit, management, and other loan underwriting standards, which shall include an analysis of (i) the previous relationships between Lender and the proposed new borrower, new key principal, new guarantor, and any Person in Control of them, and the organization of the new borrower, new key principal, and new guarantor (if applicable), and (ii) the operating and financial performance of the Mortgaged Property, including physical condition and occupancy;

(B)      none of the proposed new borrower, new key principal, and any new guarantor, or any owners of the proposed new borrower, new key principal, and any new guarantor, are a Prohibited Person; and

(C)      none of the proposed new borrower, new key principal, and any new guarantor (if any of such are entities) shall have an organizational existence termination date that ends before the Maturity Date;

    (5)      [Intentionally Deleted.];

    (6)      the proposed new borrower has:

        (A)      executed an assumption agreement acceptable to Lender that, among other things, requires the proposed new borrower to assume and perform all obligations of Borrower (or any other transferor), and that may require that the new borrower comply with any provisions of any Loan Document that previously may have been waived by Lender for Borrower, subject to the terms of Section 11.03(h);

        (B)      if required by Lender, delivered to the Title Company for filing and/or recording in all applicable jurisdictions, all applicable Loan Documents including the assumption agreement to correctly evidence the assumption and the confirmation, continuation, perfection, and priority of the Liens created hereunder and under the other Loan Documents; and

        (C)      delivered to Lender a "date-down" endorsement to the Title Policy acceptable to Lender (or a new title insurance policy if a "date-down" endorsement is not available);

    (7)      one or more individuals or entities acceptable to Lender as new guarantors have executed and delivered to Lender:

        (A)      an assumption agreement acceptable to Lender that requires the new guarantor to assume and perform all obligations of Guarantor under any guaranty given in connection with the Mortgage Loan; or

        (B)      a substitute guaranty in a form acceptable to Lender;

    (8)      Lender has reviewed and approved the Transfer documents; and

    (9)      Lender has received the fees described in Section 11.03(h).

Borrower acknowledges that an assumption of a recourse mortgage loan will often result in a "significant modification" under Section 1001 of the Internal Revenue Code. As such, Borrower acknowledges that (A) nothing in this Article 11 or any Loan Document shall be interpreted as indicating that a proposed assumption of the Mortgage Loan will be approved by Lender, and (B) any determination made by Lender will be at Lender's sole discretion.

    (b)      **Acceleration or "Due on Sale" provision.**

If Borrower shall sell, convey, or alienate the Mortgaged Property, or any part thereof, or any interest therein, or shall be divested of his title or any interest therein in any manner of way, whether voluntarily or involuntarily, without the written consent of the Lender being first had and obtained, Lender shall have the right, at its option, to declare any indebtedness or obligations secured hereby, irrespective of the maturity date specified in any note evidencing the same, immediately due and payable.

    (c)      **Estate Planning.**

Notwithstanding the provisions of Section 11.02(b)(2), so long as (1) the Transfer does not cause a change in the Control of Borrower, and (2) Key Principal and Guarantor, as applicable, maintain the same right and ability to Control Borrower as existed prior to the Transfer, Lender shall consent to Transfers of direct or indirect ownership interests in Borrower and Transfers of direct or indirect ownership interests in an entity Key Principal or entity Guarantor to:

        (A)      Immediate Family Members of such transferor, each of whom must have obtained the legal age of majority;

        (B)      United States domiciled trusts established for the benefit of the transferor or Immediate Family Members of the transferor; or

        (C)      partnerships or limited liability companies of which the partners or members, respectively, are comprised entirely of (1) such transferor and Immediate Family Members (each of whom must have obtained the legal age of majority) of such transferor, (2) Immediate Family Members (each of whom must have obtained the legal age of majority) of such transferor, or (3) United States domiciled trusts established for the benefit of the transferor or Immediate Family Members of the transferor.

If the conditions set forth in this Section 11.03(c) are satisfied, the Transfer Fee shall be waived provided Borrower shall pay the Review Fee and out-of-pocket costs set forth in Section 11.03(g).

    (d)      **Termination or Revocation of Trust.**

If any of Borrower, Guarantor, or Key Principal is a trust, the termination or revocation of such trust without the consent of the Lender is an unpermitted Transfer; provided that the termination or revocation of the trust due to the death of an individual trustor shall not be considered an unpermitted Transfer so long as:

    (1)      Lender is notified within thirty (30) days of the death; and

    (2)      such Borrower, Guarantor, Key Principal, or other Person, as applicable, is replaced with an individual or entity acceptable to Lender, in accordance with the provisions of Section 11.03(a) within ninety (90) days of the date of the death causing the termination or revocation.

(e) [Intentionally Deleted.]

(f) Death of Borrower, Key Principal, or Guarantor.

A Transfer that occurs by devise, descent, or by operation of law upon the death of a natural person who is a Guarantor, a Key Principal, or an owner of the Mortgaged Property shall not be deemed an unpermitted Transfer.

(g) [Intentionally Deleted.]

(h) Further Conditions to Transfers and Assumption.

(1) In connection with any Transfer of the Mortgaged Property, or an ownership interest in Borrower, Key Principal, or Guarantor for which Lender's approval is required under this Loan Agreement (including Section 11.03(a)), Lender may, as a condition to any such approval, require:

(A) additional collateral, guaranties, or other credit support to mitigate any risks concerning the proposed transferee or the performance or condition of the Mortgaged Property;

(B) amendment of the Loan Documents to delete or modify any specially negotiated terms or provisions previously granted for the exclusive benefit of original Borrower, Key Principal, or Guarantor, to the extent such provisions were previously modified; or

(C) a modification to the amounts required to be deposited into the Reserve/Escrow Account pursuant to the terms of the Required Repairs Agreement.

(2) In connection with any request by Borrower for consent to a Transfer, Borrower shall pay to Lender upon demand:

(A) the Transfer Fee (to the extent charged by Lender);

(B) the Review Fee (regardless of whether Lender approves or denies such request); and

(C) all of Lender's out-of-pocket costs (including reasonable attorneys' fees) incurred in reviewing the Transfer request, to the extent such costs exceed the Review Fee and regardless of whether Lender approves or denies such request.

## ARTICLE 12 - IMPOSITIONS

Section 12.01 Representations and Warranties.

The representations and warranties made by Borrower to Lender in this Section 12.01 are made as of the date hereof and the Effective Date and are true and correct.

(a) Payment of Taxes, Assessments, and Other Charges.

Borrower has:

(1) paid (or with the approval of Lender, established an escrow fund sufficient to pay when due and payable) all amounts and charges relating to the Mortgaged Property that have become due and payable before any fine, penalty interest, lien, or costs may be added thereto, including Impositions, leasehold payments, and ground rents;

(2) paid all Taxes for the Mortgaged Property that have become due before any fine, penalty interest, lien, or costs may be added thereto pursuant to any notice of assessment received by Borrower and any and all taxes that have become due against Borrower before any fine, penalty, interest, lien, or costs may be added thereto;

(3) no knowledge of any basis for any additional assessments;

(4) no knowledge of any presently pending special assessments against all or any part of the Mortgaged Property, or any presently pending special assessments against Borrower; and

(5) not received any written notice of any contemplated special assessment against the Mortgaged Property, or any contemplated special assessment against Borrower.

Section 12.02 Covenants.

(a) Imposition Deposits, Taxes, and Other Charges.

Borrower shall:

(1) deposit the Imposition Deposits with Lender on each Payment Date (or on another day designated in writing by Lender) in amount sufficient, in Lender's discretion, to enable Lender to pay each Imposition before the last date upon which such payment may be made without any penalty or interest charge being added, plus an amount equal to no more than one-sixth (1/6) (or the amount permitted by applicable law) of the Impositions for the trailing twelve (12) months (calculated based on the aggregate annual Imposition costs divided by twelve (12) and multiplied by two (2));

(2)        deposit with Lender, within ten (10) days after written notice from Lender (subject to applicable law), such additional amounts estimated by Lender to be reasonably necessary to cure any deficiency in the amount of the Imposition Deposits held for payment of a specific Imposition;

(3)        except as set forth in Section 12.03(c) below, pay, or cause to be paid, all Impositions, leasehold payments, ground rents, and Borrower taxes when due and before any fine, penalty interest, lien, or costs may be added thereto;

(4)        promptly deliver to Lender a copy of all notices of, and invoices for, Impositions, and, if Borrower pays any Imposition directly, Borrower shall promptly furnish to Lender receipts evidencing such payments; and

(5)        promptly deliver to Lender a copy of all notices of any special assessments and contemplated special assessments against the Mortgaged Property or Borrower.

**Section 12.03    Mortgage Loan Administration Matters Regarding Impositions.**

(a)        Maintenance of Records by Lender.

Lender shall maintain records of the monthly and aggregate Imposition Deposits held by Lender for the purpose of paying Taxes, insurance premiums, and each other obligation of Borrower for which Imposition Deposits are required.

(b)        Imposition Accounts.

All Imposition Deposits shall be held in an institution (which may be Lender, if Lender is such an institution) whose deposits or accounts are insured or guaranteed by a federal agency and which accounts meet the standards for custodial accounts as required by Lender from time to time. Lender shall not be obligated to open additional accounts, or deposit Imposition Deposits in additional institutions, when the amount of the Imposition Deposits exceeds the maximum amount of the federal deposit insurance or guaranty. No interest, earnings, or profits on the Imposition Deposits shall be paid to Borrower unless applicable law so requires. Imposition Deposits shall not be trust funds, nor shall they operate to reduce the Indebtedness, unless applied by Lender for that purpose in accordance with this Loan Agreement. For the purposes of 9-104(a)(3) of the UCC, Lender is the owner of the Imposition Deposits and shall be deemed a "customer" with sole control of the account holding the Imposition Deposits.

(c)        Payment of Impositions; Sufficiency of Imposition Deposits.

Lender may pay an Imposition according to any bill, statement, or estimate from the appropriate public office or insurance company without inquiring into the accuracy of the bill, statement, or estimate or into the validity of the Imposition. Imposition Deposits shall be required to be used by Lender to pay Taxes, insurance premiums and any other individual Imposition only if:

(1)        no Event of Default exists;

(2)        Borrower has timely delivered to Lender all applicable bills or premium notices that it has received; and

(3)        sufficient Imposition Deposits are held by Lender for each Imposition at the time such Imposition becomes due and payable.

Lender shall have no liability to Borrower for failing to pay any Imposition if any of the conditions are not satisfied. If at any time the amount of the Imposition Deposits held for payment of a specific Imposition exceeds the amount reasonably deemed necessary by Lender to be held in connection with such Imposition, the excess may be credited against future installments of Imposition Deposits for such Imposition.

(d)        Imposition Deposits Upon Event of Default.

If an Event of Default has occurred and is continuing, Lender may apply any Imposition Deposits, in such amount and in such order as Lender determines, to pay any Impositions or as a credit against the Indebtedness.

(e)        Contesting Impositions.

Other than insurance premiums, Borrower may contest, at its expense, by appropriate legal proceedings, the amount or validity of any Imposition if:

(1)        Borrower notifies Lender of the commencement or expected commencement of such proceedings;

(2)        Lender determines that the Mortgaged Property is not in danger of being sold or forfeited;

(3)        Borrower deposits with Lender (or the applicable Governmental Authority if required by applicable law) reserves sufficient to pay the contested Imposition, if required by Lender (or the applicable Governmental Authority);

(4)        Borrower furnishes whatever additional security is required in the proceedings or is reasonably requested in writing by Lender; and

(5)        Borrower commences, and at all times thereafter diligently prosecutes, such contest in good faith until a final determination is made by the applicable Governmental Authority.

(f)    Release to Borrower.

Upon payment in full of all sums secured by the Security Instrument and this Loan Agreement and release by Lender of the lien of the Security Instrument, Lender shall disburse to Borrower the balance of any Imposition Deposits then on deposit with Lender.

## ARTICLE 13 - INTENTIONALLY OMITTED

## ARTICLE 14 - DEFAULTS/REMEDIES

Section 14.01        Events of Default.

The occurrence of any one or more of the following in this Section 14.01 shall constitute an Event of Default under this Loan Agreement:

(1)    any failure by Borrower to pay any Monthly Debt Service Payment within ten (10) days after the applicable Payment Date or any failure by Borrower to pay or deposit when due any other amount required by the Note, this Loan Agreement or any other Loan Document;

(2)    any failure by Borrower to maintain the insurance coverage required by any Loan Document;

(3)    Intentionally Deleted;

(4)    if any warranty, representation, certification, or statement of Borrower, Guarantor, or Key Principal in this Loan Agreement or any of the other Loan Documents is false, inaccurate, or misleading in any material respect when made;

(5)    fraud, gross negligence, willful misconduct, or material misrepresentation or material omission by or on behalf of Borrower, or any of its officers, directors, trustees, partners, members, or managers, or Guarantor or Key Principal or any of their officers, directors, trustees, partners, members, or managers in connection with:

(A)    the application for, or creation of, the Indebtedness, including any financial statements, rent roll, corporate documentation, data or other information provided by or on behalf of the Borrower to Lender in consideration of its making the Mortgage Loan;

(B)    any financial statement, rent roll, or other report or information provided to Lender during the term of the Mortgage Loan; or

(C)    any request for Lender's consent to any proposed action, including a request for disbursement of Reserve/Escrow Account Funds or Collateral Account Funds;

(6)    the occurrence of any Transfer not permitted by the Loan Documents;

(7)    the occurrence of a Bankruptcy Event;

(8)    the commencement of a forfeiture action or other similar proceeding, whether civil or criminal, which, in Lender's reasonable judgment, could result in a forfeiture of the Mortgaged Property or otherwise materially impair the lien created by this Loan Agreement or the Security Instrument or Lender's interest in the Mortgaged Property;

(9)    [Intentionally Deleted.];

(10)    any failure by Borrower to complete any Repair related to fire, life, or safety issues in accordance with the terms of this Loan Agreement within the Completion Period (or such other date set forth on the Required Repairs Agreement or otherwise required by Lender in writing for such Repair);

(11)    any exercise by the holder of any other debt instrument secured by a mortgage, deed of trust, or deed to secure debt on the Mortgaged Property of a right to declare all amounts due under that debt instrument immediately due and payable;

(12)    any failure by Borrower, Key Principal or Guarantor to comply with the provisions of Section 5.02(b) and Section 5.02(c);

(13)    any failure by Borrower to perform any obligation under this Loan Agreement or any Loan Document that is subject to a specified written notice and cure period, which failure continues beyond such specified written notice and cure period as set forth herein or in the applicable Loan Document; and

(14)      any failure by Borrower to perform any of its obligations under this Loan Agreement or any Loan Document (other than those specified in Section 14.01(1) through (13) above) as and when required if the existence of such condition or event, or such failure to perform or default in performance continues for a period of thirty (30) days after written notice by Lender to Borrower of the existence of such condition or event, or of such failure to perform or default in performance, provided, however, such period may be extended for up to an additional thirty (30) days if Borrower, in the discretion of Lender, is diligently pursuing a cure of such; provided, further, however, no such written notice, grace period, or extension shall apply if, in Lender's discretion, immediate exercise by Lender of a right or remedy under this Loan Agreement or any Loan Document is required to avoid harm to Lender or impairment of the Mortgage Loan (including the Loan Documents), the Mortgaged Property or any other security given for the Mortgage Loan.

**Section 14.02      Remedies.**

(a)      Acceleration; Foreclosure.

If an Event of Default has occurred and is continuing, the entire unpaid principal balance of the Mortgage Loan, any Accrued Interest, interest accruing at the Default Rate, the Prepayment Premium (if applicable), and all other Indebtedness, at the option of Lender, shall immediately become due and payable, without any prior written notice to Borrower, unless applicable law requires otherwise (and in such case, after any required written notice has been given). Lender may exercise this option to accelerate regardless of any prior forbearance. In addition, Lender shall have all rights and remedies afforded to it hereunder and under the other Loan Documents, including, foreclosure on and/or the power of sale of the Mortgaged Property, as provided in the Security Instrument, and any rights and remedies available to it at law or in equity (subject to Borrower's statutory rights of reinstatement, if any, prior to a Foreclosure Event). Any proceeds of a foreclosure or other sale under this Loan Agreement or any other Loan Document may be held and applied by Lender as additional collateral for the Indebtedness pursuant to this Loan Agreement. Notwithstanding the foregoing, the occurrence of any Bankruptcy Event shall automatically accelerate the Mortgage Loan and all obligations and Indebtedness shall be immediately due and payable without written notice or further action by Lender.

(b)      Loss of Right to Disbursements from Collateral Accounts.

If an Event of Default has occurred and is continuing, Borrower shall immediately lose all of its rights to receive disbursements from the Reserve/Escrow Accounts and any Collateral Accounts. During the continuance of any such Event of Default, Lender may use the Reserve/Escrow Account Funds and any Collateral Account Funds (or any portion thereof) for any purpose, including:

(1)      repayment of the Indebtedness, including principal prepayments and the Prepayment Premium applicable to such full or partial prepayment, as applicable (however, such application of funds shall not cure or be deemed to cure any Event of Default);

(2)      reimbursement of Lender for all losses and expenses (including reasonable legal fees) suffered or incurred by Lender as a result of such Event of Default;

(3)      completion of the Replacement or Repair or for any other replacement or repair to the Mortgaged Property; and

(4)      payment of any amount expended in exercising (and the exercise of) all rights and remedies available to Lender at law or in equity or under this Loan Agreement or under any of the other Loan Documents.

Nothing in this Loan Agreement shall obligate Lender to apply all or any portion of the Reserve/Escrow Account Funds or Collateral Account Funds on account of any Event of Default by Borrower or to repayment of the Indebtedness or in any specific order of priority.

(c)      Remedies Cumulative.

Each right and remedy provided in this Loan Agreement is distinct from all other rights or remedies under this Loan Agreement or any other Loan Document or afforded by applicable law, and each shall be cumulative and may be exercised concurrently, independently, or successively, in any order. Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of additional default by Borrower in order to exercise any of its remedies with respect to an Event of Default.

**Section 14.03      Additional Lender Rights; Forbearance.**

(a)      No Effect Upon Obligations.

Lender may, but shall not be obligated to, agree with Borrower, from time to time, and without giving notice to, or obtaining the consent of, or having any effect upon the obligations of, Guarantor, Key Principal, or other third party obligor, to take any of the following actions:

(1)      the time for payment of the principal of or interest on the Indebtedness may be extended, or the Indebtedness may be renewed in whole or in part;

(2)      the rate of interest on or period of amortization of the Mortgage Loan or the amount of the Monthly Debt Service Payments payable under the Loan Documents may be modified;

(3)      the time for Borrower's performance of or compliance with any covenant or agreement contained in any Loan Document, whether presently existing or hereinafter entered into, may be extended or such performance or compliance may be waived;

(4)      the maturity of the Indebtedness may be accelerated as provided in the Loan Documents;

(5)      any or all payments due under this Loan Agreement or any other Loan Document may be reduced;

(6)      any Loan Document may be modified or amended by Lender and Borrower in any respect, including an increase in the principal amount of the Mortgage Loan;

(7)      any amounts under this Loan Agreement or any other Loan Document may be released;

(8)      any security for the Indebtedness may be modified, exchanged, released, surrendered, or otherwise dealt with, or additional security may be pledged or mortgaged for the Indebtedness;

(9)      the payment of the Indebtedness or any security for the Indebtedness, or both, may be subordinated to the right to payment or the security, or both, of any other present or future creditor of Borrower;

(10)      any payments made by Borrower to Lender may be applied to the Indebtedness in such priority as Lender may determine in its discretion; or

(11)      any other terms of the Loan Documents may be modified.

(b)      **No Waiver of Rights or Remedies.**

Any waiver of an Event of Default or forbearance by Lender in exercising any right or remedy under this Loan Agreement or any other Loan Document or otherwise afforded by applicable law, shall not be a waiver of any other Event of Default or preclude the exercise or failure to exercise of any other right or remedy. The acceptance by Lender of payment of all or any part of the Indebtedness after the due date of such payment, or in an amount which is less than the required payment, shall not be a waiver of Lender's right to require prompt payment when due of all other payments on account of the Indebtedness or to exercise any remedies for any failure to make prompt payment. Enforcement by Lender of any security for the Indebtedness shall not constitute an election by Lender of remedies so as to preclude the exercise or failure to exercise of any other right available to Lender. Lender's receipt of any condemnation awards or insurance proceeds shall not operate to cure or waive any Event of Default.

(c)      **Appointment of Lender as Attorney-In-Fact.**

Borrower hereby irrevocably makes, constitutes, and appoints Lender (and any officer of Lender or any Person designated by Lender for that purpose) as Borrower's true and lawful proxy and attorney-in-fact (and agent-in-fact) in Borrower's name, place, and stead, with full power of substitution, to:

(1)      use any of the funds in the Reserve/Escrow Account for the purpose of making or completing the Replacements or Repairs;

(2)      make such additions, changes, and corrections to the Replacements or Repairs as shall be necessary or desirable to complete the Replacements or Repairs;

(3)      employ such contractors, subcontractors, agents, architects, and inspectors as shall be required for such purposes;

(4)      pay, settle, or compromise all bills and claims for materials and work performed in connection with the Replacements or Repairs, or as may be necessary or desirable for the completion of the Replacements or Repairs, or for clearance of title;

(5)      adjust and compromise any claims under any and all policies of insurance required pursuant to this Loan Agreement and any other Loan Document, subject only to Borrower's rights under this Loan Agreement;

(6)      appear in and prosecute any action arising from any insurance policies;

(7)      collect and receive the proceeds of insurance, and to deduct from such proceeds Lender's expenses incurred in the collection of such proceeds;

(8)      commence, appear in, and prosecute, in Lender's or Borrower's name, any action or proceeding relating to any condemnation;

(9)      settle or compromise any claim in connection with any condemnation;

(10)      execute all applications and certificates in the name of Borrower which may be required by any of the contract documents;

(11)      prosecute and defend all actions or proceedings in connection with the Mortgaged Property or the rehabilitation and repair of the Mortgaged Property;

(12)      take such actions as are permitted in this Loan Agreement and any other Loan Documents;

(13)      execute such financing statements and other documents and to do such other acts as Lender may require to perfect and preserve Lender's security interest in, and to enforce such interests in, the collateral; and

(14)      carry out any remedy provided for in this Loan Agreement and any other Loan Documents, including endorsing Borrower's name to checks, drafts, instruments and other items of payment and proceeds of the collateral, executing change of address forms with the postmaster of the United States Post Office serving the address of Borrower, changing the address of Borrower to that of Lender, opening all envelopes addressed to Borrower, and applying any payments contained therein to the Indebtedness.

Borrower hereby acknowledges that the constitution and appointment of such proxy and attorney-in-fact are coupled with an interest and are irrevocable and shall not be affected by the disability or incompetence of Borrower. Borrower specifically acknowledges and agrees that this power of attorney granted to Lender may be assigned by Lender to Lender's successors or assigns as holder of the Note (and the Mortgage Loan). However, the foregoing shall not require Lender to incur any expense or take any action. Borrower hereby ratifies and confirms all that such attorney-in-fact may do or cause to be done by virtue of any provision of this Loan Agreement and any other Loan Documents.

(d)      Borrower Waivers.

If more than one Person signs this Loan Agreement as Borrower, each Borrower, with respect to any other Borrower, hereby agrees that Lender, in its discretion, may:

(1)      bring suit against Borrower, or any one or more of Borrower, jointly and severally, or against any one or more of them;

(2)      compromise or settle with any one or more of the persons constituting Borrower, for such consideration as Lender may deem proper;

(3)      release one or more of the persons constituting Borrower, from liability; or

(4)      otherwise deal with Borrower, or any one or more of them, in any manner, and no such action shall impair the rights of Lender to collect from any Borrower the full amount of the Indebtedness.

Section 14.04      Waiver of Marshaling.

Notwithstanding the existence of any other security interests in the Mortgaged Property held by Lender or by any other party, Lender shall have the right to determine the order in which any or all of the Mortgaged Property shall be subjected to the remedies provided in this Loan Agreement, any other Loan Document or applicable law. Lender shall have the right to determine the order in which all or any part of the Indebtedness is satisfied from the proceeds realized upon the exercise of such remedies. Borrower and any party who now or in the future acquires a security interest in the Mortgaged Property and who has actual or constructive notice of this Loan Agreement waives any and all right to require the marshaling of assets or to require that any of the Mortgaged Property be sold in the inverse order of alienation or that any of the Mortgaged Property be sold in parcels or as an entirety in connection with the exercise of any of the remedies permitted by applicable law or provided in this Loan Agreement or any other Loan Documents.

## ARTICLE 15 – MISCELLANEOUS

Section 15.01      Governing Law; Consent to Jurisdiction and Venue.

(a)      Governing Law.

This Loan Agreement and any other Loan Document which does not itself expressly identify the law that is to apply to it, shall be governed by the laws of the Property Jurisdiction without regard to the application of choice of law principles.

(b)      Venue.

Any controversy arising under or in relation to this Loan Agreement or any other Loan Document shall be litigated exclusively in the Property Jurisdiction without regard to conflicts of laws principles. The state and federal courts and authorities with jurisdiction in the Property Jurisdiction shall have exclusive jurisdiction over all controversies which shall arise under or in relation to this Loan Agreement or any other Loan Document. Borrower irrevocably consents to service, jurisdiction, and venue of such courts for any such litigation and waives any other venue to which it might be entitled by virtue of domicile, habitual residence, or otherwise.

Section 15.02      Notice

(a)      Process of Serving Notice.

Except as otherwise set forth herein or in any other Loan Document, all notices under this Loan Agreement and any other Loan Document shall be:

(1)      in writing and shall be:

(A)      delivered, in person;

Page 32 of 45

      (B)     mailed, postage prepaid, either by registered or certified delivery, return receipt requested;

      (C)     sent by overnight courier; or

      (D)     sent by electronic mail with originals to follow by overnight courier;

  (2)     addressed to the intended recipient at Borrower's Notice Address and Lender's Notice Address, as applicable; and

  (3)     deemed given on the earlier to occur of:

      (A)     the date when the notice is received by the addressee; or

      (B)     if the recipient refuses or rejects delivery, the date on which the notice is so refused or rejected, as conclusively established by the records of the United States Postal Service or such express courier service.

**(b)**    **Change of Address.**

Any party to this Loan Agreement may change the address to which notices intended for it are to be directed by means of notice given to the other parties identified on the Summary of Loan Terms in accordance with this Section 15.02.

**(c)**    **Default Method of Notice.**

Any required notice under this Loan Agreement or any other Loan Document which does not specify how notices are to be given shall be given in accordance with this Section 15.02.

**(d)**    **Receipt of Notices.**

Neither Borrower nor Lender shall refuse or reject delivery of any notice given in accordance with this Loan Agreement. Each party is required to acknowledge, in writing, the receipt of any notice upon request by the other party.

**Section 15.03**    **Successors and Assigns Bound; Sale of Mortgage Loan.**

**(a)**    **Binding Agreement.**

This Loan Agreement shall bind, and the rights granted by this Loan Agreement shall inure to, the successors and assigns of Lender and the permitted successors and assigns of Borrower. However, a Transfer not permitted by this Loan Agreement shall be an Event of Default and shall be void ab initio.

**(b)**    **Sale of Mortgage Loan; Change of Loan Servicer.**

Nothing in this Loan Agreement shall limit Lender's (including its successors and assigns) right to sell or transfer the Mortgage Loan or any interest in the Mortgage Loan. The Mortgage Loan or a partial interest in the Mortgage Loan (together with this Loan Agreement and the other Loan Documents) may be sold one or more times without prior written notice to Borrower. A sale may result in a change of the Loan Servicer.

**Section 15.04**    **Counterparts.**

This Loan Agreement may be executed in any number of counterparts with the same effect as if the parties hereto had signed the same document and all such counterparts shall be construed together and shall constitute one instrument.

**Section 15.05**    **Joint and Several (or Solidary) Liability.**

If more than one Person signs this Loan Agreement as Borrower, the obligations of such Persons shall be joint and several (solidary instead for purposes of Louisiana law).

**Section 15.06**    **Relationship of Parties; No Third Party Beneficiary.**

**(a)**    **Solely Creditor and Debtor.**

The relationship between Lender and Borrower shall be solely that of creditor and debtor, respectively, and nothing contained in this Loan Agreement shall create any other relationship between Lender and Borrower. Nothing contained in this Loan Agreement shall constitute Lender as a joint venturer, partner, or agent of Borrower, or render Lender liable for any debts, obligations, acts, omissions, representations, or contracts of Borrower.

**(b)**    **No Third Party Beneficiaries.**

No creditor of any party to this Loan Agreement and no other person shall be a third party beneficiary of this Loan Agreement or any other Loan Document or any account created or contemplated under this Loan Agreement or any other Loan Document. Nothing contained in this Loan Agreement shall be deemed or construed to create an obligation on the part of Lender to any third party nor shall any third party have a right to enforce against Lender any right that Borrower may have under this Loan Agreement. Without limiting the foregoing:

  (1)     any Servicing Arrangement between Lender and any Loan Servicer shall constitute a contractual obligation of such Loan Servicer that is independent of the obligation of Borrower for the payment of the Indebtedness;

  (2)     Borrower shall not be a third party beneficiary of any Servicing Arrangement; and

(3)     no payment by the Loan Servicer under any Servicing Arrangement will reduce the amount of the Indebtedness.

**Section 15.07     Severability; Entire Agreement; Amendments.**

The invalidity or unenforceability of any provision of this Loan Agreement or any other Loan Document shall not affect the validity or enforceability of any other provision of this Loan Agreement or of any other Loan Document, all of which shall remain in full force and effect, including the Guaranty. This Loan Agreement contains the complete and entire agreement among the parties as to the matters covered, rights granted, and the obligations assumed in this Loan Agreement. This Loan Agreement may not be amended or modified except by written agreement signed by the parties hereto.

**Section 15.08     Construction.**

(a)     The captions and headings of the sections of this Loan Agreement and the Loan Documents are for convenience only and shall be disregarded in construing this Loan Agreement and the Loan Documents.

(b)     Any reference in this Loan Agreement to an "Exhibit" or "Schedule" or a "Section" or an "Article" shall, unless otherwise explicitly provided, be construed as referring, respectively, to an Exhibit or Schedule attached to this Loan Agreement or to a Section or Article of this Loan Agreement.

(c)     Any reference in this Loan Agreement to a statute or regulation shall be construed as referring to that statute or regulation as amended from time to time.

(d)     Use of the singular in this Loan Agreement includes the plural and use of the plural includes the singular.

(e)     As used in this Loan Agreement, the term "including" means "including, but not limited to" or "including, without limitation," and is for example only and not a limitation.

(f)     Whenever Borrower's knowledge is implicated in this Loan Agreement or the phrase "to Borrower's knowledge" or a similar phrase is used in this Loan Agreement, Borrower's knowledge or such phrase(s) shall be interpreted to mean to the best of Borrower's knowledge after reasonable and diligent inquiry and investigation.

(g)     Unless otherwise provided in this Loan Agreement, if Lender's approval, designation, determination, selection, estimate, action, or decision is required, permitted, or contemplated hereunder, such approval, designation, determination, selection, estimate, action, or decision shall be made in Lender's sole and absolute discretion.

(h)     All references in this Loan Agreement to a separate instrument or agreement shall include such instrument or agreement as the same may be amended or supplemented from time to time pursuant to the applicable provisions thereof.

(i)     "Lender may" shall mean at Lender's discretion, but shall not be an obligation.

(j)     If the Mortgage Loan proceeds are disbursed on a date that is later than the Effective Date, as described in Section 2.02, the representations and warranties in the Loan Documents with respect to the ownership and operation of the Mortgage Property shall be deemed to be made as of the disbursement date.

**Section 15.09     Mortgage Loan Servicing.**

All actions regarding the servicing of the Mortgage Loan, including the collection of payments, the giving and receipt of notice, inspections of the Mortgaged Property, inspections of books and records, and the granting of consents and approvals, may be taken by the Loan Servicer unless Borrower receives notice to the contrary. If Borrower receives conflicting notices regarding the identity of the Loan Servicer or any other subject, any such written notice from Lender shall govern. The Loan Servicer may change from time to time (whether related or unrelated to a sale of the Mortgage Loan). If there is a change of the Loan Servicer, Borrower will be given written notice of the change.

**Section 15.10     Disclosure of Information.**

Lender may furnish information regarding Borrower, Key Principal, or Guarantor, or the Mortgaged Property to third parties with an existing or prospective interest in the servicing, enforcement, evaluation, performance, purchase, or securitization of the Mortgage Loan, including trustees, master servicers, special servicers, rating agencies, and organizations maintaining databases on the underwriting and performance of multifamily mortgage loans. Borrower irrevocably waives any and all rights it may have under applicable law to prohibit such disclosure, including any right of privacy.

**Section 15.11     Waiver; Conflict.**

No specific waiver of any of the terms of this Loan Agreement shall be considered as a general waiver. If any provision of this Loan Agreement is in conflict with any provision of any other Loan Document, the provision contained in this Loan Agreement shall control.

**Section 15.12     No Reliance.**

Borrower acknowledges, represents, and warrants that:

(a)     it understands the nature and structure of the transactions contemplated by this Loan Agreement and the other Loan Documents;

(b)     it is familiar with the provisions of all of the documents and instruments relating to such transactions;

(c)      it understands the risks inherent in such transactions, including the risk of loss of all or any part of the Mortgaged Property;

(d)      it has had the opportunity to consult counsel; and

(e)      it has not relied on Lender for any guidance or expertise in analyzing the financial or other consequences of the transactions contemplated by this Loan Agreement or any other Loan Document or otherwise relied on Lender in any manner in connection with interpreting, entering into, or otherwise in connection with this Loan Agreement, any other Loan Document, or any of the matters contemplated hereby or thereby.

**Section 15.13      Subrogation.**

If, and to the extent that, the proceeds of the Mortgage Loan are used to pay, satisfy, or discharge any obligation of Borrower for the payment of money that is secured by a pre-existing mortgage, deed of trust, or other lien encumbering the Mortgaged Property, such Mortgage Loan proceeds shall be deemed to have been advanced by Lender at Borrower's request, and Lender shall automatically, and without further action on its part, be subrogated to the rights, including lien priority, of the owner or holder of the obligation secured by such prior lien, whether or not such prior lien is released.

**Section 15.14      Counting of Days.**

Except where otherwise specifically provided, any reference in this Loan Agreement to a period of "days" means calendar days, not Business Days.  If the date on which Borrower is required to perform an obligation under this Loan Agreement is not a Business Day, Borrower shall be required to perform such obligation by the Business Day immediately preceding such date; provided, however, in respect of any Payment Date, or if the Maturity Date is other than a Business Day, Borrower shall be obligated to make such payment by the Business Day immediately following such date.

**Section 15.15      Revival and Reinstatement of Indebtedness.**

If the payment of all or any part of the Indebtedness by Borrower, Guarantor, or any other Person, or the transfer to Lender of any collateral or other property should for any reason subsequently be declared to be void or voidable under any state or federal law relating to creditors' rights, including provisions of the Insolvency Laws relating to a Voidable Transfer, and if Lender is required to repay or restore, in whole or in part, any such Voidable Transfer, or elects to do so upon the advice of its counsel, then the amount of such Voidable Transfer or the amount of such Voidable Transfer that Lender is required or elects to repay or restore, including all reasonable costs, expenses, and attorneys' fees incurred by Lender in connection therewith, and the Indebtedness shall automatically shall be revived, reinstated, and restored by such amount and shall exist as though such Voidable Transfer had never been made.

**Section 15.16      Time is of the Essence.**

Borrower agrees that, with respect to each and every obligation and covenant contained in this Loan Agreement and the other Loan Documents, time is of the essence.

**Section 15.17      Final Agreement.**

THIS LOAN AGREEMENT ALONG WITH ALL OF THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.  All prior or contemporaneous agreements, understandings, representations, and statements, oral or written, are merged into this Loan Agreement and the other Loan Documents. This Loan Agreement, the other Loan Documents, and any of their provisions may not be waived, modified, amended, discharged, or terminated except by an agreement in writing signed by the party against which the enforcement of the waiver, modification, amendment, discharge, or termination is sought, and then only to the extent set forth in that agreement.

**Section 15.18      Waiver of Trial by Jury.**

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH OF BORROWER AND LENDER (a) COVENANTS AND AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS LOAN AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR THE RELATIONSHIP BETWEEN THE PARTIES AS BORROWER AND LENDER, THAT IS TRIABLE OF RIGHT BY A JURY AND (b) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH ISSUE TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY EACH PARTY, KNOWINGLY AND VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL.

[Remainder of Page Intentionally Blank]

IN WITNESS WHEREOF. Borrower and Lender have signed and delivered this Loan Agreement under seal (where applicable) or have caused this Loan Agreement to be signed and delivered under seal (where applicable) by their duly authorized representatives. Where applicable law so provides, Borrower and Lender intend that this Loan Agreement shall be deemed to be signed and delivered as a sealed instrument.

C. Ray Kennedy

Cynthia M. Kennedy

Lender:
CHERRYWOOD COMMERCIAL LENDING, LLC, a Delaware limited liability company

By:

Name: Jorge L. Ramos

Title:   Executive Vice President

SCHEDULE 1 TO
LOAN AND SECURITY AGREEMENT
Definitions Schedule

Capitalized terms used in the Loan Agreement have the meanings given to such terms in this Definitions Schedule.

"Accrued Interest" means unpaid interest, if any, on the Mortgage Loan that has not been added to the unpaid principal balance of the Mortgage Loan pursuant to Section 2.02(b) (Capitalization of Accrued But Unpaid Interest) of the Loan Agreement.

"Adjustable Rate" has the meaning set forth in the Summary of Loan Terms.

"Amortization Period" " has the meaning set forth in the Summary of Loan Terms.

"Amortization Type" has the meaning set forth in the Summary of Loan Terms.

"Balloon Payment" has the meaning set forth in the Summary of Loan Terms.

"Bank Secrecy Act" means the Bank Secrecy Act of 1970, as amended (e.g., 31 U.S.C. Sections 5311-5330).

"Bankruptcy Event" means any one or more of the following:

(a)      the commencement, filing or continuation of a voluntary case or proceeding under one or more of the Insolvency Laws by Borrower;

(b)      the acknowledgment in writing by Borrower (other than to Lender in connection with a workout) that it is unable to pay its debts generally as they mature;

(c)      the making of a general assignment for the benefit of creditors by Borrower;

(d)      the commencement, filing or continuation of an involuntary case or proceeding under one or more Insolvency Laws against Borrower; or

(e)      the appointment of a receiver (other than a receiver appointed at the direction or request of Lender under the terms of the Loan Documents), liquidator, custodian, sequestrator, trustee or other similar officer who exercises control over Borrower or any substantial part of the assets of Borrower;

provided, however, that any proceeding or case under (d) or (e) above shall not be a Bankruptcy Event until the ninetieth (90th) day after filing (if not earlier dismissed) so long as such proceeding or case occurred without the consent, encouragement or active participation of (1) Borrower, Guarantor, or Key Principal, (2) any Person Controlling Borrower, Guarantor or Key Principal, or (3) any Person Controlled by or under common Control with Borrower, Guarantor or Key Principal (in which event such case or proceeding shall be a Bankruptcy Event immediately).

"Borrower" means, individually (and jointly and severally (solidarily instead for purposes of Louisiana law) if more than one), the individual (or individuals) or the entity (or entities) identified as "Borrower" in the first paragraph of the Loan Agreement.

"Borrower Affiliate" means, as to Borrower, Guarantor or Key Principal:

(a)      any Person that owns any direct ownership interest in Borrower, Guarantor or Key Principal;

(b)      any Person that indirectly owns, with the power to vote, twenty percent (20%) or more of the ownership interests in Borrower, Guarantor or Key Principal;

(c)      any Person Controlled by, under common Control with, or which Controls, Borrower, Guarantor or Key Principal;

(d)     any entity in which Borrower, Guarantor or Key Principal directly or indirectly owns, with the power to vote, twenty percent (20%) or more of the ownership interests in such entity, or

(e)     any other individual that is related (to the third degree of consanguinity) by blood or marriage to Borrower, Guarantor or Key Principal.

"**Borrower's Notice Address**" has the meaning set forth in the Summary of Loan Terms.

"**Business Day**" means any day other than (a) a Saturday, (b) a Sunday, (c) a day on which Lender is not open for business, or (d) a day on which the Federal Reserve Bank of New York is not open for business.

"**Collateral Account Funds**" means, collectively, the funds on deposit in any or all of the Collateral Accounts, including the Reserve/Escrow Account Funds.

"**Collateral Accounts**" means any account designated as such by Lender pursuant to a Collateral Agreement or as established pursuant to this Loan Agreement, including the Reserve/Escrow Account.

"**Collateral Agreement**" means any separate agreement between Borrower and Lender for the establishment of any other fund, reserve or account.

"**Completion Period**" has the meaning set forth in the Required Repairs Agreement.

"**Condemnation Action**" has the meaning set forth in the Security Instrument.

"**Control**" (including with correlative meanings, such as "Controlling," "Controlled by" and "under common Control with") means, as applied to any entity, the possession, directly or indirectly, of the power to direct or cause the direction of the management and operations of such entity, whether through the ownership of voting securities or other ownership interests, by contract or otherwise.

"**Credit Score**" " means a numerical value or a categorization derived from a statistical tool or modeling system used to measure credit risk and predict the likelihood of certain credit behaviors, including default.

"**Current Index**" "has the meaning set forth in the Summary of Loan Terms.

"**Debt Service Amounts**" means the Monthly Debt Service Payments and all other amounts payable under the Loan Agreement, the Note, the Security Instrument or any other Loan Document.

"**Default Rate**" means an interest rate equal to the lesser of:

(a)     the sum of the Interest Rate plus four (4) percentage points; or

(b)     the maximum interest rate which may be collected from Borrower under applicable law.

"**Definitions Schedule**" " means this Schedule I (Definitions Schedule) to the Loan Agreement.

"**Effective Date**" has the meaning set forth in the Summary of Loan Terms.

"**Employee Benefit Plan**" means a plan described in Section 3(3) of ERISA, regardless of whether the plan is subject to ERISA.

"**Enforcement Costs**" has the meaning set forth in the Security Instrument.

"**Environmental Indemnity Agreement**" means that certain Environmental Indemnity Agreement dated as of the Effective Date, made by Borrower to and for the benefit of Lender, as the same may be amended, restated, replaced, supplemented, or otherwise modified from time to time.

"**Environmental Inspections**" has the meaning set forth in the Environmental Indemnity Agreement.

"**Environmental Laws**" has the meaning set forth in the Environmental Indemnity Agreement.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" shall mean, with respect to Borrower, any entity that, together with Borrower, would be treated as a single

employer under Section 414(b) or (c) of the Internal Revenue Code, or Section 4001(a)(14) of ERISA, or the regulations thereunder.

"ERISA Plan" means any employee pension benefit plan within the meaning of Section 3(2) of ERISA (or related trust) that is subject to the requirements of Title IV of ERISA, Sections 430 or 431 of the Internal Revenue Code, or Sections 302, 303, or 304 of ERISA, which is maintained or contributed to by Borrower or its ERISA Affiliates.

"Event of Default" means the occurrence of any event listed in Section 14.01 (Events of Default) of the Loan Agreement.

"First Payment Change Date" has the meaning set forth in the Summary of Loan Terms.

"First Payment Date" has the meaning set forth in the Summary of Loan Terms.

"First Rate Change Date" has the meaning set forth in the Summary of Loan Terms.

"Fixed Rate" has the meaning set forth in the Summary of Loan Terms.

"Fixtures" has the meaning set forth in the Security Instrument.

"Force Majeure" shall mean acts of God, acts of war, civil disturbance, governmental action (including the revocation or refusal to grant licenses or permits, where such revocation or refusal is not due to the fault of Borrower), strikes, lockouts, fire, unavoidable casualties or any other causes beyond the reasonable control of Borrower (other than lack of financing), and of which Borrower shall have notified Lender in writing within ten (10) days after its occurrence.

"Foreclosure Event" means:

    (a)    foreclosure under the Security Instrument;

    (b)    any other exercise by Lender of rights and remedies (whether under the Security Instrument or under applicable law, including Insolvency Laws) as holder of the Mortgage Loan and/or the Security Instrument, as a result of which Lender (or its designee or nominee) or a third party purchaser becomes owner of the Mortgaged Property;

    (c)    delivery by Borrower to Lender (or its designee or nominee) of a deed or other conveyance of Borrower's interest in the Mortgaged Property in lieu of any of the foregoing; or

    (d)    in Louisiana, any dation en paiement.

"Governmental Authority" means any court, board, commission, department or body of any municipal, county, state or federal governmental unit, or any subdivision of any of them, that has or acquires jurisdiction over Borrower or the Mortgaged Property or the use, operation or improvement of the Mortgaged Property.

"Guarantor" means, individually and collectively, any guarantor of the Indebtedness or any other obligation of Borrower under any Loan Document.

"Guarantor Bankruptcy Event" means any one or more of the following:

    (a)    the commencement, filing or continuation of a voluntary case or proceeding under one or more of the Insolvency Laws by Guarantor;

    (b)    the acknowledgment in writing by Guarantor (other than to Lender in connection with a workout) that it is unable to pay its debts generally as they mature;

    (c)    the making of a general assignment for the benefit of creditors by Guarantor;

    (d)    the commencement, filing or continuation of an involuntary case or proceeding under one or more Insolvency Laws against Guarantor; or

    (e)    the appointment of a receiver (other than a receiver appointed at the direction or request of Lender under the terms of the Loan Documents), liquidator, custodian, sequestrator, trustee or other similar officer who exercises control over Guarantor or any substantial part of the assets of Guarantor, as applicable; provided, however, that any proceeding or case under (d) or (e) above shall not be a Guarantor Bankruptcy Event until the ninetieth (90th) day after filing (if not earlier dismissed) so

long as such proceeding or case occurred without the consent, encouragement or active participation of (1) Borrower, Guarantor, or Key Principal, (2) any Person Controlling Borrower, Guarantor or Key Principal, or (3) any Person Controlled by or under common Control with Borrower, Guarantor or Key Principal (in which event such case or proceeding shall be a Guarantor Bankruptcy Event immediately).

"Guarantor's Notice Address" has the meaning set forth in the Summary of Loan Terms.

"Guaranty" means, individually and collectively, any Payment Guaranty, Non-Recourse Guaranty or other guaranty executed by Guarantor in connection with the Mortgage Loan.

"Immediate Family Members" means a child, stepchild, grandchild, spouse, sibling, or parent, each of whom is not a Prohibited Person.

"Imposition Deposits" has the meaning set forth in the Security Instrument.

"Impositions" has the meaning set forth in the Security Instrument

"Improvements" has the meaning set forth in the Security Instrument.

"Indebtedness" has the meaning set forth in the Security Instrument.

"Index" has the meaning set forth in the Summary of Loan Terms.

has the meaning set forth in the Required Repairs Agreement.

"Insolvency Laws" means the United States Bankruptcy Code, 11 U.S.C. Section 101, et seq., together with any other federal or state law affecting debtor and creditor rights or relating to the bankruptcy, insolvency, reorganization, arrangement, moratorium, readjustment of debt, dissolution, liquidation or similar laws, proceedings, or equitable principles affecting the enforcement of creditors' rights, as amended from time to time.

"Insolvent" means:

    (a)    that the sum total of all of a specified Person's liabilities (whether secured or unsecured, contingent or fixed, or liquidated or unliquidated) is in excess of the value of such Person's non-exempt assets, i.e., all of the assets of such Person that are available to satisfy claims of creditors; or

    (b)    such Person's inability to pay its debts as they become due.

"Intended Prepayment Date" means the date upon which Borrower intends to make a prepayment on the Mortgage Loan, as set forth in the Prepayment Notice.

"Interest Accrual Method" has the meaning set forth in the Summary of Loan Terms.

"Interest Only Term" has the meaning set forth in the Summary of Loan Terms.

"Interest Rate" means the annual rate at which interest accrues on the Mortgage Loan as set forth in the Summary of Terms.

"Interest Rate Type" has the meaning set forth in the Summary of Loan Terms.

"Internal Revenue Code" means the Internal Revenue Code of 1986, as amended.

"Investor" means any Person to whom Lender intends to sell, transfer, deliver or assign the Mortgage Loan in the secondary mortgage market.

"Key Principal" means, collectively:

    (a)    the natural person(s) or entity that Controls Borrower that Lender determines is critical to the successful operation and management of Borrower and the Mortgaged Property, as identified as such in the Summary of Loan Terms; or

(b)      any natural person or entity who becomes a Key Principal after the date of the Loan Agreement and is identified as such in an assumption agreement, or another amendment or supplement to the Loan Agreement.

"Land" means the land described in Exhibit A to the Security Instrument.

"Last Interest Only Payment Date" has the meaning set forth in the Summary of Loan Terms, if applicable.

"Late Charge" means an amount equal to the delinquent amount then due under the Loan Documents multiplied by five percent (5%).

"Leases" has the meaning set forth in the Security Instrument.

"Lender" means the entity identified as "Lender" in the first paragraph of the Loan Agreement and its transferees, successors and assigns, or any subsequent holder of the Note.

"Lender's General Business Address" has the meaning set forth in the Summary of Loan Terms.

"Lender's Notice Address" has the meaning set forth in the Summary of Loan Terms.

"Lender's Payment Address" has the meaning set forth in the Summary of Loan Terms.

"Lien" " has the meaning set forth in the Security Instrument.

"Loan Agreement" means the Loan and Security Agreement made as of the Effective Date executed by and between Borrower and Lender to which this Definitions Schedule is attached, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Loan Amount" has the meaning set forth in the Summary of Loan Terms.

"Loan Application" means the application for the Mortgage Loan submitted by Borrower to Lender.

"Loan Documents" means the Note, the Loan Agreement, the Security Instrument, the Environmental Indemnity Agreement, the Guaranty, the Required Repairs Agreement (if required in accordance with the Summary of Loan Terms), all guaranties, all indemnity agreements, all Collateral Agreements, all O&M Plans, and any other documents now or in the future executed by Borrower, Guarantor, Key Principal, any other guarantor or any other Person in connection with the Mortgage Loan, as such documents may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Loan to Value Ratio" means the fraction expressed as a percentage, the numerator of which is the outstanding principal balance of the Loan and the denominator of which is the fair market value of the Property.

"Loan Servicer" means the entity that from time to time is designated by Lender to collect payments and deposits and receive notices under the Note, the Loan Agreement, the Security Instrument and any other Loan Document, and otherwise to service the Mortgage Loan for the benefit of Lender.  Unless Borrower receives notice to the contrary, the Loan Servicer shall be the Lender originally named on the Summary of Loan Terms.

"Loan Term" has the meaning set forth in the Summary of Loan Terms.

"Margin" has the meaning set forth in the Summary of Loan Terms.

"Material Lease" has the meaning set forth in the Summary of Loan Terms.

"Maturity Date" has the meaning set forth in the Summary of Loan Terms.

"Maximum Inspection Fee" has the meaning set forth in the Required Repairs Agreement, if any.

"Monthly Debt Service Payment" has the meaning set forth in the Summary of Loan Terms.

"Mortgage Loan" means the mortgage loan made by Lender to Borrower in the principal amount of the Note made pursuant to the Loan Agreement, evidenced by the Note and secured by the Loan Documents that are expressly stated to be security for the Mortgage Loan.

"Mortgaged Property" has the meaning set forth in the Security Instrument.

"Note" means that certain Promissory Note of even date with this Loan Agreement in the original principal amount of the stated Loan Amount made by Borrower in favor of Lender, and all schedules, riders, alonges and addenda attached thereto, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"O&M Plan" has the meaning set forth in the Environmental Indemnity Agreement.

"OFAC" means the United States Treasury Department, Office of Foreign Assets Control, and any successor thereto.

"Payment Change Date" has the meaning set forth in the Summary of Loan Terms.

"Payment Date" means the First Payment Date and the first day of each month thereafter until the Mortgage Loan is fully paid.

"Payment Guaranty" means, if applicable, that certain Guaranty (Payment) of even date herewith executed by Guarantor to and for the benefit of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Permitted Encumbrance" has the meaning set forth in the Security Instrument.

"Permitted Preferred Equity" means Preferred Equity that does not (a) require mandatory dividends, distributions, payments or returns (including at maturity or in connection with a redemption), or (b) provide the Preferred Equity owner with rights or remedies on account of a failure to receive any preferred dividends, distributions, payments or returns (or, if such rights are provided, the exercise of such rights do not violate the Loan Documents or are otherwise exercised with the prior written consent of Lender in accordance with Article 11 (Liens, Transfers and Assumptions) of the Loan Agreement and the payment of all applicable fees and expenses as set forth in Section 11.03(h) (Further Conditions to Transfers and Assumption)).

"Permitted Prepayment Date" means the last Business Day of a calendar month.

"Person" means an individual, an estate, a trust, a corporation, a partnership, a limited liability company or any other organization or entity (whether governmental or private).

"Personal Property" means the Goods, accounts, choses of action, chattel paper, documents, general intangibles (including Software), payment intangibles, instruments, investment property, letter of credit rights, supporting obligations, computer information, source codes, object codes, records and data, all telephone numbers or listings, claims (including claims for indemnity or breach of warranty), deposit accounts and other property or assets of any kind or nature related to the Land or the Improvements, including operating agreements, surveys, plans and specifications and contracts for architectural, engineering and construction services relating to the Land or the Improvements, and all other intangible property and rights relating to the operation of, or used in connection with, the Land or the Improvements, including all governmental permits relating to any activities on the Land.

"Personalty" has the meaning set forth in the Security Instrument.

"Preferred Equity" means a direct or indirect equity ownership interest in, economic interests in, or rights with respect to, Borrower that provide an equity owner preferred dividend, distribution, payment or return treatment relative to other equity owners.

"Prepayment Notice" means the written notice that Borrower is required to provide to Lender in accordance with Section 2.03 (Prepayment) of the Loan Agreement in order to make a prepayment on the Mortgage Loan, which shall include, at a minimum, the Intended Prepayment Date.

"Prepayment Premium" means the amount payable by Borrower in connection with a prepayment of the Mortgage Loan, as provided in Section 2.03 (Prepayment) of the Loan Agreement and calculated in accordance with the Prepayment Premium

Schedule.

"Prepayment Premium Period End Date" has the meaning set forth in the Prepayment Premium Schedule.

"Prepayment Premium Period Term" has the meaning set forth in the Prepayment Premium Schedule.

"Prepayment Premium Schedule" means that certain Schedule 4 (Prepayment Premium Schedule) to the Loan Agreement.

"Prohibited Person" means:

    (a)      any Person with whom Lender is prohibited from doing business pursuant to any law, rule, regulation, judicial proceeding or administrative directive; or

    (b)      any Person identified on the United States Department of Housing and Urban Development's "Limited Denial of Participation, HUD Funding Disqualifications and Voluntary Abstentions List," or on the General Services Administration's "Excluded Parties List System," each of which may be amended from time to time, and any successor or replacement thereof; or

    (c)      any Person that is determined by Lender to pose an unacceptable credit risk due to the aggregate amount of debt of such Person owned or held by Lender; or

    (d)      any Person that has caused any unsatisfactory experience of a material nature with Lender, such as a default, fraud, intentional misrepresentation, litigation, arbitration or other similar act.

"Property Jurisdiction" has the meaning set forth in the Security Instrument.

"Publicly-Held Corporation" means a corporation, the outstanding voting stock of which is registered under Sections 12(b) or 12(g) of the Securities Exchange Act of 1934, as amended.

"Publicly-Held Trust" means a real estate investment trust, the outstanding voting shares or beneficial interests of which are registered under Sections 12(b) or 12(g) of the Securities Exchange Act of 1934, as amended.

"Rate Change Date" has the meaning set forth in the Summary of Loan Terms.

"Remaining Amortization Period" has the meaning set forth in the Summary of Loan Terms.

"REMIC Trust" means a securitization trust that elects to be classified as a REMIC within the meaning of Sections 860A - 860G of the Internal Revenue Code of 1986, as amended.

"Rents" has the meaning set forth in the Security Instrument.

"Repairs" means, individually and collectively, those items listed on the Required Repair and Replacement Schedule or any other repairs required by the Lender in accordance with the Loan Documents.

"Replacements" means, individually and collectively, those items listed on the Required Repair and Replacement Schedule or any other replacements required by the Lender in accordance with the Loan Documents.

"Required Repair and Replacement Schedule" means that certain Schedule 2 (Required Repair and Replacement Schedule) to the Required Repairs Agreement.

"Required Repairs Agreement" means that certain Required Repairs Agreement between the Borrower and Lender of even date herewith, if any.

"Reserve/Escrow Account Funds" means, collectively, the funds on deposit in the Reserve/Escrow Accounts.

"Reserve/Escrow Account" means the account established by Lender into which the Lender deposits the amount set forth as the Reserve/Escrow Deposit in the Required Repairs Agreement.

"Reserve/Escrow Deposit" means the account to be deposited into the Reserved/Escrow Account as set from in the Required Repairs Agreement, if any.

"Restoration" means restoring and repairing the Mortgaged Property to the equivalent of its physical condition immediately prior to the casualty or to a condition approved by Lender following a casualty.

"Restricted Ownership Interest" means, with respect to any entity, the following:

    (a)    if such entity is a general partnership or a joint venture, fifty percent (50%) or more of all general partnership or joint venture interests in such entity;

    (b)    if such entity is a limited partnership:

        (1)    the interest of any general partner; or

        (2)    fifty percent (50%) or more of all limited partnership interests in such entity;

    (c)    if such entity is a limited liability company or a limited liability partnership:

        (1)    the interest of any non-member manager or managing member; or

        (2)    fifty percent (50%) or more of all membership or other ownership interests in such entity;

    (d)    if such entity is a corporation (other than a Publicly-Held Corporation) with only one class of voting stock, fifty percent (50%) or more of voting stock in such corporation;

    (e)    if such entity is a corporation (other than a Publicly-Held Corporation) with more than one class of voting stock, the amount of shares of voting stock sufficient to have the power to elect the majority of directors of such corporation; or

    (f)    if such entity is a trust (other than a land trust or a Publicly-Held Trust), the power to Control such trust vested in the trustee of such trust or the ability to remove, appoint or substitute the trustee of such trust (unless the trustee of such trust after such removal, appointment or substitution is a trustee identified in the trust agreement approved by Lender).

"Review Fee" means the non-refundable fee of Three Thousand Dollars ($3,000) payable to Lender.

"Schedule of Interest Rate Type Provisions" means that certain Schedule 3 (Schedule of Interest Rate Type Provisions) to the Loan Agreement.

"Security Instrument" means that certain mortgage, deed to secure debt or deed of trust executed and delivered by Borrower as security for the Mortgage Loan and encumbering the Mortgaged Property, including all riders or schedules attached thereto, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Servicing Arrangement" means any arrangement between Lender and the Loan Servicer for loss sharing or interim advancement of funds.

"Summary of Loan Terms" means that certain Schedule 2 (Summary of Loan Terms) to the Loan Agreement.

"Taxes" has the meaning set forth in the Security Instrument.

"Title Policy" means the mortgagee's loan policy of title insurance issued in connection with the Mortgage Loan and insuring the lien of the Security Instrument as set forth therein, as approved by Lender.

"Transfer" means:

    (a)    a sale, assignment, transfer or other disposition (whether voluntary, involuntary, or by operation of law);

    (b)    a granting, pledging, creating or attachment of a lien, encumbrance or security interest (whether voluntary, involuntary, or by operation of law);

    (c)    an issuance or other creation of a direct or indirect ownership interest;

    (d)    a withdrawal, retirement, removal or involuntary resignation of any owner or manager of a legal entity; or

    (e)    a merger, consolidation, dissolution or liquidation of a legal entity.

"**Transfer Fee**" means a fee equal to one percent (1%) of the unpaid principal balance of the Mortgage Loan payable to Lender in connection with a Transfer of the Mortgaged Property or of an ownership interest in Borrower, Guarantor or Key Principal for which Lender's consent is required (including in connection with an assumption of the Mortgage Loan).

"**UCC**" has the meaning set forth in the Security Instrument.

"**UCC Collateral**" has the meaning set forth in the Security Instrument.

"**Voidable Transfer**" means any fraudulent conveyance, preference or other voidable or recoverable payment of money or transfer of property.

_C. Ray Kennedy_
C. Ray Kennedy

_Cynthia M. Kennedy_
Cynthia M. Kennedy

SCHEDULE 2 TO
LOAN AND SECURITY AGREEMENT
Summary of Loan Terms
ARM Loan
(Hybrid Arm Balloon, Hybrid Arm No Balloon, ARM and Partial IO)

| I.   GENERAL PARTY AND PROPERTY INFORMATION | |
|---|---|
| Borrower(s) | 1. C. Ray Kennedy<br>2. Cynthia M. Kennedy |
| Lender | CHERRYWOOD COMMERCIAL LENDING, LLC, a Delaware limited liability company |
| Key Principal(s) | N/A |
| Guarantor(s) | Ramsey-Peele Corporation , a North Carolina corporation |
| Mortgaged Property Address | 1. 6025 Clarke Creek, CHARLOTTE, NC 28269<br>2. 16701 Northcross Dr., CHARLOTTE, NC 28269 |
| Loan Servicer | Ocwen Loan Servicing, LLC |
| II.   ADDRESSES | |
| Borrower's Notice Address | 1. 4324 Satterwythe Ln  CHARLOTTE, NC 28215<br>2. 4324 Satterwythe Ln  CHARLOTTE, NC 28215 |
| Mortgaged Property County | MECKLENBURG |
| Guarantor's Notice Address | 8350 Arrowridge Blvd  Charlotte  NC |
| Lender's Business Address | 20955 Pathfinder Road, #205Diamond Bar, CA 91765 |
| Lender's Notice Address | 20955 Pathfinder Road, #205Diamond Bar, CA 91765 |
| Lender's Payment Address | 20955 Pathfinder Road, #205Diamond Bar, CA 91765 |

Page 1 of 3

Signatory initial(s):_____

| III.  PROPERTY INFORMATION | |
|---|---|
| Property Manager | N/A |
| Material Leases | 1. Lease, dated October 1, 2017, between borrower and Ramsey-Peele Corporation d/b/a University Child Development Center for premises located on the Mortgaged Property. 2. Lease, dated October 1, 2017, between borrower and Ramsey-Peele Corporation d/b/a University Child Development Center for premises located on the Mortgaged Property. |
| Required Repairs Agreement | No |

| IV.  MORTGAGE LOAN INFORMATION | |
|---|---|
| Interest Rate | Fixed Rate during Fixed Term and thereafter, the Adjustable Rate |
| Interest Rate Type | Hybrid ARM |
| Adjustable Rate | From and after each Rate Change Date until the next Rate Change Date, a per annum interest rate that is the sum of (i) the Current Index, and (ii) the Margin, which sum is then rounded to the nearest three (3) decimal places, provided, however, that the Adjustable Rate shall not (1) exceed the Fixed Rate by more than 6.00% at any time, (2) be lower than the Fixed Rate at any time, (3) if such Rate Change Date is the First Rate Change Date, increase by more than 1.000% from the Fixed Rate, and (4) if such Rate Change Date is other than the First Rate Change Date, change by more than 1.000% , plus or minus, from the Adjustable Rate in effect for the period immediately preceding the Rate Change Date. |
| Initial Adjustable Rate | To be determined on the First Rate Change Date. |
| Amortization Period | 360 months |
| Amortization Type | Amortizing |
| Current Index | The published Index that is effective on the forty-fifth (45th) day before |
| Effective Date and Interim Interest | The date the Mortgage Loan proceeds are disbursed by the closing agent.  If the Effective Date is any day other than the first day of the month, interest for the period beginning on the Effective Date and ending on and including the last day of the month in which the disbursement occurs shall be (i) credited to the Borrower on the Effective Date if the first Payment Date is the first day of the month immediately following the month in which the Effective Date occurs or (ii) payable by Borrower on the Effective Date if the first Payment Date is the first day of the second month following the month in which the Effective Date occurs. |
| First Payment Date | The first day of November, 2017 |
| First Rate Change Date | The first day of October, 2022 |
| First Payment Change Date | The first day of November, 2022 |
| Fixed Rate | 7.75% per annum |
| Fixed Term | 60 Months |
| Index | The British Bankers Association fixing of the London Inter-Bank Offered Rate for six (6)-month U.S. Dollar-denominated deposits as reported by Reuters through electronic transmission.  In the event that the Index becomes unavailable or otherwise unpublished, the Lender will select a comparable alternative index over which it has no direct control and which is readily verifiable. |

Signatory initial(s):_____

Page 2 of 3

| | |
|---|---|
| Interest Accrual Method | 30/360 (computed on the basis of a three hundred sixty (360) day year consisting of twelve (12) thirty (30) day months). |
| Loan Amount | Three Million and 00/100 Dollars ($3,000,000) |
| Loan Term | 360 months |
| Margin | 4% |
| Maturity Date | The first day of October, 2047, or any earlier date on which the unpaid principal balance of the Mortgage Loan becomes due and payable by acceleration or otherwise. |
| Monthly Debt Service Payment | (i)     $21,492.37 for the First Payment Date and each Payment Date thereafter to but excluding the First Payment Change Date; and<br><br>(ii)     for the First Payment Change Date and each Payment Date thereafter until the Mortgage Loan is fully paid, such amount as shall cause the unpaid principal balance of Mortgage Loan to be amortized in equal monthly installments over the Remaining Amortization Period at the Adjustable Rate. |
| Balloon Payment | N/A |
| Taxes and Insurance Impositions Deposit (monthly) | The amount in addition to the Monthly Debt Service Payment to be paid to the Lender on each Payment Date. This additional amount will be equal to 1/12th of the annual amount due for taxes and insurance for the year in which such Payment Date occurs.  The annual amount initially will be determined prior to the Closing Date and will be adjusted from time to time by the Loan Servicer during the term of the loan to reflect changes in the amounts due each year. |
| Payment Change Date | The first (1st) day of the month following each Rate Change Date until the Mortgage Loan is fully paid. |
| Rate Change Date | The First Rate Change Date and the first (1st) day of every sixth (6th) month thereafter, until the Mortgage Loan is fully paid. |
| Remaining Amortization Period | As of the First Payment Change Date and each Payment Change Date thereafter, the Amortization Period minus the number of scheduled Monthly Debt Service Payments that have elapsed since the Effective Date. |

C. Ray Kennedy

Cynthia M. Kennedy

Page 3 of 3

Signatory initial(s):

**SCHEDULE 3 TO**
**LOAN AND SECURITY AGREEMENT**
Schedule of Interest Rate Type Provisions
(ARM Loans)

1.    **Defined Terms.**

Capitalized terms not otherwise defined in this Schedule have the meanings given to such terms in the Definitions Schedule to the Loan Agreement.

2.    **Interest Accrual.**

Except as otherwise provided in the Loan Agreement, interest shall accrue at the Fixed Rate until the First Rate Change Date. Thereafter, interest shall accrue at the Adjustable Rate until the Mortgage Loan is fully paid.

3.    **Adjustable Rate Adjustments.**

The Adjustable Rate shall change on each Rate Change Date based on fluctuations in the Current Index. Borrower acknowledges that the initial Adjustable Rate that becomes effective on the First Rate Change Date may exceed the Fixed Rate by up to 6 basis points. If the Index is no longer available, or is no longer posted through electronic transmission, Lender will choose a new index that is based upon comparable information and provide notice thereof to Borrower.

4.    **Notice of Interest Rate Change and Monthly Debt Service Payment.**

Before each Payment Change Date, Lender shall notify Borrower of any change in the Adjustable Rate or the amount of the next Monthly Debt Service Payment.

5.    **Correction to Monthly Debt Service Payment.**

If Lender determines at any time that it has miscalculated the amount of a Monthly Debt Service Payment (whether because of a miscalculation of the Adjustable Rate or otherwise), then Lender shall give notice to Borrower of the corrected amount of the Monthly Debt Service Payment (and the corrected Adjustable Rate, if applicable) and (a) if the corrected amount of the Monthly Debt Service Payment represents an increase, then Borrower shall, within thirty (30) calendar days thereafter, pay to Lender any sums that Borrower would have otherwise been obligated to pay to Lender had the amount of the Monthly Debt Service Payment not been miscalculated, or (b) if the corrected amount of the Monthly Debt Service Payment represents a decrease and Borrower is not otherwise in default under any of the Loan Documents, then Borrower shall thereafter be paid the sums that Borrower would not have otherwise been obligated to pay to Lender had the amount of the Monthly Debt Service Payment not been miscalculated.

C. Ray Kennedy

Cynthia M. Kennedy

Page 1 of 1

SCHEDULE 4 TO
LOAN AND SECURITY AGREEMENT
Prepayment Premium Schedule
(Graduated Prepayment Premium)

| PREPAYMENT PREMIUM INFORMATION | |
|---|---|
| Prepayment Premium Period End Date | The last day of September, 2022 |
| Prepayment Premium Period Term | 60 months |

1.      **Defined Terms.**

All capitalized terms used but not defined in this Prepayment Premium Schedule shall have the meanings assigned to them in the Loan Agreement.

2.      **Interest Accrual.**

(a)      Any Prepayment Premium payable under Section 2.03 (Prepayment) of the Loan Agreement shall be equal to the following percentage of the amount of principal being prepaid at the time of such prepayment, acceleration or application:

| | |
|---|---|
| First Loan Year | 5.00% |
| Second Loan Year | 4.00% |
| Third Loan Year | 3.00% |
| Fourth Loan Year | 2.00% |
| Fifth Loan Year | 1.00% |

(b)      Notwithstanding the provisions of Section 2.03 (Prepayment) of the Loan Agreement, no Prepayment Premium shall be payable with respect to any prepayment made after the Prepayment Premium Period Term has elapsed.

_C. Ray Kennedy_
C. Ray Kennedy

_Cynthia M. Kennedy_
Cynthia M. Kennedy

## SCHEDULE 5 TO
## LOAN AND SECURITY AGREEMENT
### Insurance Requirements

Insurance Requirements

(a)    Property Damage Insurance. Insurance against loss or damage to the Mortgaged Property by fire, windstorm, tornado and hail and against loss and damage by such other, further and additional risks as may be now or hereafter embraced by an "all-risk" or "special form" form of insurance policy must be maintained. The amount of such insurance shall be not less than the lesser of (i) the original principal balance of the Mortgage Loan and (ii) one hundred percent (100%) of the full replacement cost (insurable value) of the Improvements (as established by an appraisal). The determination of the replacement cost amount shall be adjusted annually. Full replacement cost, as used herein, means, with respect to the Improvements, the cost of replacing the Improvements without regard to deduction for depreciation, exclusive of the cost of excavations, foundations and footings below the lowest basement floor. Borrower shall also maintain insurance against loss or damage to furniture, furnishings, fixtures, equipment and other items (whether personalty or fixtures) included in the Mortgaged Property and owned by Borrower from time to time, to the extent applicable, in the amount of the cost of replacing the same, in each case, with inflation guard coverage to reflect the effect of inflation, or annual valuation. Each such policy or policies shall contain a replacement cost endorsement and either an agreed amount endorsement (to avoid the operation of any co-insurance provisions) or a waiver of any co-insurance provisions, all subject to Lender's approval. The maximum deductible shall be $10,000 per occurrence for loans over $1,000,000 and $5,000 for loans at or over $1,000,000, but never more than $25,000 in the aggregate per year. Such "all-risk" or "special form" of insurance policy shall not, as of the Effective Date, specifically exclude Acts of Terrorism, as defined in in the Terrorism Risk Insurance Act of 2002, as amended by the Terrorism Risk Insurance Program Reauthorization Act of 2007, from coverage, or if such coverage is excluded, it is covered by a separate terrorism insurance policy.

(b)    Liability Insurance. Commercial general liability insurance against claims for personal injury, bodily injury, death and property damage occurring on, in or about the Mortgaged Property in amounts not less than $1,000,000.00 per occurrence and $2,000,000.00 in the aggregate must be maintained. During any construction on the Mortgaged Property, Borrower's general contractor for such construction shall also provide the insurance required in this Subsection (b). Lender hereby retains the right to periodically review the amount of said liability insurance being maintained by Borrower and to require an increase in the amount of said liability insurance should Lender deem an increase to be reasonably prudent under then-existing circumstances. The maximum deduction shall be the greater of one percent (1%) of the principal amount of the Note or $5,000 per occurrence, but not more than $25,000 in the aggregate per year.

(c)    Boiler and Machinery Insurance. Boiler and machinery insurance is required if steam boilers or other pressure-fired vessels are in operation at the Property. Minimum liability coverage per accident must equal the greater of the replacement cost (insurable value) of the Improvements housing such boiler or pressure-fired machinery or $2,000,000.00. If one or more large HVAC units is in operation at the Property, "Systems Breakdowns" coverage shall be required, as determined by Lender.

Page 1 of 4

Minimum liability coverage per accident must equal the value of such unit(s). The maximum deductible shall not exceed $5,000.

(d)      Flood Insurance. If the Improvements or any part thereof are situated in an area now or subsequently designated by the Federal Emergency Management Agency ("FEMA") as a special flood hazard area (Zone A or Zone V), flood insurance must be obtained in an amount equal to 100% of the amount required to compensate for any damage or loss on a replacement basis. If full replacement cost coverage is not available for the the type of building insured, then the maximum insuranceinsurance available under the appropriate National Flood Insurance Administration program.  The maximum deductible shall not exceed the greater of (i) $5,000.00 and (ii) one percent of the applicable amount of coverage.

(e)      Construction Insurance. During the period of any construction, renovation or alteration of the Improvements which exceeds the lesser of 10% of the principal amount of the Note or $500,000.00, at Lender's request, a completed value, "All Risk" Builder's Risk form, or "Course of Construction" insurance policy in non-reporting form with replacement cost and no co-insurance, in an amount approved by Lender, may be required.  During the period of any construction of any addition to the existing Improvements, a completed value, "All Risk" Builder's Risk form or "Course of Construction" insurance policy in non-reporting form, in an amount approved by Lender, shall be required.

(f)      Worker's Compensation and Employer's Liability Insurance. When required by applicable law, ordinance or other regulation, Worker's Compensation and Employer's Liability Insurance must be maintained covering all persons subject to the workers' compensation laws of the state in which the Property is located.

(g)      Business Income / Rent Loss Coverage Insurance. Business income (loss of rents) insurance in amounts sufficient to compensate Borrower for all Rents or income during a period of not less than twelve (12) months must be maintained.  The amount of coverage shall be adjusted annually to reflect the Rents or income payable during the succeeding twelve (12) month period. The amount of coverage shall be adjusted annually. The maximum deductible shall be two weeks' rents per occurrence. Such business interruption policy shall not, as of the Effective Date, specifically exclude Acts of Terrorism, as defined in in the Terrorism Risk Insurance Act of 2002, as amended by the Terrorism Risk Insurance Program Reauthorization Act of 2007, from coverage, or if such coverage is excluded, it is covered by a separate terrorism insurance policy.

(h)      Other Insurance. Such other insurance on the Mortgaged Property or on any replacements or substitutions thereof or additions thereto as may from time to time be required by Lender against other insurable hazards, casualties or matters which at the time are commonly insured against in the case of property similarly situated, including, without limitation, sinkhole, mine subsidence, earthquake, terrorism, environmental and law and ordinance insurance, due regard being given to the height and type of buildings, their construction, location, use and occupancy.

(i)      General Requirements. All such insurance shall (1) be with insurers fully licensed and authorized to do business in the state within which the Mortgaged Property is located and which insurers, unless otherwise approved in writing by Lender, shall have and maintain a rating of at (i) have a "B+" rating or better in the latest edition of "Best's Insurance

Guide", (ii) be licensed to do business in the state in which the Land is located, and (iii) be licensed to transact the lines of insurance required hereunder; (2) contain the complete address of the Land (or a complete legal description); (3) be for terms of at least one year with premium prepaid; (4) be subject to the approval of Lender as to insurance companies, amounts, content, forms of policies, method by which premiums are paid and expiration dates; (5) contain deductibles which do not exceed $20,000.00 on loan balances over $1,000,000 and $10,000.00 on loan balances equal or less than $1,000,000; and (6) include a standard, non-contributory, Lender clause naming:

> Ocwen Loan Servicing, LLC, as servicer for
> CHERRYWOOD COMMERCIAL LENDING, LLC, a Delaware limited liability company, its successors and assigns
> P.O. Box 6723
> Springfield, OH 45501-6723

(i) as an additional insured under all liability insurance policies, (ii) as the first mortgagee on all property insurance policies and (iii) as the loss payee on all loss of rents or loss of business income insurance policies.

      (j)    Windstorm Coverage. If the Mortgaged Property is located within 25 miles of the coast of the Gulf of Mexico or the Atlantic coast of Florida, Georgia, South Carolina or North Carolina, the Borrower is required to maintain coverage for windstorm and/or windstorm related perils and/or "named storms" issued by an acceptable insurer as described above or endorsement covering damage from windstorm and/or windstorm related perils and/or named storms.

      (k)    Ordinance and Law Coverage. In the event that the Land or the Improvements constitutes a legal non-conforming use under applicable building, zoning or land use laws or ordinances, all policies shall include an ordinance or law coverage endorsement which will contain Coverage A: "Loss Due to Operation of Law" (with a minimum liability limit equal to Replacement Cost With Agreed Value Endorsement), Coverage B: "Demolition Cost" and Coverage C: "Increased Cost of Construction" coverage.

Borrower further agrees that each such insurance policy: (i) shall provide for at least thirty (30) days' prior written notice to Lender prior to (x) any policy reduction, cancellation or termination for any reason and (y) any modification thereof which affects the interest of Lender; (ii) shall contain an endorsement or agreement by the insurer that any loss shall be payable to Lender in accordance with the terms of such policy notwithstanding any act or negligence of Borrower which might otherwise result in forfeiture of such insurance; (iii) shall waive all rights of subrogation against Lender; and (iv) may be in the form of a blanket endorsement which will contain Coverage policy provided that, in the event that any such coverage is provided in the form of a blanket policy, Borrower hereby acknowledges and agrees that failure to pay any portion of the premium therefor which is not allocable to the Mortgaged Property or by any other action not relating to the Mortgaged Property which would otherwise permit the issuer thereof to cancel the coverage thereof, would require the Mortgaged Property to be insured by a separate, single-property policy. The blanket policy must properly identify and fully protect the Mortgaged Property as if a separate policy were issued for 100% of Replacement Cost at the time of loss and otherwise meet all of Lender's applicable insurance requirements set forth in this

shall constitute an assignment of all proceeds payable under such insurance policies relating to the Mortgaged Property by Borrower to Lender as further security for the Indebtedness. Lender shall not be responsible for nor incur any liability for the insolvency of the insurer or other failure of the insurer to perform, even though Lender has caused the insurance to be placed with the insurer after failure of Borrower to furnish such insurance. To the extent that at any time Lender agrees to accept (a) insurance in amounts less than that which is required by the foregoing provisions of this Schedule 5 or (b) insurance from an insurer that is rated less than that which is required by the foregoing provisions of this Schedule 5, Lender may terminate its waiver and reassert the aforesaid minimum coverage amounts and rating requirements upon any renewal of any insurance coverage or at any time if (x) the coverage provided under such policies is reduced or (y) the rating of any insurer is reduced or (z) Lender determines that any other material adverse event has occurred with respect to the financial condition of such insurer.

C. Ray Kennedy

Cynthia M. Kennedy

B32153 - P103

For Registration Fredrick Smith
Register of Deeds
Mecklenburg County, NC
Electronically Recorded
2017 Sep 28 10:01 AM       RE Excise Tax: $ 0.00
Book: 32153      Page: 103        Fee: $ 64.00
Instrument Number:    2017131364

Prepared by, and after recording
return to:
Cherrywood Commercial Lending, LLC
20955 Pathfinder Road, Suite 370
Diamond Bar, CA 91765
Attn:  Penny Groel, Esq.



EXHIBIT
3

DEED OF TRUST,
ASSIGNMENT OF LEASES AND RENTS,
SECURITY AGREEMENT
AND FIXTURE FILING

(NORTH CAROLINA)

LOAN No.1000028454

Security Instrument – North Carolina (2012)                    Page 1 of 22
Kennedy

Submitted electronically by "Hutchens Law Firm"
in compliance with North Carolina statutes governing recordable documents
and the terms of the submitter agreement with the Mecklenburg County Register of Deeds.

B32153 - P104

## DEED OF TRUST,
## ASSIGNMENT OF LEASES AND RENTS,
## SECURITY AGREEMENT
## AND FIXTURE FILING

This DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING (as amended, restated, replaced, supplemented, or otherwise modified from time to time, the "**Security Instrument**") dated as of September 26, 2017 is executed by C. Ray Kennedy and wife, Cynthia M. Kennedy, as grantor ("**Borrower**"), to Chicago Title Company, LLC, as trustee ("**Trustee**"), for the benefit of Cherrywood Commercial Lending, LLC, a limited liability company organized and existing under the laws of Delaware, as beneficiary ("**Lender**").

Borrower, in consideration of (i) the loan in the original principal amount of $3,000,000.00 (the "**Mortgage Loan**") evidenced by that certain Promissory Note dated as of the date of this Security Instrument, executed by Borrower and made payable to the order of Lender (as amended, restated, replaced, supplemented, or otherwise modified from time to time, the "**Note**"), (ii) that certain Loan and Security Agreement dated as of the date of this Security Instrument, executed by and between Borrower and Lender (as amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Loan Agreement**"), and (iii) the trust created by this Security Instrument, and to secure to Lender the repayment of the Indebtedness (as defined in this Security Instrument), and all renewals, extensions and modifications thereof, and the performance of the covenants and agreements of Borrower contained in the Loan Documents (as defined in the Loan Agreement), excluding the Environmental Indemnity Agreement (as defined in this Security Instrument), irrevocably and unconditionally mortgages, grants, warrants, conveys, bargains, sells, and assigns to Trustee, in trust, for benefit of Lender, with power of sale and right of entry and possession, the Mortgaged Property (as defined in this Security Instrument), including the real property located in Mecklenburg County, State of North Carolina, and described in <u>Exhibit A</u> attached to this Security Instrument and incorporated by reference (the "**Land**"), to have and to hold such Mortgaged Property unto Trustee and Trustee's successors and assigns, forever; Borrower hereby releasing, relinquishing and waiving, to the fullest extent allowed by law, all rights and benefits, if any, under and by virtue of the homestead exemption laws of the Property Jurisdiction (as defined in this Security Instrument), if applicable.

Borrower represents and warrants that Borrower is lawfully seized of the Mortgaged Property and has the right, power and authority to mortgage, grant, warrant, convey, bargain, sell, and assign the Mortgaged Property, and that the Mortgaged Property is not encumbered by any Lien (as defined in this Security Instrument) other than Permitted Encumbrances (as defined in this Security Instrument). Borrower covenants that Borrower will warrant and defend the title to the Mortgaged Property against all claims and demands other than Permitted Encumbrances.

Security Instrument – North Carolina (2012)
Kennedy

Page 2 of 22

B32153 - P105

Borrower, and by their acceptance hereof, each of Trustee and Lender covenants and agrees as follows:

**1.    Defined Terms.**

Capitalized terms used and not specifically defined herein have the meanings given to such terms in the Loan Agreement. All terms used and not specifically defined herein, but which are otherwise defined by the UCC, shall have the meanings assigned to them by the UCC. The following terms, when used in this Security Instrument, shall have the following meanings:

**"Condemnation Action"** means any action or proceeding, however characterized or named, relating to any condemnation or other taking, or conveyance in lieu thereof, of all or any part of the Mortgaged Property, whether direct or indirect.

**"Enforcement Costs"** means all expenses and costs, including reasonable attorneys' fees and expenses, fees and out-of-pocket expenses of expert witnesses and costs of investigation, incurred by Lender as a result of any Event of Default under the Loan Agreement or in connection with efforts to collect any amount due under the Loan Documents, or to enforce the provisions of the Loan Agreement or any of the other Loan Documents, including those incurred in post-judgment collection efforts and in any bankruptcy or insolvency proceeding (including any action for relief from the automatic stay of any bankruptcy proceeding or Foreclosure Event) or judicial or non-judicial foreclosure proceeding, to the extent permitted by law.

**"Environmental Indemnity Agreement"** means that certain Environmental Indemnity Agreement dated as of the date of this Security Instrument, executed by Borrower to and for the benefit of Lender, as the same may be amended, restated, replaced, supplemented, or otherwise modified from time to time.

**"Environmental Laws"** has the meaning set forth in the Environmental Indemnity Agreement.

**"Event of Default"** has the meaning set forth in the Loan Agreement.

**"Fixtures"** means all Goods that are so attached or affixed to the Land or the Improvements as to constitute a fixture under the laws of the Property Jurisdiction.

**"Goods"** means all of Borrower's present and hereafter acquired right, title and interest in all goods which are used now or in the future in connection with the ownership, management, or operation of the Land or the Improvements or are located on the Land or in the Improvements, including inventory; furniture; furnishings; machinery, equipment, engines, boilers, incinerators, and installed building materials; systems and equipment for the purpose of supplying or distributing heating, cooling, electricity, gas, water, air, or light; antennas, cable, wiring, and conduits used in connection with radio, television, security, fire prevention, or fire detection, or otherwise used to carry electronic signals; telephone systems and equipment; elevators and related machinery and equipment; fire detection, prevention and extinguishing systems and

B32153 - P106

apparatus; security and access control systems and apparatus; plumbing systems; water heaters, ranges, stoves, microwave ovens, refrigerators, dishwashers, garbage disposers, washers, dryers, and other appliances; light fixtures, awnings, storm windows, and storm doors; pictures, screens, blinds, shades, curtains, and curtain rods; mirrors, cabinets, paneling, rugs, and floor and wall coverings; fences, trees, and plants; swimming pools; exercise equipment; supplies; tools; books and records (whether in written or electronic form); websites, URLs, blogs, and social network pages; computer equipment (hardware and software); and other tangible personal property which is used now or in the future in connection with the ownership, management, or operation of the Land or the Improvements or are located on the Land or in the Improvements.

"**Imposition Deposits**" means deposits in an amount sufficient to accumulate with Lender the entire sum required to pay the Impositions when due.

"**Impositions**" means

      (a)    any water and sewer charges which, if not paid, may result in a lien on all or any part of the Mortgaged Property;

      (b)    the premiums for fire and other casualty insurance, liability insurance, rent loss insurance and such other insurance as Lender may require under the Loan Agreement;

      (c)    Taxes; and

      (d)    amounts for other charges and expenses assessed against the Mortgaged Property which Lender at any time reasonably deems necessary to protect the Mortgaged Property, to prevent the imposition of liens on the Mortgaged Property, or otherwise to protect Lender's interests, all as reasonably determined from time to time by Lender.

"**Improvements**" means the buildings, structures, improvements, and alterations now constructed or at any time in the future constructed or placed upon the Land, including any future replacements, facilities, and additions and other construction on the Land.

"**Indebtedness**" means the principal of, interest on, and all other amounts due at any time under the Note, the Loan Agreement, this Security Instrument or any other Loan Document (other than the Environmental Indemnity Agreement and Guaranty), including Prepayment Premiums, late charges, interest charged at the Default Rate, and accrued interest as provided in the Loan Agreement and this Security Instrument, advances, costs and expenses to perform the obligations of Borrower or to protect the Mortgaged Property or the security of this Security Instrument, all other monetary obligations of Borrower under the Loan Documents (other than the Environmental Indemnity Agreement), including amounts due as a result of any indemnification obligations, and any Enforcement Costs.

"**Land**" means the real property described in Exhibit A.

"**Leases**" means all present and future leases, subleases, licenses, concessions or grants or other possessory interests now or hereafter in force, whether oral or written, covering or affecting the Mortgaged Property, or any portion of the Mortgaged Property (including proprietary leases or occupancy agreements if Borrower is a cooperative housing corporation), and all modifications, extensions or renewals thereof.

"**Lien**" means any claim or charge against property for payment of a debt or an amount owed for services rendered, including any mortgage, deed of trust, deed to secure debt, security interest, tax lien, any materialman's or mechanic's lien, or any lien of a Governmental Authority, including any lien in connection with the payment of utilities, or any other encumbrance.

"**Mortgaged Property**" means all of Borrower's present and hereafter acquired right, title and interest, if any, in and to all of the following:

    (a)    the Land;

    (b)    the Improvements;

    (c)    the Personalty;

    (d)    current and future rights, including air rights, development rights, zoning rights and other similar rights or interests, easements, tenements, rights-of-way, strips and gores of land, streets, alleys, roads, sewer rights, waters, watercourses, and appurtenances related to or benefitting the Land or the Improvements, or both, and all rights-of-way, streets, alleys and roads which may have been or may in the future be vacated;

    (e)    insurance policies relating to the Mortgaged Property (and any unearned premiums) and all proceeds paid or to be paid by any insurer of the Land, the Improvements, the Personalty, or any other part of the Mortgaged Property, whether or not Borrower obtained the insurance pursuant to Lender's requirements;

    (f)    awards, payments and other compensation made or to be made by any municipal, state or federal authority with respect to the Land, the Improvements, the Personalty, or any other part of the Mortgaged Property, including any awards or settlements resulting from (1) Condemnation Actions, (2) any damage to the Mortgaged Property caused by governmental action that does not result in a Condemnation Action, or (3) the total or partial taking of the Land, the Improvements, the Personalty, or any other part of the Mortgaged Property under the power of eminent domain or otherwise and including any conveyance in lieu thereof;

    (g)    contracts, options and other agreements for the sale of the Land, the Improvements, the Personalty, or any other part of the Mortgaged Property entered into by Borrower now or in the future, including cash or securities deposited to secure performance by parties of their obligations;

(h)    Leases and Lease guaranties, letters of credit and any other supporting obligation for any of the Leases given in connection with any of the Leases, and all Rents;

(i)    earnings, royalties, accounts receivable, issues and profits from the Land, the Improvements or any other part of the Mortgaged Property, and all undisbursed proceeds of the Mortgage Loan and, if Borrower is a cooperative housing corporation, maintenance charges or assessments payable by shareholders or residents;

(j)    Imposition Deposits;

(k)    refunds or rebates of Impositions by any municipal, state or federal authority or insurance company (other than refunds applicable to periods before the real property tax year in which this Security Instrument is dated);

(l)    tenant security deposits;

(m)    names under or by which any of the above Mortgaged Property may be operated or known, and all trademarks, trade names, and goodwill relating to any of the Mortgaged Property;

(n)    Collateral Accounts and all Collateral Account Funds;

(o)    products, and all cash and non-cash proceeds from the conversion, voluntary or involuntary, of any of the above into cash or liquidated claims, and the right to collect such proceeds; and

(p)    all of Borrower's right, title and interest in the oil, gas, minerals, mineral interests, royalties, overriding royalties, production payments, net profit interests and other interests and estates in, under and on the Mortgaged Property and other oil, gas and mineral interests with which any of the foregoing interests or estates are pooled or unitized.

"**Permitted Encumbrance**" means only the easements, restrictions and other matters listed in a schedule of exceptions to coverage in the Title Policy and Taxes for the current tax year that are not yet due and payable.

"**Personalty**" means all of Borrower's present and hereafter acquired right, title and interest in all Goods, accounts, choses of action, chattel paper, documents, general intangibles (including Software), payment intangibles, instruments, investment property, letter of credit rights, supporting obligations, computer information, source codes, object codes, records and data, all telephone numbers or listings, claims (including claims for indemnity or breach of warranty), deposit accounts and other property or assets of any kind or nature related to the Land or the Improvements now or in the future, including operating agreements, surveys, plans and specifications and contracts for architectural, engineering and construction services relating to the Land or the Improvements, and all other intangible property and rights relating to the operation

of, or used in connection with, the Land or the Improvements, including all governmental permits relating to any activities on the Land.

"Prepayment Premium" has the meaning set forth in the Loan Agreement.

"Property Jurisdiction" means the jurisdiction in which the Land is located.

"Rents" means all rents (whether from residential or non-residential space), revenues and other income from the Land or the Improvements, including subsidy payments received from any sources, including payments under any "Housing Assistance Payments Contract" or other rental subsidy agreement (if any), parking fees, laundry and vending machine income and fees and charges for food, health care and other services provided at the Mortgaged Property, whether now due, past due, or to become due, and tenant security deposits.

"Software" means a computer program and any supporting information provided in connection with a transaction relating to the program. The term does not include any computer program that is included in the definition of Goods.

"Taxes" means all taxes, assessments, vault rentals and other charges, if any, general, special or otherwise, including assessments for schools, public betterments and general or local improvements, which are levied, assessed or imposed by any public authority or quasi-public authority, and which, if not paid, may become a lien, on the Land or the Improvements or any taxes upon any Loan Document.

"Title Policy" has the meaning set forth in the Loan Agreement.

"UCC" means the Uniform Commercial Code in effect in the Property Jurisdiction, as amended from time to time.

"UCC Collateral" means any or all of that portion of the Mortgaged Property in which a security interest may be granted under the UCC and in which Borrower has any present or hereafter acquired right, title or interest.

2.    Security Agreement; Fixture Filing.

(a)    To secure to Lender, the repayment of the Indebtedness, and all renewals, extensions and modifications thereof, and the performance of the covenants and agreements of Borrower contained in the Loan Documents, Borrower hereby pledges, assigns, and grants to Lender a continuing security interest in the UCC Collateral. This Security Instrument constitutes a security agreement and a financing statement under the UCC. This Security Instrument also constitutes a financing statement pursuant to the terms of the UCC with respect to any part of the Mortgaged Property that is or may become a Fixture under applicable law, and will be recorded as a "fixture filing" in accordance with the UCC. Borrower hereby authorizes Lender to file financing statements, continuation statements and financing statement amendments in such form

B32153 - P110

as Lender may require to perfect or continue the perfection of this security interest without the signature of Borrower. If an Event of Default has occurred and is continuing, Lender shall have the remedies of a secured party under the UCC or otherwise provided at law or in equity, in addition to all remedies provided by this Security Instrument and in any Loan Document. Lender may exercise any or all of its remedies against the UCC Collateral separately or together, and in any order, without in any way affecting the availability or validity of Lender's other remedies. For purposes of the UCC, the debtor is Borrower and the secured party is Lender. The name and address of the debtor and secured party are set forth after Borrower's signature below which are the addresses from which information on the security interest may be obtained.

(b)     Borrower represents and warrants that: (1) Borrower maintains its chief executive office at the location set forth after Borrower's signature below, and Borrower will notify Lender in writing of any change in its chief executive office within five (5) days of such change; (2) Borrower is the record owner of the Mortgaged Property; (3) Borrower's state of incorporation, organization, or formation, if applicable, is as set forth on Page 1 of this Security Instrument; (4) Borrower's exact legal name is as set forth on Page 1 of this Security Instrument; (5) Borrower's organizational identification number, if applicable, is as set forth after Borrower's signature below; (6) Borrower is the owner of the UCC Collateral subject to no liens, charges or encumbrances other than the lien hereof; (7) except as expressly provided in the Loan Agreement, the UCC Collateral will not be removed from the Mortgaged Property without the consent of Lender; and (8) no financing statement covering any of the UCC Collateral or any proceeds thereof is on file in any public office except pursuant hereto.

(c)     All property of every kind acquired by Borrower after the date of this Security Instrument which by the terms of this Security Instrument shall be subject to the lien and the security interest created hereby, shall immediately upon the acquisition thereof by Borrower and without further conveyance or assignment become subject to the lien and security interest created by this Security Instrument. Nevertheless, Borrower shall execute, acknowledge, deliver and record or file, as appropriate, all and every such further deeds of trust, mortgages, deeds to secure debt, security agreements, financing statements, assignments and assurances as Lender shall require for accomplishing the purposes of this Security Instrument and to comply with the rerecording requirements of the UCC.

3.     **Assignment of Leases and Rents; Appointment of Receiver; Lender in Possession.**

(a)     As part of the consideration for the Indebtedness, Borrower absolutely and unconditionally assigns and transfers to Lender all Leases and Rents. It is the intention of Borrower to establish present, absolute and irrevocable transfers and assignments to Lender of all Leases and Rents and to authorize and empower Lender to collect and receive all Rents without the necessity of further action on the part of Borrower. Borrower and Lender intend the assignments of Leases and Rents to be effective immediately and to constitute absolute present assignments, and not assignments for additional security only. Only for purposes of giving effect to these absolute assignments of Leases and Rents, and for no other purpose, the Leases and

Security Instrument – North Carolina (2012)                                          Page 8 of 22
Kennedy

B32153 - P111

Rents shall not be deemed to be a part of the Mortgaged Property. However, if these present, absolute and unconditional assignments of Leases and Rents are not enforceable by their terms under the laws of the Property Jurisdiction, then each of the Leases and Rents shall be included as part of the Mortgaged Property, and it is the intention of Borrower, in such circumstance, that this Security Instrument create and perfect a lien on each of the Leases and Rents in favor of Lender, which liens shall be effective as of the date of this Security Instrument.

(b)    Until an Event of Default has occurred and is continuing, but subject to the limitations set forth in the Loan Documents, Borrower shall have a revocable license to exercise all rights, power and authority granted to Borrower under the Leases (including the right, power and authority to modify the terms of any Lease, extend or terminate any Lease, or enter into new Leases, subject to the limitations set forth in the Loan Documents), and to collect and receive all Rents, to hold all Rents in trust for the benefit of Lender, and to apply all Rents to pay the Monthly Debt Service Payments and the other amounts then due and payable under the other Loan Documents, including Imposition Deposits, and to pay the current costs and expenses of managing, operating and maintaining the Mortgaged Property, including utilities and Impositions (to the extent not included in Imposition Deposits), tenant improvements and other capital expenditures. So long as no Event of Default has occurred and is continuing (and no event which, with the giving of notice or the passage of time, or both, would constitute an Event of Default has occurred and is continuing), the Rents remaining after application pursuant to the preceding sentence may be retained and distributed by Borrower free and clear of, and released from, Lender's rights with respect to Rents under this Security Instrument.

(c)    If an Event of Default has occurred and is continuing, without the necessity of Lender entering upon and taking and maintaining control of the Mortgaged Property directly, by a receiver, or by any other manner or proceeding permitted by the laws of the Property Jurisdiction, the revocable license granted to Borrower pursuant to Section 3(b) shall automatically terminate, and Lender shall immediately have all rights, powers and authority granted to Borrower under any Lease (including the right, power and authority to modify the terms of any such Lease, or extend or terminate any such Lease) and, without notice, Lender shall be entitled to all Rents as they become due and payable, including Rents then due and unpaid. During the continuance of an Event of Default, Borrower authorizes Lender to collect, sue for and compromise Rents and directs each tenant of the Mortgaged Property to pay all Rents to, or as directed by, Lender, and Borrower shall, upon Borrower's receipt of any Rents from any sources, pay the total amount of such receipts to Lender. Although the foregoing rights of Lender are self-effecting, at any time during the continuance of an Event of Default, Lender may make demand for all Rents, and Lender may give, and Borrower hereby irrevocably authorizes Lender to give, notice to all tenants of the Mortgaged Property instructing them to pay all Rents to Lender. No tenant shall be obligated to inquire further as to the occurrence or continuance of an Event of Default, and no tenant shall be obligated to pay to Borrower any amounts that are actually paid to Lender in response to such a notice. Any such notice by Lender shall be delivered to each tenant personally, by mail or by delivering such demand to each rental unit.

(d)   If an Event of Default has occurred and is continuing, Lender may, regardless of the adequacy of Lender's security or the solvency of Borrower, and even in the absence of waste, enter upon, take and maintain full control of the Mortgaged Property, and may exclude Borrower and its agents and employees therefrom, in order to perform all acts that Lender, in its discretion, determines to be necessary or desirable for the operation and maintenance of the Mortgaged Property, including the execution, cancellation or modification of Leases, the collection of all Rents (including through use of a lockbox, at Lender's election), the making of repairs to the Mortgaged Property and the execution or termination of contracts providing for the management, operation or maintenance of the Mortgaged Property, for the purposes of enforcing this assignment of Rents, protecting the Mortgaged Property or the security of this Security Instrument and the Mortgage Loan, or for such other purposes as Lender in its discretion may deem necessary or desirable.

(e)   Notwithstanding any other right provided Lender under this Security Instrument or any other Loan Document, if an Event of Default has occurred and is continuing, and regardless of the adequacy of Lender's security or Borrower's solvency, and without the necessity of giving prior notice (oral or written) to Borrower, Lender may apply to any court having jurisdiction for the appointment of a receiver for the Mortgaged Property to take any or all of the actions set forth in Section 3. If Lender elects to seek the appointment of a receiver for the Mortgaged Property at any time after an Event of Default has occurred and is continuing, Borrower, by its execution of this Security Instrument, expressly consents to the appointment of such receiver, including the appointment of a receiver *ex parte*, if permitted by applicable law. Borrower consents to shortened time consideration of a motion to appoint a receiver. Lender or the receiver, as applicable, shall be entitled to receive a reasonable fee for managing the Mortgaged Property and such fee shall become an additional part of the Indebtedness. Immediately upon appointment of a receiver or Lender's entry upon and taking possession and control of the Mortgaged Property, possession of the Mortgaged Property and all documents, records (including records on electronic or magnetic media), accounts, surveys, plans, and specifications relating to the Mortgaged Property, and all security deposits and prepaid Rents, shall be surrendered to Lender or the receiver, as applicable. If Lender or receiver takes possession and control of the Mortgaged Property, Lender or receiver may exclude Borrower and its representatives from the Mortgaged Property.

(f)   The acceptance by Lender of the assignments of the Leases and Rents pursuant to this Section 3 shall not at any time or in any event obligate Lender to take any action under any Loan Document or to expend any money or to incur any expense. Lender shall not be liable in any way for any injury or damage to person or property sustained by any Person in, on or about the Mortgaged Property. Prior to Lender's actual entry upon and taking possession and control of the Land and Improvements, Lender shall not be:

(1)   obligated to perform any of the terms, covenants and conditions contained in any Lease (or otherwise have any obligation with respect to any Lease);

B32153 - P113

(2)    obligated to appear in or defend any action or proceeding relating to any Lease or the Mortgaged Property; or

(3)    responsible for the operation, control, care, management or repair of the Mortgaged Property or any portion of the Mortgaged Property.

The execution of this Security Instrument shall constitute conclusive evidence that all responsibility for the operation, control, care, management and repair of the Mortgaged Property is and shall be that of Borrower, prior to such actual entry and taking possession and control by Lender of the Land and Improvements.

(g)    Lender shall be liable to account only to Borrower and only for Rents actually received by Lender. Lender shall not be liable to Borrower, anyone claiming under or through Borrower or anyone having an interest in the Mortgaged Property by reason of any act or omission of Lender under this Section 3, and Borrower hereby releases and discharges Lender from any such liability to the fullest extent permitted by law, provided that Lender shall not be released from liability that occurs as a result of Lender's gross negligence or willful misconduct as determined by a court of competent jurisdiction pursuant to a final, non-appealable court order. If the Rents are not sufficient to meet the costs of taking control of and managing the Mortgaged Property and collecting the Rents, any funds expended by Lender for such purposes shall be added to, and become a part of, the principal balance of the Indebtedness, be immediately due and payable, and bear interest at the Default Rate from the date of disbursement until fully paid. Any entering upon and taking control of the Mortgaged Property by Lender or the receiver, and any application of Rents as provided in this Security Instrument, shall not cure or waive any Event of Default or invalidate any other right or remedy of Lender under applicable law or provided for in this Security Instrument or any Loan Document.

4.    **Protection of Lender's Security.**

If Borrower fails to perform any of its obligations under this Security Instrument or any other Loan Document, or any action or proceeding is commenced that purports to affect the Mortgaged Property, Lender's security, rights or interests under this Security Instrument or any Loan Document (including eminent domain, insolvency, code enforcement, civil or criminal forfeiture, enforcement of Environmental Laws, fraudulent conveyance or reorganizations or proceedings involving a debtor or decedent), Lender may, at its option, make such appearances, disburse or pay such sums and take such actions, whether before or after an Event of Default or whether directly or to any receiver for the Mortgaged Property, as Lender reasonably deems necessary to perform such obligations of Borrower and to protect the Mortgaged Property or Lender's security, rights or interests in the Mortgaged Property or the Mortgage Loan, including:

(a)    paying fees and out-of-pocket expenses of attorneys, accountants, inspectors and consultants;

**B32153 - P114**

(b)     entering upon the Mortgaged Property to make repairs or secure the Mortgaged Property;

(c)     obtaining (or force-placing) the insurance required by the Loan Documents; and

(d)     paying any amounts required under any of the Loan Documents that Borrower has failed to pay.

Any amounts so disbursed or paid by Lender shall be added to, and become part of, the principal balance of the Indebtedness, be immediately due and payable and bear interest at the Default Rate from the date of disbursement until fully paid. The provisions of this Section 4 shall not be deemed to obligate or require Lender to incur any expense or take any action.

5.     **Default; Acceleration; Remedies.**

(a)     If an Event of Default has occurred and is continuing, Lender, at its option, may declare the Indebtedness to be immediately due and payable without further demand, and may either with or without entry or taking possession as herein provided or otherwise, proceed by suit or suits at law or in equity or any other appropriate proceeding or remedy (1) to enforce payment of the Mortgage Loan; (2) to foreclose this Security Instrument judicially or non-judicially by the power of sale granted herein; (3) to enforce or exercise any right under any Loan Document; and (4) to pursue any one (1)or more other remedies provided in this Security Instrument or in any other Loan Document or otherwise afforded by applicable law. Each right and remedy provided in this Security Instrument or any other Loan Document is distinct from all other rights or remedies under this Security Instrument or any other Loan Document or otherwise afforded by applicable law, and each shall be cumulative and may be exercised concurrently, independently, or successively, in any order. Borrower has the right to bring an action to assert the nonexistence of an Event of Default or any other defense of Borrower to acceleration and sale.

(b)     Borrower acknowledges that the power of sale granted in this Security Instrument may be exercised or directed by Lender without prior judicial hearing. In the event Lender invokes the power of sale and if it is determined in a hearing held in accordance with applicable law that Trustee can proceed to sale:

(1)     Lender shall send to Borrower and any other Persons required to receive such notice, written notice of Lender's election to cause the Mortgaged Property to be sold. Borrower hereby authorizes and empowers Trustee to take possession of the Mortgaged Property, or any part thereof, and hereby grants to Trustee a power of sale and authorizes and empowers Trustee to sell (or, in the case of the default of any purchaser, to resell) the Mortgaged Property or any part thereof, in compliance with applicable law, including compliance with any and all notice and timing requirements for such sale;

(2)     Trustee shall have the authority to determine the terms of the sale, subject to applicable law. In connection with any such sale, the whole of the Mortgaged Property

B32163 - P115

may be sold in one (1) parcel as an entirety or in separate lots or parcels at the same or different times. Lender shall have the right to become the purchaser at any such sale. Trustee shall be entitled to receive fees and expenses from such sale not to exceed the amount permitted by applicable law;

(3)    within a reasonable time after the sale, Trustee shall deliver to the purchaser of the Mortgaged Property a deed or such other appropriate conveyance document conveying the Mortgaged Property so sold without any express or implied covenant or warranty. The recitals in such deed or document shall be prima facie evidence of the truth of the statements made in those recitals; and

(4)    the outstanding principal amount of the Mortgage Loan and the other Indebtedness, if not previously due, shall be and become immediately due and payable without demand or notice of any kind. If the Mortgaged Property is sold for an amount less than the amount outstanding under the Indebtedness, the deficiency shall be determined by the purchase price at the sale or sales. Borrower waives all rights, claims, and defenses with respect to Lender's ability to obtain a deficiency judgment.

(c)    Borrower acknowledges and agrees that the proceeds of any sale shall be applied as determined by Lender unless otherwise required by applicable law.

(d)    In connection with the exercise of Lender's rights and remedies under this Security Instrument and any other Loan Document, there shall be allowed and included as Indebtedness: (1) all expenditures and expenses authorized by applicable law and all other expenditures and expenses which may be paid or incurred by or on behalf of Lender for reasonable legal fees, appraisal fees, outlays for documentary and expert evidence, stenographic charges and publication costs; (2) all expenses of any environmental site assessments, environmental audits, environmental remediation costs, appraisals, surveys, engineering studies, wetlands delineations, flood plain studies, and any other similar testing or investigation deemed necessary or advisable by Lender incurred in preparation for, contemplation of or in connection with the exercise of Lender's rights and remedies under the Loan Documents; and (3) costs (which may be reasonably estimated as to items to be expended in connection with the exercise of Lender's rights and remedies under the Loan Documents) of procuring all abstracts of title, title searches and examinations, title insurance policies, and similar data and assurance with respect to title as Lender may deem reasonably necessary either to prosecute any suit or to evidence the true conditions of the title to or the value of the Mortgaged Property to bidders at any sale which may be held in connection with the exercise of Lender's rights and remedies under the Loan Documents. All expenditures and expenses of the nature mentioned in this Section 5, and such other expenses and fees as may be incurred in the protection of the Mortgaged Property and rents and income therefrom and the maintenance of the lien of this Security Instrument, including the fees of any attorney employed by Lender in any litigation or proceedings affecting this Security Instrument, the Note, the other Loan Documents, or the Mortgaged Property, including bankruptcy proceedings, any Foreclosure Event, or in preparation

**B32153 - P116**

of the commencement or defense of any proceedings or threatened suit or proceeding, or otherwise in dealing specifically therewith, shall be so much additional Indebtedness and shall be immediately due and payable by Borrower, with interest thereon at the Default Rate until paid.

(e)    Any action taken by Trustee or Lender pursuant to the provisions of this Section 5 shall comply with the laws of the Property Jurisdiction. Such applicable laws shall take precedence over the provisions of this Section 5, but shall not invalidate or render unenforceable any other provision of any Loan Document that can be construed in a manner consistent with any applicable law. If any provision of this Security Instrument shall grant to Lender (including Lender acting as a mortgagee-in-possession), Trustee or a receiver appointed pursuant to the provisions of this Security Instrument any powers, rights or remedies prior to, upon, during the continuance of or following an Event of Default that are more limited than the powers, rights, or remedies that would otherwise be vested in such party under any applicable law in the absence of said provision, such party shall be vested with the powers, rights, and remedies granted in such applicable law to the full extent permitted by law.

6.    **Waiver of Statute of Limitations and Marshaling.**

Borrower hereby waives the right to assert any statute of limitations as a bar to the enforcement of the lien of this Security Instrument or to any action brought to enforce any Loan Document. Notwithstanding the existence of any other security interests in the Mortgaged Property held by Lender or by any other party, Lender shall have the right to determine the order in which any or all of the Mortgaged Property shall be subjected to the remedies provided in this Security Instrument and/or any other Loan Document or by applicable law. Lender shall have the right to determine the order in which any or all portions of the Indebtedness are satisfied from the proceeds realized upon the exercise of such remedies. Borrower, for itself and all who may claim by, through, or under it, and any party who now or in the future acquires a security interest in the Mortgaged Property and who has actual or constructive notice of this Security Instrument waives any and all right to require the marshaling of assets or to require that any of the Mortgaged Property be sold in the inverse order of alienation or that any of the Mortgaged Property be sold in parcels (at the same time or different times) in connection with the exercise of any of the remedies provided in this Security Instrument or any other Loan Document, or afforded by applicable law.

7.    **Waiver of Redemption; Rights of Tenants.**

(a)    Borrower hereby covenants and agrees that it will not at any time apply for, insist upon, plead, avail itself, or in any manner claim or take any advantage of, any appraisement, stay, exemption or extension law or any so-called "Moratorium Law" now or at any time hereafter enacted or in force in order to prevent or hinder the enforcement or foreclosure of this Security Instrument. Without limiting the foregoing:

(1)    Borrower for itself and all Persons who may claim by, through, or under Borrower, hereby expressly waives any so-called "Moratorium Law" and any and all rights of reinstatement and redemption, if any, under any order or decree of foreclosure of this Security Instrument, it being the intent hereof that any and all such "Moratorium Laws," and all rights of reinstatement and redemption of Borrower and of all other Persons claiming by, through, or under Borrower are and shall be deemed to be hereby waived to the fullest extent permitted by applicable law;

(2)    Borrower shall not invoke or utilize any such law or laws or otherwise hinder, delay or impede the execution of any right, power remedy herein or otherwise granted or delegated to Lender but will suffer and permit the execution of every such right, power and remedy as though no such law or laws had been made or enacted; and

(3)    if Borrower is a trust, Borrower represents that the provisions of this Section 7 (including the waiver of reinstatement and redemption rights) were made at the express direction of Borrower's beneficiaries and the persons having the power of direction over Borrower, and are made on behalf of the trust estate of Borrower and all beneficiaries of Borrower, as well as all other persons mentioned above.

(b)    Lender shall have the right to foreclose subject to the rights of any tenant or tenants of the Mortgaged Property having an interest in the Mortgaged Property prior to that of Lender.  The failure to join any such tenant or tenants of the Mortgaged Property as party defendant or defendants in any such civil action or the failure of any decree of foreclosure and sale to foreclose their rights shall not be asserted by Borrower as a defense in any civil action instituted to collect the Indebtedness, or any part thereof or any deficiency remaining unpaid after foreclosure and sale of the Mortgaged Property, any statute or rule of law at any time existing to the contrary notwithstanding.

8.    Notice.

(a)    All notices under this Security Instrument shall be:

(1)    in writing, and shall be (A) delivered, in person, (B) mailed, postage prepaid, either by registered or certified delivery, return receipt requested, or (C) sent by overnight express courier;

(2)    addressed to the intended recipient at its respective address set forth at the end of this Security Instrument; and

(3)    deemed given on the earlier to occur of:

(A)    the date when the notice is received by the addressee; or

B32153 - P118

(B)    if the recipient refuses or rejects delivery, the date on which the notice is so refused or rejected, as conclusively established by the records of the United States Postal Service or such express courier service.

(b)    Any party to this Security Instrument may change the address to which notices intended for it are to be directed by means of notice given to the other party in accordance with this Section 8.

(c)    Any required notice under this Security Instrument which does not specify how notices are to be given shall be given in accordance with this Section 8.

9.    **Mortgagee-in-Possession.**

Borrower acknowledges and agrees that the exercise by Lender of any of the rights conferred in this Security Instrument shall not be construed to make Lender a mortgagee-in-possession of the Mortgaged Property so long as Lender has not itself entered into actual possession of the Land and Improvements.

10.    **Release.**

Upon payment in full of the Indebtedness, Lender shall cause the release of this Security Instrument and Borrower shall pay Lender's costs incurred in connection with such release.

11.    **Substitute Trustee.**

Lender, at Lender's option, may from time to time remove Trustee and appoint a successor trustee in accordance with the laws of the Property Jurisdiction. Without conveyance of the Mortgaged Property, the successor trustee shall succeed to all the title, power and duties conferred upon the Trustee in this Security Instrument and by applicable law.

12.    **North Carolina State Specific Provisions.**

In the event of any inconsistencies between the terms and conditions of this Section 12 and the other terms and conditions of this Security Instrument, the terms and conditions of this Section 12 shall control and be binding.

(a)    Borrower hereby waives and releases any rights Borrower may have with regard to release of liability or obligations of Borrower pursuant to N.C. Gen. Stat. Section 45-45.1 (or any amendment thereto).

(b)    This Security Instrument secures all present and future advances and obligations of Borrower to Lender. The time period within which future advances and obligations are to be made and incurred and secured by this Security Instrument is the period between the date hereof and the date which is thirty (30) years from the date hereof, including any future loans, advances

B32153 - P119

and readvances which may be made from time to time by Lender to Borrower, and any and all amendments or modifications thereto which may hereafter be entered into from time to time between Borrower and Lender or any other instrument, document or agreement between Borrower and Lender. The maximum principal amount, including present and future obligations, which may be secured by this Security Instrument at any one (1) time is two hundred percent (200%) of the original principal amount of the Note, plus accrued interest, fees and expenses. Any additional amounts advanced pursuant to the provisions of this Security Instrument shall be deemed necessary expenditures for the protection of the security. Borrower does not need to sign any instrument or notation evidencing or stipulating that future advances are secured by this Security Instrument.

13.     **Governing Law; Consent to Jurisdiction and Venue.**

This Security Instrument shall be governed by the laws of the Property Jurisdiction without giving effect to any choice of law provisions thereof that would result in the application of the laws of another jurisdiction. Borrower agrees that any controversy arising under or in relation to this Security Instrument shall be litigated exclusively in the Property Jurisdiction. The state and federal courts and authorities with jurisdiction in the Property Jurisdiction shall have exclusive jurisdiction over all controversies that arise under or in relation to any security for the Indebtedness. Borrower irrevocably consents to service, jurisdiction, and venue of such courts for any such litigation and waives any other venue to which it might be entitled by virtue of domicile, habitual residence or otherwise.

14.     **Miscellaneous Provisions.**

(a)     This Security Instrument shall bind, and the rights granted by this Security Instrument shall benefit, the successors and assigns of Lender. This Security Instrument shall bind, and the obligations granted by this Security Instrument shall inure to, any permitted successors and assigns of Borrower under the Loan Agreement. If more than one (1) person or entity signs this Security Instrument as Borrower, the obligations of such persons and entities shall be joint and several. The relationship between Lender and Borrower shall be solely that of creditor and debtor, respectively, and nothing contained in this Security Instrument shall create any other relationship between Lender and Borrower. No creditor of any party to this Security Instrument and no other person shall be a third party beneficiary of this Security Instrument or any other Loan Document.

(b)     The invalidity or unenforceability of any provision of this Security Instrument or any other Loan Document shall not affect the validity or enforceability of any other provision of this Security Instrument or of any other Loan Document, all of which shall remain in full force and effect. This Security Instrument contains the complete and entire agreement among the parties as to the matters covered, rights granted and the obligations assumed in this Security Instrument. This Security Instrument may not be amended or modified except by written agreement signed by the parties hereto.

B32153 - P120

(c)     The following rules of construction shall apply to this Security Instrument:

(1)     The captions and headings of the sections of this Security Instrument are for convenience only and shall be disregarded in construing this Security Instrument.

(2)     Any reference in this Security Instrument to an "Exhibit" or "Schedule" or a "Section" or an "Article" shall, unless otherwise explicitly provided, be construed as referring, respectively, to an exhibit or schedule attached to this Security Instrument or to a Section or Article of this Security Instrument.

(3)     Any reference in this Security Instrument to a statute or regulation shall be construed as referring to that statute or regulation as amended from time to time.

(4)     Use of the singular in this Security Instrument includes the plural and use of the plural includes the singular.

(5)     As used in this Security Instrument, the term "including" means "including, but not limited to" or "including, without limitation," and is for example only, and not a limitation.

(6)     Whenever Borrower's knowledge is implicated in this Security Instrument or the phrase "to Borrower's knowledge" or a similar phrase is used in this Security Instrument, Borrower's knowledge or such phrase(s) shall be interpreted to mean to the best of Borrower's knowledge after reasonable and diligent inquiry and investigation.

(7)     Unless otherwise provided in this Security Instrument, if Lender's approval, designation, determination, selection, estimate, action or decision is required, permitted or contemplated hereunder, such approval, designation, determination, selection, estimate, action or decision shall be made in Lender's sole and absolute discretion.

(8)     All references in this Security Instrument to a separate instrument or agreement shall include such instrument or agreement as the same may be amended or supplemented from time to time pursuant to the applicable provisions thereof.

(9)     "Lender may" shall mean at Lender's discretion, but shall not be an obligation.

15.    **Time is of the Essence.**

Borrower agrees that, with respect to each and every obligation and covenant contained in this Security Instrument and the other Loan Documents, time is of the essence.

B32153 - P121

16.    WAIVER OF TRIAL BY JURY.

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH OF BORROWER AND LENDER (BY ITS ACCEPTANCE HEREOF) (A) COVENANTS AND AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS SECURITY INSTRUMENT OR THE RELATIONSHIP BETWEEN THE PARTIES AS BORROWER AND LENDER THAT IS TRIABLE OF RIGHT BY A JURY AND (B) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH ISSUE TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY EACH OF BORROWER AND LENDER, KNOWINGLY AND VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL.

ATTACHED EXHIBITS.  The following Exhibits are attached to this Security Instrument and incorporated fully herein by reference:

Exhibit A          Description of the Land

[Remainder of Page Intentionally Blank]

B32153 - P122

IN WITNESS WHEREOF, Borrower has signed and delivered this Security Instrument under seal (where applicable) or has caused this Security Instrument to be signed and delivered by its duly authorized representative under seal (where applicable). Where applicable law so provides, Borrower intends that this Security Instrument shall be deemed to be signed and delivered as a sealed instrument.

BORROWER:

C. Ray Kennedy

Cynthia M. Kennedy

The name, chief executive office and organizational identification number Debtor under any applicable Uniform Commercial Code) are:
Debtor Name/Record Owner:
C. Ray Kennedy and Cynthia M. Kennedy Debtor Chief Executive Office A
4324 Satterwythe Ln , CHARLOTTE NC 28215

The name and chief executive office of Lender (as Secured Party) are:
Secured Party Name: Cherrywood Commercial Lending, LLC
Secured Party Chief Executive Office Address:
20955 Pathfinder Road, #370
Diamond Bar, CA 91765

NOTICE ADDRESS FOR TRUSTEE:
Chicago Title Company, LLC
200 South Tryon Street, Suite 800
Charlotte, NC 28202

Security Instrument – North Carolina (2012)
Kennedy

B32153 - P123

Mecklenburg County, North Carolina

I certify that the following person(s) personally appeared before me this day, each acknowledging to me that he or she signed the foregoing document:

C. RAY KENNEDY and CYNTHIA M. KENNEDY

Name(s) of principal(s)

Date: 9.26.17

(Official Seal)

Official Signature of Notary

John F. Renger III , Notary Public

Notary's printed or typed name

My commission expires:

4.22.21

JOHN F. RENGER III
NOTARY
Comm. Exp.
4-22-2021
PUBLIC
MECKLENBURG COUNTY, NC

B32153 - P124

## EXHIBIT A

**TRACT ONE:**

Lying and being situate in Mecklenburg County, NC, and being more particularly described as follows:

Being all of Lot(s) 2, Block 33, Highland Creek (Village Center Phase 1, Map 2, Tract "D"), according to the plat thereof recorded in Map Book 32, page 409, in the Office of the Register of Deeds of Mecklenburg County, NC.

For informational purposes: 6025 Clarke Creek, Charlotte, NC 28269

**TRACT TWO:**

Lying and being situate in Mecklenburg County, NC, and being more particularly described as follows:

Being all of Lot(s) 1, Northcross Corporate Center, Map 1 Phase 1, according to the plat thereof recorded in Map Book 25, page 422, in the Office of the Register of Deeds of Mecklenburg County, NC, LESS AND EXCEPT that parcel conveyed to the Department of Transportation by Deed recorded on February 11, 1994 and recorded in Book 7666 at Page 59 in the aforesaid registry.

For informational purposes: 16701 Northcrosse Drive, Charlotte, NC 28269

B32154 - P61

For Registration Fredrick Smith
Register of Deeds
Mecklenburg County, NC
Electronically Recorded
2017 Sep 28 12:06 PM      RE Excise Tax: $ 0.00
Book: 32154      Page: 61      Fee: $ 26.00
Instrument Number:    2017131531

*Fredrick Smith*

---

*(Space above reserved for recording information)*

Prepared by, and after recording return to:
Penny Groel, Esq.
Cherrywood Commercial Lending, LLC
20955 Pathfinder Road #205
Diamond Bar, CA 91765

## ASSIGNMENT OF DEED OF TRUST

KNOW ALL MEN BY THESE PRESENTS THAT, as of the 26th day of September, 2017,

CHERRYWOOD COMMERCIAL LENDING, LLC ("Assignor"), for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by Assignor, hereby assigns unto

CHERRYWOOD COMMERCIAL HOLDINGS, LLC, a Delaware limited liability company
("Assignee"),

and does hereby grant, bargain, sell, convey, assign, transfer and set over unto Assignee all of the right, title and interest of Assignor in and to that certain Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated as of **September 26, 2017,** made and executed by **C Ray Kennedy** and wife, **Cynthia M. Kennedy,** as grantor, and being recorded simultaneously herewith, in the office of the Register/Clerk of the County of Mecklenburg, State of North Carolina, covering premises known as and by:

Street Address: **6025 Clarke Creek, Charlotte, NC 28269**

See Legal Description Attached as Exhibit A.

The word "assignor" or "assignee" shall be construed as if it read "assignors" or "assignees" whenever the sense of the instrument so requires.

### [Remainder of Page Intentionally Blank]


EXHIBIT
4
tabbies

Submitted electronically by "Hutchens Law Firm"
in compliance with North Carolina statutes governing recordable documents
and the terms of the submitter agreement with the Mecklenburg County Register of Deeds.

AOM                                                                              Page 1 of 3
C Ray Kennedy and wife, Cynthia M. Kennedy

B32154 - P62

IN WITNESS WHEREOF, Assignor has duly executed this assignment effective as of the day and year first above written.

ASSIGNOR:

CHERRYWOOD COMMERCIAL LENDING, LLC

By _____
Name: Jorge L. Ramos
Title:   Executive Vice President

## ACKNOWLEDGEMENT

> *A Notary Public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.*

State of California
County of Los Angeles

On September 25, 2017, before me Josh Christian Miller, Notary Public, personally appeared Jorge L. Ramos, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal,

Signature _____  (Seal)

JOSH CHRISTIAN MILLER
COMM # 2079695
LOS ANGELES COUNTY
NOTARY PUBLIC-CALIFORNIA
MY COMMISSION EXPIRES
AUG. 28, 2018

Notary Public: Los Angeles County, California
Printed Name: Josh Christian Miller
My Commission expires: August 28, 2018
Commission #: 2079695

AOM
C Ray Kennedy and wife, Cynthia M. Kennedy

## EXHIBIT A

### Legal Description

PARCEL ONE:

Lying and being situate in Mecklenburg County, NC and being more particularly described as follows:

Being all of Lot(s) 1, Northcross Corporate Center, Map 1 Phase 1, according to the plat thereof recorded
in Map Book 25, page 422, in the Office of the Register of Deeds of Mecklenburg County, NC, LESS AND
EXCEPT that parcel conveyed to the Department of Transportation by Deed recorded on February 11, 1994 and recorded in Book 7666 at Page 59 in the aforesaid registry.

For informational purposes:  16701 Northcross Drive, Charlotte, NC 28269

PARCEL TWO:

Lying and being situate in Mecklenburg County, NC, and being more particularly described as follows:

Being all of Lot(s) 2, Block 33, Highland Creek (Village Center Phase 1, Map 2, Tract "D"), accordingly to
the plat thereof recorded in Map Book 32, page 409, in the Office of the Register of Deed Of Mecklenburg
County, NC.

For informational purposes:  6025 Clarke Creek, Charlotte, NC 28269

AOM
C Ray Kennedy and wife, Cynthia M. Kennedy

FOR REGISTRATION
Fredrick Smith
REGISTER OF DEEDS
Mecklenburg County, NC
2019 FEB 20 02:34:10 PM
BK:33296 PG:890-890
FEE:$36.00
INSTRUMENT # 2019018782

PHETSL



2019018782

PREPARED BY & RETURN TO:
C. R. Hall
2860 Exchange Blvd. # 100
Southlake TX 76092

**(CORRECTIVE)**
**Assignment of Deed of Trust**

For Valuable Consideration, the undersigned, CHERRYWOOD COMMERCIAL HOLDINGS, LLC whose address is 20955 Pathfinder Road, #370, Diamond Bar CA 91765 (Assignor) by these presents does assign and set over, without recourse, to WILMINGTON SAVINGS FUND SOCIETY, FSB, D/B/A CHRISTIANA TRUST, NOT IN ITS INDIVIDUAL CAPACITY BUT SOLELY AS OWNER TRUSTEE OF RESIDENTIAL CREDIT OPPORTUNITIES TRUST II whose address is 3020 Old Ranch Pkwy, Ste 180, Seal Beach CA 90740 (Assignee) the described deed of trust with all interest, all liens, any rights due or to become due thereon, executed by C. RAY KENNEDY AND WIFE, CYNTHIA M. KENNEDY to CHERRYWOOD COMMERCIAL LENDING, LLC, A LIMITED LIABILITY COMPANY. Trustee: CHICAGO TITLE COMPANY, LLC Said deed of trust Dated: 9/26/2017 is recorded in the State of NC, County of Mecklenburg on 9/28/2017, as Book 32153 Page 103 Instrument 2017131364 AMOUNT: $3,000,000.00   *THIS CORRECTIVE ASSIGNMENT OF DEED OF TRUST IS BEING RECORDED TO CORRECT THE DATE OF THE ASSIGNMENT RECORDED ON 3/13/2018, BK 32522, PG 809, INST# 2018028776 *
Property Address: 6025 CLARK CREEK, CHARLOTTE, NC

IN WITNESS WHEREOF, the Undersigned Entity has caused this instrument to be executed as a sealed instrument by its proper signatory.
Executed on: 2/5/19
CHERRYWOOD COMMERCIAL HOLDINGS, LLC

By: _____ EVP

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of Los Angeles
On 2/5/19 before me, Josh Christian Miller, Notary Public, personally appeared Jorge Ramos, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.
I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.
WITNESS my hand and official seal.

Notary public _____
My commission expires: _____

JOSH CHRISTIAN MILLER
Notary Public - California
Los Angeles County
Commission # 2270352
My Comm. Expires Dec 9, 2022

EXHIBIT
# 5

NC  Mecklenburg

## GUARANTY
### (Payment)

This GUARANTY (Payment) (this "Guaranty"), dated as of September 26, 2017, is executed by undersigned ("Guarantor"), to and for the benefit of CHERRYWOOD COMMERCIAL LENDING, LLC, a Delaware limited liability company ("Lender").

### RECITALS:

A.      Pursuant to that certain Loan and Security Agreement dated as of the date hereof, by and between C. Ray Kennedy & Cynthia M. Kennedy ("Borrower") and Lender (as amended, restated, replaced, supplemented or otherwise modified from time to time, the "Loan Agreement"), Lender is making a loan to Borrower in the original principal amount of Three Million and 00/100 Dollars ($3,000,000) (the "Mortgage Loan"), as evidenced by that certain Promissory Note dated as of the date hereof, executed by Borrower and made payable to the order of Lender in the amount of the Mortgage Loan (as amended, restated, replaced, supplemented or otherwise modified from time to time, the "Note").

B.      The Note will be secured by, among other things, a Security Instrument (as defined in the Loan Agreement) encumbering the real property described in the Security Instrument (the "Property").

C.      Guarantor has an economic interest in Borrower or will otherwise obtain a material financial benefit from the Mortgage Loan.

D.      As a condition to making the Mortgage Loan to Borrower, Lender requires that Guarantor execute this Guaranty.

NOW, THEREFORE, in order to induce Lender to make the Mortgage Loan to Borrower, and in consideration thereof, Guarantor agrees as follows:

### AGREEMENTS:

1.      **Recitals**

The recitals set forth above are incorporated herein by reference as if fully set forth in the body of this Guaranty.

2.      **Defined Terms.**

Capitalized terms used and not specifically defined herein have the meanings given to such terms in the Loan Agreement.

3.      **Guaranteed Obligations.**

Guarantor hereby absolutely, unconditionally and irrevocably guarantees to Lender the full and prompt payment and performance when due, whether at maturity or earlier, by reason of acceleration or otherwise, and at all times thereafter, of:

(a)       the entire Indebtedness;

Page 1 of 11



(a)  the entire Indebtedness;

(b)  all amounts, obligations and liabilities owed to Lender under Article 3 (Personal Liability) of the Loan Agreement (including the payment and performance of all indemnity obligations of Borrower described in Section 3.03 (Personal Liability for Indemnity Obligations) of the Loan Agreement and including all of Borrower's obligations under the Environmental Indemnity Agreement); and

(c)  all costs and expenses, including reasonable fees and out-of-pocket expenses of attorneys and expert witnesses, incurred by Lender in enforcing its rights under this Guaranty.

4.  Survival of Guaranteed Obligations

The obligations of Guarantor under this Guaranty shall survive any Foreclosure Event, and any recorded release or reconveyance of the Security Instrument or any release of any other security for any of the Indebtedness.

5.  Guaranty of Payment; Community Property.

Guarantor's obligations under this Guaranty constitute a present and unconditional guaranty of payment and not merely a guaranty of collection. If Guarantor (or any Guarantor, if more than one) is a married person, and the state of residence of Guarantor or Guarantor's spouse is a community property jurisdiction, Guarantor (or each such married Guarantor, if more than one) agrees that Lender may satisfy Guarantor's obligations under this Guaranty to the extent of all Guarantor's separate property and Guarantor's interest in any community property.

6.  Obligations Unsecured; Cross-Default.

The obligations of Guarantor under this Guaranty shall not be secured by the Security Instrument or the Loan Agreement. However, a default under this Guaranty shall be an Event of Default under the Loan Agreement, and a default under this Guaranty shall entitle Lender to be able to exercise all of its rights and remedies under the Loan Agreement and other Loan Documents.

7.  Continuing Guaranty.

The obligations of Guarantor under this Guaranty shall be unconditional irrespective of the genuineness, validity, regularity or enforceability of any provision of this Guaranty, the Note, the Loan Agreement, the Security Instrument or any other Loan Document. Guarantor agrees that performance of the obligations hereunder shall be a primary obligation, shall not be subject to any counterclaim, set-off, recoupment, abatement, deferment or defense based upon any claim that Guarantor may have against Lender, Borrower, any other guarantor of the obligations hereunder or any other person or entity, and shall remain in full force and effect without regard to, and shall not be released, discharged or affected in any way by any circumstance or condition (whether or not Guarantor shall have any knowledge thereof), including:

(a)        any furnishing, exchange, substitution or release of any collateral securing repayment of the Mortgage Loan, or any failure to perfect any lien in such collateral;

(b)        any failure, omission or delay on the part of Borrower, Guarantor, any other guarantor of the obligations hereunder or Lender to conform or comply with any term of any of the Loan Documents or failure of Lender to give notice of any Event of Default;

(c)        any action or inaction by Lender under or in respect of any of the Loan Documents, any failure, lack of diligence, omission or delay on the part of Lender to perfect, enforce, assert or exercise any lien, security interest, right, power or remedy conferred upon it in any of the Loan Documents, or any other action or inaction on the part of Lender;

(d)        any Bankruptcy Event, or any voluntary or involuntary bankruptcy, insolvency, reorganization, arrangement, readjustment, assignment for the benefit of creditors, composition, receivership, liquidation, marshaling of assets and liabilities or similar events or proceedings with respect to Guarantor or any other guarantor of the obligations hereunder, or any of their respective property or creditors or any action taken by any trustee or receiver or by any court in such proceeding;

(e)        any merger or consolidation of Borrower into or with any entity or any sale, lease or Transfer of any asset of Borrower, Guarantor or any other guarantor of the obligations hereunder to any other Person;

(f)        any change in the ownership of Borrower or any change in the relationship between Borrower, Guarantor or any other guarantor of the obligations hereunder, or any termination of such relationship;

(g)        any release or discharge by operation of law of Borrower, Guarantor or any other guarantor of the obligations hereunder, or any obligation or agreement contained in any of the Loan Documents; or

(h)        any other occurrence, circumstance, happening or event, whether similar or dissimilar to the foregoing, and whether seen or unforeseen, which otherwise might constitute a legal or equitable defense or discharge of the liabilities of a guarantor or surety or which otherwise might limit recourse against Borrower or Guarantor to the fullest extent permitted by law.

8.    **Guarantor Waivers.**

Guarantor hereby waives:

(a)        the benefit of all principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms of this Guaranty (and agrees that Guarantor's obligations shall not be affected by any circumstances, whether or not referred to in this Guaranty, which might otherwise constitute a legal or equitable discharge of a surety or a guarantor);

(b)        the benefits of any right of discharge under any and all statutes or other laws relating to guarantors or sureties and any other rights of sureties and guarantors;

Page 3 of 11

(c)      diligence in collecting the Indebtedness, presentment, demand for payment, protest and all notices with respect to the Loan Documents and this Guaranty which may be required by statute, rule of law or otherwise to preserve Lender's rights against Guarantor under this Guaranty, including notice of acceptance, notice of any amendment of the Loan Documents, notice of the occurrence of any Event of Default, notice of intent to accelerate, notice of acceleration, notice of dishonor, notice of foreclosure, notice of protest and notice of the incurring by Borrower of any obligation or indebtedness; and

(d)      all rights to require Lender to:

(1)      proceed against or exhaust any collateral held by Lender to secure the repayment of the Indebtedness;

(2)      proceed against or pursue any remedy it may now or hereafter have against Borrower or any guarantor, or, if Borrower or any guarantor is a partnership, any general partner of Borrower or general partner of any guarantor; or

(3)      demand or require collateral security from Borrower, any other guarantor or any other Person as provided by applicable law or otherwise.

(e)      Guarantor also waives, to the fullest extent permitted by law, all rights, including, without limitation, all rights granted by Sections 26-7 through 26-9, inclusive, of the North Carolina Statutes, to require Lender to:

(1)      proceed against or exhaust any collateral held by Lender to secure the repayment of the Indebtedness;

(2)      proceed against or pursue any remedy it may now or hereafter have against Borrower or any guarantor, or, if Borrower or any guarantor is a partnership, any general partner of Borrower or general partner of any guarantor; or

(3)      demand or require collateral security from Borrower, any other guarantor or any other Person as provided by applicable law or otherwise.

9.      **No Effect Upon Obligations.**

At any time or from time to time and any number of times, without notice to Guarantor and without releasing, discharging or affecting the liability of Guarantor:

(a)      the time for payment of the principal of or interest on the Indebtedness may be extended or the Indebtedness may be renewed in whole or in part;

(b)      the rate of interest on or period of amortization of the Mortgage Loan or the amount of the Monthly Debt Service Payments payable under the Loan Documents may be modified;

(c)      the time for Borrower's performance of or compliance with any covenant or agreement contained in any Loan Document, whether presently existing or hereinafter entered into, may be extended or such performance or compliance may be waived;

otherwise dealt with or additional security may be pledged or mortgaged for the Indebtedness;

(i)      the payment of the Indebtedness or any security for the Indebtedness, or both, may be subordinated to the right to payment or the security, or both, of any other present or future creditor of Borrower;

(j)      any payments made by Borrower to Lender may be applied to the Indebtedness in such priority as Lender may determine in its discretion; and

(k)      any other terms of the Loan Documents may be modified as required by Lender.

## 10.    Joint and Several (or Solidary) Liability.

If more than one Person executes this Guaranty as Guarantor, such Persons shall be liable for the obligations hereunder on a joint and several (solidary instead for purposes of Louisiana law) basis. Lender, in its discretion, may:

(a)      to the extent permitted by applicable law, bring suit against Guarantor, or any one or more of the Persons constituting Guarantor, and any other guarantor, jointly and severally (solidarily instead for purposes of Louisiana law), or against any one or more of them;

(b)      compromise or settle with any one or more of the Persons constituting Guarantor, or any other guarantor, for such consideration as Lender may deem proper;

(c)      discharge or release one or more of the Persons constituting Guarantor, or any other guarantor, from liability or agree not to sue such Person; and

(d)      otherwise deal with Guarantor and any guarantor, or any one or more of them, in any manner, and no such action shall impair the rights of Lender to collect from Guarantor any amount guaranteed by Guarantor under this Guaranty.
Nothing contained in this Section 10 shall in any way affect or impair the rights or obligations of Guarantor with respect to any other guarantor.

## 11.    Subordination of Affiliated Debt.

Any indebtedness of Borrower held by Guarantor now or in the future is and shall be subordinated to the Indebtedness and any such indebtedness of Borrower shall be collected, enforced and received by Guarantor, as trustee for Lender, but without reducing or affecting in any manner the liability of Guarantor under the other provisions of this Guaranty.

## 12.    Subrogation.

Guarantor shall have no right of, and hereby waives any claim for, subrogation or reimbursement against Borrower or any general partner of Borrower by reason of any payment by Guarantor under this Guaranty, whether such right or claim arises at law or in equity or under any contract or statute, until the

Indebtedness has been paid in full and there has expired the maximum possible period thereafter during which any payment made by Borrower to Lender with respect to the Indebtedness could be deemed a preference under the Insolvency Laws.

13.      **Voidable Transfer.**

If any payment by Borrower is held to constitute a preference under any Insolvency Laws or similar laws, or if for any other reason Lender is required to refund any sums to Borrower, such refund shall not constitute a release of any liability of Guarantor under this Guaranty. It is the intention of Lender and Guarantor that Guarantor's obligations under this Guaranty shall not be such discharged except by Guarantor's performance of such obligation and then only to be extent of performance. If any payment by any Guarantor should for any reason subsequently be declared to be void or voidable under any state or federal law relating to creditors' rights, including provisions of the Insolvency Laws relating to a Voidable Transfer, and if Lender is required to repay or restore, in whole or in part, any such Voidable Transfer, or elects to do so upon the advice of its counsel, then the obligations guaranteed hereunder shall automatically be revived, reinstated and restored by the amount of such Voidable Transfer or the amount of such Voidable Transfer that Lender is required or elects to repay or restore, including all reasonable costs, expenses and legal fees incurred by Lender in connection therewith, and shall exist as though such Voidable Transfer had never been made, and any other guarantor, if any, shall remain liable for such obligations in full.

14.      **Credit Report/Credit Score.**

Guarantor acknowledges and agrees that Lender is authorized, no more frequently than once in any twelve (12) month period, to obtain a credit report (if applicable) on Guarantor, the cost of which shall be paid for by Guarantor. Guarantor acknowledges and agrees that Lender is authorized to obtain a Credit Score (if applicable) for Guarantor at any time at Lender's expense.

15.      **Financial Reporting.**

Guarantor shall deliver to Lender such Guarantor financial statements as required by Section 8.02 (Books and Records; Financial Reporting – Covenants) of the Loan Agreement.

16.      **Further Assurances.**

Guarantor acknowledges that Lender (including its successors and assigns) may sell or transfer the Mortgage Loan, or any interest in the Mortgage Loan.

(a)      Guarantor shall, subject to Section 16(b) below:

(1)      do anything necessary to comply with the reasonable requirements of Lender or any Investor of the Mortgage Loan or provide, or cause to be provided, to Lender or any Investor of the Mortgage Loan within ten (10) days of the request, at Borrower's and Guarantor's cost and expense, such further documentation or information as Lender or Investor may reasonably require, in order to enable:

(A)      Lender to sell the Mortgage Loan to such Investor;

(B)      Lender to obtain a refund of any commitment fee from any such Investor; or

(C)      any such Investor to further sell or securitize the Mortgage Loan;

(2)      confirm that Guarantor is not in default under this Guaranty or in observing any of the covenants or agreements contained in this Guaranty (or, if Guarantor is in default, describing such default in reasonable detail); and

(3)      execute and deliver to Lender and/or any Investor such other documentation, including any amendments, corrections, deletions or additions to this Guaranty as is reasonably required by Lender or such Investor.

(b)      Nothing in this Section 16 shall require Guarantor to do any further act that has the effect of:

(1)      changing the essential economic terms of the Mortgage Loan set forth in the related commitment letter between Borrower and Lender;

(2)      imposing on Borrower or Guarantor greater personal liability under the Loan Documents than that set forth in the related commitment letter between Borrower and Lender; or

(3)      materially changing the rights and obligations of Borrower or Guarantor under the commitment letter.

17.   Successors and Assigns.

Lender may assign its rights under this Guaranty in whole or in part and, upon any such assignment, all the terms and provisions of this Guaranty shall inure to the benefit of such assignee to the extent so assigned. Guarantor may not assign its rights, duties and obligations under this Guaranty, in whole or in part, without Lender's prior written consent and any such assignment shall be deemed void ab initio. The terms used to designate any of the parties herein shall be deemed to include the heirs, legal representatives, successors and assigns of such parties.

18.     Final Agreement.

Guarantor acknowledges receipt of a copy of each of the Loan Documents and this Guaranty.  THIS GUARANTY REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.  All prior or contemporaneous agreements, understandings, representations and statements, oral or written, are merged into this Guaranty. Neither this Guaranty nor any of its provisions may be waived, modified, amended, discharged or terminated except by an agreement in writing signed by the party against which the enforcement of the waiver, modification, amendment, discharge or termination is sought, and then only to the extent set forth in that agreement.

19.     Governing Law.

This Guaranty shall be governed by and construed in accordance with the substantive law of the Property Jurisdiction without regard to the application of choice of law principles that would result in the application of the laws of another jurisdiction.

20.     Property Jurisdiction.

. Guarantor agrees that any controversy arising under or in relation to this Guaranty shall be litigated exclusively in the Property Jurisdiction.  The state and federal courts and authorities with jurisdiction in the Property Jurisdiction shall have exclusive jurisdiction over all controversies which shall arise under or in relation to this Guaranty or any other Loan Document with respect to the subject matter hereof.  Guarantor irrevocably consents to service, jurisdiction and venue of such courts for any such litigation and waives any other venue to which it might be entitled by virtue of domicile, habitual residence or otherwise.

21.     Time is of the Essence.

Guarantor agrees that, with respect to each and every obligation and covenant contained in this Guaranty, time is of the essence.

22.     No Reliance.

Guarantor acknowledges, represents and warrants that:

(a)     it understands the nature and structure of the transactions contemplated by this Guaranty and the other Loan Documents;

(b)     it is familiar with the provisions of all of the documents and instruments relating to such transactions;

Page 8 of 11

(c)      it understands the risks inherent in such transactions, including the risk of loss of all or any part of the Mortgaged Property or of the assets of Guarantor;

(d)      it has had the opportunity to consult counsel; and

(e)      it has not relied on Lender for any guidance or expertise in analyzing the financial or other consequences of the transactions contemplated by this Guaranty or any other Loan Document or otherwise relied on Lender in any manner in connection with interpreting, entering into or otherwise in connection with this Guaranty, any other Loan Document or any of the matters contemplated hereby or thereby.

23.    Notices.

Guarantor agrees to notify Lender of any change in Guarantor's address within ten (10) Business Days after such change of address occurs.  All notices under this Guaranty shall be:

(a)      in writing and shall be

(1)      delivered, in person;

(2)      mailed, postage prepaid, either by registered or certified delivery, return receipt requested;

(3)      sent by overnight courier; or

(4)      sent by electronic mail with originals to follow by overnight courier;

(b)      addressed to the intended recipient at the notice addresses provided under the signature block at the end of this Guaranty; and

(c)      deemed given on the earlier to occur of:

(1)      the date when the notice is received by the addressee; or

(2)      if the recipient refuses or rejects delivery, the date on which the notice is so refused or rejected, as conclusively established by the records of the United States Postal Service or such express courier service.

24.    Construction.

(a)      Any reference in this Guaranty to an "Exhibit" or "Schedule" or a "Section" or an "Article" shall, unless otherwise explicitly provided, be construed as referring, respectively, to an exhibit or schedule attached to this Guaranty or to a Section or Article of this Guaranty.

(b)      Any reference in this Guaranty to a statute or regulation shall be construed as referring to that statute or regulation as amended from time to time.

(c)      Use of the singular in this Guaranty includes the plural and use of the plural includes the singular.

(d)      As used in this Guaranty, the term "including" means "including, but not limited to" or "including, without limitation," and is for example only, and not a limitation.

(e)      Whenever Guarantor's knowledge is implicated in this Guaranty or the phrase "to Guarantor's knowledge" or a similar phrase is used in this Guaranty, Guarantor's knowledge or such phrase(s) shall be interpreted to mean to the best of Guarantor's knowledge after reasonable and diligent inquiry and investigation.

(f)      Unless otherwise provided in this Guaranty, if Lender's approval, designation, determination, selection, estimate, action or decision is required, permitted or contemplated hereunder, such approval, designation, determination, selection, estimate, action or decision shall be made in Lender's sole and absolute discretion.

(g)      All references in this Guaranty to a separate instrument or agreement shall include such instrument or agreement as the same may be amended or supplemented from time to time pursuant to the applicable provisions thereof.

(h)      "Lender may" shall mean at Lender's discretion, but shall not be an obligation.

25.      WAIVER OF JURY TRIAL.

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH OF GUARANTOR AND LENDER (A) AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS GUARANTY OR ANY LOAN DOCUMENT OR THE RELATIONSHIP BETWEEN THE PARTIES AS GUARANTOR AND LENDER THAT IS TRIABLE OF RIGHT BY A JURY AND (B) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH ISSUE TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY GUARANTOR AND LENDER, KNOWINGLY AND VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL.

26.      Schedules.

The schedules, if any, attached to this Guaranty are incorporated fully into this Guaranty by this reference and each constitutes a substantive part of this Guaranty.

ATTACHED SCHEDULE. The following Schedule is attached to this Guaranty:

NONE

[Remainder of Page Intentionally Blank]

Page 10 of 11

IN WITNESS WHEREOF, Guarantor has signed and delivered this Guaranty under seal (where applicable) or has caused this Guaranty to be signed and delivered under seal (where applicable) by its duly authorized representative.  Where applicable law so provides, Guarantor intends that this Guaranty shall be deemed to be signed and delivered as a sealed instrument.

GUARANTOR:

Ramsey-Peele Corporation  , a North Carolina corporation

By
Name: C. Ray Kennedy
Title: President

Address for Notices:
8350 Arrowridge Blvd
Charlotte  NC

Page 11 of 11

For Registration Fredrick Smith
Register of Deeds
Mecklenburg County, NC
Electronically Recorded
2017 Sep 28 12:06 PM        RE Excise Tax: $ 0.00
Book: 32154      Page: 75            Fee: $ 26.00
Instrument Number:      2017131533

## RECORDING COVER PAGE

Document Type:              Subordination of Lease

Landlord:                  C. Ray Kennedy and Cynthia M. Kennedy

Tenant:                    Ramsey-Peele Corporation

                           d/b/a University Child Development Center

PREPARED BY/
RETURN TO:
Hutchens Law Firm, 6230 Fairview Road, Ste. 315, Charlotte, NC 28210



EXHIBIT

7

Submitted electronically by "Hutchens Law Firm"
in compliance with North Carolina statutes governing recordable documents
and the terms of the submitter agreement with the Mecklenburg County Register of Deeds.

RECORDING COVER PAGE

Document Type:          Subordination of Lease

Landlord:               C. Ray Kennedy and Cynthia M. Kennedy

Tenant:                 Ramsey-Peele Corporation

                        d/b/a University Child Development Center

PREPARED BY/
RETURN TO:
Hutchens Law Firm, 6230 Fairview Road, Ste. 315, Charlotte, NC 28210

------------------- [Space Above This Line For Recording Data] -------------------

## SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

This SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT (this "**Agreement**") dated as of September 26, 2017, is executed by and among CHERRYWOOD COMMERCIAL LENDING, LLC, a Delaware limited liability company ("**Lender**"), C. Ray Kennedy & Cynthia M. Kennedy
("**Landlord**") and Ramsey-Peele Corporation d/b/a University Child Development Center ("**Tenant**").

## RECITALS:

A.      Tenant is leasing premises (the "**Premises**") that are a part of the real property located at 6025 Clarke Creek, CHARLOTTE, NC 28269 (the "**Mortgaged Property**") pursuant to a Lease Agreement dated as of October 1, 2017, (the "**Lease**") between Tenant and Landlord.

B.      Pursuant to that certain Loan and Security Agreement dated as of the date hereof, executed by and between Landlord and Lender (as amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Loan Agreement**"), Lender has agreed to make a loan to Landlord in the original principal amount of $3,000,000 (the "**Mortgage Loan**"), as evidenced by that certain Promissory Note dated as of the date hereof, executed by Landlord and made payable to the order of Lender in the amount of the Mortgage Loan (as amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Note**").

C.      In addition to the Loan Agreement, the Mortgage Loan and the Note are also secured by a certain Mortgage, Deed of Trust, or Deed to Secure Debt dated as of the date hereof (as amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Security Instrument**"). The Note, the Security Instrument, the Loan Agreement and any other agreement executed in connection with the Mortgage Loan are referred to collectively as the "**Loan Documents**").

D.      Tenant and Landlord are affiliated and Tenant has an economic interest in Landlord

or will otherwise obtain a benefit from the Mortgage Loan. Tenant, in order to induce Lender to make the Mortgage Loan, has agreed to the assignment of the Lease to Landlord and the subordination of the Lease to the Security Instrument and the other Loan Documents in accordance with the terms of this Agreement.

## AGREEMENTS:

NOW THEREFORE, in consideration of the mutual covenants in this Agreement and for other valuable consideration, the receipt and sufficiency of which are acknowledged, Landlord, Lender, and Tenant agree as follows:

Section 1.        Recitals

The recitals set forth above are incorporated herein by reference as if fully set forth in the body of this Agreement.

Section 2.        Defined Terms.

The following terms, when used in this Agreement, shall have the following meanings:
"Foreclosure Event" means (a) the foreclosure of the Security Instrument or any other sale by Lender or any trustee for Lender pursuant to the Security Instrument or any other Loan Document; (b) any other exercise by Lender of its rights and remedies as holder of the Mortgage Loan or the Security Instrument as a result of which Lender or any other Successor Landlord acquires title to, or the right of possession of, the Mortgaged Property; or (c) acquisition of title to the Mortgaged Property in lieu of foreclosure or other conveyance of Landlord's interest in the Mortgaged Property in lieu of any of the foregoing.
"Subsequent Sale" means the first sale of the Mortgaged Property by Lender, Lender's nominee or any trustee for Lender after a Foreclosure Event.
"Successor Landlord" means any party that becomes owner of the Mortgaged Property as the result of a Foreclosure Event or a Subsequent Sale, including, without limitation, Lender and any nominee of Lender.

Section 3.        Subordination.

The Lease and all estates, rights, options, liens, and charges therein contained or created under the Lease are and shall be subject and subordinate to the lien and effect of the Security Instrument and the other Loan Documents insofar as it affects the real and personal property of which the Premises form a part, and to all renewals, modifications, consolidations, replacements,

and extensions thereof, and to all advances made or to be made thereunder, to the full extent of amounts secured thereby and interest thereon. Without limiting the generality of the foregoing subordination provision, Tenant hereby agrees that any of its right, title and interest in and to insurance proceeds and condemnation awards (or other similar awards arising from eminent domain proceedings) with respect to damage to or the condemnation (or similar taking) of any of the Mortgaged Property, shall be subject and subordinate to Lender's right, title and interest in and to such proceeds and awards.

Section 4.    Default.

Tenant acknowledges that upon, (1) the default of Landlord under any of the terms, covenants, or conditions of the Loan Agreement or this Agreement, or (2) the default of Tenant under any of the terms, covenants or conditions of the Lease or the Agreement, Lender may (a) immediately or at any time thereafter terminate the Lease, (b) name Tenant or join Tenant as a party in any suit, action or proceeding for the foreclosure of the Security Instrument or the enforcement of any rights of Lender under the Security Instrument, and (c) terminate or disturb Tenant's right to quiet enjoyment and possession of the Premises under the terms of the Lease or any of Tenant's other rights under the Lease in the exercise of Lender's rights under the Security Instrument and the other Loan Documents.

Section 5.    Possession of the Mortgaged Property.

In the event that a Successor Landlord acquires title to or the right to possession of the Mortgaged Property upon a Foreclosure Event or a Subsequent Sale, and Successor Landlord elects not to terminate the Lease, Lender and Tenant hereby agree to recognize one another as landlord and tenant, respectively, under the Lease and to be bound to one another under all of the terms, covenants, and conditions of the Lease. Successor Landlord shall assume all of the obligations of Landlord under the Lease subject to the provisions of this Agreement and Tenant agrees to attorn to such Successor Landlord and to recognize such Successor Landlord as "landlord" under the Lease without any additional documentation to effect such attornment (provided, however, if applicable law shall require additional documentation at the time Lender exercises its remedies then Tenant shall execute such additional documents evidencing such attornment as may be required by applicable law). Accordingly, from and after such event, Successor Landlord and Tenant shall have the same remedies against each other for the breach of an agreement contained in the Lease as Tenant and Landlord had before Successor Landlord succeeded to the interest of Landlord; provided, however, that Successor Landlord shall not be:

(a)    liable for any act or omission of any prior landlord (including Landlord);

(b)　　subject to any offsets or defenses that Tenant might have against any prior landlord (including Landlord);

(c)　　bound by any rent or additional rent that Tenant might have paid for more than one (1) month in advance to any prior landlord (including Landlord);

(d)　　bound by any amendment or modification of the Lease made after the date of this Agreement without Lender's prior written consent;

(e)　　liable for return of any security deposit not actually paid over to such Successor Landlord by the Landlord;

(f)　　bound by, or liable for, any breach of any representation or warranty or indemnity agreement contained in the Lease or otherwise made by any prior landlord (including Landlord); or

(g)　　personally liable for the payment of any claim hereunder or for the performance of any obligation, agreement, contribution, or term to be performed or observed by Successor Landlord hereunder or under the Security Instrument, the Loan Agreement, or any other agreement or document securing or collateral to the Security Instrument, such Successor Landlord's liability being limited in all cases to its interest in the Mortgaged Property.

**Section 6.**　　**Delivery of Documents.**

Although the foregoing provisions of this Agreement shall be self-operative, Tenant agrees to execute and deliver to Successor Landlord, such other instrument or instruments as Successor Landlord shall from time to time request in order to confirm such provision.

**Section 7.**　　**Representations, Warranties, Covenants and Agreements.**

Tenant hereby warrants and represents, covenants, and agrees to and with Lender:

(a)　　that the Lease constitutes the entire agreement between Tenant and Landlord with respect to the Premises and there are no other agreements, written or verbal, governing the tenancy of Tenant with respect to the Premises;

(b)　　not to alter or modify the Lease in any respect without prior written consent of Lender;

(c)　　to deliver to Lender in accordance with Section 11 a duplicate of each notice of default delivered to Landlord at the same time as such notice is given to Landlord;

(d)　　that Tenant is now the sole owner of the leasehold estate created by the Lease and

shall not hereafter transfer the Lease except as permitted by the terms thereof;

(e)      not to seek to terminate the Lease by reason of any default of Landlord without prior written notice thereof to Lender and the lapse thereafter of such time as under the Lease was offered to Landlord in which to remedy the default, and the lapse of thirty (30) days after the expiration of such time as Landlord was permitted to cure such default; provided, however, that with respect to any default of Landlord under the Lease which cannot be remedied within such time, if Lender commences to cure such default within such time and thereafter diligently proceeds with such efforts and pursues the same to completion, Lender shall have such time as is reasonably necessary to complete curing such default. Notwithstanding the foregoing, in the event either Lender or Landlord do not cure or commence curing such default within the time provided to Landlord under the Lease and the nature of the default threatens Tenant's ability to conduct its daily business or threatens to materially or adversely damage Tenant's property located on the Premises, Tenant shall be permitted to exercise its right under the Lease against Landlord;

(f)      not to pay any rent or other sums due or to become due under the Lease more than thirty (30) days in advance of the date on which the same are due or to become due under the Lease; and

(g)      to certify promptly in writing to Lender in connection with any proposed assignment of the Loan Agreement, whether or not any default on the part of Landlord then exists under the Lease.

Section 8.      Assignment.

Tenant further acknowledges that Landlord has collaterally assigned to Lender the Lease and the rents and other amounts, including lease termination fees, if any, due and payable under such leases. In connection therewith, Tenant agrees that, upon receipt by Tenant of a notice from Lender of the occurrence of a default by Landlord under such assignment and a demand by Lender for direct payment to Lender of the rents due under the Lease, Tenant will honor such demand and make all subsequent rent payments directly to Lender. Landlord hereby agrees that any rents, fees or other amounts paid by Tenant to or as directed by Lender pursuant to this section shall be deemed to have been duly and validly paid by Tenant under the Lease, and any such amounts shall be credited against Tenant's obligations under the Lease as if the same were paid directly to Landlord. Landlord and Tenant each agree that Tenant shall have no obligation to determine whether Landlord is in default under such assignment, and Tenant may rely on such notice and direction from Lender without any duty to investigate.

Section 9.      Successors and Assigns.

This Agreement shall inure to the benefit of and be binding upon the parties hereto and their successors and assigns.

**Section 10.**      **Trustee.**

If the Security Instrument is a deed of trust and this Agreement is entered into by one or more trustees acting on behalf of Lender in his, her or its capacity as trustee and not individually, then Tenant agrees that neither such trustees, nor any of its officers, employees, agents, or shareholders shall be personally liable under this Agreement.

**Section 11.**      **Notice.**

(a)      All notices under this Agreement shall be:

(1)      in writing, and shall be :

(A)      delivered, in person,

(B)      mailed, postage prepaid, either by registered or certified delivery, return receipt requested,

(C)      sent by overnight express courier, or

(D)      by facsimile or other electronic transmission.

(2)      addressed to the intended recipient at its respective address set forth at the end of this Agreement; and

(3)      deemed given on the earlier to occur of:

(A)      the date when the notice is received by the addressee; or

(B)      if the recipient refuses or rejects delivery, the date on which the notice is so refused or rejected, as conclusively established by the records of the United States Postal Service or such express courier service or electronic transmission.

(b)      Any party to this Agreement may change the address to which notices intended for it are to be directed by means of notice given to the other party in accordance with this Section 11.

(c)      Any required notice under this Agreement which does not specify how notices are to be given shall be given in accordance with this Section 11.

Section 12.          Counterparts.

This Agreement may be executed in any number of counterparts, each of which shall be considered an original for all purposes; provided, however, that all such counterparts shall constitute one and the same instrument.

Section 13.          Governing Law; Venue and Consent to Jurisdiction.

(a)          Governing Law.

This Agreement shall be governed by the laws of the jurisdiction in which the Mortgaged Property is located (the "Property Jurisdiction" ), without regard to the application of choice of law principles.

(b)          Venue; Consent to Jurisdiction.

Any controversy arising under or in relation to this Agreement shall be litigated exclusively in the Property Jurisdiction without regard to conflicts of laws principles.  The state and federal courts and authorities with jurisdiction in the Property Jurisdiction shall have exclusive jurisdiction over all controversies which shall arise under or in relation to this Agreement.  Tenant irrevocably consents to service, jurisdiction and venue of such courts for any such litigation and waives any other venue to which it might be entitled by virtue of domicile, habitual residence or otherwise.

Section 14.          Severability; Amendments.

The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, all of which shall remain in full force and effect.  This Agreement contains the complete and entire agreement among the parties as to the matters covered, rights granted and the obligations assumed in this Agreement.  This Agreement may not be amended or modified except by written agreement signed by the parties hereto.

[Remainder of Page Intentionally Blank]

IN WITNESS WHEREOF, Landlord, Tenant and Lender have signed and delivered this Agreement under seal (where applicable) or have caused this Agreement to be signed and delivered under seal (where applicable) by their duly authorized representative. Where applicable law so provides, Landlord, Tenant and Lender intend that this Agreement shall be deemed to be signed and delivered as a sealed instrument.

**TENANT:**

Ramsey-Peele Corporation d/b/a University Child Development Center

By _C. Ray Kennedy_

Name:  _C. RAY KENNEDY_

Title:  _President_

Notice Address: _4324 Bottering Ln_
_Charlotte NC 28215_

State of _NC_
County of _MECKLENBURG_

This instrument was acknowledged before me on _9·26·17_ (date) by
_C. Ray Kennedy_ (name/s of person/s).



_____
(Signature of Notary Public)
Print Name: _____

JOHN F. RENGER, III
NOTARY
Comm. Exp.
4-22-2021
PUBLIC
MECKLENBURG COUNTY, NC

LANDLORD:

C. Ray Kennedy

Cynthia M. Kennedy

Notice Address: _4324 Sutterwhite Ln_
_Charlotte NC 28215_

State of ___N C___
County of ___Mecklenburg___

This instrument was acknowledged before me on _9-26-17_ (date) by
_C. Ray Kennedy &_ (name/s of person/s).
_Cynthia M. Kennedy_



_____
(Signature of Notary Public)
Print Name: _____

JOHN F. RENGER III
NOTARY
Comm. Exp.
4-22-2021
PUBLIC
MECKLENBURG COUNTY, NC

LENDER:
CHERRYWOOD COMMERCIAL LENDING,
LLC, a Delaware limited liability company
By:_____
Name: Jorge L. Ramos
Title:  Executive Vice President

Address: 20955 Pathfinder Road, #205
Diamond Bar, CA 91765

---

*A Notary Public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.*

---

ACKNOWLEDGEMENT

State of California

County of Los Angeles

On September 25, 2017 before me Josh Christian Miller, Notary Public, personally appeared Jorge L. Ramos, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

Notary Public: Los Angeles County, California
Printed Name: Josh Christian Miller
My Commission expires: August 28, 2018
Commission #: ███████████

For Registration Fredrick Smith
Register of Deeds
Mecklenburg County, NC
Electronically Recorded
2017 Sep 28 12:06 PM          RE Excise Tax: $ 0.00
Book: 32154      Page: 64          Fee: $ 26.00
Instrument Number:    2017131532

## RECORDING COVER PAGE

Document Type:              Subordination of Lease

Landlord:                  C. Ray Kennedy and Cynthia M. Kennedy

Tenant:                    Ramsey-Peele Corporation

                           d/b/a University Child Development Center

PREPARED BY/
RETURN TO:
Hutchens Law Firm, 6230 Fairview Road, Ste. 315, Charlotte, NC 28210

Submitted electronically by "Hutchens Law Firm"
in compliance with North Carolina statutes governing recordable documents
and the terms of the submitter agreement with the Mecklenburg County Register of Deeds.

RECORDING COVER PAGE

Document Type:          Subordination of Lease

Landlord:               C. Ray Kennedy and Cynthia M. Kennedy

Tenant:                 Ramsey-Peele Corporation

                        d/b/a University Child Development Center

PREPARED BY/
RETURN TO:
Hutchens Law Firm, 6230 Fairview Road, Ste. 315, Charlotte, NC 28210



---------------------- [Space Above This Line For Recording Data] --------------------

## SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

This SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT (this "Agreement") dated as of September 26, 2017, is executed by and among CHERRYWOOD COMMERCIAL LENDING, LLC, a Delaware limited liability company ("Lender"), C. Ray Kennedy & Cynthia M. Kennedy ("Landlord") and Ramsey-Peele Corporation d/b/a University Child Development Center ("Tenant").

### RECITALS:

A. Tenant is leasing premises (the "Premises") that are a part of the real property located at 16701 Northcross Drive, CHARLOTTE, NC 28269 (the "Mortgaged Property") pursuant to a Lease Agreement dated as of October 1, 2017, (the "Lease") between Tenant and Landlord.

B. Pursuant to that certain Loan and Security Agreement dated as of the date hereof, executed by and between Landlord and Lender (as amended, restated, replaced, supplemented or otherwise modified from time to time, the "Loan Agreement"), Lender has agreed to make a loan to Landlord in the original principal amount of $3,000,000 (the "Mortgage Loan"), as evidenced by that certain Promissory Note dated as of the date hereof, executed by Landlord and made payable to the order of Lender in the amount of the Mortgage Loan (as amended, restated, replaced, supplemented or otherwise modified from time to time, the "Note").

C. In addition to the Loan Agreement, the Mortgage Loan and the Note are also secured by a certain Mortgage, Deed of Trust, or Deed to Secure Debt dated as of the date hereof (as amended, restated, replaced, supplemented or otherwise modified from time to time, the "Security Instrument"). The Note, the Security Instrument, the Loan Agreement and any other agreement executed in connection with the Mortgage Loan are referred to collectively as the "Loan Documents").

D. Tenant and Landlord are affiliated and Tenant has an economic interest in Landlord

Page 1 of 10

or will otherwise obtain a benefit from the Mortgage Loan. Tenant, in order to induce Lender to make the Mortgage Loan, has agreed to the assignment of the Lease to Landlord and the subordination of the Lease to the Security Instrument and the other Loan Documents in accordance with the terms of this Agreement.

## AGREEMENTS:

NOW THEREFORE, in consideration of the mutual covenants in this Agreement and for other valuable consideration, the receipt and sufficiency of which are acknowledged, Landlord, Lender, and Tenant agree as follows:

**Section 1.        Recitals**

The recitals set forth above are incorporated herein by reference as if fully set forth in the body of this Agreement.

**Section 2.        Defined Terms.**

The following terms, when used in this Agreement, shall have the following meanings:
"Foreclosure Event" means (a) the foreclosure of the Security Instrument or any other sale by Lender or any trustee for Lender pursuant to the Security Instrument or any other Loan Document; (b) any other exercise by Lender of its rights and remedies as holder of the Mortgage Loan or the Security Instrument as a result of which Lender or any other Successor Landlord acquires title to, or the right of possession of, the Mortgaged Property; or (c) acquisition of title to the Mortgaged Property in lieu of foreclosure or other conveyance of Landlord's interest in the Mortgaged Property in lieu of any of the foregoing.
"Subsequent Sale" means the first sale of the Mortgaged Property by Lender, Lender's nominee or any trustee for Lender after a Foreclosure Event.
"Successor Landlord" means any party that becomes owner of the Mortgaged Property as the result of a Foreclosure Event or a Subsequent Sale, including, without limitation, Lender and any nominee of Lender.

**Section 3.        Subordination.**

The Lease and all estates, rights, options, liens, and charges therein contained or created under the Lease are and shall be subject and subordinate to the lien and effect of the Security Instrument and the other Loan Documents insofar as it affects the real and personal property of which the Premises form a part, and to all renewals, modifications, consolidations, replacements,

and extensions thereof, and to all advances made or to be made thereunder, to the full extent of amounts secured thereby and interest thereon. Without limiting the generality of the foregoing subordination provision, Tenant hereby agrees that any of its right, title and interest in and to insurance proceeds and condemnation awards (or other similar awards arising from eminent domain proceedings) with respect to damage to or the condemnation (or similar taking) of any of the Mortgaged Property, shall be subject and subordinate to Lender's right, title and interest in and to such proceeds and awards.

**Section 4.      Default.**

Tenant acknowledges that upon, (1) the default of Landlord under any of the terms, covenants, or conditions of the Loan Agreement or this Agreement, or (2) the default of Tenant under any of the terms, covenants or conditions of the Lease or the Agreement, Lender may (a) immediately or at any time thereafter terminate the Lease, (b) name Tenant or join Tenant as a party in any suit, action or proceeding for the foreclosure of the Security Instrument or the enforcement of any rights of Lender under the Security Instrument, and (c) terminate or disturb Tenant's right to quiet enjoyment and possession of the Premises under the terms of the Lease or any of Tenant's other rights under the Lease in the exercise of Lender's rights under the Security Instrument and the other Loan Documents.

**Section 5.      Possession of the Mortgaged Property.**

In the event that a Successor Landlord acquires title to or the right to possession of the Mortgaged Property upon a Foreclosure Event or a Subsequent Sale, and Successor Landlord elects not to terminate the Lease, Lender and Tenant hereby agree to recognize one another as landlord and tenant, respectively, under the Lease and to be bound to one another under all of the terms, covenants, and conditions of the Lease. Successor Landlord shall assume all of the obligations of Landlord under the Lease subject to the provisions of this Agreement and Tenant agrees to attorn to such Successor Landlord and to recognize such Successor Landlord as "landlord" under the Lease without any additional documentation to effect such attornment (provided, however, if applicable law shall require additional documentation at the time Lender exercises its remedies then Tenant shall execute such additional documents evidencing such attornment as may be required by applicable law). Accordingly, from and after such event, Successor Landlord and Tenant shall have the same remedies against each other for the breach of an agreement contained in the Lease as Tenant and Landlord had before Successor Landlord succeeded to the interest of Landlord; provided, however, that Successor Landlord shall not be:

(a)      liable for any act or omission of any prior landlord (including Landlord);

(b)      subject to any offsets or defenses that Tenant might have against any prior landlord (including Landlord);

(c)      bound by any rent or additional rent that Tenant might have paid for more than one (1) month in advance to any prior landlord (including Landlord);

(d)      bound by any amendment or modification of the Lease made after the date of this Agreement without Lender's prior written consent;

(e)      liable for return of any security deposit not actually paid over to such Successor Landlord by the Landlord;

(f)      bound by, or liable for, any breach of any representation or warranty or indemnity agreement contained in the Lease or otherwise made by any prior landlord (including Landlord); or

(g)      personally liable for the payment of any claim hereunder or for the performance of any obligation, agreement, contribution, or term to be performed or observed by Successor Landlord hereunder or under the Security Instrument, the Loan Agreement, or any other agreement or document securing or collateral to the Security Instrument, such Successor Landlord's liability being limited in all cases to its interest in the Mortgaged Property.

**Section 6.      Delivery of Documents.**

Although the foregoing provisions of this Agreement shall be self-operative, Tenant agrees to execute and deliver to Successor Landlord, such other instrument or instruments as Successor Landlord shall from time to time request in order to confirm such provision.

**Section 7.      Representations, Warranties, Covenants and Agreements.**

Tenant hereby warrants and represents, covenants, and agrees to and with Lender:

(a)      that the Lease constitutes the entire agreement between Tenant and Landlord with respect to the Premises and there are no other agreements, written or verbal, governing the tenancy of Tenant with respect to the Premises;

(b)      not to alter or modify the Lease in any respect without prior written consent of Lender;

(c)      to deliver to Lender in accordance with Section 11 a duplicate of each notice of default delivered to Landlord at the same time as such notice is given to Landlord;

(d)      that Tenant is now the sole owner of the leasehold estate created by the Lease and

shall not hereafter transfer the Lease except as permitted by the terms thereof;

(e)     not to seek to terminate the Lease by reason of any default of Landlord without prior written notice thereof to Lender and the lapse thereafter of such time as under the Lease was offered to Landlord in which to remedy the default, and the lapse of thirty (30) days after the expiration of such time as Landlord was permitted to cure such default; provided, however, that with respect to any default of Landlord under the Lease which cannot be remedied within such time, if Lender commences to cure such default within such time and thereafter diligently proceeds with such efforts and pursues the same to completion, Lender shall have such time as is reasonably necessary to complete curing such default. Notwithstanding the foregoing, in the event either Lender or Landlord do not cure or commence curing such default within the time provided to Landlord under the Lease and the nature of the default threatens Tenant's ability to conduct its daily business or threatens to materially or adversely damage Tenant's property located on the Premises, Tenant shall be permitted to exercise its right under the Lease against Landlord;

(f)     not to pay any rent or other sums due or to become due under the Lease more than thirty (30) days in advance of the date on which the same are due or to become due under the Lease; and

(g)     to certify promptly in writing to Lender in connection with any proposed assignment of the Loan Agreement, whether or not any default on the part of Landlord then exists under the Lease.

Section 8.     Assignment.

Tenant further acknowledges that Landlord has collaterally assigned to Lender the Lease and the rents and other amounts, including lease termination fees, if any, due and payable under such leases. In connection therewith, Tenant agrees that, upon receipt by Tenant of a notice from Lender of the occurrence of a default by Landlord under such assignment and a demand by Lender for direct payment to Lender of the rents due under the Lease, Tenant will honor such demand and make all subsequent rent payments directly to Lender. Landlord hereby agrees that any rents, fees or other amounts paid by Tenant to or as directed by Lender pursuant to this section shall be deemed to have been duly and validly paid by Tenant under the Lease, and any such amounts shall be credited against Tenant's obligations under the Lease as if the same were paid directly to Landlord. Landlord and Tenant each agree that Tenant shall have no obligation to determine whether Landlord is in default under such assignment, and Tenant may rely on such notice and direction from Lender without any duty to investigate.

Section 9.     Successors and Assigns.

This Agreement shall inure to the benefit of and be binding upon the parties hereto and their successors and assigns.

### Section 10.      Trustee.

If the Security Instrument is a deed of trust and this Agreement is entered into by one or more trustees acting on behalf of Lender in his, her or its capacity as trustee and not individually, then Tenant agrees that neither such trustees, nor any of its officers, employees, agents, or shareholders shall be personally liable under this Agreement.

### Section 11.      Notice.

    (a)    All notices under this Agreement shall be:

        (1)    in writing, and shall be :

            (A)    delivered, in person,

            (B)    mailed, postage prepaid, either by registered or certified delivery, return receipt requested,

            (C)    sent by overnight express courier, or

            (D)    by facsimile or other electronic transmission.

        (2)    addressed to the intended recipient at its respective address set forth at the end of this Agreement; and

        (3)    deemed given on the earlier to occur of:

            (A)    the date when the notice is received by the addressee; or

            (B)    if the recipient refuses or rejects delivery, the date on which the notice is so refused or rejected, as conclusively established by the records of the United States Postal Service or such express courier service or electronic transmission.

    (b)    Any party to this Agreement may change the address to which notices intended for it are to be directed by means of notice given to the other party in accordance with this Section 11.

    (c)    Any required notice under this Agreement which does not specify how notices are to be given shall be given in accordance with this Section 11.

Section 12.        Counterparts.

This Agreement may be executed in any number of counterparts, each of which shall be considered an original for all purposes; provided, however, that all such counterparts shall constitute one and the same instrument.

Section 13.        Governing Law; Venue and Consent to Jurisdiction.

(a)        Governing Law.

This Agreement shall be governed by the laws of the jurisdiction in which the Mortgaged Property is located (the "Property Jurisdiction"), without regard to the application of choice of law principles.

(b)        Venue; Consent to Jurisdiction.

Any controversy arising under or in relation to this Agreement shall be litigated exclusively in the Property Jurisdiction without regard to conflicts of laws principles. The state and federal courts and authorities with jurisdiction in the Property Jurisdiction shall have exclusive jurisdiction over all controversies which shall arise under or in relation to this Agreement. Tenant irrevocably consents to service, jurisdiction and venue of such courts for any such litigation and waives any other venue to which it might be entitled by virtue of domicile, habitual residence or otherwise.

Section 14.        Severability; Amendments.

The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, all of which shall remain in full force and effect. This Agreement contains the complete and entire agreement among the parties as to the matters covered, rights granted and the obligations assumed in this Agreement. This Agreement may not be amended or modified except by written agreement signed by the parties hereto.

[Remainder of Page Intentionally Blank]

**IN WITNESS WHEREOF**, Landlord, Tenant and Lender have signed and delivered this Agreement under seal (where applicable) or have caused this Agreement to be signed and delivered under seal (where applicable) by their duly authorized representative. Where applicable law so provides, Landlord, Tenant and Lender intend that this Agreement shall be deemed to be signed and delivered as a sealed instrument.

**TENANT:**

Ramsey-Peele Corporation d/b/a University Child Development Center

By _C. Ray Kennedy_

Name: C. RAY KENNEDY

Title: PRESIDENT

Notice Address: 43 24 SMITERWYTHE LN
CHARLOTTE, NC 28215

State of ___NC___
County of ___MECKLENBURG___

This instrument was acknowledged before me on _9-26-17_ (date) by
_C. RAY KENNEDY_ (name/s of person/s).

[Notary Seal: JOHN F. RENGER III, NOTARY PUBLIC, MECKLENBURG COUNTY, NC, Comm. Exp. 4-22-2021]

_____ (Signature of Notary Public)
Print Name: _____

LANDLORD:

C. Ray Kennedy

Cynthia M. Kennedy
Notice Address: 4724 SAIDENWYTHE LN
CHARLOTTE, NC 28215

State of _NC_
County of _MECKLENBURG_

This instrument was acknowledged before me on _4-26-17_ (date) by
_C. RAY KENNEDY & CYNTHIA_ (name/s of person/s).
_(M. KENNEDY)_



_____
(Signature of Notary Public)
Print Name: _____

JOHN F. RENGER, III
NOTARY
PUBLIC
Comm. Exp.
4-22-2021
MECKLENBURG COUNTY, NC

LENDER:
CHERRYWOOD COMMERCIAL LENDING,
LLC, a Delaware limited liability company
By: _____
Name: _____ _Jorge L. Ramos__
Title: _____ EVP _____

Address: 20955 Pathfinder Road, #205Diamond
Bar, CA 91765

---

*A Notary Public or other officer completing this certificate verifies only the identity
of the individual who signed the document to which this certificate is attached, and
not the truthfulness, accuracy, or validity of that document.*

ACKNOWLEDGEMENT
State of California
County of Los Angeles

On _9/26_ , 20_17_ before me _Barbara G. Fedullo_, Notary Public, personally appeared
_Jorge L. Ramos_ who proved to me on the basis of satisfactory evidence to be the person
whose name is subscribed to the within instrument and acknowledged to me that he executed the
same in his authorized capacity, and that by his signature on the instrument the person, or the entity
upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the
foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

BARBARA G. FEDULLO
Commission # 2056760
Notary Public - California
Los Angeles County
My Comm. Expires Feb 2, 2018

Page 10 of 10

| Fill in this information to identify your case and this filing: |
|---|

Debtor 1    **Calvin Ray Kennedy**
First Name    Middle Name    Last Name

Debtor 2    **Cynthia M. Kennedy**
(Spouse, if filing)    First Name    Middle Name    Last Name

United States Bankruptcy Court for the:    WESTERN DISTRICT OF NORTH CAROLINA

Case number    **20-30208**

☐ Check if this is an amended filing

## Official Form 106A/B
## Schedule A/B: Property                                                           12/15

In each category, separately list and describe items. List an asset only once. If an asset fits in more than one category, list the asset in the category where you think it fits best. Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write your name and case number (if known). Answer every question.

| Part 1: | Describe Each Residence, Building, Land, or Other Real Estate You Own or Have an Interest in |
|---|---|

1. Do you own or have any legal or equitable interest in any residence, building, land, or similar property?

☐ No. Go to Part 2.
☒ Yes. Where is the property?

1.1

**4324 Satterwythe Lane**
Street address, if available, or other description

**Charlotte**      **NC**    **28215-0000**
City              State    ZIP Code

**Mecklenburg**
County

**What is the property?** Check all that apply
☒ Single-family home
☐ Duplex or multi-unit building
☐ Condominium or cooperative
☐ Manufactured or mobile home
☐ Land
☐ Investment property
☐ Timeshare
☐ Other _____

**Who has an interest in the property?** Check one
☐ Debtor 1 only
☐ Debtor 2 only
☒ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another

Other information you wish to add about this item, such as local property identification number:

**Parcel ID: 10518184; tax value - $645,800; Zillow value $679,2564; purchase price $240,000 - 12/1990**

Do not deduct secured claims or exemptions. Put the amount of any secured claims on *Schedule D: Creditors Who Have Claims Secured by Property.*

Current value of the entire property?      Current value of the portion you own?
**$600,000.00**                            **$600,000.00**

Describe the nature of your ownership interest (such as fee simple, tenancy by the entireties, or a life estate), if known.

**tenants by the entirety**

☐ Check if this is community property (see instructions)



EXHIBIT
9

| Debtor 1 | Calvin Ray Kennedy | | Case number *(if known)* | 20-30208 |
| Debtor 2 | Cynthia M. Kennedy | | | |

**If you own or have more than one, list here:**

1.2

**16701 Northcross Drive and
6025 Clark Creek Parkway**
Street address, if available, or other description

|  | **00000-0000** | |
|---|---|---|
| City | State | ZIP Code |

**Mecklenburg**
County

**What is the property?** Check all that apply

☐ Single-family home
☐ Duplex or multi-unit building
☐ Condominium or cooperative
☐ Manufactured or mobile home
☐ Land
☐ Investment property
☐ Timeshare
■ Other    **Day Care**

**Who has an interest in the property?** Check one

☐ Debtor 1 only
☐ Debtor 2 only
■ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another

Other information you wish to add about this item, such as local
property identification number:

Do not deduct secured claims or exemptions. Put
the amount of any secured claims on *Schedule D:
Creditors Who Have Claims Secured by Property.*

| Current value of the entire property? | Current value of the portion you own? |
|---|---|
| **$3,496,000.00** | **$3,496,000.00** |

**Describe the nature of your ownership interest**
(such as fee simple, tenancy by the entireties, or
a life estate), if known.

**tenants by the entirety**

☐ Check if this is community property
(see instructions)

**16701 Northcross Drive, Hunterville NC:  Parcel ID: 00930105; 2019 tax
value - $2,979,300. The value shown is based on market value per broker
price opinion in 2018. The property was appraised for more in 2016. This
is "daycare specific" real estate which the debtors believe has become
less valuable due to trends in the daycare industry and the significant
costs involved to convert a daycare center into a different kind of
business.**

**6025 Clark Creek Parkway, Charlotte NC:  Parcel ID: 02973604; 2019 tax
value - $1,908,000; value shown is based on market value per broker price
opinion in 2018. The property was appraised for more in 2016. This is
"daycare specific" real estate which the debtors believe has become less
valuable due to trends in the daycare industry and the significant costs
involved to convert a daycare center into a different kind of business.**

---

1.3    **If you own or have more than one, list here:**

**1 acre lot located at Kings Circle**
Street address, if available, or other description

| **Statesville** | **NC** | |
|---|---|---|
| City | State | ZIP Code |

**Iredell**
County

**What is the property?** Check all that apply

☐ Single-family home
☐ Duplex or multi-unit building
☐ Condominium or cooperative
☐ Manufactured or mobile home
■ Land
☐ Investment property
☐ Timeshare
☐ Other

**Who has an interest in the property?** Check one

☐ Debtor 1 only
☐ Debtor 2 only
■ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another

Other information you wish to add about this item, such as local
property identification number:

Do not deduct secured claims or exemptions. Put
the amount of any secured claims on *Schedule D:
Creditors Who Have Claims Secured by Property.*

| Current value of the entire property? | Current value of the portion you own? |
|---|---|
| **$9,750.00** | **$9,750.00** |

**Describe the nature of your ownership interest**
(such as fee simple, tenancy by the entireties, or
a life estate), if known.

**tenants by the entirety**

☐ Check if this is community property
(see instructions)

**Parcel No. 4649291003, Lot number 36, Kings Acres S2 PB12-58; purchase
price 1980 - $5,000; tax value - $9,750**

---

| Debtor 1 | Calvin Ray Kennedy |
| Debtor 2 | Cynthia M. Kennedy |

Case number *(if known)*   20-30208

**If you own or have more than one, list here:**

1.4  **4320 Satterwythe Lane**
Street address, if available, or other description

| | |
|---|---|
| Charlotte | NC | 28215-0000 |
| City | State | ZIP Code |

**Mecklenburg**
County

**What is the property?** Check all that apply
- ☐ Single-family home
- ☐ Duplex or multi-unit building
- ☐ Condominium or cooperative
- ☐ Manufactured or mobile home
- ☒ Land
- ☐ Investment property
- ☐ Timeshare
- ☐ Other

**Who has an interest in the property?** Check one
- ☐ Debtor 1 only
- ☐ Debtor 2 only
- ☒ Debtor 1 and Debtor 2 only
- ☐ At least one of the debtors and another

Do not deduct secured claims or exemptions. Put the amount of any secured claims on *Schedule D: Creditors Who Have Claims Secured by Property.*

| Current value of the entire property? | Current value of the portion you own? |
|---|---|
| $57,300.00 | $57,300.00 |

**Describe the nature of your ownership interest (such as fee simple, tenancy by the entireties, or a life estate), if known.**

tenants by the entirety

☐ **Check if this is community property**
(see instructions)

Other information you wish to add about this item, such as local property identification number:

**Parcel ID: 10518184; 1.011 acre vacant lot adjoining residence; 2019 tax value - $57,300**

2. Add the dollar value of the portion you own for all of your entries from Part 1, including any entries for pages you have attached for Part 1. Write that number here................................................=>

| $4,163,050.00 |
|---|

**Part 2:** Describe Your Vehicles

Do you own, lease, or have legal or equitable interest in any vehicles, whether they are registered or not? Include any vehicles you own that someone else drives. If you lease a vehicle, also report it on *Schedule G: Executory Contracts and Unexpired Leases.*

3. Cars, vans, trucks, tractors, sport utility vehicles, motorcycles

- ☒ No
- ☐ Yes

4. Watercraft, aircraft, motor homes, ATVs and other recreational vehicles, other vehicles, and accessories
*Examples:* Boats, trailers, motors, personal watercraft, fishing vessels, snowmobiles, motorcycle accessories

- ☒ No
- ☐ Yes

5. Add the dollar value of the portion you own for all of your entries from Part 2, including any entries for pages you have attached for Part 2. Write that number here................................................=>

| $0.00 |
|---|

**Part 3:** Describe Your Personal and Household Items

Do you own or have any legal or equitable interest in any of the following items?

Current value of the portion you own?
Do not deduct secured claims or exemptions.

6. Household goods and furnishings
*Examples:* Major appliances, furniture, linens, china, kitchenware
- ☐ No
- ☒ Yes. Describe.....

| Debtor 1 | Calvin Ray Kennedy | | |
|---|---|---|---|
| Debtor 2 | Cynthia M. Kennedy | Case number *(if known)* | 20-30208 |

> LIVING ROOM: sofa, 2 chair, piano ($3,000)
> DINING ROOM: table, chairs, china cabinet, buffet
> FAMILY ROOM/DEN: sofa, 2 side chairs, TV
> BEDROOMS: 5 beds, 7 lamps, 5 cabinets, 3 dressers, 6 night
> stand, table
> KITCHEN: 3 stools, refridgerator, dishwasher, microwave,
> OFFICE/GAME ROOM: exercise equipment, TV, desk, chair
> PROPERTY LOCATED OUTSIDE OF HOUSE; storage building

$5,000.00

> Property not located at residence: old Christmas decoration in
> storage at Rocky River Storage.

$100.00

**7. Electronics**
*Examples:* Televisions and radios; audio, video, stereo, and digital equipment; computers, printers, scanners; music collections; electronic devices including cell phones, cameras, media players, games

☐ No
☑ Yes. Describe.....

> 7 TVs (4 over 15 yrs old; 3 between 5 and 10 years old); 2 DVD
> players, 1 VCR, iPad, 2 cell phones, 3 radios, stereo (20 yrs old), 2
> fax machines, 5 home telephones

$300.00

**8. Collectibles of value**
*Examples:* Antiques and figurines; paintings, prints, or other artwork; books, pictures, or other art objects; stamp, coin, or baseball card collections; other collections, memorabilia, collectibles

☐ No
☑ Yes. Describe.....

> books, art objects, tapes

$200.00

**9. Equipment for sports and hobbies**
*Examples:* Sports, photographic, exercise, and other hobby equipment; bicycles, pool tables, golf clubs, skis; canoes and kayaks; carpentry tools; musical instruments

☐ No
☑ Yes. Describe.....

> used golf clubs

$200.00

**10. Firearms**
*Examples:* Pistols, rifles, shotguns, ammunition, and related equipment

☐ No
☑ Yes. Describe.....

> used pistol

$200.00

**11. Clothes**
*Examples:* Everyday clothes, furs, leather coats, designer wear, shoes, accessories

☐ No
☑ Yes. Describe.....

> used clothing

$200.00

**?. Jewelry**
*Examples:* Everyday jewelry, costume jewelry, engagement rings, wedding rings, heirloom jewelry, watches, gems, gold, silver

☐ No

| Debtor 1 | Calvin Ray Kennedy | Case number *(if known)* | 20-30208 |
|---|---|---|---|
| Debtor 2 | Cynthia M. Kennedy | | |

■ Yes.  Describe.....

| 1/2 carat diamond ring; tennis bracelet, slide bracelet, gold chain, pearl earrings/neckaces/bracelets, costume jewelry | $5,700.00 |
|---|---|

**13.  Non-farm animals**
   *Examples:* Dogs, cats, birds, horses
   ■ No
   ☐ Yes.  Describe.....

**14.  Any other personal and household items you did not already list, including any health aids you did not list**
   ☐ No
   ■ Yes.  Give specific information.....

| old Christmas decorations and other personal property having little market value | $100.00 |
|---|---|

**15.  Add the dollar value of all of your entries from Part 3, including any entries for pages you have attached for Part 3. Write that number here** ....................................................................

| $12,000.00 |
|---|

| **Part 4:** | Describe Your Financial Assets |
|---|---|

Do you own or have any legal or equitable interest in any of the following?

*Current value of the portion you own?*
Do not deduct secured claims or exemptions.

**16.  Cash**
   *Examples:* Money you have in your wallet, in your home, in a safe deposit box, and on hand when you file your petition
   ☐ No
   ■ Yes.....................................................................................................

| | Cash | $20.00 |
|---|---|---|

**17.  Deposits of money**
   *Examples:* Checking, savings, or other financial accounts; certificates of deposit; shares in credit unions, brokerage houses, and other similar institutions. If you have multiple accounts with the same institution, list each.
   ☐ No
   ■ Yes.....................
   
   Institution name:

| 17.1. | checking | Wood Forest Bank, Concord NC *3699 | $5,300.00 |
|---|---|---|---|
| 17.2. | checking | M & F Bank *3670 | $81.46 |
| 17.3. | checking | Wells Fargo *9735 | $1,200.00 |
| 17.4. | checking account | M & F Bank *7886 | $22,000.00 |

| Debtor 1 | Calvin Ray Kennedy | | Case number *(if known)* | 20-30208 |
| Debtor 2 | Cynthia M. Kennedy | | | |

18. **Bonds, mutual funds, or publicly traded stocks**
   *Examples:* Bond funds, investment accounts with brokerage firms, money market accounts
   ☐ No
   ■ Yes.................

   | | Institution or issuer name: | |
   |---|---|---|
   | | BB&T stock | $13,952.07 |

19. **Non-publicly traded stock and interests in incorporated and unincorporated businesses, including an interest in an LLC, partnership, and joint venture**
   ☐ No
   ■ Yes.  Give specific information about them...................

   | Name of entity: | % of ownership: | |
   |---|---|---|
   | Ramsey-Peele Corporation, d/b/a University Child Development Center.  Operates three day care centers in Charlotte, N.C. Two of the locations (shown on schedules) are owned by the Debtors and leased to Ramsey-Peele. Third location is leased from an unrelated third party. Company has a negative balance sheet net worth of $2.27M. | 85%       % | $1.00 |
   | Value Innovation Technologies. The debtors valued their interest in this company at $5M in 2016, which represented the cost to develop the software, and which was based on offers from investors to purchase a portion of the equity . The company owns code to a software platform which has been difficult to sell. The company owns no tangible assets of value and has debt in excess of $3M. | 85%       % | $1.00 |

20. **Government and corporate bonds and other negotiable and non-negotiable instruments**
   *Negotiable instruments* include personal checks, cashiers' checks, promissory notes, and money orders.
   *Non-negotiable instruments* are those you cannot transfer to someone by signing or delivering them.
   ■ No
   ☐ Yes. Give specific information about them
   Issuer name:

21. **Retirement or pension accounts**
   *Examples:* Interests in IRA, ERISA, Keogh, 401(k), 403(b), thrift savings accounts, or other pension or profit-sharing plans
   ■ No
   ☐ Yes. List each account separately.
   Type of account:        Institution name:

22. **Security deposits and prepayments**
   Your share of all unused deposits you have made so that you may continue service or use from a company
   *Examples:* Agreements with landlords, prepaid rent, public utilities (electric, gas, water), telecommunications companies, or others
   ■ No
   ☐ Yes. ......................        Institution name or individual:

23. **Annuities** (A contract for a periodic payment of money to you, either for life or for a number of years)
   ■ No
   ☐ Yes.............        Issuer name and description.

24. **Interests in an education IRA, in an account in a qualified ABLE program, or under a qualified state tuition program.**
   26 U.S.C. §§ 530(b)(1), 529A(b), and 529(b)(1).
   ■ No
   ☐ Yes.............        Institution name and description. Separately file the records of any interests.11 U.S.C. § 521(c):

| Debtor 1 | **Calvin Ray Kennedy** | | Case number *(if known)* | 20-30208 |
|---|---|---|---|---|
| Debtor 2 | **Cynthia M. Kennedy** | | | |

**25.  Trusts, equitable or future interests in property (other than anything listed in line 1), and rights or powers exercisable for your benefit**
- ■ No
- ☐ Yes.  Give specific information about them...

**26.  Patents, copyrights, trademarks, trade secrets, and other intellectual property**
*Examples:* Internet domain names, websites, proceeds from royalties and licensing agreements
- ■ No
- ☐ Yes.  Give specific information about them...

**27.  Licenses, franchises, and other general intangibles**
*Examples:* Building permits, exclusive licenses, cooperative association holdings, liquor licenses, professional licenses
- ■ No
- ☐ Yes.  Give specific information about them...

**Money or property owed to you?**

**Current value of the portion you own?**
Do not deduct secured claims or exemptions.

**28.  Tax refunds owed to you**
- ■ No
- ☐ Yes. Give specific information about them, including whether you already filed the returns and the tax years.......  _____

**29.  Family support**
*Examples:* Past due or lump sum alimony, spousal support, child support, maintenance, divorce settlement, property settlement
- ■ No
- ☐ Yes. Give specific information......

**30.  Other amounts someone owes you**
*Examples:* Unpaid wages, disability insurance payments, disability benefits, sick pay, vacation pay,  workers' compensation, Social Security benefits; unpaid loans you made to someone else
- ☐ No
- ■ Yes.  Give specific information..

| | |
|---|---|
| Loans/notes owed to debtors by Ramsey-Peele for rent and expenses related to day care centers (sporadic repayments of this debt is majority of income needed for debtor's living expenses). The amount owed to the debtors as of 2.20.20 was approximately $1,825,000.00. However, Ramsey Peele's current financial condition is such that, if the day care centers were to cease operating, there woud be no ability to repay this debt to the Debtors. | $0.00 |
| Value Innovation Technologies Corp. Promissory Note, face value is $246,352.53 but VIT is insolvent and unable to pay debt at this time. | $0.00 |

**31.  Interests in insurance policies**
*Examples:* Health, disability, or life insurance; health savings account (HSA); credit, homeowner's, or renter's insurance
- ☐ No
- ■ Yes. Name the insurance company of each policy and list its value.

| Company name: | Beneficiary: | Surrender or refund value: |
|---|---|---|
| **Federal Insurance Co. homeowners insurance** | | $0.00 |

| Debtor 1 | **Calvin Ray Kennedy** | | |
|---|---|---|---|
| Debtor 2 | **Cynthia M. Kennedy** | Case number *(if known)* | **20-30208** |

| | | |
|---|---|---|
| **New York whole life insurance policy no. 4327 ($250,000 base plan death benefit; cash value shown is net of loan balance - $97,820.88)** | Ray Kennedy | **$9,193.99** |
| **AARP term life insurance policy - $50,000** | Ray Kennedy | **$0.00** |
| **Health insurance:  AFLAC (Special Event, Intensive Care, Accidental and Cancer)** | | **$0.00** |
| **Health Insurance:  VA, Blue Cross Blue Shield (Medicare Supplement)** | | **$0.00** |
| **Western World (insurance on two commercial properties), premiums are paid by Ramsey-Peele** | | **$0.00** |

32. **Any interest in property that is due you from someone who has died**
    If you are the beneficiary of a living trust, expect proceeds from a life insurance policy, or are currently entitled to receive property because someone has died.
    ■ No
    ☐ Yes.  Give specific information..

33. **Claims against third parties, whether or not you have filed a lawsuit or made a demand for payment**
    *Examples:* Accidents, employment disputes, insurance claims, or rights to sue
    ■ No
    ☐ Yes.  Describe each claim.........

34. **Other contingent and unliquidated claims of every nature, including counterclaims of the debtor and rights to set off claims**
    ■ No
    ☐ Yes.  Describe each claim.........

35. **Any financial assets you did not already list**
    ■ No
    ☐ Yes.  Give specific information..

36. Add the dollar value of all of your entries from Part 4, including any entries for pages you have attached for Part 4. Write that number here................................................................................................................
    | **$51,749.52** |
    |---|

**Part 5:**  Describe Any Business-Related Property You Own or Have an Interest In. List any real estate in Part 1.

37. Do you own or have any legal or equitable interest in any business-related property?
    ■ No. Go to Part 6.
    ☐ Yes.  Go to line 38.

**Part 6:**  Describe Any Farm- and Commercial Fishing-Related Property You Own or Have an Interest In.
    If you own or have an interest in farmland, list it in Part 1.

46. Do you own or have any legal or equitable interest in any farm- or commercial fishing-related property?
    ■ No. Go to Part 7.
    ☐ Yes.  Go to line 47.

| Debtor 1 | **Calvin Ray Kennedy** | | |
|---|---|---|---|
| Debtor 2 | **Cynthia M. Kennedy** | Case number *(if known)* | **20-30208** |

| **Part 7:** | **Describe All Property You Own or Have an Interest in That You Did Not List Above** |
|---|---|

**Do you have other property of any kind you did not already list?**
*Examples:* Season tickets, country club membership

■ No
☐ Yes. Give specific information.........

54. **Add the dollar value of all of your entries from Part 7. Write that number here** ....................................      **$0.00**

| **Part 8:** | **List the Totals of Each Part of this Form** |
|---|---|

55. **Part 1: Total real estate, line 2** ........................................................................................................      **$4,163,050.00**

56. **Part 2: Total vehicles, line 5**      **$0.00**

57. **Part 3: Total personal and household items, line 15**      **$12,000.00**

58. **Part 4: Total financial assets, line 36**      **$51,749.52**

59. **Part 5: Total business-related property, line 45**      **$0.00**

60. **Part 6: Total farm- and fishing-related property, line 52**      **$0.00**

61. **Part 7: Total other property not listed, line 54**      +      **$0.00**

62. **Total personal property. Add lines 56 through 61...**      **$63,749.52**      Copy personal property total      **$63,749.52**

63. **Total of all property on Schedule A/B. Add line 55 + line 62**      **$4,226,799.52**

3 Collier on Bankruptcy P 330.03

### [d] Objecting Party Has Burden of Proof

A party objecting to the amount of time spent on services has the burden of proving that too much time was spent and cannot merely allege a general dissatisfaction with the results. In *In re Blackwood Associates, L.P.*,[54] the bankruptcy court held that a party opposing a professional's application for compensation and reimbursement of expenses must carry the burden of explaining specifically what the party finds unreasonable in the application or, at least, what would be reasonable under the circumstances. The objecting creditor's general and unsubstantiated allegations of dissatisfaction with the fee application of the debtor's attorney failed to substantively confront the tasks performed and the time allotments set forth in the application. The court explained that an objecting party has a responsibility to challenge the information presented in a fee application and to produce evidence controverting that produced by the applicant.[55]

### [e] Court's Duty to Scrutinize Time Records

It must be remembered that the adequacy of a professional's time records does not come under scrutiny only when there has been an objection to the professional's fee application. Adequate time records are an essential prerequisite to an allowance of compensation even when no interested party has objected to the claim.[56] The court has an independent obligation to review all fee applications and evaluate the propriety of the compensation requested.

### [6] Fee Application Must Identify and Explain the Entries

In order to be deemed sufficient, a professional's fee application should clearly identify, describe and explain the services and expenses charged to the estate clearly, so that the court is able to evaluate the reasonableness of the compensation requested.[57] Most courts find entries such as "telephone call" or "meeting" unacceptable without further description. Likewise, courts do not fully compensate professionals who lump a number of activities into a single entry. The practice of "lumping" is discouraged because it does not allow the court to determine whether or not the time spent on a specific task was reasonable.[58]

On the other hand, at least one court has advocated against "slavish and overburdensome record-keeping requirements" that result in long, detailed fee applications that ultimately may be of little value to the court in determining the amount of a fee award.[59] In light of the detailed guidelines for fee applications set by the Office

---

[54] *165 B.R. 108 (Bankr. E.D.N.Y. 1994).*

[55] *165 B.R. 108, 112* (quoting *Steinlauf v. Continental Ill. Corp. (In re Continental Ill. Sec. Litig.), 962 F.2d 566, 570 (7th Cir. 1992)); see also* FTC v. Capital Acquisitions & Mgmt. Corp., 2005 WL 3676529, at *6 (N.D. Ill. Aug. 26, 2005) (finding that the receiver's requested fees and expenses were reasonable because the receiver established a prima facie case which the objecting party failed to rebut.).

[56] *In re Jones, 4 C.B.C.2d 1447, 1450, 13 B.R. 192, 194 (Bankr. E.D. Va. 1980); In re Howard, 2019 Bankr. LEXIS 910, at *16 (Bankr. E.D. Wis. Mar. 22, 2019)* ("The Court has an independent duty to review each fee application, whether or not a party has objected to a portion of the fee. It is a fact-specific inquiry, and the determination of compensability is within the sound discretion of the court.").

[57] *In re Deval Corp., 592 B.R. 587, 602 (Bankr. E.D. Pa. 2018)* (providing that applicant "bears the burden of establishing by a preponderance of the evidence that requested expenses were actual and necessary" and "must detail each expense incurred for which reimbursement is sought, and their attorneys must provide adequate time records"), *aff'd, 601 B.R. 725 (E.D. Pa. 2019); In re S.T.N. Enters., Inc., 16 C.B.C.2d 1355, 70 B.R. 823 (Bankr. D. Vt. 1987).*

[58] *See In re Gurley Hous. Assocs., L.P., 2021 Bankr. LEXIS 49 (Bankr. N.D.N.Y. Jan. 12, 2021)* (reducing debtor counsel's fee application by five percent due to "lumped billing entries"); *In re GSC Group., Inc., 502 B.R. 673 (Bankr. S.D.N.Y. 2013); In re Wiedau's, Inc., 78 B.R. 904, 908 (Bankr. S.D. Ill. 1987); In re Metro Transp. Co., 78 B.R. 416 (Bankr. E.D. Pa. 1987); In re Amatex Corp. 70 B.R. 624 (Bankr. E.D. Pa. 1985); In re Affinito & Son, Inc., 63 B.R. 495 (Bankr. W.D. Pa. 1986).*

[59] *In re Frontier Airlines, Inc., 74 B.R. 973, 976 (Bankr. D. Colo. 1987).*

EXHIBIT
10

Meghan Francis

## *In re Parker*

United States Bankruptcy Court for the Eastern District of North Carolina, Raleigh Division

August 27, 2015, Decided

CASE NO. 12-03128-8-SWH

EXHIBIT

11

**Reporter**

2015 Bankr. LEXIS 2861 *; 2015 WL 5095948

IN RE: WILLIAM DOUGLAS PARKER, JR. DIANA LYNNE PARKER, DEBTOR

**Counsel:** [*1] For William Douglas Parker, Jr, aka William D. Parker, Jr, aka W.D. Parker, Jr., aka Doug Parker, Debtor: Blake P. Barnard, William P Janvier, Samantha Y. Moore, Janvier Law Firm, PLLC, Raleigh, NC; William F. Braziel, III, The Janvier Law Firm, Raleigh, NC; Charles M. Ivey, III, Greensboro, NC; Justine S. O'Connor-Petts, Janvier Law Firm, Raleigh, NC.

For Diana Lynne Parker, aka Diana L. Parker, Joint Debtor: Blake P. Barnard, William P Janvier, Samantha Y. Moore, Janvier Law Firm, PLLC, Raleigh, NC; William F. Braziel, III, The Janvier Law Firm, Raleigh, NC; Charles M. Ivey, III, Greensboro, NC; Justine S. O'Connor-Petts, Janvier Law Firm, Raleigh, NC.

**Judges:** Stephani W. Humrickhouse, United States Bankruptcy Judge.

**Opinion by:** Stephani W. Humrickhouse

## Opinion

### ORDER REGARDING FEE APPLICATION OF GEORGIA CAPITAL, LLC

The matter before the court is the application for reimbursement of legal fees, costs and expenses filed by Georgia Capital, LLC ("GCAP"). A hearing was held on March 31, 2015, in Raleigh, North Carolina.

### BACKGROUND

William Douglas Parker, Jr., and Diana Lynne Parker (the "debtors") are the owners of various tracts of real property in North Carolina, and prior to filing for bankruptcy, had engaged in the [*2] business of developing real

estate in and around Raleigh. The debtors are the primary shareholders and officers of Gregory & Parker, Inc. ("G&P") and Gregory & Parker — Seaboard, LLC ("G&P — Seaboard") (collectively, the "Companies"). To advance certain development projects, the debtors obtained loans from GCAP in 2009 and 2010.

On February 27, 2009, the debtors obtained the initial GCAP loan in the original principal amount of $2,550,000.00 ("First Loan"). As security for the First Loan, GCAP was granted a deed of trust to roughly 70 acres of undeveloped real property owned by the debtors in Garner, North Carolina and a 1.25 acre tract of land on Semart Drive in Raleigh owned by G&P. Later, the First Loan was modified to provide, as additional collateral, a .22 acre strip of land on Semart Drive. On October 14, 2010, the debtors obtained a second GCAP loan in the original principal amount of $1,400,000.00 ("Second Loan"). To secure the Second Loan, GCAP was granted a deed of trust encumbering the debtors' 262.41 acre farm in Garner and G&P's tracts in downtown Raleigh located at 518 South West Street, 801 Halifax Street, 807 Halifax Street and 5 West Franklin Street.

The debtors ultimately [*3] defaulted under the loans by failing to pay upon maturity on August 31, 2011. As a result, GCAP declared the loans in default and instituted foreclosure proceedings. On April 25, 2012, the debtors filed a petition in bankruptcy under chapter 11.[1] GCAP filed a proof of claim on June 8, 2012 in the total amount of $4,186,317.33, which included the principal balance of $3,950,000.00 and interest in the amount of $345,805.91, less a contingency reserve of $104,280.95 and a cash collateral reserve of $12,250.00.

On October 22, 2013, pursuant to the Order dated August 2, 2013 in the Companies' Case, certain of G&P's real property was sold to William Peace University for $20,750,000.00. Of this amount, GCAP received the sum of $3,100,000.00 as partial payment on its secured claim, and a balance of $1,744,444.49 ("Escrow Amount") was placed in the trust account of the closing attorneys pending further court order. Pursuant to the Order dated April 29, 2014 in the Companies' [*4] Case, GCAP received the additional sum of $1,200,000.00 from the Escrow Amount and was deemed to hold a subordinated lien in the amount of $418,544.49. The debtors retain sales proceeds in the sum of $122,595.11 ("Sales Proceeds") from the sale of a portion of GCAP's collateral, to which GCAP's lien attached pursuant to the Order dated October 24, 2014, and also continue to hold real property collateral.

On March 11, 2013, the debtors filed an objection to GCAP's claim to the extent that it included a default interest component, and by Order dated November 19, 2014, the court allowed the debtors' objection by disallowing the

---

[1] The Companies filed separate petitions under chapter 11 on February 22, 2012. Case Nos. 12-01382-8-SWH; 12-01383-8-SWH. The cases were authorized to be jointly administered by Order dated April 3, 2012 ("Companies' Cases").

default interest portion of GCAP's claim in its entirety.[2] The November 19, 2014 Order further directed GCAP to file an amended statement of claim calculated at the contract non-default rate of interest both pre- and post-petition. GCAP filed its amended proof of claim on February 2, 2015, which showed the amount of principal and interest remaining on the claim to be $0.00. On January 6, 2015, the debtors filed a motion seeking authorization to use the Sales Proceeds to pay administrative claims, to which GCAP objected on the grounds that such proceeds may still [*5] be subject to its lien. At a hearing on January 28, 2015, the court directed GCAP to file its initial application for fees, costs and expenses pursuant to 11 U.S.C. § 506(b) in order to resolve the issue.

On February 11, 2015, GCAP filed its initial application for fees, costs and expenses incurred through January 31, 2015. In its application, GCAP requests $355,464.88 in attorneys' fees[3] and $12,618.94 in costs, less $104,280.95 held in a contingency reserve account. These fees and expenses were incurred by four law firms in the following respective amounts: Nexsen Pruet, PLLC, $106,824.97; Horack Talley, $151,847.11; Miller & Martin, $92,574.64; and The Law Office of John T. Benjamin, Jr. P.A., $4,225.86.[4] GCAP contends that it is entitled to reimbursement under § 506(b) by virtue of its secured status, because the loan documents provide for such recovery, and because the fees and costs were reasonably and necessarily incurred in protecting its rights and interests in collateral. Objections were filed by both the bankruptcy administrator ("BA") and the debtors. The BA and the debtors each objected to the billing entries submitted by GCAP on the grounds that significant [*6] redactions therein prevented adequate review.[5] The debtors listed additional grounds for their objection. The debtors argue that many of the fees exceeded the scope of the loan documents and are therefore not recoverable, and also that fees are not recoverable under North Carolina law because GCAP failed to demonstrate compliance with the notice requirements of N.C. Gen. Stat. § 6-21.2. Additionally, the debtors contend that it was unreasonable for GCAP to employ four different law firms, and that the fees are unreasonable because GCAP was never in danger of nonpayment. Further, the debtors argue that the high non-default rate of interest already effectively compensated GCAP for its attorneys' fees.

---

[2] GCAP filed a notice of appeal on December 2, 2014.

[3] This figure includes $332,029.43 in attorneys' fees and $23,435.45 in legal expenses.

[4] According to Exhibit A to GCAP's fee application, the total amount billed by these four firms adds up to $355,472.58, which varies from the amount of fees sought in GCAP's prayer for relief by $7.70. In the absence of any explanation as to these differing amounts, the court will use the $355,464.88 figure provided in GCAP's prayer for relief as the total amount of fees sought.

[5] At the hearing on the application, GCAP supplied the [*7] court with unredacted versions of the billing entries for an in camera review.

## DISCUSSION

GCAP claims entitlement to fees, costs and expenses pursuant to § 506(b), which provides that:

To the extent that an allowed secured claim is secured by property the value of which . . . is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose.

Section 506(b) applies to claims for post-petition fees, costs and expenses. See In re Croatan Surf Club, LLC, Case No. 11-00194-8-SWH, 2012 Bankr. LEXIS 2369, 2012 WL 1906386, at *6 (Bankr. E.D.N.C. May 25, 2012) (analyzing and allowing pre-petition interest and fees under § 502 and post-petition fees and interest under § 506). As an initial matter, the court notes that GCAP's fee application includes fees and costs incurred both pre- and post-petition.[6] In light of the differing Code sections applicable to pre- and post-petition fees and costs, the court will separately address the pre- and post-petition amounts, and turns first to the requested post-petition fees and costs under § 506(b). To show entitlement to the requested post-petition amounts, GCAP must show that: (1) it is oversecured; (2) [*8] the underlying agreement provides for such fees and costs; and (3) the requested fees and costs are reasonable. In re Gwyn, 150 B.R. 150, 154 (Bankr. M.D.N.C. 1993). The court retains broad discretion in determining the amount of fees and expenses to be allowed under § 506(b). Id.

The court will first address whether GCAP is oversecured. The debtors argue that GCAP is not an oversecured creditor for purposes of § 506(b) because the collateral granted by G&P cannot be considered in determining GCAP's secured status in this case. However, the debtors admitted at the hearing that they simply had no support for this argument. Their argument also stands in direct contradiction to previous representations made by the debtors. Part of the basis relied on by the debtors in objecting to the default rate of interest component of GCAP's claim was that GCAP faced little or no risk because it was well oversecured. This argument also lacks legal merit, as courts have expressly determined that, at least with regard to affiliated debtor entities, collateral is to be [*9] aggregated when determining oversecured status. See In re Residential Capital, LLC, 501 B.R. 549, 598 (Bankr. S.D.N.Y. 2013) (creditor entitled to aggregate collateral across debtor entities); In re SW Hotel Venture, LLC, 460 B.R. 4 (Bankr. D. Mass. 2011) (collateral pledged by all affiliated debtors is considered in determining secured

---

[6] Although the fee application does not demarcate between pre- and post-petition fees, the court finds that the fee application contains billing entries for pre-petition services in the amount of $5,980.36.

status), aff'd in part and rev'd on other grounds sub nom. _SW Boston Hotel Venture, LLC v. City of Boston (In re SW Boston Hotel Venture, LLC), 479 B.R. 210 (B.A.P. 1st Cir. 2012)_. The court finds that any other interpretation of § 506(b) would simply "lead to inequitable and illogical results." _Residential Capital, 501 B.R. at 598_. The reasoning outlined in _Residential Capital_ is instructive:

> If, to be oversecured, and thus entitled to payment in full of all amounts owing, including postpetition interest, fees, costs, and charges in a bankruptcy case, secured lenders were required to be oversecured at a single entity, credit agreements and indentures might begin to prohibit corporate families from employing the type of complex subsidiary and affiliate structures that are currently commonplace and borrowers will be required to hold all collateral at a single entity.

_501 B.R. at 602_. Therefore, the court concludes that the first requirement under § 506(b), oversecurity, is satisfied.

Next, the court must consider whether the underlying loan documents encompass the services for which the fees and costs were incurred. The court must necessarily find that the loan documents [*10] include a provision entitling GCAP to attorneys' fees and costs, and also must find that the fees and costs for which GCAP seeks compensation fall within the scope of the provision. Thus, the court must analyze the loan documents in comparison with the billing entries. Both the First and Second Loan provide the following simple language: "In the event this Note or any part thereof is collected by or through an attorney at law, Maker agrees to pay all costs of collection, including but not limited to, reasonable attorney's fees and court costs." To the extent that GCAP's fees and costs consist of collection efforts, they will fall under the terms of the agreement and satisfy this prong of the analysis. The debtors contend that certain fees for which GCAP seeks reimbursement were incurred outside the scope of this provision, including those incurred: pursuant to efforts to dismiss the debtors' case; objecting to the debtors' efforts to sell property; coordinating objections with Conan McClain, another creditor in the debtors' case; objecting to the debtors' motions to hire professionals; and complying with third party discovery and subpoenas.

Attorneys' fee provisions are strictly construed. [*11] _See Gwyn, 150 B.R. at 155_. Clauses covering "collection efforts" do not encompass all services rendered in connection with a debtor. _Id._ Rather, the pertinent consideration is whether the services were incurred to enforce an obligation and were in furtherance of collection. _See id. at 156_. Collection includes "'anything done in an effort to secure or obtain payment of a debt or to convert property into money,' including acts to protect collateral with the aim of eventual collection," _In re Dwiggins, 359 B.R. 717, 722 (Bankr. W.D. Ark. 2007)_ (quoting _In re Williams, 183 B.R. 895, 899 (D. Kan. 1995)_), as well as participating in proceedings to expedite collection and preserve assets, _In re Winslow, Case No. 10-06745-8-JRL, 2011 Bankr._

*LEXIS 4633, 2011 WL 5902619, at \*3 (Bankr. E.D.N.C. June 22, 2011)* (quoting *Telerent Leasing Corp. v. Boaziz, 200 N.C. App. 761, 766-67, 686 S.E.2d 520, 524 (2009))*. Collection activities have been deemed to include: defending suits initiated by the debtor to the extent that doing so is necessary to the ability to collect; attending 341 meetings; filing proofs of claim; objecting to confirmation; objecting to the sale of collateral; legal research concerning the aforementioned actions; negotiations regarding plan provisions; and negotiations regarding use of creditor's cash collateral. See *Dwiggins, 359 B.R. at 723-25*; *Unsecured Creditors' Comm. 82-00261c-11A v. Walter E. Heller & Co. Se., Inc., 768 F.2d 580, 581 (4th Cir. 1985)*; *In re Steel Network, Inc., Case Nos. 09-81230, 09-81231, 2011 Bankr. LEXIS 3418, 2011 WL 4002206, at \*4 (Bankr. M.D.N.C. June 27, 2011)*; *In re Mills, 77 B.R. 413, 419 (Bankr. S.D.N.Y. 1987)*. On the other hand, courts have reduced or disallowed fees: [*12] for title work services done for a title insurance company, *Gwyn, 150 B.R. at 155-56*; for fees incurred defending itself in a civil action initiated by a shareholder of the debtor for tortious interference with contract, *Steel Network, 2011 Bankr. LEXIS 3418, 2011 WL 4002206, at \*3*; and for services in connection with the closing of a sale, *Mills, 77 B.R. at 419* (not covered by provision allowing fees for protecting or defending rights or upholding creditor's lien).

GCAP seeks post-petition attorneys' fees in the amount of $349,484.52 incurred by four separate law firms: Nexsen Pruet, Horack Talley, Miller & Martin, and the Law Office of John T. Benjamin, Jr. These firms provided various services during the period of April 2012 through January 2015. The extensive services provided include: handling pre-petition foreclosure proceedings; reviewing filings and advising GCAP as to the effect of the bankruptcy; conferences with the debtors' counsel and the trustee; conferring with GCAP representatives; legal research and preparing briefs; participating in mediation; responding to various motions and appearing in court; reviewing and filing objections to the debtors' plan and disclosure statement; preparing motions, including a motion for relief from stay and a motion to convert or dismiss; reviewing [*13] motions filed by other creditors; accounting on the loans and reserve accounts; and reviewing and advising on tax issues.

The court finds that the fees incurred for services relating to the debtors' objection to claim fall squarely within the scope of the attorneys' fee provision, as defending the objection was necessary to GCAP's ability to collect sums provided for under the loan documents. Additionally, GCAP's actions attempting to collect from Company property, including objecting to the debtors' motions to sell and hire professionals and conferring with the debtors' counsel, the client and other lienholders,[7] were related to GCAP's protection of its interest in collateral and ultimate collection on the debt. Additionally, filing the above-referenced objections and motions and reviewing motions filed by other

---

[7] Regions Bank held a first position deed of trust to property that GCAP had a security interest in.

creditors that could have affected GCAP's recovery, such as Mr. McClain's motion to convert, were in furtherance of collection. Deferring a determination of whether the fees were reasonable, the court finds that the services recounted above were aimed at collection and were provided for by the loan documents. The court also finds that the following costs were covered by the [*14] loan documents: travel expenses for GCAP representatives, telephone conference fees, and mediation fees.

However, certain fees and costs incurred by GCAP were not reasonably within the scope of collection activities. These fees include those incurred in responding to and complying with discovery requests and subpoenas from Mr. McClain. This encompasses fees billed by Nexsen Pruet in the amount of $1,628.00, by Horack Talley in the amount of $4,696.84, and by Miller & Martin in the amount of $555.00. The court will also disallow recovery of $947.00 billed by Nexsen Pruet for routine review of appellate procedural rules. Additionally, the court finds that fees in the amount of $118.00 incurred consulting with counsel for Mr. McClain about the status of the hearing on the objection to claim does not relate to collection. Therefore, $7,944.84 of the requested fees are disallowed as being outside of the scope of the attorneys' fee provision. The court finds that certain costs are also outside the scope of collection and must be disallowed, namely, meals billed by GCAP in the amount of $60.60. [*15]

Notwithstanding the court's determination that certain of the aforementioned fees and costs were provided for under the loan documents, the court still must find that those fees and costs are reasonable. The debtors maintain that the fees are not reasonable, as GCAP has never been in danger of nonpayment, charged a high non-default interest rate that already compensated it for attorneys' fees, and has not demonstrated compliance with the notice requirements of _N.C. Gen. Stat. § 6-21.2_. The debtors also argue that it was unreasonable for GCAP to use four different law firms and contest the fees to the extent they were incurred in an attempt to collect default interest.

The reasonableness limitation found in _§ 506(b)_ serves to prevent squandering of estate assets by oversecured creditors that "fail to exercise restraint in the attorneys' fees and expenses they incur, perhaps exhibiting excessive caution, overzealous advocacy and hyperactive legal efforts." _Gwyn, 150 B.R. at 155_. It has been said that the key determinant is whether the creditor engaged in "actions that similarly situated creditors might reasonably conclude should be taken." _In re F.B.F. Indus., Inc., Case No. 91-24613DWS, 1995 Bankr. LEXIS 1645, 1995 WL 691893, at *4 (Bankr. E.D. Penn. Nov. 15, 1995)_ (quoting _Dalessio v. Dalessio (In re Dalessio), 74 B.R. 721, 723 (B.A.P. 9th Cir. 1987))_ (internal quotations omitted). In that [*16] regard, the requested fees need not have been _actually_ necessary; rather, the creditor simply must have _reasonably believed_ they were necessary. _Mason & Dixon Lines, Inc. v. First Nat'l Bank of Boston, 86 B.R. 476, 484 (M.D.N.C. 1988)_. In conducting the reasonable fee inquiry, the

court must consider the twelve factors enumerated in _Barber v. Kimbrell's, Inc., 577 F.2d 216 (4th Cir. 1978)_, which

the U.S. Court of Appeals for the Fourth Circuit adopted from _Johnson v. Ga. Highway Express, Inc., 488 F.2d 714_

_(5th Cir. 1974)_. _Steel Network, 2011 Bankr. LEXIS 3418, 2011 WL 4002206, at *5_. The _Johnson_ factors are as

follows: (1) the time and labor required; (2) the novelty and difficulty of the issues; (3) the skill required to properly

perform the service; (4) the preclusion of other employment due to acceptance of the case; (5) the customary fee;

(6) whether the fee is fixed or contingent; (7) any time limitations imposed by the client or the circumstances; (8) the

amount involved and the results obtained; (9) the experience, reputation and ability of the attorneys; (10) the

undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards

in similar cases. _Id._ (citing _Johnson, 488 F.2d at 717-719_). The proper procedure is to first calculate the lodestar

figure using the _Johnson_ factors to come up with a reasonable hourly rate and reasonable number of hours. _Id. at_

_*5_ (quoting _Daly v. Hill, 790 F.2d 1071, 1078 (4th Cir. 1986)_). This figure results in a presumptively reasonable

and **[*17]** fully compensatory fee award. _Id._ The applicant bears the burden of proving reasonableness. _Steel_

_Network, 2011 Bankr. LEXIS 3418, 2011 WL 4002206, at *6_. The court will refer to a number of the _Johnson_ factors

in analyzing the present fee request.

Before considering the debtors' reasonableness objections, the court will turn to the argument that GCAP cannot

recover post-petition attorneys' fees for allegedly failing to comply with the notice requirements of _N.C. Gen. Stat. §_

_6-21.2_. The Fourth Circuit rejected this argument in _Unsecured Creditors' Comm. 82-00261c-11A v. Walter E._

_Heller & Co. Southeast, Inc. (In re K.H. Stephenson Supply Co.), 768 F.2d 580 (4th Cir. 1985)_, in which it adopted

the majority view that attorneys' fees are recoverable as part of a secured claim under _§ 506(b)_ notwithstanding

contrary state law. _768 F.2d at 583_ (specifically considering _N.C. Gen. Stat. § 6-21.2_); see also _JP Morgan Chase_

_Bank v. ELL 11, LLC, 414 B.R. 881, 884 (M.D. Ga. 2008)_ ("the [Eleventh Circuit] concurred with the four other

circuits that have addressed the [relation between state law enforceability and _§ 506(b)_] by concluding that

contractual enforceability under state law, or lack thereof, does not negate the applicability of the _§ 506(b)_

reasonableness standard.") (citing _In re Welzel, 275 F.3d 1308, 1315 (11th Cir. 2001)_); _First W. Bank & Trust v._

_Drewes (In re Schriock Constr., Inc.), 104 F.3d 200 (8th Cir. 1997)_; _Blackburn-Bliss Trust v. Hudson Shipbuilders,_

_Inc. (In re Hudson Shipbuilders, Inc.), 794 F.2d 1051 (5th Cir. 1986)_; _Joseph F. Sanson Inv. Co. v. 268 Ltd. (In re_

_268 Ltd.), 789 F.2d 674 (9th Cir. 1986)_); Colliers ¶ 506.04[3][b] (legislative history shows that attorneys' fees are

allowed despite such fees being unenforceable under state law; most courts hold that federal law applies **[*18]** over

state law). The debtors' citation to _Three Sisters Partners, L.L.C. v. Harden (In re Shangra-La, Inc.), 167 F.3d 843_

_(4th Cir. 1999)_, is misplaced; this case involved attorneys' fees under _§ 365_ rather than _§ 506(b)_, and therefore is

not relevant to the court's analysis. Furthermore, the Shangra-La court itself recognized the meaningful distinction between these two sections of the Code, stating that the language of § 506(b) "indicate[s] clear congressional intent to displace state law to the extent that it might be contrary to the written agreement." 167 F.3d at 851, n.8.[8] Therefore, GCAP was not required to comply with N.C. Gen. Stat. § 6-21.2, and any failure to do so is not fatal to its application for attorneys' fees under § 506(b).

With the Johnson factors in mind, the court next must consider the reasonableness of GCAP's fee application. The first factor, the time and labor required in the case, involves considering whether the work performed is legal work and whether the time spent was reasonable. Steel Network, 2011 Bankr. LEXIS 3418, 2011 WL 4002206, at *6. This factor is particularly relevant to this case. Included in the evaluation is the extent to which services are unnecessarily duplicative or ministerial. Id. At the hearing, counsel for GCAP represented that the firms [*19] it employed were all engaged in performing distinct services on varying issues. However, upon review of the fee applications, the court has discovered numerous instances of duplicative billing — both within and between the firms. This is evidenced by multiple attorneys working on a single project, reviewing each other's work, extensive inter- and intra-firm telephone conferences and e-mails, and even instances of double billing. For example, both Miller & Martin and Horack Talley billed for services involving: cash collateral, proof of claim, sale of collateral, reviewing and objecting to the debtors' plan, applications to employ, reviewing monthly reports, reviewing motions filed by other creditors, reviewing the status of the case, responding to discovery requests and subpoenas, filing motions, reviewing appraisals, updating accounting, reviewing and responding to motions filed by the debtors, reviewing briefs, researching default interest, reviewing and responding to the debtors' objections to claim, and reviewing orders. While surely these services were performed in satisfaction of duties owed to their client, fees attributable to "overlawyering" are not properly billed to the [*20] debtor. In re Davidson Metals, Inc., 152 B.R. 917, 921 (Bankr. N.D. Ohio 1993). Given the numerous instances of duplication, the court finds it reasonable to apply a reduction, which will be accounted for in the court's final calculation. See Steel Network, 2011 Bankr. LEXIS 3418, 2011 WL 4002206, at *7 (finding it unreasonable that five different attorneys in one office worked on the matters, which resulted in overlapping involvement and numerous inter-office conferences; applicants failed to show why using multiple attorneys was necessary or reasonable); In re McCormick, 417 B.R. 372, 375 (Bankr. M.D.N.C. 2008) (should disallow fees for services involving unnecessary duplication); In re Green Valley Beer, 281 B.R. 253, 258 (Bankr. W.D. Penn. 2002) (firm used six different attorneys, half of whom billed more than 50 hours of work,

---

[8] The Shangra-La court further stated that § 365(b)(1)(B) does not create an independent right to attorneys' fees, whereas § 506(b) does create such a right. 167 F.3d at 849, 851 n.8.

and also included work that could have been done by paralegals at a lower rate); *Citicorp Savings of Fla., a Fed. Savings and Loan Assoc. v. Oliver (In re Oliver), 183 B.R. 87, 92 (Bankr. W.D. Penn. 1995)* (unnecessary and unreasonable to employ firm whose services consisted almost entirely of conferences and correspondence with local counsel and reviewing local counsel's work).

The application also seeks reimbursement for several instances of ministerial work that is not properly billed to the debtors. Examples of ministerial work included in the fee application include: communicating with courtroom staff; printing and organizing exhibits; printing, reviewing, and calendaring; filing pleadings; scanning documents; preparing motions **[*21]** to continue; reviewing the docket; checking on rules; pulling copies of bankruptcy attorney information; preparing certificates of services; and requesting transcripts. To account for certain specific instances of ministerial services, the court will reduce the fee award by $9,185.67. See *McCormick, 417 B.R. at 375* (should disallow fees for purely ministerial services); *In re Ward, 190 B.R. 242, 248 (Bankr. D. Md. 1995)*; *Davidson Metals, 152 B.R. at 921*.

Also relevant to the time and labor required in this case, although not dispositive, is the amount billed by the debtors' counsel. The fees billed by the debtors' counsel provides "at least some evidence of the scope of the litigation and the significance of the issues." *In re Villa Capri of Ga. Assocs. Ltd. P'ship, 141 B.R. 257, 264 (Bankr. N.D. Ga. 1992)*; see also *In re Digital Products Corp., 215 B.R. 478, 482 (Bankr. S.D. Fla. 1997)*; *Davidson Metals, Inc., 152 B.R. at 920*; *In re Wire Cloth Products, Inc., 130 B.R. 798, 814 (Bankr. N.D. Ill. 1991)*. At the hearing, counsel for the debtors represented that they incurred $223,328.72 in fees for the entire duration of the case, whereas GCAP seeks to recover post-petition fees amounting to $349,484.52. Based on the debtors' representations, GCAP incurred more than one and a half times the amount of fees incurred by the debtors. This further lends credence to the court's finding that a reduction is warranted under this factor.

The next factor is the novelty and difficulty of the work involved. As in *Steel Network, 2011 Bankr. LEXIS 3418, 2011 WL 4002206*, this is a contentious case that has involved various objections, **[*22]** motions and hearings where the parties were at odds. While the court finds that these circumstances explain the use of multiple counsel and the high number of hours billed, the services were unreasonable to the extent that they involved duplicative and ministerial services. Since the court has already accounted for those unreasonable fees, a further reduction is not necessary under this factor.

The third factor is the skill required to perform the legal services at issue. The court finds that the services were of great importance to the client and its recovery, but that they were not needlessly complex. No adjustment is necessary under this factor.

The court will next consider the fifth factor, the customary fee for similar work in the community. The relevant market is the community in which the presiding court sits. _Steel Network, 2011 Bankr. LEXIS 3418, 2011 WL 4002206, at *9._ In this case, the relevant community is the Eastern District of North Carolina. The hourly fees billed by GCAP's counsel ranged between $130.00 to $440.00, averaging at around $282.00. The determination of prevailing hourly rates may be based upon personal knowledge of the court. _Id. at *10._ The court finds that the counsel employed by GCAP had a great deal of experience in bankruptcy [*23] matters, and based upon its own experience, the court finds that the rates charged fall within the range of rates charged for similar services in the community. _See Villa Capri of Ga., 141 B.R. at 262._ Similarly, the ninth factor, relating to the skill, experience and reputation of the chosen counsel, supports the hourly rates charged.

The eighth factor, the amount involved and the results obtained, appears to be the most logical factor under which to consider the debtors' argument that the fees requested should be disallowed to the extent that they were incurred pursuant to the objection to claim litigation, wherein the court ruled against GCAP. The court does not find merit in this argument, as the objection to claim centered on GCAP's right to recover a default rate of interest, which was explicitly provided for under the terms of the loan documents. It was certainly reasonable for GCAP to defend itself in this litigation, and the fact that it ultimately lost does not preclude it from recovering fees. "Success in bankruptcy litigation is not a prerequisite for an award of reasonable attorney fees to an oversecured creditor pursuant to _Section 506(b)._" _In re Mills, 77 B.R. 413, 418 (Bankr. S.D.N.Y. 1987)_; see also _In re Dwiggins, 359 B.R. 717, 722 (Bankr. W.D. Ark. 2007)_ (fee award does not depend on whether creditor prevailed in action [*24] for which services were provided). The debtors also argue that the fee request is unreasonable because GCAP was always oversecured and faced little risk. Although the court did find that GCAP faced little risk in its opinion disallowing the default rate of interest, Order Allowing Debtors' Objection to Claim, Doc. No. 537, this is not a basis to adjust the fee award. The court finds that no adjustment is warranted.

There is no evidence to warrant an adjustment based on the tenth factor, the undesirability of the case. GCAP employed four different law firms; this hardly shows that its case was so undesirable that it faced difficulty obtaining counsel. The eleventh factor involves the nature and length of the attorney-client relationship. There is evidence that while some of the attorneys were employed pre-petition, assistance of certain others was obtained in light of

specialized issues arising in the case. This factor does not affect the amount of the award to be allowed in this case.

The twelfth factor involves a consideration of awards in similar cases and has already been discussed within the context of several other factors. The court also considers two additional circumstances that [*25] do not fit neatly into any of the Johnson factors, but which courts routinely consider in analyzing fee applications: lumping and inadequate records. Lumping describes where multiple services are listed as a single time entry, making it impossible for the court to determine how much time was dedicated to the specific tasks involved. Lumping is "universally disapproved" by bankruptcy courts. _In re Staggie, 255 B.R. 48, 55 (Bankr. D. Idaho 2000)_ (quoting _In re Automobile Warranty Corp., 138 B.R. 72, 76 (Bankr. D. Colo. 1991))_ (internal quotations omitted). When presented with a fee application including lumped time entries, courts generally take one of two approaches. Some courts deny each lumped entry in its entirety, while others make a percentage adjustment. _In re Pearson_, No. 00-1086012, 2001 WL 1699657, at *5 (Bankr. M.D.N.C. Jan. 26, 2001); _see also Green Valley Beer, 281 B.R. at 259_. The time sheets included in the present fee application involve numerous instances of lumping. The court has taken this into consideration in arriving at its final fee award.

The problem with lumping is that it hinders courts from determining reasonableness, which is why it goes hand in hand with the principal that a vague or inadequate record will warrant adjustments to the award. _See Green Valley Beer, 281 B.R. at 259_ (recourse is premised on the applicant's failure to sustain its burden of proving reasonableness). Billing entries may not be descriptive enough to justify [*26] an award if services are lumped together or the record is vague. _See Davidson Metals, 152 B.R. at 920_ (disallowed portion of fees that were nondescriptive). Accordingly, the court will disallow the $15,155.00 "consultant fee" billed by Miller & Martin. Miller & Martin's time log leaves unanswered, among other things, what consulting services were provided, by whom and for how long the services were utilized. It is simply too vague to be an allowed fee. _See also Ward, 190 B.R. at 247_ (disallowed compensation for vague phrases, such as "prepare correspondence"); _Wire Cloth Products, 130 B.R. at 814_ (entries omitted nature or purpose of phone calls or who spoke with).

The same descriptiveness principle applies with regard to reasonable costs. Although the cost sheet included with GCAP's application includes dates and amounts, it leaves off pertinent details such as who incurred the costs and specifically what they were incurred for. Therefore, the court finds that only the costs incurred for mediation in the amount of $1,715.00 should be allowed.

Accordingly, the court will allow GCAP post-petition fees and expenses in the amount of $200,704.17 for attorneys' fees and $1,715.00 for costs. After applying the $104,280.95 contingency reserve credit against such amount, the amount **[*27]** payable by the debtors amounts to $98,138.22.

The inquiry is not over, however, because the court must next consider GCAP's argument that the unreasonable post-petition fees should be allowed as an unsecured claim and enforced under *§ 502*. The law is unsettled on this issue. However, the court need not decide this question because the fees and costs in question are not enforceable under *§ 502*. In that regard, the following discussion is equally applicable to the pre-petition fees sought in the fee application which the court finds are similarly barred by *§ 502*. *Section 502* provides that:

(a) A claim or interest . . . is deemed allowed, unless a party in interest . . . objects. (b) Except as provided . . . if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that —

(1) such claim is unenforceable against the debtor and property of the debtor, under any agreement *or applicable law* for a reason other than because such claim is contingent or unmatured; . . . .

*§ 502*. Therefore, enforceability under *§ 502* may be negated **[*28]** by applicable state law.

The debtors argue that applicable law precludes enforcement because GCAP failed to comply with the notice requirements of *N.C. Gen. Stat. § 6-21.2*. GCAP contests this and argues that it provided notice of the loans' maturity and demanded payment, as well as gave notice that it intended to exercise its remedies under the loan documents if not paid within 12 days. The court will now turn to the North Carolina notice requirements.

*N.C. Gen. Stat. § 6-21.2* provides that an obligation to pay attorneys' fees shall be valid and enforceable, subject to the provision that:

(5) The holder of an unsecured note or other writing(s) evidencing an unsecured debt, and/or the holder of a note and chattel mortgage or other security agreement and/or the holder of a conditional sale contract or any other such security agreement which evidences both a monetary obligation and a security interest in or a lease of specific goods, or his attorney at law, shall, after maturity of the obligation by default or otherwise, notify the maker, debtor, account debtor, endorser or party sought to be held on said obligation that the provisions relative to payment of attorneys' fees in addition to the "outstanding balance" shall be enforced and **[*29]** that such maker, debtor, account debtor, endorser or party sought to be held on said obligation has five days from

the mailing of such notice to pay the "outstanding balance" without the attorneys' fees. If such party shall pay the "outstanding balance" in full before the expiration of such time, then the obligation to pay the attorneys' fees shall be void, and no court shall enforce such provisions.

§ 6-21.2(5). Courts interpreting § 6-21.2(5) have held that the notice requirement is strictly construed. *Three Sisters Partners, L.L.C. v. Harden (In re Shangra-La, Inc.), 167 F.3d 843, 851 (4th Cir. 1999)*; *McGinnis Point Owners Assoc. v. Joyner, 135 N.C. App. 752, 757, 522 S.E.2d 317, 320 (1999)*; *Blanton v. Sisk, 70 N.C. App. 70, 74-75, 318 S.E.2d 560, 564 (1984)*. The party requesting attorneys' fees must specifically advise the debtor that it seeks to enforce the provisions of the agreement relative to payment of attorneys' fees, and must inform the debtor of its right to pay the outstanding balance without incurring attorneys' fees. *Branch Banking and Trust Co. v. Price, Case No. 12-60466, 520 Fed. Appx. 262, 2013 WL 1189238, at \*4 (5th Cir. 2013)*; *Davis Lake Community Ass'n v. Feldmann, 138 N.C. App. 292, 297, 530 S.E.2d 865, 869 (2000)*; *Hedgecock Builders Supply Co. of Greensboro v. White, 92 N.C. App. 535, 543, 375 S.E.2d 164, 170 (1999)*; *Blanton at 74-75, 318 S.E.2d at 564*. Failure to provide notice will result in the disallowance of attorneys' fees. *In re Sanjeev and Rajeev, Inc. 411 B.R. 480, 483 (Bankr. S.D. Ga. 2008)* (interpreting similar law).

The facts show that on September 1, 2011, GCAP sent notice to the male debtor that the loans had reached maturity on August 31, 2011, and declared a default and demanded immediate payment. Ex. 1 to GCAP's Rely in Support of Fee Application, Doc. No. 635-1 at 2. The notice further provided that in the event that the **[\*30]** full amount outstanding was not paid by September 12, 2011, GCAP would exercise its remedies set forth in the loan documents. Id. at 3. The notice did not, however, explicitly inform the debtors that it sought to enforce the attorneys' fee provision under the loan documents. The notice does not reference attorneys' fees at all. Therefore, the court finds that GCAP has not complied with the notice requirements of *N.C. Gen. Stat. § 6-21.2(5)*, and applicable law prevents recovery of unreasonable fees and pre-petition fees under *§ 502*.


## CONCLUSION

Accordingly, the court will disallow the requested pre-petition attorneys' fees in the amount of $5,980.36. The court will allow as part of GCAP's secured claim post-petition fees and costs in the amount of $98,138.22.[9] The

---

[9] This figure includes post-petition fees and costs in the respective amounts of $200,704.17 and $1,715.00, less the contingency reserve credit of $104,280.95.

2015 Bankr. LEXIS 2861, *30

remainder of the fees and costs being found unreasonable or outside the scope of the loan documents, in the respective amounts of $148,780.35 and $10,903.94, are disallowed.

**SO ORDERED.**

**SIGNED this 27 day of August, 2015.**

/s/ Stephani W. Humrickhouse

**Stephani W. Humrickhouse**

**United States Bankruptcy Judge**

End of Document

PUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 22-1104

COLORADO BANKERS LIFE INSURANCE COMPANY,

Plaintiff - Appellee,

v.

ACADEMY FINANCIAL ASSETS, LLC,

Defendant - Appellant.



Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh. James C. Dever III, District Judge. (5:20-cv-00185-D)

Argued: December 7, 2022

Decided: February 15, 2023

Before THACKER, HARRIS, and HEYTENS, Circuit Judges.

Affirmed by published opinion. Judge Heytens wrote the opinion in which Judge Thacker and Judge Harris joined.

**ARGUED:** Matthew Nis Leerberg, FOX ROTHSCHILD LLP, Raleigh, North Carolina, for Appellant. Lauren Elizabeth Fussell, WILLIAMS MULLEN, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Matthew W. Krueger-Andes, FOX ROTHSCHILD LLP, Charlotte, North Carolina; Aaron Z. Tobin, CONDON TOBIN SLADEK THORNTON, PLLC, Dallas, Texas, for Appellant. Camden R. Webb, Alexander M. Gormley, WILLIAMS MULLEN, Raleigh, North Carolina, for Appellee.

TOBY HEYTENS, Circuit Judge:

This appeal is governed by North Carolina law and raises two questions. First, did the district court err in granting summary judgment for Colorado Bankers Life Insurance Company in its suit against Academy Financial Assets for violating a loan agreement? Second, did the district court err in concluding a North Carolina statute requires Academy to pay 15% of the outstanding loan balance as attorneys' fees? Seeing no error, we affirm the district court's judgment.

I.

Colorado Bankers is a life, accident, and health insurance company. At all relevant times, its controlling shareholder was Greg Lindberg.

In June 2019, Colorado Bankers made several interrelated agreements with Lindberg and various other Lindberg-controlled entities, including Academy. The relevant ones here are a memorandum of understanding (MOU) and a revolving credit agreement (revolver). The MOU provided for the restructuring of various Lindberg-controlled entities, including Academy.

Under the revolver, meanwhile, Academy could borrow up to $40 million from Colorado Bankers. The revolver detailed several events that would constitute default, including the MOU's failure to become effective by March 31, 2020, or Academy's failure to pay back any outstanding principal or interest by June 30, 2020. The revolver also established various consequences for default. For example, Colorado Bankers would have the right to accelerate the loan and declare all principal and interest payable immediately. Moreover, Academy would have to pay various fees, including:

2

all out-of-pocket costs and expenses (including, without limitation, the reasonable fees, charges and disbursements of outside counsel and the allocated cost of inside counsel) incurred by [Colorado Bankers] in connection with the enforcement or protection of its rights in connection with [the revolver].

JA 554–55.

Within a few months, Academy exhausted almost the entire credit line. On March 31, 2020, Academy defaulted for the first time when the MOU failed to come into effect. The next day, Colorado Bankers accelerated the full outstanding balance and filed a breach of contract suit in state court seeking more than $40 million in damages, including the principal and accrued interest. Academy removed the case to federal court based on diversity jurisdiction. See 28 U.S.C. § 1441(a). After Academy failed to pay the still-outstanding balance in full by the June 30 maturity date, Colorado Bankers filed an amended complaint adding a second breach of contract claim.

Academy did not deny the revolver was a valid contract or that it had breached the contract. Instead, Academy asserted various "affirmative defenses seeking to excuse its performance and contend[ed] that genuine issues of material facts exist[ed] concerning whether [Colorado Bankers] failed to mitigate damages, obstructed the purposes of the agreement, waived payment, or committed a prior material breach." JA 719. The district court concluded Academy failed to raise a genuine dispute of material fact about any of its affirmative defenses. The court also determined that because the revolver "allows for reasonable attorneys' fees and does not specify a percentage," a North Carolina statute required a fee award of 15% of the outstanding loan balance without regard to "the attorneys' actual billings or usual rates." JA 725. The district court thus granted summary

3

judgment for Colorado Bankers, and determined Colorado Bankers was entitled to just under $40 million in damages; just under $5 million in prejudgment interest; and just over $6 million in attorneys' fees.

II.

We hold the district court correctly granted summary judgment for Colorado Bankers.

"We review a district court's grant of a motion for summary judgment de novo, applying the same legal standards as the district court." *Nader v. Blair*, 549 F.3d 953, 958 (4th Cir. 2008). In opposing Colorado Bankers' summary judgment motion, Academy relied solely on affirmative defenses on which it would bear the burden of proof at trial. See *Bartels v. Saber HealthCare Grp., LLC*, 880 F.3d 668, 681 (4th Cir. 2018) ("The party asserting an affirmative defense bears the burden of proving it."); see also *Wells Fargo Ins. Servs. USA, Inc. v. Link*, 827 S.E.2d 458, 472 (N.C. 2019) (breach established by showing existence of a valid contract and violation of its terms). So once Colorado Bankers met its "initial responsibility of informing the district court of the basis for its motion[] and identifying those portions of" the record it believed "demonstrate[d] the absence of a genuine issue of material fact," the burden shifted to Academy to identify "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986) (quotation marks omitted); see *Addax Energy SA v. M/V Yasa H. Mulla*, 987 F.3d 80, 85 (4th Cir. 2021) (defendant who asserts affirmative defense in opposing a summary judgment motion "must show that there is a genuine dispute of material fact").

Like the district court, we conclude Academy created no genuine dispute of material fact about its affirmative defenses. Academy insists Colorado Bankers failed to mitigate its damages and obstructed Academy's contract performance by declining to approve several third-party financing options supposedly available to Academy, which would have (the argument goes) enabled Academy to repay the loan. Academy criticizes the district court for ignoring these purported proposals and for failing to determine whether Colorado Bankers acted reasonably in rejecting them.

But there was nothing for the district court to consider. Academy's assertions that the financing options existed were based on testimony from Greg Lindberg, who controlled both Colorado Bankers and Academy during the relevant period. During his deposition, Lindberg made vague remarks that various companies were offering "tens of millions of dollars" in financing. JA 140–41. Sometimes, Lindberg was more specific about the offered sums, stating, for example, that an asset management company "was willing and able to lend" "$700 million." JA 288–89.

That was it. And in response to Colorado Bankers' summary judgment motion, Academy provided no details about the proposals Lindberg referenced—including the dates or terms of any offers, the existence (or lack) of subordination clauses, or the timelines for distributing any funds.

This lack of detail matters. Under North Carolina law, "the burden is on the breaching party [here, Academy] to prove that the nonbreaching party [here, Colorado Bankers] failed to exercise reasonable diligence to minimize the loss." *Isbey v. Crews*, 284 S.E.2d 534, 538 (N.C. Ct. App. 1981). In addition, a nonbreaching party "need not

5

pursue a particular corrective measure if a reasonable person would conclude the measure was imprudent, impractical, or would likely be unsuccessful." *Smith v. Childs*, 437 S.E.2d 500, 507–08 (N.C. Ct. App. 1993). And to make out a successful prevention of performance defense, the conduct of the allegedly obstructing party "must be wrongful, and, accordingly, in excess of his legal rights." *Goldston Bros. v. Newkirk*, 64 S.E.2d 424, 427 (N.C. 1951).

To avoid summary judgment based on its affirmative defenses, then, it was not enough for Academy to create a genuine dispute about whether refinancing offers existed. Instead, Academy needed to raise triable issues about whether any such offers could have prevented a breach of the revolver, mitigated damages, or enabled repayments *and* whether the offers' terms were sufficiently favorable that it would have been unreasonable or wrongful for Colorado Bankers to withhold its approval. See *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 761 (4th Cir. 2021) (factual dispute is only genuine and therefore capable of precluding a grant of summary judgment "if the evidence offered is such that a reasonable jury might return a verdict for the non-movant"). Academy failed to do so. Indeed, Lindberg's vague assertion about alternative financing arrangements represents precisely the sort of "conclusory testimony" that is, "without more, . . . insufficient to preclude granting [a] summary judgment motion." *Wai Man Tom v. Hospitality Ventures LLC*, 980 F.3d 1027, 1041–42 (4th Cir. 2020).

III.

We also hold the district court did not err in awarding Colorado Bankers 15% of the outstanding loan balance as attorneys' fees.

6

This Court reviews a district court's grant of attorneys' fees for abuse of discretion, but "legal determinations justifying an award . . . are reviewed de novo." *Zoroastrian Ctr. & Darb-E-Mehr of Metro. Wash., D.C. v. Rustam Guiv Found. of N.Y.*, 822 F.3d 739, 754 (4th Cir. 2016). Because this case comes down to the proper interpretation of a North Carolina statute, we review the district court's conclusion de novo. See *Salve Regina Coll. v. Russell*, 499 U.S. 225, 231 (1991) ("a court of appeals should review *de novo* a district court's determination of state law").

In North Carolina, a prevailing party is not entitled to attorneys' fees unless expressly authorized by statute. See *Hicks v. Albertson*, 200 S.E.2d 40, 42 (N.C. 1973). As relevant here, North Carolina General Statute § 6-21.2 makes "[o]bligations to pay attorneys' fees upon any . . . evidence of indebtedness . . . valid and enforceable . . . subject to" certain "provisions" set forth in the rest of the statute.

This case requires us to interpret the relationship between two of those provisions. The first—Subsection 1—addresses circumstances where the "evidence of indebtedness provides for attorneys' fees in some specific percentage of the 'outstanding balance.'" N.C. Gen. Stat. § 6-21.2(1). In that situation, "such provision and obligation shall be valid and enforceable up to but not in excess of fifteen percent (15%) of said 'outstanding balance' owing on said note, contract or other evidence of indebtedness." *Id.* Subjection 2, in contrast, applies if the "evidence of indebtedness provides for the payment of reasonable attorneys' fees by the debtor, without specifying any specific percentage." § 6-21.2(2). In that case, "such provision shall be construed to mean fifteen percent (15%) of the 'outstanding balance' owing on said note, contract or other evidence of indebtedness." *Id.*

7

Based solely on the statutory language, this case looks straightforward. Because the revolver obligates Academy to pay Colorado Bankers' attorneys' fees without "specifying any specific percentage," N.C. Gen. Stat. § 6-21.2(2), this case appears to be governed by Subsection 2. And, if so, it appears the district court was correct in making a fee award of "fifteen percent (15%) of the 'outstanding balance'" without requiring any other evidence from Colorado Bankers. *Id.*

To be sure, the final word about what a state law means rests with the State's highest court. See *Gurley v. Rhoden*, 421 U.S. 200, 208 (1975) ("a State's highest court is the final judicial arbiter of the meaning of state statutes"). Colorado Bankers suggests the Supreme Court of North Carolina addressed this issue in 1997, when it summarily affirmed a decision by the North Carolina Court of Appeals that described Subsection 2 as a "statutory mandate" requiring neither "evidence" nor "findings of fact supporting the reasonableness of" a 15% fee award. *Trull v. Central Carolina Bank & Tr.*, 478 S.E.2d 39, 44 (N.C. Ct. App. 1996), aff'd, 490 S.E.2d 238 (N.C. 1997) (per curiam).

We disagree. Under North Carolina procedure, when an appeal of right depends solely on a dissent—the situation in *Trull*—"review by the Supreme Court is limited to a consideration of those issues that are . . . specifically set out in the dissenting opinion as the basis for that dissent." N.C. R. App. P. 16(b). Because the dissenting opinion in *Trull* did not address the relationship between Subsection 1 and Subsection 2 or whether Subsection 2 requires proving the reasonableness of a fee award, see *Trull*, 478 S.E.2d at 44 (Walker, J., concurring in part and dissenting in part), those issues were not before the Supreme Court of North Carolina.

8

Lacking direct guidance, we must "predict" how the Supreme Court of North Carolina "would rule if presented with the issue." *Private Mortg. Inv. Servs., Inc. v. Hotel & Club Assocs., Inc.*, 296 F.3d 308, 312 (4th Cir. 2002). In doing so, the decisions of intermediate appellate courts "constitute the next best indicia of what state law is." *Id.* (quotation marks omitted). Unlike those of the State's highest court, however, such decisions are never binding and "may be disregarded if the federal court is convinced by other persuasive data that the highest court of the state would decide otherwise." *Id.* (quotation marks omitted).

The problem here is that North Carolina's intermediate appellate court appears to have tackled this issue in conflicting ways. It is true that the North Carolina Court of Appeals has applied Subsection 1 to an agreement containing no percentage but providing for reasonable fees "but not more than such attorneys' usual hourly charges for the time actually expended." *Barker v. Agee*, 378 S.E.2d 566, 570 (N.C. Ct. App. 1989), aff'd in part, rev'd in part on other grounds, 389 S.E.2d 803 (N.C. 1990). But the same court has also stated a trial court "correctly chose to apply" Subsection 2 to a contract that did not specify a percentage and provided for "reasonable attorneys' fees" which "shall be such as to fully reimburse all attorneys' fees reasonably incurred." *North Carolina Indus. Cap., LLC v. Clayton*, 649 S.E.2d 14, 23 (N.C. Ct. App. 2007). Likewise, Academy is right that North Carolina's intermediate appellate court has described Subsection 2 as setting a "statutory *ceiling* of fifteen percent" and affirmed fee awards of less than 15% under that provision. *Telerent Leasing Corp. v. Boaziz*, 686 S.E.2d 520, 523–24 (N.C. Ct. App. 2009) (emphasis added). But that same court has also—and not just in *Trull*—described

9

Subsection 2 as having "predetermined that 15% is a reasonable amount" and rejected arguments that a plaintiff must provide "evidence of what percentage will be reasonable in" cases covered by that provision. *RC Assocs. v. Regency Ventures, Inc.*, 432 S.E.2d 394, 397 (N.C. App. 1993).\*

Academy insists the various decisions can be reconciled and, in any event, the ones favoring its position are "the controlling precedent" under the North Carolina courts' approach to stare decisis. Academy Reply Br. 21. Academy also insists "[t]he weight of recent cases in lower courts"—specifically decisions by federal district and bankruptcy courts—supports its views. Academy Br. 42 (quotation marks omitted).

But all of this is taking us rather far afield. Our task is not to determine how North Carolina's intermediate appellate court would—or should—resolve any tension within its own precedent. Nor is it to tally up the decisions supporting one position or the other. Instead, because "North Carolina currently has no mechanism for us to certify questions of state law," *Town of Nags Head v. Toloczko*, 728 F.3d 391, 398 (4th Cir. 2013), our job is to predict—as best we can—how the Supreme Court of North Carolina would rule if presented with the issues before us.

---

\* Academy employs selective editing in asserting the North Carolina Court of Appeals has described Subsection 2 as "'a fall-back only,' should the parties not provide their own methodology." Academy Br. 43 (quoting *Coastal Prod. Credit Ass'n v. Goodson Farms, Inc.*, 319 S.E.2d 650, 654 (N.C. Ct. App. 1984)). What that decision said is that the legislature "apparently intended" that Subsection 2 operate "as a fall-back only in case the agreement contained nothing regarding the parties' intent *as to what constituted a reasonable percentage.*" *Id.* (emphasis added). Indeed, that decision states Subsection 2 "becomes operative" only when a contract "fail[s] to specify *any* percentage" (*id.*), which is precisely the situation here.

10

Without clearer guidance, we predict North Carolina's highest court would follow
its repeated admonitions that "[s]tatutory interpretation properly begins with an
examination of the plain words of the statute." *JVC Enters., LLC v. City of Concord*,
855 S.E.2d 158, 161 (N.C. 2021) (quotation marks omitted). We also think this is a
situation when that court would say it must "give effect to the plain meaning of the statute,
and judicial construction of legislative intent is not required." *Matter of J.E.B.*, 853 S.E.2d
424, 428–29 (N.C. 2021) (quotation marks omitted).

This statute's plain words divide the world into two types of fee-shifting provisions:
those that "provide[] for attorneys' fees in some specific percentage of the 'outstanding
balance'" and those that "provide[] for the payment of reasonable attorneys' fees . . .
without specifying any specific percentage." N.C. Gen. Stat. § 6-.21.2(1)–(2). Because the
revolver provides for "the reasonable fees, charges and disbursements of outside counsel
and the allocated cost of inside counsel," JA 554–55, without mentioning any specific
percentage, it is governed by Subsection 2. Subsection 2, in turn, provides the revolver
"*shall* be construed to mean" that Academy is required to pay "fifteen percent (15%) of the
'outstanding balance'" as attorneys' fees. N.C. Gen. Stat. § 6-21.2(2) (emphasis added). It
is "well established" in North Carolina "that the word 'shall' is generally imperative or
mandatory," *Multiple Claimants v. North Carolina Dep't of Health & Hum. Servs.*,
646 S.E.2d 356, 360 (N.C. 2007), and here the inference is strengthened by the legislature's
use of "up to but not in excess of fifteen percent (15%)" in the directly neighboring
Subsection 1. The district court thus did not err in imposing a 15% fee award.

Academy offers two responses, but neither is persuasive. Academy's first argument is that Subsection 2 "has no application here . . . because the parties spelled out what fees could be shifted—out-of-pocket expenses—and in which circumstances." Academy Br. 15. That approach has no basis in the statutory text. True, as Academy points out, the introductory language to N.C. General Statute § 6-21.2 provides that private agreements to shift fees are "valid and enforceable." See Oral Arg. 2:24–3:00. The problem, however, is the same provision later clarifies such agreements are *only* valid and enforceable "subject to the following provisions," which include Subsections 1 and 2. N.C. Gen. Stat. § 6-21.2; see *Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23, 36 (2012) ("[T]he first rule of . . . statutory interpretation is: Read on."). In short, the statutory text provides no basis for enforcing a fee-shifting agreement without considering either Subsection 1 or Subsection 2.

Shifting gears, Academy insists this case is governed by *both* Subsections. According to this version of the argument, Subsection 2 establishes only a rule of construction by stating a fee shifting clause containing no percentage "shall be construed" as containing a 15% cap, N.C. Gen. Stat. § 6-21.2(2), at which point a court must return to Subsection 1 to determine the amount of fees that is ultimately permissible. Academy further insists Subsection 1 not only renders unenforceable any contractual provision setting fees "in excess of fifteen percent (15%)," § 6-21.2(1)—it *also* directs courts to require documentation and make a reasonableness finding supporting any fee award, no matter what the contract says.

12

Although we acknowledge various federal district and bankruptcy courts have adopted this view, we decline to do so. While perhaps appealing as a policy matter, Academy's argument has scant basis in the statutory text, and Academy has identified no compelling reason for concluding the Supreme Court of North Carolina would interpret the statute in such an atextual manner. We thus hold the district court did not err in following the plain language of the statute and imposing a 15% fee award without requiring evidence of "the attorney's actual billings or usual rates." JA 725.

\*     \*     \*

It is certainly possible the Supreme Court of North Carolina would see matters differently than we have. But Academy is the party that chose a federal forum by removing Colorado Bankers' suit from state court to federal court, so we must do our best to predict what North Carolina's highest court would do. Having done so, the district court's judgment is

*AFFIRMED.*

IN THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

IN RE:

CALVIN RAY KENNEDY a/k/a                          CASE NO.: 20-30208
C. RAY KENNEDY and                                CHAPTER 11
CYNTHIA M. KENNEDY,

                    Debtors.

## CERTIFICATE OF SERVICE

I, William Walt Pettit as attorney of record for Wilmington Savings Fund Society, FSB, d/b/a Christiana Trust, not in its individual capacity but solely as Owner Trustee of Residential Credit Opportunities Trust II, hereby certify that on the __15__ day of August, 2023, I served a copy of the Witness and Exhibit List by either electronic notice in accordance with the local rules or by depositing the same, enclosed in a postpaid, properly addressed wrapper, in an official depository under the exclusive care and custody of the United states Postal Service, said envelope being addressed as follows:

Calvin Ray Kenney                          James H. Henderson, Esq.
Cynthia M Kennedy                          The Henderson Law Firm, PLLC
4324 Satterwythe Lane                      (by ECF service)
Charlotte NC 28215

Shelley Abel, Esq.                         Michael Leon Martinez, Esq.
U.S. Bankruptcy Administrator's Office     Grier Wright Martinez, PA
(by ECF service)                           (by ECF service)

Stacy Cordes, Esq.
Cordes Law, PLLC
(by ECF service)

                    HUTCHENS LAW FIRM LLP
                    Attorneys for Wilmington Savings Fund Society, FSB, d/b/a
                    Christiana Trust, not in its individual capacity but solely as
                    Owner Trustee of Residential Credit Opportunities Trust II

                    By:_____
                        William Walt Pettit
                        N.C. Bar No. 9407
                        6230 Fairview Road, Suite 315
                        Charlotte, N.C. 28210
                        Telephone: (704) 362-9255
                        Email: walt.pettit@hutchenslawfirm.com