

FILED & JUDGMENT ENTERED
Steven T. Salata

December  7  2023

Clerk, U.S. Bankruptcy Court
Western District of North Carolina



J. Craig Whitley
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **CALVIN R. KENNEDY** | ) | Case No. 20-30208 |
| **CYNTHIA M. KENNEDY,** | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | |
| | ) | |

## ORDER AWARDING LENDER'S ATTORNEY'S FEES UNDER
## SECTION 506(b) IN PART, DENYING IN PART

**THIS MATTER** is before the Court upon Wilmington Savings'[1] Application for

compensation for Attorney's fees and expenses, filed March 4, 2022 ("Original Application")

and its Amended Application for Compensation ("Amended Application") (collectively the

"Application"), filed on June 6, 2023. *Wilmington Savings' Application for Compensation*, Case

No. 20-30208, Doc. 133 (Mar. 4, 2022); *Wilmington Savings' Amended Application*, Case No.

20-30208, Doc. 192 (June 6, 2023).  Objections were filed by Calvin and Cynthia Kennedy

("Kennedys" or "Debtors") on March 19, 2022, and supplemented on August 29, 2022

("Supplemental Objection") (collectively the "Objections").  *Debtors' Objection*, Case No. 20-

30208, Doc. 135 (Mar. 19, 2022); *Debtors' Supplemental Response*, Case No. 20-30208, Doc.

---

[1] The creditor's full legal name is Wilmington Savings Fund Society, FSB d/b/a Christina Trust, not in its individual
capacity but solely as Owner Trustee of Residential Creditor Opportunities Trust II, but will be hereinafter
("Wilmington Savings").

156 (Aug. 29, 2022).  After many months of the parties variously negotiating and sparring over this Section 506(b) application, a hearing was held on August 17, 2023.

At that hearing, the Debtors were represented by James Henderson of the Henderson Law Firm, and Wilmington Savings was represented by William Pettit of Hutchens Law Firm. Having considered the evidence and legal arguments presented, the Court enters this Memorandum Opinion.

## PROCEDURAL POSTURE

Wilmington Savings, a mortgage creditor of the Debtors, seeks to recover its attorney's fees and expenses pursuant to 11 U.S.C. § 506(b) and Rule 2016(a).  Fed. R. Bankr. P Rule 2016(a).  In total, Wilmington Savings seeks $70,529.00 in fees and $1,558.85 in expenses. These sums represent work performed by Wilmington Savings' counsel in this protracted Chapter 11 case and in pursuing a state court collection action against a nondebtor guarantor. Wilmington Savings also seeks a small amount of fees incurred in litigating this Application ("Fees on Fees").

The Debtors say Wilmington Savings' attorney's fees are "egregious," and unnecessary. *Debtors' Objection*, Doc. 135 at p. 1.  The Debtors believe they have been "treated unfairly" by Wilmington Savings during the case.  *Testimony of Cy Kennedy* at 29:00, Case No. 20-30208, Doc. 208 (Aug. 17, 2023).  While the Debtors take issue with billings for specified tasks, their overarching contentions are that Wilmington Savings was unduly aggressive in the case and that it unreasonably rejected the Kennedys' plan proposals.  Otherwise, much of the legal work in question would have been avoided.  The Debtors ask that the Application be denied.

# BACKGROUND

The Kennedys filed a voluntary Chapter 11 petition on February 19, 2020.[2] Their plan for reorganization was not confirmed until January 11, 2022, almost two years after the filing.

At the bankruptcy date, the Kennedys owned[3] and operated a business known as The Ramsey-Peele Corporation ("Ramsey-Peele").    Ramsey-Peele d/b/a University Child Development Center operates three licensed day care centers in Charlotte, NC.  The Day Cares serve children from underprivileged communities.  All three locations are leased by Ramsey-Peele.  Two of these locations are owned by the Kennedys (6025 Clarke Creek and 16701 Northcross Drive) (the "Collateral Properties").

The Collateral Properties were originally financed through Cherrywood Commercial Lending ("Cherrywood").  Specifically, in September 2017, the Kennedys borrowed $3M from Cherrywood, pursuant to a promissory note ("Mortgage loan").  The Mortgage Loan was secured by a Deed of Trust on the Collateral Properties as well as by an assignment of leases or rents, security agreements, and fixture filings.  Ramsey-Peele is a guarantor of the Mortgage Loan.  Later, Wilmington Savings purchased the debt from Cherrywood.  It is now the holder of the Mortgage Loan and the associated collateral and guaranty.

Wilmington Savings is an investment trust that has no employees.  A related company, PHH Mortgage Services ("PHH") services the Mortgage Loan on behalf of Wilmington Savings.[4]

---

[2] The case was filed as a Subchapter 5 reorganization, the first filed in this District.  However, the Kennedys were considerably over the statutory liability caps for Subchapter 5.  Thus, on Feb. 25, 2020 the Debtors and the Bankruptcy Administrator stipulated that the election would be rescinded and that the case would proceed as a standard Chapter 11 reorganization.  *See Stipulation and Consent Order Rescinding Debtors' Small Business Designation and Subchapter V Election,* Case No. 20-30208, Doc. No. 11 (Feb. 25, 2020).

[3] The Debtors owned a controlling membership interest, with the remaining membership units being held by family members.

[4] Unless otherwise stated, when we refer to the activities of Wilmington Savings, we mean those taken by PHH on its behalf.

Although Wilmington Savings has been the Kennedys' principal adversary in this reorganization,[5] this bankruptcy case was not occasioned by the debt owed to Wilmington Savings. In fact, payments on the Mortgage Loan were substantially current on the filing date.[6] Rather, this chapter 11 case was filed due to the demise of another of the Kennedys' businesses, American Product Distribution ("AMD"), a product distribution business. AMD struggled and subsequently closed in 2018. Among other trade debts, AMD left behind a $2.1M obligation owed to supplier, Essendant, Co. ("Essendant"). The Essendant debt was personally guarantied by the Kennedys.

Essendant obtained a judgment against the Kennedys and then domesticated that judgment in Mecklenburg County in November of 2019. This created a lien against all of the Kennedys' real property, including the Collateral Properties. To prevent those liens from becoming final (meaning, unavoidable),[7] the Kennedys filed Chapter 11.

Although not the cause of the bankruptcy case, Wilmington Savings was quickly drawn into the Kennedys' bankruptcy. Through counsel—Walt Pettit ("Pettit")—Wilmington Savings filed a notice of appearance on March 5, 2020. This was followed by a secured proof of claim for $2,927,332.40, filed April 9, 2020. The Debtors suggest that Wilmington Savings' active involvement in this reorganization was largely unnecessary; however, it was inevitable that the first priority lender on the Debtors' most valuable property would have a substantial role. Still, two strategic decisions made by the Debtors precipitated Wilmington Savings' active involvement.

---

[5] Essendant Corporation, another creditor, comes in as a close second.
[6] Technically, the loan was in default due to the presence of junior liens on the Collateral Properties and potentially for escrow shortages.
[7] The case was filed 89 days after domestication, so the judgment liens were potentially avoidable as preferences under 11 U.S.C. § 547.

**Cash Collateral Use**

The first flash point occurred almost immediately.  The Debtors failed to seek approval for their use of cash collateral under Bankruptcy Code Section 363. 11 U.S.C. § 363.  Under Section 363, Chapter 11 debtors are required to obtain lender consent and usually court approval to use a creditor's "cash collateral," meaning soft collateral subject to dissipation (like accounts receivables, inventory, and rents).  11 U.S.C. §§363(a)-(b).  Such approval is sought through "first day" motions.  10 *Collier on Bankruptcy* ¶ 6003.01[2][a], (16th ed. 2023).  The Kennedys did not file such a motion.

The written lease of the Collateral Properties requires Ramsey-Peele to pay the Kennedys' monthly lease payments of $32,000.00.  Wilmington Savings has an assignment of the rents derived from those two properties.  Thus, the lease payments serve as additional collateral for Wilmington Savings' Mortgage Loan.  However, at the bankruptcy date, and for some time beforehand, the Kennedys were not collecting lease payments from Ramsey-Peele.[8]

Over its 35-year lifetime, Ramsey-Peele has not always been profitable.  The Kennedys have from time to time made member loans to Ramsey-Peele to keep it in business.  At the bankruptcy date, Ramsey-Peele owed the Debtors $1,825,000 on such documented loans.[9]

Ramsey-Peele lacked the ability to simultaneously pay its operating expenses, lease payments, and repayments of the Kennedys' member loans.  For tax, and perhaps, other reasons,[10] the Debtors chose to have Ramsey-Peele repay their member loans while foregoing lease payments on the Collateral Properties.[11]  In the year prior to bankruptcy, the Kennedys

---

[8] *See Debtors' Statement of Financial Affairs*, Case No. 20-30208, Doc. 27 at p.33 (Mar. 16, 2020).
[9] The member loans were memorialized in promissory notes.  *See Debtors' Statement of Financial Affairs*, Doc. 27 at p.36.
[10] And possibly because Wilmington had the assignment of rents on the Collateral Properties but no liens on the Kennedys' personal property.
[11] This is contradictory to the Debtors' Schedules which suggest that say that Ramsey-Peele makes the $28,649.70 monthly mortgage payment to PHH and pays additional sums to the Debtors only when able to do so.  *See Statement of Financial Affairs*, Doc. 27 at p.24.

caused Ramsey-Peele to repay $750,000 (per Cy's testimony) and $105,000 (per *Debtors'*
*Statement of Income*) of their member loans, while making no lease payments whatsoever.
*Testimony of Cy Kennedy* at 25:30, Doc. 209 (Aug. 17, 2023); *see also Debtors' Statement of
Income*, Case No. 20-30208, Doc. 27 at p. 39 (Mar. 16, 2020).

The Kennedys' 'loan versus rent' decision was not an issue prior to bankruptcy.  The
Kennedys used a portion of the loan repayments they received from Ramsey-Peele to make the
monthly mortgage payments ($28,291.84 per month) to Wilmington Savings.  Because its loan
was not in default, Wilmington Savings had no reason to enforce its assignment of rents.  Thus, it
remained unaware of Ramsey-Peele's precarious financial position and the Kennedys' decision
not to collect rent.

After bankruptcy, the Debtors and their counsel rationalized that because the Kennedys
weren't collecting lease payments from Ramsey-Peele, they were not really using Wilmington
Savings' rents (its cash collateral).[12]  The Debtors therefore concluded that no court authorization
was needed and they chose not to communicate this decision to Wilmington Savings.

**The Debtors' Willfully Default on Postpetition Payments**.

A second flash point occurred when immediately after bankruptcy the Kennedys failed to
pay Wilmington Savings the March installment payment on the Mortgage Loan.

In January 2020, the Centers for Disease Control and Prevention (CDC) alerted the
Nation to the outbreak of Covid-19 abroad.  Centers for Disease Control and Prevention, *CDC
Museum    COVID-19    Timeline*    (last    visited:    Dec    4,    2023)
https://www.cdc.gov/museum/timeline/covid19.html#.  Later that month, the first national case
of COVID-19 was reported in Washington state.  *Id.*  By March 2020, COVID-19 was deemed a
global health emergency and a pandemic.  *Id.*  Businesses around the United States began to

---

[12] As described below, this was an imprudent assumption.

close. *Id*. On March 27, 2020, Governor Cooper signed an executive order directing North Carolinians to stay at home for thirty days to slow the spread of the virus. North Carolina Department of Health and Human Services, *Governor Cooper Announces Statewide Stay at Home Order until April 29* (Mar. 27, 2020) https://www.ncdhhs.gov/news/press-releases/2020/03/27/governor-cooper-announces-statewide-stay-home-order-until-april-29.

The Kennedys blame the Pandemic for their failure to make the March 2020 mortgage payment to Wilmington Savings. While they admit that they continued to receive substantial payments from Ramsey-Peele and had the money to make the payment, the Kennedys chose to "protect their cash."[13] *Debtors' Supplemental Response*, Doc. 156 at p. 1. Once again, the Debtors did not consult with Wilmington Savings about this decision.[14] Thus, in the early weeks of the case, the mortgage loan went into payment default for the first time. A second mortgage payment was missed in April, for the same reasons.

This combination of events prompted a reaction. On April 27, 2020, Wilmington Savings filed a motion to prohibit the Kennedys from using its cash collateral (i.e., the rents), and alternatively asked for relief from stay to foreclose on the Collateral Properties.[15] *Wilmington Savings' Motion to Prohibit Use of Cash Collateral*, Case No. 20-30208, Doc. 32 (Apr. 27, 2020). And as agreed upon in its loan documents, Wilmington Savings began charging default rate interest (11.75% versus the usual 7.75% contract rate) on the debt.

At the May 28, 2020, hearing on the Motion, this Court was apprised that that the Kennedys were collecting loan repayments (noncollateral) from Ramey-Peale in lieu of lease

---

[13] Given the Debtors subsequent efforts to artificially impair Wilmington Savings' oversecured claim (discussed below), it is entirely possible that their decision not to pay was also made for strategic bankruptcy purposes.

[14] Legally, Wilmington Savings was not necessarily entitled to continue to collect its mortgage payments after bankruptcy. If adequately protected by an equity cushion, the lender might have to wait until confirmation for these to resume. However, in practice, Chapter 11 debtors typically continue to make payments to avoid the accrual of interest, late fees, and significantly, motions by the affected seeking adequate protection or relief from stay. Here, however, there had been no prior payment defaults so the Debtors failure to make the payment was noteworthy.

[15] The Motion also sought a ruling declaring this to be a Single Asset Real Estate Case under 11 U.S.C. § 101(51B).

payments (putatively, cash collateral). This fact did not sit well with Wilmington Savings.[16] Nor did the fact that by this point the Debtors were past due for the May payment. However, the parties were able to put a band-aid on their disputes and agreed that the Debtors could use "cash collateral" for one month under a reservation of rights. This use was premised on the Debtors paying Wilmington Savings one monthly mortgage payment $28,291.84 by June 5, 2020. *Order Continuing Motion to Prohibit Use of Cash Collateral*, Case No. 20-30208, Doc. 39 at p. 2 (June 5, 2020).

Given the circumstances—payment defaults, COVID-19 shutdowns, lack of lease payments—Wilmington Savings wanted to keep close tabs on this situation. The hearing was continued one month, until June 23, 2020. This was the first of nine short-term cash collateral orders under which the parties proceeded until a plan was confirmed on January 28, 2021. Each continuance and each order were consensual.

As detailed below, the Kennedys did not substantially cure the postpetition mortgage payment defaults[17] until August 24, 2020. At that time, they made an $84,875 payment to catch up the payments. However, in the interim, other difficulties had arisen between these parties.[18]

**Early Discussions about Wilmington Savings' Secured Status.**

As noted, Wilmington Savings was owed a debt of $2,935,046.21 on the petition date. The Debtors scheduled the value of the Collateral Properties as being $3,496,000, so Wilmington Savings was an oversecured creditor. Under the Code, an oversecured creditor is entitled to recover not just its principal, but interest on the debt, and potentially its attorney's fees and expenses. 11 U.S.C. § 506.

---

[16] Whether deemed Lease Payments or debt repayments, the monies paid by Ramsey-Peele to the Debtors derived from the operation of the Collateral Properties. Thus, Wilmington Savings considered them to fall under its assignment of rents. The Debtors did not agree with this interpretation. The issue was never actually litigated.
[17] Excluding the default interest, which was not paid until confirmation.
[18] Among these, Wilmington Savings maintains that the Debtors defaulted on the June, July, and August payments. The record is unclear whether these payments were missed.

In this fee dispute, the Debtors have asserted that the actual value of the Leased Properties is $5,405,000.00. *Debtors' Supplemental Response*, Doc. 156 at p. 1. Depending on which (if either) valuation is correct, Wilmington Savings had an equity cushion between $560,000 and $2.4M.[19]

However, Pettit recalls that in early discussions with Henderson, Debtors' counsel asserted that the Collateral Properties may be worth less than the debt. *Wilmington Savings' Reply to Debtors' Response*, Doc. 204 at p. 1. Henderson does not remember making this statement, and the evidence is inconclusive as to whether this statement was made. It is clear that in an April 28, 2020 email to Pettit, Henderson asserted the $560,000 equity cushion but acknowledged that this was "gross equity." *Debtors' Exhibit E*, Trial Exhibits, p. 2. And, he continued, "the pandemic is a wildcard which may or may not depress day care center values." *Id*. Pettit thought Henderson had asserted that Wilmington Savings was undersecured. True or not, this affected Wilmington Savings' state of mind and subsequent actions in the case.

**Early Plan/Settlement Negotiations**

In the aforementioned email chain—before the cash collateral hearing—Wilmington Savings/Pettit concluded that the Debtors and Ramsey-Peele lacked the ability to pay their debt, much less their other creditors. Pettit encouraged the Debtor to sell the property, arguing that they would walk away with $2 million. *Debtors' Exhibit E,* Trial Exhibits, p. 1. Henderson's April 28 reply went the other way—he wanted to "make [Wilmington Savings] happy and impaired and in favor of a Chapter 11 plan." *Debtors' Exhibit E*, Trial Exhibits, p. 2. To this end, Henderson's counter proposal was: Wilmington Savings waives its default interest, agrees to a modification of its debt (capitalize the April payment and extension of the loan term by a couple of months), and supports the Debtors' plan in exchange for the Debtors making the May

---

[19] A debtor is generally not permitted to impeach his schedules. *See In re Arcade Pub. Inc.*, 455 B.R 373, 382 n. 11 (Bankr. S.D.N.Y. 2011).

payment and promising to not otherwise attempt to modify Wilmington Savings' rights as a secured creditor. *Id*. Wilmington Savings found this offer unacceptable.

On May 15, 2020, and with the Debtors now three months in default, Henderson again proposed plan treatment for Wilmington Savings' mortgage loan. He proposed that the missed mortgage payments be added "on the back end" of the mortgage, the remaining terms of Wilmington's loan and its security documents would remain the same, and Wilmington Savings would vote for and support the Debtors Plan. In return, the Debtors would recommence ongoing mortgage payments in June of 2020.

At hearing, Henderson explained these proposals. With Essendant controlling the unsecured creditor class and being at odds with the Debtors (who sought to avoid its liens), Henderson needed to impair Wilmington Savings' claim in order to cram down a plan on Essendant and other unsecured creditors. This would meet the Section 1129(a)(10) confirmation requirement of having one "impaired" class vote in favor of the Plan. Since Wilmington Savings was oversecured and the Debtors had the money to pay the mortgage payments, Henderson was strategically attempting to create an artificial impairment. However, his gambit didn't work; Wilmington Savings declined the Debtors' offers.

Similar proposals followed. On June 17, 2020, Henderson again suggested to Pettit that they modify Wilmington Savings' mortgage, adding one missed payment to the end of the term. *Debtors' Exhibit E*, Trial Exhibits, p. 5. This was "in order to keep the claim impaired." *Id*. Wilmington Savings was again asked to waive the default interest and to support the Debtors plan, with the additional incentive of the loan maturity date (October of 2047) being moved forward 17 years to 2030. *See id*. Wilmington also rejected this offer. The Debtors' June 23, 2020 proposal was nearly identical but featured a 10-year reduction in the term of the mortgage, and was similarly rejected. *Id*. at p. 6. On July 30, 2020, Henderson made another proposal; if

Wilmington Savings would waive its default interest, modify the mortgage to add one of the missed payments to the end of the mortgage, and vote for the plan, the Debtors would make up the other two missed payments, resume making monthly mortgage payments, and reduce the note maturity date to 10 years from confirmation.

As an oversecured creditor, Wilmington was entitled to all of its payments and default interest. It saw no reason to make the proposed concessions sought by the Debtor. Further, as an investment trust, the payment modifications proposed by Henderson would require approval from the trust beneficiaries. Wilmington Savings, through PHH, deemed the Debtors ineligible for a loan modification, and it saw the various requested lender concessions as not being in the best interests of the trust beneficiaries. *See Testimony of Torres* at 15:10, Case No. 20-30208, Doc. 210 (Aug. 17, 2023). Finally, Wilmington Savings believed—with good reason, considering the 'rent versus loan repayments' choice—that Debtors and Ramsey-Peele lacked the financial ability to reorganize. Thus, Wilmington Savings was not interested in these proposals. Pettit once again suggested to Henderson that the Debtors sell the Collateral Properties and to pay off its mortgage debt.

**Litigation against Ramsey-Peele on the Guaranty**.

Against this backdrop, in June of 2020, Wilmington Savings began preparations to pursue collection of its debt from the nondebtor guarantor, Ramsey-Peele. This decision appears to have been motivated in part by the impasse in the case. It was also motivated by Wilmington Savings' desire to capture the income which the Ramsey-Peele continued to pay to the Debtors on their loans, but which, in turn, the Debtors were not paying to Wilmington Savings on its mortgage. And at some later point in time, Wilmington Savings learned that Ramsey-Peele had almost $1.1M of funds in its bank accounts, which monies we now know to be attributable to Paycheck Protection Program loans ("PPP"). In sum, Wilmington Savings decided it could

recover a significant part of its debt from Ramsey-Peele.  So it sued.

A demand letter was sent to Ramsey-Peele on August 14, 2020.  When payment was not forthcoming, the guaranty action was filed in November 2020.  Ramsey-Peele retained counsel and vigorously defended that action, which proceeded all the way through discovery.  The action was only resolved when, in January of 2021, an agreement was reached on a plan in this case.

**Insurance Escrow Problems.**

Another dispute between the parties concerns insurance on the Collateral Properties.  The Wilmington Savings Loan provides for the escrow of insurance and ad valorum taxes on its collateral.  However, the Debtors have historically maintained insurance for three commercial buildings under a single insurance policy.  *Debtors' Supplemental Response*, Doc. 156 at p. 2. As noted, only two of those buildings are owned by the Debtors and pledged to Wilmington.  It appears that until the matter came up during the case, Wilmington was unaware that it was maintaining escrow for a noncollateral property.  *Wilmington Savings' Reply to Debtors' Response*, Case No. 20-30208, Doc. 204.

When Wilmington Savings learned of this after petition, Pettit asked Henderson to have the Debtors provide an amended invoice that billed only for insurance coverage on the Collateral Properties.  *Id*. at pp. 3-4.  Wilmington Savings believed that it could not maintain escrow for properties that were not its collateral.  Several requests were made.  However, the Debtors were unwilling to break up the insurance coverage, because bundling the three properties saved them substantial sums on the insurance premiums.

This impasse lasted for several months.  In November 2020, Ray Kennedy received a call from his insurance agent, who advised that PHH had not paid the insurance premiums on the commercial buildings and the policy was in danger of lapse.  *Debtors' Supplemental Response*, Doc. 156 at p. 3.  To avoid this lapse, Ray Kennedy paid the insurance company the $17,391.00

premium. *Id*.

**The Plans and Confirmation**

On December 14, 2020, the Debtors filed their first plan of reorganization, without creditor support. *Debtors' Chapter 11 Plan*, Case No. 20-30208, Doc. 63 (Dec. 14, 2020).  Cy Kennedy described this as a "bad" plan, one intended to "get Wilmington Savings' attention." *Testimony of Cy Kennedy* at 50:10, Doc. 208.  Meaning, this was an unreasonable plan proposal designed to leverage Wilmington Savings into accepting one of the Kennedys' earlier, "reasonable" proposals.   In this original Plan, the Debtors proposed to significantly impair Wilmington Savings: 1) reducing the 11.75% default interest and the 7.75% contract interest rate to a very debtor-friendly 3.25% rate; 2) by making no payments to Wilmington Savings for 10 months post confirmation and using the savings  to pay other creditors; 3) amortizing the mortgage debt over 360 months; extending the mortgage term five years; and 4) enjoining the lender from pursuing Ramsey-Peele on the guaranty.  *Debtors' Chapter 11 Plan*, Doc. 63 at pp. 10-11.  Not surprisingly, Wilmington Savings was opposed.

Reflecting the nonviability of this plan, the Debtors did not file a Disclosure Statement until February 17, 2021.  *Debtors' Chapter 11 Disclosure Statement*, Case No. 20-30208, Doc. 73 (Feb. 17, 2021).  Even then, they did not seriously pursue confirmation; the hearing on the Disclosure Statement was continued several months before the original Plan was abandoned.

The Debtors filed an Amended Plan and Amended Disclosure Statement on June 15, 2021.  *Debtors' Amended Chapter 11 Plan*, Case No. 20-30208, Doc. 96, (June 15, 2023).  This was another "poison pill" plan designed to prod Wilmington Savings into accepting the Debtors' earlier plan proposals.  This time the Debtors proposed to 1) not pay mortgage payments to Wilmington Savings for 10 months after confirmation and instead to use those "rents" to pay junior lienholders and unsecured creditors; 2) extend the term of Wilmington Savings' mortgage

by five years; 4) reduce the interest rate on the mortgage from 7.5% to 3.25% (with no default interest); and 3) enjoin Wilmington Savings from pursuing collection on the guaranty. *Debtors' Amended Plan Chapter 11 Plan,* Doc. 96 at pp. 9-11. Both Wilmington Savings and Essendant objected to confirmation. Faced with opposition, the Debtors did not move forward with the First Amended Plan but sought further negotiations.

At some point, the Debtors gave up on coercing Wilmington Savings, and instead sought a settlement with Essendant. In April 2021, a mediated settlement was reached. This opened the door to plan confirmation.

The Debtors filed their Second Amended Plan filed on December 12, 2021. *Debtors' Second Amended Plan,* Case No. 20-30208, Doc. 119 (Dec. 12, 2021). As to Wilmington Savings, this plan was a capitulation by the Debtors as to the treatment of the Mortgage Loan; the debt was treated as fully secured, the contract interest rate was left intact, and the contractual loan term was retained. *Id.* The Debtors also agreed to pay Wilmington Savings $20,000 in default interest. A post-petition payment made by Kennedy for insurance coverage of $17,391.00 was credited to the amounts owing for that default interest or legal fees. Finally, Wilmington Savings maintained the right to seek its costs and attorney's fees under Section 506(b). In sum, the Wilmington Savings mortgage debt would pass through confirmation unscathed.

With the agreement of the two principal creditors, the Debtors' Second Amended Plan was confirmed at a hearing held on January 11, 2022. *See Order Confirming Chapter 11 Plan*, Case No. 20-30208, Doc. 1261 (Jan. 28, 2022) ("Confirmed Plan").

Then, and as contemplated by the Confirmed Plan, Wilmington Savings filed this Section 506(b) application.

## DISCUSSION

Subject matter jurisdiction over this dispute lies under 28 U.S.C. § 1334 and the General Order of Reference entered by the United States District Court for the Western District of North Carolina on July 30, 1984. This is a "core" proceeding under 28 U.S.C. 157. Venue is proper under 28 U.S.C. §§ 1408 and 1409.

Attorney's fees, costs and charges may be part of a creditor's allowed secured claim if the creditor is over secured, and the costs are both (1) provided for by agreement under which creditor's claim arose and (2) reasonable. 11 U.S.C.A. § 506(b). *See* 4 *Collier on Bankruptcy* ¶ 506.04[3] (16th ed. 2023).

Here, with the exception of the "fees on fees" charges,[20] it is undisputed that Wilmington Savings' loan agreements with the Debtors' provided for the recovery of its reasonable costs and attorney's fees. And while Henderson may have attempted to "soften up" Wilmington Savings by suggesting otherwise, there is no dispute that it was an oversecured creditor. Therefore, our only inquiry is whether the attorney's fees and costs incurred by Wilmington Savings were "reasonable" within the meaning of the statute.

Reasonableness of attorney's fees has two prongs: (1) the itemized fees themselves must be reasonable; and (2) the creditor's actions in incurring these fees must also be reasonable. 11 U.S.C.A. § 506(b); *Ryker v. Current*, 338 B.R. 642, 651 (D.N.J. 2006), *aff'd*, 2007 WL 2138590 (3d Cir. 2007). The creditor seeking fees, costs, or charges has the burden of proof on each of the requirements for recovery. *See* 11 U.S.C. 506(b); *In re SW Boston Hotel Venture, LLC.*, 479 B.R. 210, 220 (B.A.P. 1st Cir. 2012), *rev'd on other grounds,* 748 F.3d 393 (1st Cir. 2014). "Reasonable attorney's fees" are those necessary to collection and protection of creditor's

---

[20] Discussed below.

claim.  *In re Griffin*, 302 B.R. 1, 4 (Bankr. W.D. Ark. 2003), *aff'd*, 310 B.R. 610 (B.A.P. 8th Cir. 2004).

Bankruptcy courts review the reasonableness of attorney fees of an oversecured creditor under a federal standard, the so-named *Johnson* factors. *See* 11 U.S.C. § 506(b); *In re Britt*, 551 B.R. 522, 523-24 (Bankr. N.D. Fla. 2016) (citing *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974).  The *Johnson* factors are:

> (1) The time and labor required in the case, (2) the novelty and difficulty of the questions presented, (3) the skill required to perform the necessary legal services, (4) the preclusion of other employment by the lawyer due to acceptance of the case (5) the customary fee for similar work, (6) the contingency of a fee, (7) the time pressures imposed in the case, (8) the award involved and the results obtained, (9) the experience, reputation, and ability of the lawyer, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship between the lawyer and the client, and (12) the fee awards made in similar cases.

*Johnson*, 488 F.2d at 717-19; *Pellegrin v. Nat'l Union Fire Ins. Co. of Pittsburgh* (*In re Abrams & Abrams, P.A.*), 605 F.3d 238, 244 (4th Cir. 2010); *see also Barber v. Kimbrell's Inc.*, 577 F.2d 216, 226 (4th Cir. 1978).  Of these, the greatest weight is given to the time and labor required in the representation.

An over secured creditor is "not entitled to compensation for its attorney's fees for every action it takes by claiming that its rights have been affected."  *In re Digital Products Corp.*, 215 B.R. 478, 482 (Bankr. S.D. Fla. 1997) (citing *In re Huhn*, 145 B.R. 872, 876 (W.D. Mich. 1992).  Rather, reasonableness is gauged under an objective standard.  When assessing the reasonableness of a creditor's actions, the Court must consider "whether the creditor took the kind of reasonable actions similarly situated creditors would have taken, and whether such actions and fees were outside the range so as to be deemed unreasonable."  *Ryker v. Current*, 338 B.R. at 651.

The reasonableness of a creditor's actions is determined by the circumstances of the case. "A creditor must not impede the debtor's reorganization by saddling the debtor with attorney's fees and expenses." *In re West Elec. Inc.*, 158 B.R. 37, 40 (Bankr. D.N.J. 1993). Nor is the creditor required to accede to the debtor's reorganization proposals. There is a balance to be maintained: "[C]reditors are entitled to engage counsel and pay for constant, comprehensive, and aggressive representation, but where services are not reasonably necessary or where action is taken because of an attorney's excessive caution or over-zealous advocacy, courts have the right and the duty, in the exercise of their discretion, to disallow fees and costs under § 506(b)." *In re Wonder Corp. of America*, 72 B.R. 580, 591 (Bankr. D. Conn. 1987) *aff'd* 82 B.R. 186 (D. Conn. 1988).

**A. Wilmington Savings' Attorney's Fees and Costs Generally Meet the Johnson Factors.**

The Hutchens Law firm performed and billed Wilmington Savings for approximately 245.35 hours of work for which they seek reimbursement. *Wilmington Savings' Amended Application*, Doc. 204 at p. 7. This is a relatively large amount of time to devote to a chapter 11 case of this size. However, this case took two years to get to confirmation; Wilmington Savings didn't control the Plan nor the timeline. Between the Pandemic, the Kennedys' problems with Essendant and their questionable tactic of trying to artificially impair Wilmington Saving's oversecured mortgage loan, it took a long time and a lot of work to get to confirmation.[21] Further, the time charged by the Hutchings Firms included filing and prosecuting a guaranty action through the discovery phase of that case. Reserving for the moment, 1) the Debtors specific objections to these fees and 2) assuming every matter pursued was itself reasonable, the hours billed by the Hutchins Firm reflect a reasonable amount of time spent on each matter.

---

[21] Typically, the time spent by creditors' counsel can be gauged for reasonableness by comparison to the applications of the debtor's counsel. However, and most unusually, Debtors' counsel has not applied for fees in this case.

As to the rate, the Hutchens firm billed Wilmington Savings at the rate of $300 per hour for Attorney Pettit's time and $100 per hour for his paralegal. These rates were discounted by agreement with the creditor. They are significantly below the rates charged by bankruptcy attorneys of Pettit's experience level (30+ years), in this marketplace. The rates are reasonable.

The results obtained by Wilmington Savings were excellent. As noted above, the Debtors and their attorney were insistent upon impairing Wilmington Savings' secured claim. They sought loan modifications, interest rate concessions, waiver of default interest, extensions of the loan maturity date, and possibly a bifurcation of the claim. These were unwarranted requests. Wilmington Savings was an oversecured creditor. While the Debtors may have wanted to impair the claim, there was no legal reason to do so.

Wilmington Savings successfully resisted these repeated overtures and the Debtors' efforts to coerce it into accepting such treatment. The plan that was finally confirmed treated this mortgage lender's claim as fully secured, its loan was not modified, and Wilmington Savings retained both its contractual interest rate and agreed loan term. Additionally, Wilmington Savings recovered much of its default interest, and it preserved the right to seek recovery of its attorney's fees and expenses.

A confirmed plan of reorganization is not a zero-sum game. Typically, there are multiple winners, debtor and creditor alike. Here, the Debtors achieved a good result for themselves—a confirmed plan of reorganization, retention of their business and principal assets, and favorable treatment of the Essendant claim (which was treated as largely unsecured). However, if there was a principal winner in the reorganization, it was Wilmington Savings. Its debt largely rode through bankruptcy unaffected. This weighs in favor of allowance of the Application.

The remaining *Johnson* factors are largely inapplicable.  There was no novel question presented.  The skills required to perform the services are those required of a bankruptcy creditor's counsel.  There are no issues of employment preclusion.  The fees were customary for bankruptcy work.  The fees were not contingent.  The time pressures imposed were those typical of bankruptcy cases.  Wilmington Savings' efforts resulted in achieving full satisfaction of its own interests.  There is no issue of "undesirability."  There is nothing significant concerning the nature and length of professional relationship between lawyer and clients.  Finally, other fees awarded in similar cases can be astronomically higher.

And while Debtors justifiably objected to certain vague time entries and lumping of services in the Application, these were resolved by the Amended application.

Thus, the fees and costs (expenses) billed by the Hutchins Firm would appear reasonable under a Section 506(b) analysis, <u>provided</u> that the actions undertaken by Wilmington Savings were themselves reasonable.

## B. The Debtors Contentions that Wilmington Was Too Aggressive and its Actions were Unreasonable and Unnecessary

The Kennedys say Wilmington Savings' actions were not reasonable.  From their perspective, and because of its equity cushion, Wilmington Savings was never in danger of nonrepayment.  Thus, the Kennedys say Wilmington Savings' actions demonstrate "excessive caution, overzealous advocacy and hyperactive legal efforts."  *Debtors' Objection*, Doc. 135 at ¶ 16.  The implication of this objection is that because Wilmington Savings had such a large equity cushion, it should have taken little action in the case, except to accept the Kennedys' "reasonable offers."  Instead, Wilmington Savings ran up a big bill needlessly by interjecting itself in the case and in attempting to collect from Ramsey-Peele, an insolvent corporation.  The Debtors speculate that Wilmington Savings undertook these actions for a variety of improper

reasons: to force a sale of the Collateral Properties, to generate servicing fees for PHH, etc. The Debtors say Wilmington Savings took advantage of them.

Although there is no question that the Debtors are sincere as to these contentions, I cannot agree with most of these assertions or the Debtors' ultimate conclusion that Wilmington Savings acted improperly.

There are several problems with the Kennedys' contentions, but the core problem is one of perspective. Essentially, the Debtors object to Wilmington Savings refusing to do what they, the Kennedys', would have preferred Wilmington Savings to do. Had Wilmington Savings acted as the Debtors preferred, it would allow the Kennedys to achieve their owns goals in the case. This self-interested perspective does not reflect what a reasonable lender would have done under these circumstances to protect its own financial interests.

There is no doubt that if Wilmington Savings had a limited or zero equity cushion, almost all of the actions it took in this case would have been warranted. However, the Debtors suggest that with a $2.4M equity cushion, it was unreasonable for Wilmington Savings to act at all. From this assertion, almost all the Debtors other criticisms follow.

At the outset, I do not accept the Debtors' contention that Wilmington Savings was protected by $2.4M equity cushion. The evidence presented does not support the assertion. The Debtors' own sworn Schedules ascribed the Collateral Properties a value of only $3,490,000. Because they are sworn statements, a debtor is not usually permitted to impeach his or her Schedules. *See, e.g., In re Arcade Pub. Inc.*, 455 B.R. 373, 382 n. 11 (Bankr. S.D.N.Y. 2011) ("Bankruptcy schedules, executed under penalty of perjury, when offered against a debtor are eligible for treatment as judicial admissions."); *In re Henderson*, 560 B.R. 365, 371 (Bankr. D. N.M. 2016) (finding an omission from the schedules constitutes and admission"); *In re*

*Quadruple D Trust*, 639 B.R. 204, 211 n. 30 (Bankr. D. Colo. 2022) ("A debtor may not adopt a cavalier attitude toward the accuracy of his schedules by arguing that they are not precise and correct") (quoting *In re Bohrer*, 266 B.R. 200, 201 (Bankr. N.D. Cal. 2001). These documents are attested to under penalty of perjury. The Debtors do not justify their attempt to impeach their sworn statement. Even if the Debtors had attempted to do so, the asserted $5.8M value comes from an old appraisal, one that was not commissioned by either party, but by Cherrywood. This appraisal was not introduced at hearing, and being hearsay, it likely could not have been admitted.

More fundamentally, the Debtors asserted in their pleadings that after bankruptcy they commissioned an appraisal which showed a property value of $3.7M, a number more in line with the value from the Schedules. Again, this revised number is an assertion and not admitted evidence. But even if the $5.8M number was in evidence, the Debtors never explain why the older appraisal was more probative of value than their $3.5M petition date value or the subsequent $3.7M restated value. Thus, as best we know, on the petition date the Collateral properties were worth $3.5M, meaning Wilmington Savings had only $560k of equity on its $3.1M debt.

As any undergraduate business student knows, the value of income-producing property changes over time as revenues and discount rates change. The $3.5M Schedule value predated the Pandemic. Both the Pandemic and the Governor's 'stay at home' Order negatively affected most income-producing properties, and the Collateral Properties were no exception. Even Henderson, the Kennedys' counsel, recognized these potential effects in his April 28, 2020 email to Pettit: "the pandemic is a wildcard which may or may not depress day care center values." *Debtors' Exhibit E*, Trial Exhibits, p. 2. It follows that in late April of 2020, whether or not

Wilmington Savings had a $560,000 equity cushion at the filing date, that pre-Pandemic value

was not likely an accurate number after the pandemic.  Whatever the value may be, the cushion

wasn't large enough to justify passive inaction by the lender in this case, given the

circumstances.

Second, viewing this matter with their own goals in mind, the Kennedys fail to consider

the lender's perspective.  Our present inquiry is not to determine the fees and expenses that a

reasonable debtor would believe to be appropriate for its lender.  The inquiry is to determine

whether those fees and expenses were what a reasonable mortgage creditor would incur.  Here, I

conclude that in the main, they were.

To recap, Wilmington Savings began the case with a mortgage loan on which the

monthly payments were current.  Out of the gate, the Debtors failed to seek permission to use

cash collateral, an action which any lender would have expected.  Although the Debtors had an

argument that these were not property rents (and therefore, not cash collateral) this was only

contention, not a fact.  The Debtors did not consult Wilmington about the issue before stopping

payments.  Rather, they rationalized an outcome to their favor that also happened to be to

Wilmington Savings' detriment as it arguably deprived the lender of its rents' collateral.

Then the Pandemic struck, causing great uncertainty in the national economy and in the

finances of both Ramsey-Peele and the Debtors.  These economic uncertainties would have

affected not just the Debtors choices but those of Wilmington Savings as well.  Without

consulting with Wilmington Savings or seeking court approval, the Debtors intentionally missed

the first mortgage payment due after bankruptcy.  Then they intentionally missed a second

payment and then a third, all the while, the Debtors had the money.  Finally, when Wilmington

Savings moved to prohibit cash collateral use, the Debtors still failed to produce a monthly budget by which their operations and financial prospects could have been gauged.

Meanwhile, the Debtors' counsel attempted to use the intentionally created post-petition payment defaults to exact further from Wilmington Savings on plan treatment: modifying the mortgage to add the missed payments to principal, dramatically cutting the interest rate on the debt, and conditioning further monthly payments on the lender accepting these proposals. Precious few, if any, commercial mortgage lenders would tolerate such a tactic. Most would have taken action when the first day motions were not timely filed, and others would have acted after two post-petition payments were missed.[22] Any lender would have viewed the Debtors' attempt to use the missed payments to leverage concessions on a fully secured mortgage as improper.

Further, the Pandemic and the shutdown order jeopardized the revenues and threatened the continued existence of Ramsey-Peele. This company was the only income source from which the mortgage payments could be made, yet the Kennedys represented to Wilmington Savings that Ramsey-Peele was insolvent. This assertion was made before the COVID-19 shutdowns. Afterwards, Ramsey-Peele was in danger of losing funding via the students' tuition payments because schools were closing, and it was also uncertain whether the State would continue funding the institution. As noted, those school shutdowns would likely reduce the value of the Collateral Properties. And as Henderson had also suggested to Pettit, these were very specialized properties—day care schools. What would a lender do with such collateral in a Pandemic if Ramsey-Peele were shut down?

---

[22] In the undersigned's experience, in bankruptcy, mortgage lenders will sometime tolerate one payment default, but not two or three. Many have internal policies requiring legal action after two missed payments.

It is intellectually inconsistent of the Debtors to suggest that it was "understandab[le]" that they, the Debtors, held back mortgage payments due to the Pandemic, but to simultaneously assert that Wilmington Savings should have been content with its equity position. *Debtors' Objection*, Doc. 135 at p. 2. If COVID-19 spurred the Debtors to take such radical actions, then it should have affected Wilmington Savings in the same way. Both parties' economic interests were unexpectedly and unpredictably affected. Each was looking to protect its own economic interests, and these uncertainties continued throughout much of the case.

The Kennedys justifiably see the Ramsey-Peele day care as a personal mission and an important community service. However, they seem to believe that keeping the daycare schools open was an obligation which Wilmington Savings and PHH shared. That is entirely incorrect. PHH is a fiduciary for the Wilmington Savings' trust beneficiaries, not the Kennedys or the non-debtor Ramsey-Peele. A secured creditor owes no fiduciary duties to its borrowers—their relationship is contractual. *Caper Corp. v. Wells Fargo, N.A.*, 578 Fed. Appx. 276, 286 (4th Cir. 2016) ("Ordinary borrower-lender or debtor-creditor relationships . . . are marked by arm's length transactions and do not typically give rise to fiduciary duties."). Finally, the Debtors themselves were in breach of those contracts—the Wilmington Savings was in payment default.

Given all, and with due sympathy for the Debtors' subjective feelings about the matter, I conclude that Wilmington Savings' actions were, on the whole, reasonable collection activities. With one or two specific exceptions noted below, the actions undertaken by the Hutchens Law Firm for Wilmington Savings were taken in pursuit of the clients' financial interests. There is no indication that they were meanspirited or vindictive. They were consistent with what other similarly situated lenders might have done under these unique circumstances. Finally, they were successful in these actions and protected fully Wilmington Savings' interests.

**C. The Kennedy's Contentions that Wilmington Savings should have accepted their "Reasonable Offers."**

In the same vein, the Debtors complain that Wilmington Savings refused their "reasonable" offers to impair and restructure the Mortgage Loan. Had it acceded to these entrees, most of the fees and expenses that Wilmington Savings now seeks to recover could have been avoided. While that last part is certainly true, the Kennedy's settlement overtures were not "reasonable," and ultimately, they failed. Thus, we cannot fault Wilmington Savings from rejecting them.

Again, we must view the Kennedy's settlement offers from the perspective of a reasonable mortgage creditor. And we must do so within the prism of the case facts: the Debtors decision to forego lease payments (arguably collateral) in favor of (arguably non-collateral) loan payments from Ramsey-Peele, the willfully created post-petition payment, and the Pandemic with its school shutdowns. All of these factors threatened both Wilmington Savings' collateral and its borrowers' viability.

On top of these uncertainties, the Debtors attempted over many months to use these circumstances to exact loan concessions from Wilmington Savings. These efforts first began on April 28, 2020, one day after Wilmington filed its first substantive pleading in this bankruptcy case, and they continued without let up until April 27, 2021, when the Kennedy's reached agreement with Essendant.

These plan proposals ranged from requiring relatively modest modifications to the Mortgage Loan (April 28, 2020 & May 15, 2020: offering to defer one payment to the end of the loan term) to requiring more significant financial concessions (June 17, 2020 & July 30, 2020: deferring one payment plus a waiver of default interest), to the unconscionable (Original Plan and Amended Plan: extended loan term; reducing the default (11.75%) and contract ( 7.75%)

interest rates to 3.25%; no mortgage payments for 10 months and using those monies to pay other creditors; and enjoining Wilmington Savings from pursuing Ramsey-Peele on the guaranty).

These proposals were not based on financial merit, but legal maneuvering. At hearing, Henderson explained that as Essendant controlled the unsecured creditor class vote, and being at odds with the Kennedy's, the Debtors needed to create an impaired accepting class to achieve a "cram down" confirmation. *See* 11 U.S.C. § 1129(a)(10). To this end, he wanted to impair Wilmington Savings' fully secured claim <u>and</u> secure its acceptance of the Debtors' plan. Since the Debtors had the money to pay the mortgage payments and Wilmington Savings was oversecured, Henderson was attempting to an artificial "impairment" of the Mortgage Loan.

From Wilmington Savings' perspective, there was no upside to these proposals. As an oversecured creditor, it was already entitled to a full payout of its mortgage debt payments and arguably to recover default interest as long as the payment default existed. It was under no obligation to restructure its loan. And as an investment trust, the payment modifications that Henderson proposed would require approval by the trust beneficiaries. Their fiduciary, PHH believed that the Kennedy's didn't qualify under its operating procedures, and the modifications were not to be in their best interests of the Trust beneficiaries.

Finally, and from the start of the case, Wilmington Savings justifiably believed the Debtors and Ramsey-Peele lacked the financial ability to reorganize. Even putting a single payment off until the end of the loan term was undesirable if the borrower isn't likely to make the payments in the current year. For all these reasons, it was not unreasonable for an over secured lender to reject these offers.

Furthermore, the Kennedys' first two plans were arguably filed in bad faith.  The Original Plan and the Amended Plan were admittedly filed not based on a belief that they were warranted, but to "get Wilmington's attention."  These would not have met the Section 1129(a)(3) good faith requirement and likely would violate Rule 9011 of the Federal Rules of Bankruptcy Procedure.  11 U.S.C. § 1129(a)(3); Fed. R. Bankr. P. § 9011.  In short, these plans were designed by the Debtors and their attorney to coerce Wilmington Savings into accepting one of their earlier plan proposals.  One cannot fault Wilmington Savings from rejecting these either.

Ultimately, the Kennedy's reached agreement with Essendant on the treatment of its claim.  Frankly, this is where the Debtors should have begun their plan negotiations instead of with Wilmington Savings.  Essendant had judgment liens obtained during the 90-day preference period.  If avoided, or it there was a lack of equity in the real properties, it was an unsecured creditor.  Thus, and in contrast with Wilmington Savings, Essendant was likely to be actually economically "impaired," and its vote would satisfy Section 1129(a)(10).  11 U.S.C. § 1129(a)(10).

And that's what happened.  The Essendant settlement led to the Second Amended Plan filed on December 12, 2021.  And this was an almost total capitulation by the Debtors on the treatment of Wilmington Savings' claim.  *See Order Confirming Chapter 11 Plan,* Doc. No. 126.

Given that the Debtors did not need, but also failed to achieve a confirmed Plan any of the concessions they sought by negotiation, their contention that Wilmington Savings improperly rejected their "very reasonable proposals" rings false.

**D. Specific Objections Which have been Mooted by Amendment, Abandoned by the Debtors, or clearly not supported by Evidence.**

In addition to, or perhaps as a part of, the Kennedys' overarching contention, the

Kennedys raise a slew of specific objections.

Several of these have been cured by Wilmington Savings' Amendment to the fee application filed on June 6, 2023. For example, the Debtors asserted that a number of the Hutchings Firm's billing entries lack an adequate description of the services provided, are vague, and/or are "lumped" so that one cannot ascertain the time spent on each activity. The Amended Application rectified these problems, and they were not argued at hearing.

1. Other specific objections were not argued at hearing and have also been abandoned:

*a. Objection: PHH made litigation decisions in order to generate servicing fees.*

*Debtors' Objection,* Doc. 135 at ¶ 19. The Debtors argued in their written Objections that PHH undertook many of the aforementioned case actions in order to generate servicing fees for its own benefit. The evidence does not support this speculative allegation. Over PHH's objection, this Court required production of the Servicing Agreement. The Agreement and the testimony presented at hearing indicate that PHH was paid a flat rate, not one based upon the activities undertaken in the case. The Debtors offered no contrary evidence.

*b. Charging the Debtors legal fees and default interest is essentially charging the debtors twice for the same thing. Further, because the Debtors have paid Wilmington Savings a significant amount of Default interest, the Court should factor this in in allowing attorney's fees.*

*Debtors' Objection*, Doc. 135 at ¶ 15; *Debtors' Supplemental Response*, Doc 156 at p. 7. Clearly, default interest and legal fees paid to counsel are not the same thing. In the Loan documents, the Kennedys agreed to pay each in the event of a default. *Wilmington Saving's Exhibit 1*, Trial Exhibits, p. 2 ¶ 4; *Wilmington Savings' Exhibit 2*, Trial Exhibits, ¶ 4.02(g). It is undisputed that the Kennedys defaulted on the mortgage loan.

Even if the two concepts were related, the Debtors agreed in the Confirmed Plan to pay $20,000 of default interest to Wilmington Savings, while reserving to Wilmington Savings the right to seek recovery of its attorney's fees. Thus, the Kennedys' contention is explicitly

contrary to the Confirmed Plan.

2. Other objections lacked merit:

*a. The application contains no analysis of the relevant (Johnson) factors considered by courts in determining the reasonableness of attorney's fees and expenses.*

*Reply of Debtors to Responses*, Case No. 20-30208, Doc. 152 at p. 2 (Aug. 7, 2022);

*Debtors' Supplemental Response*, Doc 156 at p. 2.  While such analysis is necessary to a court ruling that determines the allowed amount of such fees and expenses, it is not a pleading requirement.  Wilmington Savings properly supported its application with the time and billing records of the Hutchinson Law Firm.  This is the traditional method of supporting fee requests in a bankruptcy case.

*b. Wilmington Savings was inefficient in that Pettit dealt with too many PHH employees in the case.*

*Debtors' Supplemental Response*, Doc. 156 at p. 6.  This contention was refuted in Wilmington Savings' Amended Application and at hearing.  *Wilmington Savings' Reply*, Doc. 204 at p. 6.  The number of persons with whom Pettit had contact at PHH reflected the roles that each PHH employee played.  Pettit represented Wilmington Savings in this case and in the guaranty action.  He necessarily dealt with several PHH employees.  In any event, PHH was paid the same Special Servicing Fees, irrespective of the number of actions undertaken in the case or the number of employees involved.  *Id.*

*c. Up charging.*

The Debtors written Objection speculates that there may have been a difference between what the Hutchinson Firm billed Wilmington Savings and what Wilmington Savings seeks to collect from them.  *Debtors' Supplemental Response*, Doc. 156 at p. 6.  The Debtors reference a single $325 charge related to the preparation of a proof of claim.  As Pettit explained, the proof of claim was prepared by separate counsel and then reviewed by Counsel.  *Wilmington Savings'*

*Reply*, Doc. 204 at p. 6.  Thus, it does not support the assertion of up charging.  This objection is but idle speculation.

3. However, other specified objections warrant specific consideration:

*a. Cash Collateral Orders*

Among the fees billed, the Hutchins firm charged $10,500 for 35 hours work in representing Wilmington Savings in regard to the cash collateral motion and the several hearings held in the case on that matter.  The Kennedy's suggest that the nine continuances, hearings, and orders was not reasonable.  They contend Wilmington Savings ought to have filed a single order authorizing the Debtors use of cash collateral "with a mechanism to trigger a hearing if any issues arose."  The Debtors allege Wilmington Savings' action was unnecessary and the 35 hours in fees associated indicate "excessive caution given the circumstances."

The Wilmington Savings motion is not itself problematic.  The Debtors could and likely should have filed their own motion under Section 363 to approve the use of the rents, but they failed to do so.  After the Debtors had ceased paying monthly mortgage payments (even as they were collecting monies from Ramsey-Peele), Wilmington Savings felt compelled to file its motion to enjoin use of cash collateral.  I cannot fault Wilmington Savings' reasoning.  If anything, Wilmington Savings should have filed the Motion in March rather than at the end of April.

As to continued hearings on the cash collateral motion, they were certainly numerous—as many as I can recall in a case of this size.  However, where a newly filed debtor's financial ability to perform is in doubt, it is often the practice of secured lenders to keep the debtor on a short tether.  Here, Wilmington Savings doubted the Debtors' ability to pay, and the Debtors justified that concern by immediately defaulting on the loan payments. Further, even when the issue was joined, the Debtors did not propose a budget, the normal prerequisite to cash collateral

use.  Finally, the case proceeded slowly; a disclosure statement was not filed in the case until February 2021—a full year after the case was filed— and a plan wasn't confirmed until late January of 2022.

Whether all these short-term Cash Collateral orders and associated continued hearings were actually needed is a non-starter as both parties agreed to them.  Debtors cannot be heard to complain about case actions to which they consented.

Ultimately, the Cash Collateral actions allowed the Kennedys to continue operating their business, Ramsey-Peele, and to reorganize their own finances.  Thus, they protected the interests of both the Debtors and Wilmington Savings.  Accordingly, the actions associated with the Cash Collateral orders and the fees are reasonable and recoverable.

*b. Ramsey-Peele Litigation*

About a third of the Wilmington fee application relates to the guaranty law suit that Wilmington Savings filed against Ramsey-Peele in November 2020.  The Hutchins firm billed $26,640 for 88.80 hours for this action.

The Debtors contend that this civil action was "mean spirited and overzealous." According to them, it was also "pointless."   The Debtors say Wilmington Savings (constructively) knew that Ramsey-Peele was insolvent, and simultaneously that Ramsey-Peele was the entity responsible for generating income to the Debtors for its monthly loan payments. According to the Debtors, when Wilmington Savings commenced the guaranty suit in November 2020, the mortgage payments were current.[23]   Thus, the Kennedy's suggest that Wilmington Savings filed the guaranty action simply to "kill the case" by cutting off their cash.  The Debtors' ask that all guaranty action fees be disallowed.

---

[23] This is not correct.  There were other defaults, the including the unpaid default interest.

Wilmington Savings responds by saying it recognized that keeping Ramsey-Peele in business was key.  It only decided to file the civil guaranty suit against Ramsey-Peele in June 2020, after the Debtors had repeatedly—and intentionally—failed to make monthly mortgage payments.[24]   During those months, the Debtors were still collecting "debt payments" from Ramsey-Peele.  Finally, from what it knew about Ramsey-Peele's past operations, Wilmington Savings believed the company could pay a considerable part of the mortgage debt.

While this is the closest of the issues presented, I conclude that Wilmington Savings' suit against its guarantor, Ramsey-Peele, was a reasonable lender action.  The Fourth Circuit has held that the automatic stay is not extended to third parties who guarantied the debt of a bankrupt debtor.  *Credit Alliance Corp. v. Williams*, 851 F.2d 119, 121 (4th Cir. 1988).  Thus, secured creditors routinely pursue guaranty actions even as the principal borrower is in bankruptcy.

Further, the circumstances leading up to the litigation would place any lender in reasonable doubt as to the security of its claims.  Wilmington Savings was faced with the questions of whether the Debtors and Ramsey Peele were viable, and whether Debtors were willing to make payments unless granted unwarranted concessions on the mortgage loan.  These combined circumstances appear to have been the primary motivation for the civil action against Ramsey-Peele, the guarantor.

The Debtors assert that Ramsey-Peele was insolvent, and likely it was.  However, they fail to note other relevant factors.  One is that most of Ramsey-Peele's debts were owed to the Kennedy's and to other family members, not outside creditors.  Insolvency was a problem only if the Debtors chose to make it one.

---

[24] While both parties appear to agree the Debtors failed to pay the March, April, and May 2020 payments, Wilmington Savings claims the Debtors also defaulted on their June, July, and August 2020 monthly payments.  The record was not sufficiently developed to know who is correct.  However, it is clear some payments and the default interest were not paid.

Second, there is a difference between a company being balance sheet insolvent and it lacking assets.  Ramsey-Peele had assets: it had the revenue stream derived from the day care operations and it bank deposits.  At some point, Wilmington Savings learned that Ramsey-Peele has significant sums in its bank accounts, likely the $1M in PPP loans paid by the Government.  However, these observations caused Wilmington Savings to think it could recover part of its debt through Ramsey-Peele.

Third, when a business is rendered insolvent, it typically sets off a scramble to collect among the creditors.  If Ramsey-Peele was insolvent, then a lender like Wilmington Savings would typically sue out of caution that the Ramsey-Peele assets might not be available in the near future.

Finally, the likely cause of this argument is the Debtors' belief that Wilmington Savings should not have tried to collect from Ramsey-Peele, given that this might have put the day care out of business.  The short answer here is that lenders lend, and if not repaid, they sue to collect.  Wilmington Savings owed its trust beneficiaries a fiduciary obligation to try to collect on its Mortgage Loan.  It owed no such duties to Ramsey-Peele.  And if it is less than admirable to take legal action against a day care business, it must be remembered that the Kennedy's and their company assumed this risk when Ramsey-Peele guaranteed the Kennedy's mortgage loan and gave Cherrywood an assignment of rents.

Considering all the attendant circumstances, it was not unreasonable for Wilmington Savings to pursue action against Ramsey-Peele.  The fees and actions generated in the Ramsey-Peele litigation are recoverable.

*c. Insurance Dispute*

In the Amended Application, Wilmington Savings also seeks $60 for 0.20 hours of time

dealing with Insurance issues pertaining to the Kennedy's insurance escrow.[25]   The Debtors
object to these charges on the argument that they were occasioned by Wilmington Savings'
improper conduct, not their own.

In November of 2020, the Debtors were informed that they faced a lapse of their
insurance coverage.  Payment for the insurance premiums had not been paid by PHH out of the
monies escrowed for this purpose.  Historically, the Debtors bundled insurance policy covered
the two collateral properties and a third noncollateral property.  Apparently, prior to bankruptcy,
the entire premium was paid out of escrow for all three properties.

Wilmington Savings says it did not realize the Kennedys were using its escrow to pay
insurance premiums for a noncollateral property.   When they learned of this, Wilmington
Savings asked the Debtors to provide it with an amended insurance invoice covering only the
two collateral properties.  This was not received because the Kennedys refused to change the
policy; they were receiving a discount on the insurance coverable by bundling all three properties
and didn't want to pay more for the same coverage.  *Testimony of Cy Kennedy* at 53:10, Case
No. 20-30208, Doc. 208.  It is unclear whether Wilmington was informed of their refusal.  The
standoff continued until the insurance policy was in danger of lapse.[26]

On these facts, I conclude that Wilmington Savings unreasonably withheld payment of
the Debtors' insurance premiums and created the dispute and the associated fees.  While it was
appropriate and reasonable for Wilmington Savings to require separate insurance on the
Collateral properties, Wilmington Savings did not inform the Debtors that it would not pay the
premiums but instead allowed the coverage to lapse.  Wilmington Savings did not seek this
Court's aid in resolving the dispute.

---

[25] In the original application, $1,695 was sought.
[26] The Debtors have suggested that they never received credit for the $17,391 payment.  This assertion is difficult to
understand.  The Confirmed Plan expressly provided that that payment would be credited to the amounts owing for
default interest or legal fees.  *Debtors' Second Amended Plan*, Doc. 119 at p. 10.

By summarily refusing to release the moneys already collected for this purpose, Wilmington Savings created an unnecessary crisis. It placed the Collateral Properties, the most significant assets of the Kennedy's estate, at risk. It put its own economic interests at risk. It also jeopardized the students and teachers of the day care.

Wilmington Savings' actions regarding the Insurance Dispute were not reasonable. The associated fees and costs are not recoverable under Section 506(b). The fees incurred through this action $60 for 0.20 hours work are disallowed.

### 4. Conversations with Essendant

The Debtors take issue with another $2,640 or 8.8 hours of time billed by the Hutchins Firm in communicating with the attorney for Essendant about the case.

Essendant filed an adversary proceeding against the Debtors challenging their right to discharge its $2M judgment debt. Essendant then lawfully obtained and served a subpoena duces tecum on Wilmington Savings. Its counsel and Pettit then held several related telephone conversations about the discovery, eventually totaling 8.8 hours.

The Debtors dispute the fees incurred while responding to Essendant's subpoena. Specifically, the Debtors take issue with the broad language of the description of the subject-matter discussed. They further suggest that being of different classes (secured v. unsecured),[27] these parties lacked a common ground or reason for the extended conversations. They would disallow these fees.

I do not agree. It would have been entirely reasonable for Wilmington Savings' counsel to communicate with counsel for Essendant about this case. Both creditors were active in the case. As detailed above, the Debtors needed one or both to accept their plan. Further, each

---

[27] Here, the Kennedy's assumed that Essendant's judgment lien on the Collateral Properties and other real estate assets was avoidable and that it was an unsecured creditor. However, at the time the work was performed, Essendant was a putative lien creditor. Ultimately, the confirmed Plan treated Essendant as a partially secured creditor.

creditor held liens on the Collateral Properties, although Essendant's was potentially avoidable.

And as explained at the hearing, after Essendant initiated its dischargeability suit, it issued subpoenas duces tecum on third parties, including Wilmington Savings. Essendant wanted appraisals of the Collateral Properties from Wilmington Savings' file. Pettitt communicated with Henderson about the subpoena. The Debtors did not consent to production and asked to file for a protective order. Further complicating matters, Pettit believed that Essendant had improperly served the subpoena.

Wilmington Savings could hardly ignore the subpoena. It had a duty to either respond to the subpoena or move for a protective order, and it chose to engage with Essendant's counsel to try and resolve the issue. This doubtless saved the Debtors money as compared to litigating the matter. The time billed by Pettit communicating with Essendant's counsel about these subpoenas was reasonable and necessary. The fees and actions associated with the conversation with Essendant are recoverable.

*5. Affidavit Preparation*

Wilmington Savings' application for fees and expenses included approximately $3,375 for 11.25 hours of time 11 hours of affidavit preparation. In their objection, the Debtors demanded clarity on what the affidavit was used for and why it took so long to prepare.

The amended Section 506(b) application specified that there were in fact three affidavits prepared for various case matters. *See Wilmington Savings' Amended Application*, Doc. 192; *see also Wilmington Savings' Reply to Debtors' Response*, Doc. 204 at p. 5. One was an affidavit of PHH employee Marilyn Solivan. This document was 5 pages in length and included 102 pages of exhibits. *Affidavit of Marilyn Solivan*, Case No. 20-30208, Doc. 103 (July 12, 2021). Pettit prepared a second six-page affidavit for Kawanna McDowell—another PHH employee—which also contained substantial exhibits. *Request to take Judicial Notice*, Case No. 20-30208, Doc.

36

173 (Feb. 14, 2023).

A third affidavit was that of Pettit dated February 14, 2023, a 2-page affidavit was prepared to as part of the proof in this Section 506(b) fee application. *Affidavit of William Walt Petit*, Case No. 20-30208, Doc. 172 (Feb. 14, 2023).

With the Amended Application, the Debtors' objection over the Affidavit preparation expenses is substantially mooted. The seemingly excessive time devoted to one affidavit turns out to be more reasonable amounts of time preparing three affidavits for use in the cases. Marilyn Solivan's affidavit was submitted to protect Wilmington Savings' secured claim. The affidavit by Kawanna McDowell was used in the Guaranty action. In it, McDowell attests to the default notice letter and supports Wilmington Savings' claim of five defaulted monthly payments. Finally, William Pettit's affidavit was submitted in support of Wilmington Savings' assertion that the Debtor was in default for the three additional monthly payments.

The affidavits were prepared and submitted during the course of protecting Wilmington Savings' interests in this case. The fees and actions associated with the affidavit preparation are recoverable.

*6. Fees on Fees*

Legally, the most difficult question raised by this dispute is whether Wilmington Savings can recover "fees on fees;" that is, attorney's fees for prosecuting this Section 506(b) application (or better said, defending against the Kennedy's many objections thereto). Wilmington Savings, in their application, included $450.00 for 1.5 hours of time by the Hutchens Law Firm ("Hutchens") on March 29, 2022 for "[c]ourt appearance in regarding [sic] Application of Attorney Fees and Expenses". *Wilmington Savings' Amended Application*, Doc. 192 at p. 6. Of course, the parties have continued to litigate this Application and Wilmington Savings has since incurred much greater, but as yet unquantified, attorney's fees and costs defending the

Application.

The Kennedys have objected to the $450 charge and have filed briefs arguing that Fees on Fees are not allowed under § 506(b).  Within those arguments, the Debtors highlight the "American Rule," under which parties generally must pay for their own attorney's fees; *Baker Botts*, wherein the Supreme Court held 11 U.S.C. § 330(a) did not allow for awarding attorney's fees; and finally, a lack of explicit allowance of 'fees on fees' within Wilmington Savings' loan documents.

Wilmington Savings submitted its own briefs arguing that Fees on Fees are not foreclosed under § 506(b).  They argue that *Baker Botts* is inapposite; it interpreted a different statute, Code Section 330, and the ruling does not apply to Section 506(b).  They point out that the Promissory Note (which incorporates the Loan and Security Agreement) includes a provision holding the Borrower to pay the Lender's out-of-pocket fees, costs, charges, or expenses incurred in litigation of any Bankruptcy Event.  Wilmington Savings further points to N.C. Gen. Stat. § 6-21.2(2) allowing for the recovery of 15% of the "outstanding balance" of a debt for attorney's fees when a specific amount is not explicitly delineated in the agreement.  Wilmington Savings relies upon these authorities and the assertion that this litigation is "reasonable" as its basis for recovering fees for defending its fee application.

When it comes to awarding attorneys fees, the initial presumption is each side will pay its own, unless there is statutory or contract language proving otherwise ("the American Rule"). *See Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 252-53 (2010).  The Supreme Court has instructed that a court is not to deviate from the American Rule "absent explicit statutory authority."  *Baker Botts L.L.P. v. ASARCO LLC*, 576 U.S. 121, 126 (2015) (quoting *Buckhannon Board & Care home, Inc. v. West Virginia Dept. of Health & Human Resources*, 532 U.S. 598, 602 (2001)).

There are specific statutes which "expressly transfer costs of litigation from one adversarial party to the other." *Baker Botts*, 576 U.S. at 129. In fact, the Court in *Baker Botts* highlighted Section 110(i) as an example of an express statute where fee shifting is explicitly allowed. *Id.* That Code Section provides that "[i]f a bankruptcy petition preparer . . . commits any act that the court finds to be fraudulent, unfair, or deceptive . . . the court shall order the bankruptcy petition preparer to pay to the debtor . . . reasonable attorney's fees in moving for damages . . . ." 11 U.S.C. § 110(i).

By contrast, the *Baker Botts* Court did <u>not</u> find this express transfer language to exist in Section 330(a)(1) which provides "the court may award . . . reasonable compensation for actual, necessary services rendered . . . for professional person[s]. . . employed. . . ." *Id*. at 128; *see also* 11 U.S.C. § 330(a)(1).

Importantly, the Supreme Court in *Baker Botts* held that the fee transfer language must be more "specific and explicit" than general terms like "reasonable compensation" in order to justify deviation from the American Rule. *See Baker Botts*, 576 U.S. at 133 (citing *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 260 (1975).

As both parties have pointed out, there is scant law indicating whether Section 506(b) is an exception to the American Rule. *See Artho v. Happy State Bank* (*In re Jerry Artho*), No. 17-02002 2018 WL 4631761 (Bankr. N.D. Tex. 2018); *In re Tatum*, No. 15-31925, 2017 WL 3311219 (Bankr. D.N.J. 2017). Of these limited rulings, there appears to be a lean towards disallowing the award of fees on fees under Section 506(b). In *Artho v. Happy State Bank*, the fees sought under Section 506(b) were not awarded because the language of both agreement and the state statute did not explicitly award such a right. *Artho*, 2018 WL 4631761 at \*13-14. In contrast, *In re Tatum* flatly denied fees on fees under Section 506(b) by interpreting the *Baker*

*Botts* decision as disallowing as much. *In re Tatum*, 2017 WL 3311219 at *6.[28]

It is true, as Wilmington Savings has argued, that the *Baker Botts* Court paid significant attention to the specific and limiting language of Section 330(b) ("actual" and "necessary") when deciding to disallow fees in defense of a fee application. Yet it is also unclear whether the language of Section 506(b) is sufficiently specific and explicit to warrant a departure from the American Rule.

However, this question does not necessarily arise in this case because Section 506(b) is clear that the holder of secured claim may recover "any reasonable fees, costs, or charges provided for <u>under the agreement or State statute</u> under which such claim arose." 11 U.S.C. § 506(b) (emphasis added). The question before the Court is instead: are fees in defense of an application recoverable under either North Carolina law or Wilmington Savings' contract?

Turning first to statutory authorization, Wilmington Savings points to N.C. GEN. STAT. § 6-21.2(2) as authorizing their recovery of 'fees on fees.' They analogize to 'fees on fees' awarded under N.C. GEN. STAT. § 75-16.1, which several courts in this district have upheld. *See e.g.*, *DENC, LLC. v. Phila. Indem. Ins. Co.*, 32 F.4th 38, 55 (4th Cir. 2022) (affirming district court award of attorney's fees under N.C. GEN. STAT. § 75-16.1); *ABT Bldg. Prods. Corp. v. Nat'l Union Fire Ins. Co.*, 472 F.3d 99, 127 (4th Cir. 2006). However, N.C. GEN. STAT. § 75-16.1 awards attorney's fees upon a finding of either (1) a willful violation of N.C. GEN. STAT. § 75-1.1 (Unfair methods of competition), or (2) the party instituting the § 75-1.1 action knew or should have known the action was frivolous and malicious. N.C. GEN. STAT. § 75-16.1.

I question whether N.C.G.S. § 6-21.2 even applies here given that it speaks to collection of debts "after maturity." Arguably, Wilmington's claim against the Debtors has not matured

---

[28] This Court has also considered a third fees on fees decision arising out of this district, but finds the circumstances inapplicable to this case. *See In re Jerrell*, Case No. 21-30680, 2023 WL 3101860 (Bankr. W.D.N.C. 2023) (disallowing fees on fees to a Chapter 13 trustee).

and with the plan confirmed, payments have resumed.  Wilmington hasn't accelerated its debt.

And if applicable, § 6-21.2(2) is not analogous to N.C. GEN. STAT. § 75-16.  The latter provision clearly requires some evidence of bad faith in order to award a fee-shift.  This requirement is notably absent from § 6-21.2(2).  Thus, I conclude that Wilmington Savings lacks statutory support to prove an award of 'fees on fees.'

Turning to the question of contractual support for awarding 'fees on fees,' Wilmington Savings points to the broad language of the Debtors' Loan and Security Agreement and the Guaranty by Ramsey-Peele.  The Loan and Security Agreement provides:

> "Borrower shall pay, on demand, all of Lender's out of pocket fees, costs, charges or expenses (including the reasonable fees and expenses of attorneys, . . .) incurred by the Lender in connection with: (3) the administration or enforcement of, or preservation of <u>rights or remedies</u> under, this Loan Agreement or any other Loan Documents including, or in connection with, any litigation or appeals, . . . and (4) any Bankruptcy Event."

*Wilmington Savings' Request to Take Judicial Notice*, Case No. 20-30208, Doc. 173 at p. 29 (emphasis added).  Bankruptcy Event is defined as, among other unrelated events, "(a) the commencement, filing or continuation of a voluntary case or proceeding under one or more of the Insolvency Laws by Borrower; . . ." *Id*. at p. 56.

The aforementioned language, while broad, only allows Wilmington Savings recovery of expenses for "rights and remedies under [the] Loan Agreement" or other Bankruptcy Events.  However, the Loan Agreement does not specifically delineate a right to collect fees incurred in defense of a related fee application. This right also does not arise under bankruptcy law.  Relying upon the broad nature of the language will not create rights that were not included within the Loan Agreement, only those rights which were bargained-for.

Similarly, the Guaranty by Ramsey-Peele guarantees Wilmington Savings "all costs and expenses, including reasonable fees and out-of-pocket expenses of attorneys and expert witnesses, incurred by Lender in enforcing its rights under [the] Guaranty." *Wilmington*

*Savings' Request to Take Judicial Notice*, Doc. 173 at p. 75. Yet again, there are no rights within the Guaranty authorizing the lender to recover fees in defense of a related fee application.

Thus, it would also appear that Wilmington Savings lacks specific contractual authority to collect 'fees on fees' from the Kennedys. Although its recovery rights under the associated loan agreements are broad, the right to recover fees incurred in defense of a fee application is outside of those arising under Bankruptcy law and is not specifically delineated within either contract.

Finally, both parties have advanced policy arguments in support of their positions. These arguments are a mixed bag. It is certainly true, as the Debtors postulate, that one purpose of Section 506(b) is to prevent hyperaggressive creditors from saddling debtors with needless costs. *See Debtors' Memorandum in Support of Debtors' Objection*, Case No. 20-30208, Doc. 165, p. 4 (Feb. 6, 2023). Permitting a creditor to collect attorneys fees defending an unreasonable fee application would appear contrary to that purpose. On the other hand, secured creditors contract for the right to recover their fees and expenses. If these provisions are not enforced in bankruptcy, the creditor loses the benefit of its bargain. An unreasonable or vindictive debtor can abuse the creditor by advancing spurious objections to entirely reasonable fee applications. It is ultimately an 'either/or' situation, with no clear public policy driving the decision in either party's favor.

Section 506(b) permits an over secured creditor to recover fees from a bankruptcy estate if that right is provided for by agreement or state statute. Importantly, that right must be explicit. *Artho v. Happy State Bank (In re Artho)*, 2018 Bankr. LEXIS 2912 (N.D. Texas 2018); *In re 218 Jackson LLC*, 2022 Bankr. LEXIS 3124, 646 B.R. 533 (M.D. Fla. 2022). Here, however, no such statute or contract term explicitly provides for the recovery of attorney's fees in defending an application for attorney's fees. The creditor's recovery of these fees and expenses would

appear inconsistent with the reasoning behind *Baker Botts*.  Thus, I conclude that the attorney's fees and expense incurred in the adjudication of Wilmington Savings Section 506(b) fee recovery application are not recoverable.  The application will be reduced by $450.[29]

## CONCLUSION

The protracted delay in confirming a Plan in this case and the events giving rise to the instant controversy, are in some part, attributable to the onset of the COVID-19 Pandemic.  This extraordinary event occurred shortly after the case was filed.  The widespread business and school shutdowns reasonably caused the Debtors' reactions to financial uncertainty.  However, to a greater extent, these delays and disputes stem from preexisting financial problems of the Debtors and their businesses: the Kennedys' protracted efforts to obtain unwarranted concessions from Wilmington Savings on the plan treatment of its fully secured claim; the resistance of Wilmington Savings to proposals, and its own efforts to collect from a nondebtor guarantor.  Under the attendant circumstances, these were reasonable lender actions.

Thereby, with the exception of the Insurance Dispute and Fees on Fees request, I hold that Wilmington Savings is entitled to reasonable attorney's fees under Section 506(b), and such that its Amended Application will be **GRANTED** as follows:

- Expenses are fully awarded in the amount of $1,558.85.
- Fees are awarded in the amount of $70,069, the sum reflects the requested fees subtracted by the amount incurred under the Insurance Dispute and the fees on fees charges.

**SO ORDERED**.

**This Order has been signed electronically.**          **United States Bankruptcy Court**
**The Judge's signature and Court's seal**
**appear at the top of the Order.**

---

[29] Additionally, Wilmington Savings' unapplied for fees and expenses are also uncollectible.